**Erik J. Heipt,** *pro hac vice*
erik@budgeandheipt.com
**Edwin S. Budge,** *pro hac vice*
ed@budgeandheipt.com
BUDGE & HEIPT, P.L.L.C.
705 Second Ave., Suite 910
Seattle, WA 98104
Telephone: 206-624-3060
Facsimile: 206-621-7323

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## DISTRICT OF ALASKA

| | |
|---|---|
| JULIA WALKER, individually and as Personal Representative of the ESTATE OF TROY WALLACE,<br><br>    Plaintiffs,<br><br>v.<br><br>DAVID D. HENDERSON, LAURI A. MURRAY, WALTER T. RUD, SHERRI L. DAVIS, EDWIN D. IRIZARRY, LINDA MONTECILLO AND ERNEST MELOCHE, M.D.,<br><br>    Defendants. | NO. A05-0176 CV (RRB)<br><br>PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS STATE LAW CLAIMS WITHOUT PREJUDICE |

## INTRODUCTION

Because there is complete diversity between the parties—and therefore an independent basis for subject matter jurisdiction over plaintiff's state law claims—the Court is without discretion to grant the relief requested by defendants.

PLAINTIFF'S RESPONSE                                    1

Moreover, notwithstanding the existence of complete diversity, there is no legitimate reason to decline supplemental jurisdiction over the state law claims. Defendants' proposal to split this case in half is impractical, inefficient, and unnecessary. Defendants suggest dividing this case into two lawsuits, each of which would involve precisely the same facts and precisely the same people. Those two cases would then be litigated in parallel proceedings—in two separate courts—thus doubling the impact on the court system and substantially increasing the burden to all parties, particularly the plaintiff. Yet, as discussed below, the individual defendants would gain virtually nothing from splitting the case in two. Dividing the case would not affect their financial exposure. Nor would it reduce their "burden of litigation" in the slightest since they would necessarily remain individual defendants in the federal action and because they would have to participate in the state action to virtually the same extent as if they were parties. In essence, defendants propose multiplying the complexity of this case with little or no resulting practical benefit to anyone. Accordingly, and for the reasons discussed in more detail below, defendants' motion should be denied.

## FACTS

The plaintiff, Julia Walker, is the mother of Troy Wallace. On July 24, 2004, Mr. Wallace died, helpless and alone, on the concrete floor of a jail cell in the Ketchikan Correctional Center. He lost his life because of the defendants' deliberate indifference and extreme negligence at repeated critical stages throughout his short incarceration. He was 32 years old when he died. It was an eminently avoidable death—mirroring a scenario that has played out far too often in our nation's jail systems.

Although we recognize that the merits of this case will be argued another day, defendants have initiated a discussion of the facts, and Ms. Walker agrees that understanding the basic nature of this case may be helpful to resolving the defendants' motion.

Troy Wallace was an alcoholic. He had been physically dependent on alcohol for many years. On the afternoon of July 20, 2004, Mr. Wallace went to the Ketchikan Correctional Center to serve a ten-day sentence arising from an earlier charge of disorderly conduct. His girlfriend drove him to the jail. Mr. Wallace had not had a drink since the day before. According to the booking officer who first saw Mr. Wallace at the time he self-committed, Mr. Wallace was "shaking and stated that he was withdrawing from alcohol." A post-death investigation also revealed that "[u]pon his arrival at KCC he was observed to have severe shakes and stated that he was withdrawing from alcohol."[1]

At the time of booking, Mr. Wallace was suffering from the initial stages of alcohol withdrawal. During periods of forced abstinence, people who are physically dependent on alcohol experience a progression of symptoms, which usually peak after approximately 3-5 days. Initially, tremors are a primary symptom. As time goes on, the symptoms may grow to include severe sweating, increased heart rate, elevated blood pressure, insomnia, bizarre behavior, and other physical disturbances. If not properly treated, the symptoms can become acute. A deprived alcoholic can come to suffer a condition known as delirium tremens (sometimes referred to as DT or the DT's), during which he or she can experience hallucinations, seizures and eventual death.

---

[1] Defendants' brief incorrectly states that "there was a strong odor of intoxicants on or about this person" when Mr. Wallace presented himself to be admitted to the jail. Carelessly, defendants' quote is from another booking report made *four months prior* to Mr. Wallace's incarceration.

PLAINTIFF'S RESPONSE                                   3

There is a high mortality rate associated with acute alcohol withdrawal that is not properly treated. With correct in-hospital treatment, the risk of death is dramatically less. Accordingly, the condition of acute alcohol withdrawal—characterized by delirium tremens—is nearly universally recognized among physicians as a medical crisis requiring emergency hospital care. It is critical that withdrawing alcoholics receive care appropriate to the level of severity throughout the withdrawal process. Treatment is necessary both as a preventative measure—to prevent the patient's condition from becoming more acute—and to address existing symptoms.

The need for prompt and proper treatment of withdrawing alcoholics is particularly important in the context of incarceration. Severe alcoholics who enter the jail setting are immediately and involuntarily cut off from the one substance on which their bodies have become physically dependent. Once they enter a jail, such individuals are at once deprived from alcohol, unable to self-medicate, and prevented from making voluntary decisions concerning their own medical care. They literally put their lives in the hands of their jailers. Accordingly, numerous courts have recognized the Eighth Amendment duty owed to withdrawing alcoholic inmates by jails, their staff, and medical providers. See, e.g., Thompson v. Upshur County, 245 F.3d 447 (5th Cir. 2001) (jail sergeant subject to suit under Section 1983 as a result of inmate's death from alcohol withdrawal—qualified immunity denied); Lancaster v. Monroe County, 116 F.3d 1419 (11th Cir. 1997) (jail staff subject to Section 1983 liability arising from death of inmate from alcohol withdrawal—qualified immunity denied); Liscio v. Warren, 901 F.2d 274 (2nd Cir. 1990) (mismanagement of inmate's alcohol withdrawal by jail's contract physician gave rise to Section 1983 claim); Morrison v. Washington County, 700 F.2d 678 (11th Cir. 1983) (jail staff and others subject to Section 1983 liability from inmate's death due to alcohol withdrawal); Fielder v. Bosshard, 590 F.2d 105 (5th Cir. 1979) (affirming jury verdict under Section 1983 against jail

staff arising from inmate's death from alcohol withdrawal); <u>Estate of McSwine v. Newaygo County</u>, No. 93-CV-750, 1994 U.S. Dist. LEXIS 11036 (W.D. Mich. 1994) (qualified immunity denied in Section 1983 claim arising from inmate's death from alcohol withdrawal).

The Ketchikan Correctional Center requires that inmates receive a medical screening before being accepted into confinement by the jail. Despite Mr. Wallace's outward symptoms of alcohol withdrawal, the jail accepted him for confinement without a medical screening. He received no initial medication nor professional evaluation for his symptoms.

It was not until approximately twenty-four hours after his confinement—on July 21, 2004—that Mr. Wallace received his "pre-remand screening" by the jail's nurse.[2] At that time, the nurse documented that Mr. Wallace was displaying symptoms consistent with alcohol withdrawal. She noted a "concern[] of alcohol withdrawal," the continued presence of tremors, and wrote that Mr. Wallace should be "observe[d] for DT." Yet, Mr. Wallace was not evaluated by a physician and still received no medication. By now, it had been approximately forty-eight hours since his last drink, and his condition was deteriorating.

Another day passed. On the afternoon of July 22, 2004, the jail nurse again saw Mr. Wallace. This time she noted several alarming symptoms. He was sweating profusely. He was shaking. His pulse rate was extremely high. His blood pressure was markedly elevated. He was experiencing visual hallucinations, prompting the nurse to document that Mr. Wallace was seeing "things . . . moving on top of [the] counter."

---

[2] The jail had, as its only on-staff medical provider, a nurse who worked during the mornings. For most of every day, the jail was without an on-staff medical provider.

PLAINTIFF'S RESPONSE                5

After evaluating Mr. Wallace, the jail's nurse apparently telephoned an emergency physician at the Ketchikan General Hospital.³ Despite the fact that the hospital was less than two and one-half miles from the jail, the emergency physician declined to physically examine or evaluate Mr. Wallace. Instead, he apparently authorized her to provide certain vitamins and medicine to Mr. Wallace at the jail. The evidence will show that this treatment was utterly inappropriate and inadequate to address the severity of Mr. Wallace's withdrawal.

The jail's nurse went home on the afternoon on July 22, 2004, leaving the jail without an on-staff medical provider. Mr. Wallace stayed confined at the jail, and his condition remained serious. During the afternoon and evening of July 22nd, a sergeant at the jail noted that Mr. Wallace "was experiencing sever[e] shakes and hallucinations during the entire period since [he] was on shift" from approximately 6:00 p.m. into the night. Yet, he was not taken to the hospital or evaluated by a physician and remained confined at the jail without critically needed medical treatment.

The next morning, July 23, 2004, the jail nurse again saw Mr. Wallace and again documented his acute condition. The nurse noted that Mr. Wallace was still sweating profusely and that he "continue[d] to hallucinate." Still, despite his continued critical condition, he was not taken to the nearby hospital nor even seen by a doctor. The jail's nurse went home early in the afternoon on July 23rd. Once again, she left Mr. Wallace in the sole custody of corrections officers, with no on-staff medical provider.

During the afternoon and evening of July 23rd, Mr. Wallace's condition worsened still. He was kept alone in a cell. There was a video camera in his cell. The video camera allowed the jail's corrections officers—who were stationed in a secure room just a few steps from Mr.

---

³ As alleged in the Amended Complaint, the emergency physician provided services pursuant to agreement

PLAINTIFF'S RESPONSE                    6

Wallace's cell—to watch his activities on a monitor screen. During the course of the evening, they saw Mr. Wallace continuing to engage in bizarre behavior characteristic of someone suffering from delirium tremens. They watched him "climbing on the bunk," "scratching on the walls and doors," stuffing things into his mouth, and falling down in his cell. Yet, no one summoned medical care. Mr. Wallace remained alone, confined in his cell without the emergency medical care he desperately needed.

At some point during the evening of July 23rd, Mr. Wallace became incontinent. Corrections officers entered the cell and mopped it out. They removed all of Mr. Wallace's clothing, leaving him clad only his underwear. Mr. Wallace was not given any change of clothing. The officers then left the cell and shut the door. Yet again, no medical attention was summoned. Mr. Wallace's bizzare behavior and acute condition continued to be filmed by the video camera, while a group of officers remained stationed just steps from his cell door. The final period of Mr. Wallace's life is recorded on video tape. Late into the night and into the early morning hours of July 24, 2004, his intense suffering from delirium tremens is plainly evident. Despite their clear duty to summon medical attention, corrections officers took no action. Their actions (and lack thereof) were inexcusable and reflected their deliberate indifference to Mr. Wallace's serious medical needs.

Near 1:00 a.m. on July 24, 204, Mr. Wallace collapsed to the concrete floor of his cell. He began to writhe and seize on the cell floor. His convulsions continued for a number of minutes. Yet, no corrections officer entered the cell. No one came to check on him. No one summoned medical aid, which was just minutes away.

---

with the Alaska Department of Corrections.

PLAINTIFF'S RESPONSE                                    7

Soon after 1:10 a.m. his convulsions ceased and his body stopped moving. He lay in a contorted position near the door of his cell, on the concrete where he last convulsed. Although Mr. Wallace almost certainly could have been saved, again no one summoned medical aid. No corrections officer entered the cell or evaluated him. He stayed lying, awkwardly, where he last fell and never moved again. Mr. Wallace began to die.

Time passed. 1:30 a.m. passed and no one opened the door or evaluated him. 2:00 a.m. passed and no one opened the door or evaluated him. 2:30 a.m. passed and no one opened the door or evaluated him. Finally, sometime after 3:05 a.m.—nearly two hours after he stopped moving—officers finally entered the cell. They found Mr. Wallace's body, stiff, cold and discolored. According to the corrections officers, Mr. Wallace was so clearly dead that they made no effort to resuscitate him.

Mr. Wallace's death was caused by the deliberate indifference and gross negligence of his handlers. His mother, individually and as personal representative of her son's estate, has filed claims under 42 U.S.C. § 1983 and Alaska state law against each individual defendant. The defendants are individual corrections officers, the jail's nurse, and the emergency physician.

## ARGUMENT

Defendants have filed a motion requesting that the court decline "supplemental jurisdiction" over the state law claims. Defendants propose that the state law claims be dismissed without prejudice so that plaintiff can file them in state court. This would create a second lawsuit. The second lawsuit would involve precisely the same facts, precisely the same people, and nearly identical issues.

As discussed below, the Court lacks discretion to decline jurisdiction over the state law claims. Moreover, even if it had such discretion, there is no legitimate justification for turning what should clearly be a single lawsuit into two.

### A. Because There is Complete Diversity Between the Parties, the Court Lacks Discretion to Dismiss the State Law Claims

Ms. Walker has alleged two independent bases for jurisdiction over the state law claims:

> This Court has supplemental jurisdiction over the plaintiffs' related state claims pursuant to 28 U.S.C. § 1367(a). This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties, and because the plaintiffs' claims exceed $75,000 in damages, exclusive of interests and costs.

Complaint, ¶ 2; Amended Complaint, ¶ 2.

Plainly, if there is diversity jurisdiction over the state law claims, the Court has no discretion to dismiss them and the doctrine of supplemental jurisdiction need not even been invoked. Defendants acknowledge that if there is original diversity jurisdiction over the state law claims, then their motion is futile at the outset.

In the present case, there is complete diversity of citizenship between all parties, giving the Court original jurisdiction under 28 U.S.C. § 1332. It is undisputed that all defendants are residents of the State of Alaska. It is undisputed that Julia Walker, individually, is a resident of the State of Washington. It is undisputed that the sum in controversy exceeds the jurisdictional amount.

Defendants attempt to defeat diversity jurisdiction by invoking 28 U.S.C. § 1332 (c)(2), which states that "the legal representative of the estate of a decedent shall be deemed to be a citizen only of the same state as the decedent." Defendants then assert—without providing any supporting evidence—that Mr. Wallace "is deemed to be a citizen of the State of Alaska."

Defendants Br. at p. 4. Although defendants have correctly quoted the statute, their premise is wrong.

While Mr. Wallace lived in Ketchikan at the time of his death, he was a legal resident of the State of Washington. The King County Superior Court in Seattle, Washington issued an order to this effect. See In the Matter of the Estate of Troy Alvin Wallace, King County Superior Court Cause No. 05-4-03464-2 SEA. According to its Order Adjudicating Intestancy and Heirship, Appointing Administrator and Waiving Bond, the King County Superior Court ordered "that Troy Alvin Wallace (the "Decedent") is adjudged to have died intestate on July 24, 2004 and was a resident of the State of Washington." A true and correct copy of the court's order is attached as Exhibit A to the accompanying Declaration of Edwin S. Budge.[4] Defendants have offered no contrary evidence. Accordingly, for purposes of diversity jurisdiction, Ms. Walker is considered a Washington resident both in her capacity as personal representative of her son's estate and in her individual capacity.

Pursuant to 28 U.S.C. § 1332, including subsection (c)(2), there is complete diversity of citizenship between all parties. The amount in controversy is satisfied. Thus, as a matter of law, this Court has jurisdiction over plaintiff's state law claims. The doctrine of supplemental jurisdiction need not even been invoked. For this reason alone, defendants' motion should be denied.

---

[4]  Mr. Wallace's family moved to Washington when he was less than one year old. He lived in Washington for his entire life. Approximately one year before his death, he went to Alaska to earn money with the intent of returning to his family in Washington.

**B.   Even if There Was No Diversity Jurisdiction, There is No Legitimate Reason to Decline Supplemental Jurisdiction Over the State Law Claims**

Even if diversity jurisdiction did not exist, the Court still has jurisdiction over all claims. There is no dispute that the Court has original, federal question jurisdiction over plaintiff's claims under 42 U.S.C. § 1983. Because it has federal question jurisdiction over those claims, it has supplemental jurisdiction over the related state law claims. Supplemental jurisdiction is governed by 28 U.S.C. § 1367(a), which provides that "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy [under Article III]." Plainly, there is supplemental jurisdiction over plaintiff's state law claims since "[a] state claim is part of the same case or controversy when it shares a common nucleus of operative fact with the federal claims and the state and federal claims would normally be tried together." Bahrampour v. Lampert, 356 F.3d 969, 978 (9th Cir. 2004) (internal quotations omitted).[5]

In some situations, district courts can decline to exercise supplemental jurisdiction over state claims that form part of the same case or controversy. Those circumstances are limited, however, and are specifically set out by statute:

> The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—
>
>    (1)  the claim raises a novel or complex issue of State law,
>
>    (2)  the claim substantially predominates over the claim or claims over which the district court has jurisdiction,

---

[5]   In similar circumstances, where inadequate medical care to an inmate gives rise to claims under Section 1983 and state law, courts routinely exercise supplemental jurisdiction over the state law claims. See, e.g., Marcotte v. Monroe Correctional Complex, 394 F. Supp.2d 1289 (W.D. Wash. 2005) (rejecting defense motion asking court to decline supplemental jurisdiction over inmate's state law medical negligence claim).

PLAINTIFF'S RESPONSE                                                11

> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in *exceptional circumstances*, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c) (emphasis added).

In the present case, defendants do not argue for the application of subsections (1), (2), or (3), and there is no legitimate basis to do so. Defendants' only argument is that there are "exceptional circumstances" that warrant declining jurisdiction. Defendants' argument is incorrect.

The Ninth Circuit has held that the "exceptional circumstances" language means what it says. Declining supplemental jurisdiction under 28 U.S.C. § 1367(c)(4) should reserved only for situations that are "quite unusual." Executive Software N. Am., Inc. v. United States Dist. Court, 24 F.3d 1545, 1557-58 (9th Cir. 2004). In determining whether to decline supplemental jurisdiction, "a district court must undertake a case-specific analysis to determine whether declining supplemental jurisdiction 'comports with the underlying objective of most sensibly accommodating the values of economy, convenience, fairness and comity.'" Bahrampour, 356 F.3d at 978 (quoting Executive Software, 24 F.3d at 1558). In the present case, these factors weigh strongly in favor of exercising supplemental jurisdiction.

Defendants' argument centers on their inability to substitute the State of Alaska as a party defendant for the state law claims should the state law claims remain in this Court. The statute they cite for support provides for the State of Alaska to substitute itself as a party defendant for individually named state employees, but only as to state law claims which are "commenced . . . in a state court." AS 9.50.253(c). The Alaska Legislature could easily have written the statute differently. It could have expanded the scope of the statute by permitting the Attorney General

PLAINTIFF'S RESPONSE               12

to make a limited waiver of sovereign immunity, thereby permitting the State of Alaska to substitute itself as a party defendant for *all* state law claims regardless of whether the state law claims were commenced in state or federal court. (Plaintiff would have no objection to the State of Alaska substituting itself as a party defendant for the state law claims, so long as those claims remained in this Court.) The fact is, however, that the legislature chose not to do so—instead, *expressly limiting* the statute to state law claims "commenced in a state court."

Defendants' hands are tied by the statutory scheme enacted by the Alaska Legislature. They therefore seek to circumvent the statute through outright dismissal of plaintiff's state law claims. In practice, accepting defendants' argument would mean that no plaintiff in a Section 1983 case could *ever* pursue supplemental state law claims in the United States District Court for the District of Alaska. By defendants' logic, supplemental state law claims arising from the negligent acts of state employees would have to be dismissed in every single instance since (1) the State of Alaska cannot be made a defendant in federal court, and (2) the State of Alaska cannot substitute itself as a party defendant for state employees in federal court. Clearly this was not the Legislature's intended result. Moreover, as specifically applied to the present case, the Executive Software factors strongly weigh in favor of retaining supplemental jurisdiction.

**1. Defendants Will Gain Nothing By the Assertion of AS 09.50.253 in this Instance**

Defendants argue that they will be adversely affected if the State of Alaska is not substituted as a party under AS 09.50.253. This is incorrect—in fact they will gain nothing from the relief they request.

To begin, defendants' *financial* exposure is unaffected by whether the individual defendants or the State of Alaska is the party defendant. As defendants' own materials make

clear, AS 09.50.253 does "not change the economic picture against the [state] employee; it only changes the employee's involvement in the lawsuit." See Defendants' Exhibit C, p. 4 (2004 Senate Judiciary Committee session of March 24, 2004). This is because "employees are [already] defended and indemnified by the state for negligent acts." Id. Thus, the exercise of AS 09.50.253 does not provide the state employee with any additional financial protection—they are fully defended and indemnified whether or not they are individually named parties.

Defendants acknowledge this. Instead, they argue that the state employees and the public would benefit intangibly from dismissal of the state law claims against state employees. They note the desire for efficient use of "valuable state time and resources," the "distraction and concerns which come with being a defendant in a lawsuit," the desire for state employees "to give full attention to public service," and the need for individually-named employees to "disclose the pending lawsuit" to creditors or others. See Generally Defendants' Br., p. 7.

However, all of these arguments are inapplicable in the present case for one simple reason: whether or not the state law claims are dismissed, the individual employees will still be defendants in this case with regard to plaintiff's Section 1983 claims. They will not be relieved from the burden of defending a federal wrongful death lawsuit in any way, shape or form. There is nothing anyone can do about this. Plaintiff is prohibited from naming the State of Alaska as a defendant under Section 1983. Further, because AS 9.50.253 applies only to state law claims and not claims under Section 1983, the State of Alaska cannot substitute itself as a defendant. In other words, there is going to continue to be a federal lawsuit against the individually named defendants for causing the death of Troy Wallace. Nothing about defendants' motion will change that. Any "distraction," diversion of "time and resources," or the need to "disclose the pending lawsuit" will not be in the slightest bit ameliorated by granting the relief defendants

request. The only thing that would result from granting defendants' motion is that the State of Alaska would be substituted as to *one cause of action*. Every burden associated with being a defendant in a wrongful death lawsuit would remain. And, as discussed below, granting defendants' motion would considerably increase the complexity and burden of the overall litigation.

### 2. Parallel Lawsuits in Two Courts Will Substantially Burden the Plaintiff, the Court System, Defendants and Others

Should defendants' motion be granted, defendants would still be required to bear every burden associated with being an individual defendant in this federal wrongful death case arising from Troy Wallace's death. However, instead of consolidating two causes of action into one lawsuit, there would be a *second* case in state court. The cases would go on in parallel and would involve exactly the same conduct and the same people—a literal model of inefficiency.

To the plaintiff, two lawsuits would substantially increase her overall burden of litigation. She would have to file and serve a new complaint in state court. A distinct case schedule would be set. Presumably (although there would be some overlap) she would have to duplicate discovery. Different rules of civil procedure would govern each action. New and distinct documents would have to be filed throughout the litigation. Separate court appearances would have to be made. Plaintiff's expert witnesses would charge thousands of extra dollars to appear at a second trial. And, perhaps most importantly, she would have to conduct two separate trials *about the exact same thing.*

To the court system and the public, two lawsuits would be a waste of public resources. A second judge would have to become involved. A second set of court staff would have to become involved. An entire second jury would have to become involved. The publicly-paid Attorney

PLAINTIFF'S RESPONSE               15

General would have two lawsuits to defend instead of one. Alaska citizens would have to pay expert witnesses to testify twice. Far from saving "time and resources," granting defendants' motion will waste them. There is simply no reason to put a new wrongful death lawsuit on the docket of the state court—doubling the impact to the court system and the general public— when it need not be there.

To the defendants, a new lawsuit would also increase the burden of litigation. Whether or not they were named defendants in the state action is almost irrelevant to their level of involvement. They would have to participate in defending the case to virtually the same extent as if they were parties. They would be obligated to testify in two trials. They would be obligated to provide information in state court discovery. They would be obligated to assist the Attorney General in numerous respects throughout its defense of the second case.

Finally, to third party witnesses, a second lawsuit would be doubly burdensome. Former inmate witnesses, including those no longer in Ketchikan, would have to travel to two separate trials. Corrections personnel would have to testify in two separate trials. Family members and others, some of whom live out of state, would have to testify in two separate trials.

In sum, doubling the number of lawsuits makes no sense. This case is the classic example of why supplemental jurisdiction exists.

## CONCLUSION

The Court lacks discretion to dismiss the state law claims because there is original diversity jurisdiction over them. Even if there was not diversity jurisdiction, there is no legitimate reason to decline supplemental jurisdiction over the state law claims. For the foregoing reasons, defendants' Motion to Dismiss State Law Claims Without Prejudice should be denied.

DATED this 3rd day of January, 2006.

                        BUDGE & HEIPT, P.L.L.C.

                        _____

                        Edwin S. Budge, *pro hac vice*
                        Erik J. Heipt, *pro hac vice*
                        Attorneys for Plaintiff