**Erik J. Heipt,** *pro hac vice*
erik@budgeandheipt.com
**Edwin S. Budge,** *pro hac vice*
ed@budgeandheipt.com
BUDGE & HEIPT, P.L.L.C.
705 Second Ave., Suite 910
Seattle, WA 98104
Telephone: 206-624-3060
Facsimile: 206-621-7323

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF ALASKA

| | |
|---|---|
| JULIA WALKER, individually and as Personal Representative of the ESTATE OF TROY WALLACE,<br><br>Plaintiffs,<br><br>v.<br><br>DAVID D. HENDERSON, LAURI A. MURRAY, WALTER T. RUD, SHERRI L. DAVIS, EDWIN D. IRIZARRY, LINDA MONTECILLO AND ERNEST MELOCHE, M.D.,<br><br>Defendants. | NO. A05-0176 CV (RRB)<br><br>PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR INTRA-DISTRICT TRANSFER TO KETCHIKAN |

### I.    INTRODUCTION

Plaintiff Julia Walker ("Ms. Walker") respectfully submits this memorandum in opposition to the Motion for Intra-District Transfer filed by the sole remaining defendant, Dr. Ernest Meloche. For the reasons discussed below, Dr. Meloche's motion should be denied.

PLAINTIFF'S RESPONSE                    1

Dr. Meloche has a very good reason for wanting trial to occur in Ketchikan rather than Anchorage—he is a prominent member of that small community.  Many members of a Ketchikan jury pool will know him or have family or friends who know him.  Virtually every potential Ketchikan juror is likely to be connected to Dr. Meloche by one degree of separation or less.  Transferring this case to Ketchikan for trial will make it extraordinarily difficult to empanel an unbiased jury.  Moreover, although it is not likely that many additional Ketchikan witnesses will be called, the difficulty of empanelling an unbiased jury will be compounded for every additional Ketchikan witness the defense claims to need.  At best, trial of this case in Ketchikan will be fraught with the danger of bias.

Meanwhile, there is no compelling reason to try this case in Ketchikan.  The plaintiff and her counsel are residents of Washington state, making trial in Anchorage equally convenient to them as trial in Ketchikan.  Dr. Meloche's attorney is officed in Juneau, making trial in Anchorage equally convenient for him.  The parties have identified eight expert witnesses— seven of these experts are from out of state (Washington, California and Michigan)—making Anchorage equally convenient for them.  The remaining expert is a resident of Auke Bay, Alaska (near Juneau) making trial in Anchorage equally convenient for him.  The defense has identified at least three witnesses who reside in *Anchorage*, making trial in Ketchikan decidedly *in*convenient for them.  Finally, although the defense has identified a number of potential witnesses who are claimed to reside in the Ketchikan area, the simple fact is that the vast majority of these witnesses are wholly unnecessary to this case and stand little chance of actually testifying.

## II.    FACTS

### A.    Summary of the Case

Troy Wallace was an alcoholic. He had been physically dependent on alcohol for many years. On the afternoon of July 20, 2004, Mr. Wallace went to the Ketchikan Correctional Center—a jail operated by the Alaska Department of Corrections—to serve a ten-day sentence arising from an earlier charge of disorderly conduct. Mr. Wallace had not had a drink since the day before.

At the time of booking, Mr. Wallace was suffering from the initial stages of alcohol withdrawal. During periods of forced abstinence, people who are physically dependent on alcohol experience a progression of symptoms, which usually peak after approximately 3-5 days. Initially, tremors are a primary symptom. As time goes on, the symptoms may grow to include severe sweating, increased heart rate, elevated blood pressure, insomnia, bizarre behavior, and other physical disturbances. If not properly treated, the symptoms can become acute. A deprived alcoholic can come to suffer a condition known as delirium tremens (sometimes referred to as DT or the DT's), during which he or she can experience hallucinations, seizures and eventual death.

There is a high mortality rate associated with acute alcohol withdrawal that is not properly treated. With correct in-hospital treatment, the risk of death is dramatically less. Accordingly, the condition of acute alcohol withdrawal—characterized by delirium tremens—is nearly universally recognized among physicians as a medical crisis requiring emergency hospital care. It is critical that withdrawing alcoholics receive care appropriate to the level of severity

throughout the withdrawal process. Treatment is necessary both as a preventative measure—to prevent the patient's condition from becoming more acute—and to address existing symptoms.

The need for prompt and proper treatment of withdrawing alcoholics is particularly important in the context of incarceration. Severe alcoholics who enter the jail setting are immediately and involuntarily cut off from the one substance on which their bodies have become physically dependent. Once they enter a jail, such individuals are at once deprived from alcohol, unable to self-medicate, and prevented from making voluntary decisions concerning their own medical care.

Twenty-four hours after his confinement—on July 21, 2004—Mr. Wallace received his "pre-remand screening" by the jail's nurse, Linda Monticello.  At that time, the nurse documented that Mr. Wallace was displaying symptoms consistent with alcohol withdrawal. She noted a "concern[] of alcohol withdrawal," the continued presence of tremors, and wrote that Mr. Wallace should be "observe[d] for DT." By now, it had been approximately forty-eight hours since his last drink, and his condition was deteriorating.

Another day passed.  On the afternoon of July 22, 2004, the jail nurse again saw Mr. Wallace. This time she noted several alarming symptoms.  He was sweating profusely.  He was shaking.  His pulse rate was extremely high.  His blood pressure was markedly elevated.  He was experiencing visual hallucinations, prompting the nurse to document that Mr. Wallace was seeing "things . . . moving on top of [the] counter."

After evaluating Mr. Wallace, the jail's nurse telephoned Dr. Ernest Meloche, an emergency physician at the Ketchikan General Hospital.  Dr. Meloche was, and had been for many years, the contract medical provider for the Ketchikan Correctional Center.  He was under contract with the Department of Corrections to provide medical care to inmates at the jail.

PLAINTIFF'S RESPONSE                    4

Despite the fact that the hospital was less than two and one-half miles from the jail, Dr. Meloche declined to physically examine or evaluate Mr. Wallace. Instead, he authorized the nurse to provide certain vitamins and medicine to Mr. Wallace at the jail. The evidence will show that this treatment was utterly inappropriate and inadequate to address the severity of Mr. Wallace's withdrawal.

The jail's nurse went home on the afternoon on July 22, 2004, leaving the jail without an on-staff medical provider. Dr. Meloche knew that there would be no medical provider monitoring Mr. Wallace's condition at the jail during the afternoon and evening hours of his confinement but, remarkably, allowed him to stay confined at the jail without medical monitoring. During the afternoon and evening of July 22nd, a sergeant at the jail noted that Mr. Wallace "was experiencing sever[e] shakes and hallucinations during the entire period since [he] was on shift" from approximately 6:00 p.m. into the night.

During the afternoon and evening of July 23rd, Mr. Wallace's condition worsened still. He was kept alone in a cell. Mr. Wallace continuing to engage in bizarre behavior characteristic of someone suffering from delirium tremens. He was "climbing on the bunk," "scratching on the walls and doors," stuffing things into his mouth, and falling down in his cell. At some point during the evening of July 23rd, Mr. Wallace became incontinent. Yet, the only treatment he received at any time was the inadequate treatment that had been ordered by Dr. Meloche. At no time did Dr. Meloche—nor any other doctor—even examine him.

Near 1:00 a.m. on July 24, 204, Mr. Wallace collapsed to the concrete floor of his jail cell and died.

Ms. Walker has settled with the six original defendants, leaving Dr. Meloche as the only remaining defendant. There are two causes of action: (1) violations of 42 U.S.C. § 1983; and (2) professional negligence.

### B.    A Few Facts about Ketchikan

Dr. Meloche wants to transfer this case to Ketchikan. According to the U.S. Census Bureau, Ketchikan has a total population of less than 8,000 total residents (including those ineligible for jury service.) [1] There are less than 2,000 family households in the entire city.[2] Id. There are few additional people in the outlying areas. The total estimated population of the entire Ketchikan Gateway Borough *including the City of Ketchikan* is barely more than 13,000 total residents (including those ineligible for jury service) and less than 5,500 total households.[3] There is only one hospital serving the whole population of the Ketchikan Gateway Borough—the Ketchikan General Hospital. There, Dr. Meloche has continuously practiced emergency medicine for more than seventeen years.

### C.    A Few Facts about Dr. Meloche

Dr. Meloche has lived and practiced medicine continuously in Ketchikan since June, 1989.[4] Over the past ten years *alone*, Dr. Meloche has provided medical care to *more than one thousand area patients*.[5] Thus, in the past ten years alone, Dr. Meloche has personally provided medical care to nearly 8% of the entire population of the Ketchikan Gateway Borough and roughly *1 in 5 households*. It is reasonable to assume that many more area residents will have obtained medical care from Dr. Meloche's colleagues at the same hospital.

---

[1]    *See* U.S. Census Bureau Statistics attached as Exhibit 1 to the Declaration of Edwin S. Budge.
[2]    *Id.*
[3]    *See* U.S. Census Bureau Statistics attached as Exhibit 2 to the Declaration of Edwin S. Budge.
[4]    *See* Defendant Meloche's Responses to Plaintiff's Third Discovery Requests (Response to Interrogatory Nos 1 and 2) attached as Exhibit 3 to the Declaration of Edwin S. Budge.

Dr. Meloche is also active in local organizations. He is the current medical director for the North Tongass Fire Department.[6] He is the previous medical director for the communities on nearby Prince of Wales Island.[7] He is the medical director for the Alaska Marine Highway System.[8] He donates to the Ketchikan Arts Council, the First City Players musical organization and the First City Ballet.[9] Dr. Meloche regularly attends shows in Ketchikan having to do with art, music and dance.[10] He has acted as the photographer for the Ketchikan Arts Council.[11] He teaches local classes on medical care, including Advanced Cardiac Life Support.[12] In short, there is little question that many potential Ketchikan jurors will personally know Dr. Meloche, either through his practice of medicine or through his involvement in community activities. Virtually every potential juror is likely to have some family member or friend who knows Dr. Meloche socially or has received medical care from him.

### D.    Other Witnesses

#### 1.    Witnesses Identified by Ms. Walker

Although this is an important case, it is also a simple case that can be easily and efficiently tried. Ms. Walker's witness list is therefore limited. Ms. Walker has identified only nine witnesses.[13] Four of these witnesses are experts: one from Michigan, one from California, and two from Seattle. There are five lay witnesses: Dr. Meloche himself, the plaintiff herself, Josh Walker (a Washington resident), Linda Monticello (a Ketchikan resident) and Jenny Simpson (a Ketchikan resident).

---

[5]     *Id.* (Response to Interrogatory No. 4).
[6]     *Id.* (Response to Interrogatory No. 3).
[7]     *Id.*
[8]     *Id.*
[9]     *Id.*
[10]    *Id.* (Response to Interrogatory No. 7).
[11]    *Id.*
[12]    *Id.*

Jenny Simpson will testify briefly, if at all. Ms. Simpson was Mr. Wallace's girlfriend, and drove him to the jail when he reported to serve his sentence. If she testifies, the plaintiff will, of course, pay permitted expenses associated with bringing her to Anchorage for trial.

Other than Dr. Meloche himself, the only other Ketchikan witness is Linda Monticello. Ms. Monticello is the jail nurse who contacted Dr. Meloche seeking instructions after recording Mr. Wallace's alarming withdrawal symptoms. Ms. Monticello is a central witness who was deposed in Ketchikan on September 19, 2006. (Other than the plaintiff herself, Ms. Monticello is the only witness who has been deposed by either party to date.[14]) Like Dr. Meloche, she has significant ties to the Ketchikan community. She graduated from Ketchikan High School in 1975 and, but for nursing school, has worked and lived in Ketchikan ever since. [15] She worked as a nurse at the Ketchikan General Hospital from approximately 1982 until 1991.[16] From 1991 until the present, she has worked as a nurse at the Ketchikan Correctional Center.[17] Nurse Monticello and Dr. Meloche know each other well, having socialized at local parties, dance performances and scenic tours.[18] It is probable that many potential jurors will personally know Nurse Monticello or members of her family. Nurse Monticello and Dr. Meloche are the two most central witnesses in the case. Finding jurors who know neither of them will be challenging at best. If the trial occurs in Anchorage, Ms. Walker is willing to bear the reasonable expenses associated with Nurse Monticello's travel and lodging.

---

[13]    *See* Plaintiff's Witness List attached as Exhibit 4 to the Declaration of Edwin S. Budge.

[14]    Dr. Meloche's deposition is scheduled for December 8th.

[15]    *See* Deposition of Linda Monticello, p. 7, l. 23 through p. 9, l. 4, attached as Exhibit 5 to the Declaration of Edwin S. Budge.

[16]    *Id.* at p. 8, l. 18 through p. 9, l. 4.

### 2.    Witnesses Identified by Dr. Meloche

Dr. Meloche has identified far more witnesses than Ms. Walker.[19]  Witnesses 1-4, 6 and 8-21 are current or former corrections officers at the Ketchikan Correctional Center.  Dr. Meloche has provided no residential addresses for these witnesses and has provided no information about their possible testimony other than to say that they were on duty during some parts of Mr. Wallace's incarceration.  It is unclear what, if anything, their testimony can add to the case since none of them had any contact with Dr. Meloche vis-à-vis Troy Wallace. Moreover, if Dr. Meloche truly intends to call any of them as witnesses, this will only add to the difficulty in finding Ketchikan jurors who are not personally familiar with the trial witnesses.

Witness 5 is Dr. Meloche himself.  Witness 7 is Nurse Monticello.  Witness 22 is Dr. Susan Klinger, Deputy Medical Examiner for the State of Alaska.  Dr. Klinger performed the autopsy on Mr. Wallace.   According to Dr. Meloche's witness list, she is a resident of *Anchorage*.

Witness 23 is the plaintiff, Julia Walker, a resident of Washington.

Witness 24 is Allen Bailey, the "long time superintendent" of the Ketchikan Correctional Center.  It is doubtful that Superintendent Bailey has any relevant testimony to add since, like the corrections officers, he had no contact with Dr. Meloche about Troy Wallace.  Dr. Meloche's list describes Mr. Bailey as having "knowledge of the facility history, KCC policies and procedures, and Dr. Meloche."  It is unlikely that any of this information is relevant to any remaining issue in this case.  Moreover, as a long time resident of Ketchikan, many potential jurors will know him or be connected to him in some fashion.

---

[17]    *Id.* at p. 9, ll. 2-4.

[18]    *Id.* at p. 120, l. 13 through p. 121, l. 5.

[19]    *See* Defendant Ernest Meloche's Witness List, attached as Exhibit 6 to the Declaration of Edwin S. Budge.

Witness 25 is Dr. John Roberts, former medical director for the State of Alaska Department of Corrections. The defense admits that his address is "unknown" but there is no reason to believe he lives in Ketchikan.

Witness 26 is identified as "State of Alaska Department of Corrections employees, including Drs. Luban and Bingham" both of whom are residents of the *Anchorage* area. It will be inconvenient and expensive to bring them to Ketchikan should the location of trial be moved.

Witnesses 27-30 are defense experts, none of whom are based in Ketchikan. For all of them, trial in Anchorage would be at least equally convenient as trial in Ketchikan.

## III.    ARGUMENT

Resolving Dr. Meloche's motion requires little legal analysis. It is a pragmatic question. The first question is whether it is practical to expect an unbiased jury pool in Ketchikan where the defendant is a prominent member of the community and has personally provided medical care to a large fraction of its population. The difficulty of empaneling Ketchikan jurors who are not familiar with the players in the case will be compounded given that Nurse Monticello is an important witness and a long-time resident of the community.

Given the likely difficulty of finding an unbiased jury in Ketchikan, is there any compelling reason to have the trail there? With regard to the issue of convenience, only two central witnesses (Dr. Meloche and Nurse Monticello) reside in Ketchikan. To the lawyers and the expert witnesses, Ketchikan is no more convenient than Anchorage. It is unlikely that it will be necessary to call many additional lay witnesses. Even if some of Dr. Meloche's lay witnesses are called to testify, some of them live in Anchorage making Ketchikan decidedly *less* convenient for them.

There are no other practical reasons why the case should be moved to Dr. Meloche's home town. The fact that the underlying events occurred in Ketchikan is, frankly, irrelevant to what city the trial should take place in. The underlying events, though tragic, are simple. The focus of the trial will be limited. Anchorage residents are just as interested in determining whether the actions and inactions of the state's contract physician constituted deliberate indifference or fell below the standard of care. Moreover, if anything, a fair trial requires jurors who are *un*familiar with the incident and media reports of the incident. Similarly, the fact that Troy Wallace (although a resident of Washington state) was living in Ketchikan at the time of his death is immaterial to the question of where the trial should take place.

### IV.    CONCLUSION

This is not a complex case. It is a simple case that can be efficiently and fairly tried in Anchorage with little or no more inconvenience than trial in Ketchikan. Meanwhile, there will be an unacceptable risk of juror bias if the trial is held in Ketchikan. Without a compelling reason to take this risk, the trial should stay in Anchorage.

Dated this 21st day of November, 2006.

Erik J. Heipt, *pro hac vice*
Edwin S. Budge, *pro hac vice*
Budge & Heipt, P.L.L.C.
705 Second Ave., Suite 910
Seattle, WA 98104

The undersigned certifies that on the 21st day of November, 2006, the foregoing document was served via electronic service to the following attorney of record:

Michael Lessmeier
Lessmeier & Winters, LLC
3000 Vintage Blvd., Suite 100
Juneau, AK 99801

DATED this 21st day of November, 2006.

_____
Edwin S. Budge, *pro hac vice*