Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

JULIA WALKER, individually )
and as Personal Representative )
of the Estate of TROY WALLACE )
                               )
       Plaintiffs,   )
                          )
   vs.                )
                          )
DAVID D. HENDERSON, LAURI A. )
MURRAY, WALTER T. RUD, SHERRI )
L. DAVIS, EDWIN D. IRIZARRY, )
LINDA MONTICELLO and ERNEST )
MELOCHE M.D. )
                          )
      Defendants.   )  No. A05-0176 CV

DEPOSITION ON ORAL EXAMINATION

OF

LINDA MONTECILLO

8:15 a.m.
September 19, 2006
Ketchikan Correctional Center
1201 Schoenbar Road
Ketchikan, Alaska 99901

Exhibit G
page 1 of 10

Page 86

1  MR. LESSMEIER: Objection, form.
2  A  Yes.
3  Q  Other than your telephone call with Dr. Meloche
4     on 7/22/04 at 1430, did you have any other
5     contact with him on that day?
6  A  No.
7  Q  Do you know whether you had any contact with any
8     other person about Mr. Wallace on that day?
9  A  Perhaps I had spoke with the shift supervisor
10    and, just because I had written monitor, they
11    need to keep an eye on him, and to follow up
12    before I left.
13 Q  But you don't have any specific recollection?
14 A  No. None that's written.
15 Q  Okay. Could you go ahead and look at the -- are
16    you guys okay to go ahead and keep going or do
17    you want to take a break?
18 MS. JACOBSON: Do you want a break? Yeah.
19 MR. LESSMEIER: Yeah, no problem.
20 (Off record)
21 Q  Okay. Let's go back to exhibit number 3 please.
22    I'd like to you take a look at the entry under
23    7/23/04 at 6:10 a.m. Do you see that?
24 A  Yes.
25 Q  Was this your next contact with Mr. Wallace?

Page 87

1  A  Yes.
2  Q  So you had no contact with him between 7/22/04
3     at 1450 and 7/23/04 at 6:10?
4  A  No.
5  Q  And to your knowledge he was not evaluated by
6     any medical provider during that period of time?
7  A  During the time that there was no contact?
8  Q  Right.
9  A  Correct.
10 Q  What does it say? Could you read it for me
11    please, under 7/23/04 at 6:10?
12 A  Observed in room 224, was informed by officer
13    inmate refused to give breakfast tray to cell
14    mate, now placed in room 224.
15 Q  And then go ahead and read the next entry for
16    seven a.m., please.
17 A  Inmate medicated, hand tremors observed,
18    cooperative.
19 Q  And then read what it says under 7:10.
20 A  observed -- escorted to shower, officer
21 observing.
22 Q  All right, and then under 9:30, can you read
23    that please?
24 A  Inmate to exam room, diaphoretic, continues to
25    hallucinate, continues to be cooperative, vital

Page 88

1     signs BP 115 over 84, pulse 80, regular
2     respiration 20 easy. Talks about just got a
3     job. Offered water to inmate, drank fluids
4     without hesitation. Officer Morley present.
5  Q  And did you actually conduct an examination on
6     Mr. Wallace at 9:30 a.m. on 7/23/04?
7  A  That's what I have written on here, yes.
8  Q  And by diaphoretic do you mean that he was
9     continuing to sweat excessively?
10 A  He was continuing to sweat, yes.
11 Q  And you wrote that he continues to hallucinate.
12    Do you have any specific recollection about what
13    caused you to write that?
14 A  You know, specifically what he was hallucinating
15    about, I really don't know, but obviously he did
16    hallucinate because I wrote down that he
17    continues to hallucinate.
18 Q  Do you know if it was auditory or visual
19    hallucinations?
20 A  I couldn't specify and tell you exactly which
21    one.
22 Q  Do you know whether you asked him, are you
23    hallucinating, and he said yes and you wrote it
24    down or, alternatively, whether he just
25    described things that he was seeing that were

Page 89

1     not there?
2  A  Most likely he was seeing things that were not
3     there.
4  Q  His blood pressure is down, correct?
5  A  Correct.
6  Q  His pulse is also down, is that right?
7  A  Correct.
8  Q  What led you to write talked about just got a
9     job?
10 A  Most likely he was telling me that he just got a
11    job, just by conversation he was telling me that
12    he just got a job.
13 Q  Did you write it down because you thought it had
14    some significance to your evaluation?
15 A  Yes.
16 Q  Okay, and why did it have significance to your
17    evaluation?
18 A  Because, most likely, it was not part of our
19    conversation and he just said something about
20    it.
21 Q  Okay, so did it appear that there was some sort
22    of -- in other words, it didn't make sense that
23    he was saying that?
24 A  Correct.
25 Q  And if you could go down under the next entry

23 (Pages 86 to 89)

Exhibit G
page 2 of 10

SEAK Professional Services, LLC
2415 Hemlock Street, Suite 104, Ketchikan, Alaska 99901

aeab9ce5-623d-40b4-8df2-a93c87c8565d

Page 90

1  under 1410?
2  A  Observe -- inmate observed sitting on bunk,
3     writer advised inmate to rest, inmate nodding,
4     fixed his blankets. Writer consult with
5     Sergeant Ellis to make certain inmate eats
6     dinner.
7  Q  Why did you write that he was nodding and fixing
8     blankets?
9  A  Nodding, possibly because I had instructed him
10    to rest and he nods, meaning to say that he
11    understood what I was saying, and he was fixing
12    his blanket when he was nodding his head. So it
13    was just something that I just noted.
14 Q  Okay. Did the fact that he was fixing his
15    blankets have any import to your evaluation or
16    was it just something you observed?
17 A  Just something that I observed.
18 Q  Now you said that you consulted with Sergeant
19    Ellis to make sure that he eats dinner. Did you
20    have any concerns about how much he was eating?
21 A  No. I just wanted to be sure that he was
22    hydrated and he had nutrients.
23 Q  Did you have any communications with Dr. Meloche
24    on this day, 7/23/04?
25 A  Not to my recall, no.

Page 91

1  Q  Do you know if anybody at the jail had any
2     communications with Dr. Meloche on that day?
3  A  Not to my knowledge.
4  Q  Did you make any effort to contact Dr. Meloche
5     on 7/23/04?
6  A  No.
7  Q  Do you know whether or not he made any effort to
8     contact you on that day?
9  A  Not to my knowledge.
10 Q  And other than basic back and forth that you
11    made -- that you may have had with corrections
12    officers here at the jail, did you have any
13    other communication with any other person about
14    Mr. Wallace's condition on 7/23/04?
15 A  Actually, I -- I did. It's my standard of care
16    that if there's somebody that I have concerns
17    about, I normally would call, especially in this
18    instance wherein he needed to have medication at
19    night time. And so I called the evening of
20    7/22nd to be sure he got his medicine. I called
21    on the evening of 7/23 to be sure that he got
22    his dose.
23 Q  Meaning that you called the jail from home?
24 A  Yes.
25 Q  But from 1410 on 7/23/04 until his death in the

Page 92

1  early morning hours of 7/24/04 was there any
2  medical provider here at the jail?
3  A  No.
4  Q  Was there any medical provider at the jail in
5     the late afternoon and night that spanned
6     7/22/04 until you came on shift on 7/23/04?
7  A  No.
8  Q  Okay, if you would look at what I'm going to
9     mark as Exhibit 4. Do you recognize this?
10 A  I don't recognize the first two pages.
11          (Exhibit 4 introduced)
12 Q  Okay. And for the record, this exhibit consists
13    of four pages marked in the lower right AWG001
14    through 004. Have you ever seen the first two
15    pages before?
16 A  You know, I can't recall if I have or not.
17 Q  That's not something that you recognize today?
18 A  No. Un-huh (Negative). No.
19 Q  Is part of this document the protocol that you
20    mentioned previously?
21 A  Yes, and I'd like to put a lot of emphasis that
22    it's not a DT protocol, it's an alcohol
23    withdrawal protocol. I guess I had been
24    mentioning DT protocol, but it's actually
25    alcohol withdrawal protocol.

Page 93

1  Q  Okay, so when you have previously been referring
2     to DT protocol.....
3  A  It's.....
4  Q  .....you mean alcohol withdrawal protocol?
5  A  Correct.
6  Q  So is it -- is it that the documents marked
7     AWG003 to AWG004, is this the protocol or is it
8     simply the page marked AWG003?
9     MR. LESSMEIER: Objection, form, foundation.
10 A  I don't know -- I'm sorry. I don't know that
11    AWG004 is part of the protocol.
12 Q  Okay. So you know that AWG003 is part of the
13    protocol?
14    MR. LESSMEIER: Objection, form, foundation.
15 A  Correct.
16 Q  Okay. Let me ask the question a better way. If
17    you go back to exhibit number 3 and under the
18    entry for 7/22/04 at 1430, where it says
19    initiated DT protocol, to what document are you
20    referring when you write initiate DT protocol?
21 A  The alcohol withdrawal protocol.
22 Q  AWG003?
23    MR. LESSMEIER: Objection, form, foundation.
24 A  I'm sorry, I've got different from what you guys
25    got.

24 (Pages 90 to 93)

Exhibit G
page 3 of 10

SEAK Professional Services, LLC
2415 Hemlock Street, Suite 104, Ketchikan, Alaska 99901

aeab9ce5-623d-40b4-8df2-a93c87c8565d

Page 102

1  Q  Okay. And go ahead and look at the entry on the
2     following page at 7:00 a.m.
3  A  Telephone call -- or telephone conversation R.
4     Hale, PA, Anchorage on-call staff per medical,
5     writer advised inmate status.
6  Q  Who is R. Hale, PA?
7  A  He's the on-call DOC staff for Department of
8     Corrections.
9  Q  On-call DOC staff?
10 A  Staff.
11 Q  What does that mean?
12 A  That Department of Corrections has a staff
13    that's on-call for all the facilities in the
14    state, so if he -- like, in a weekend where
15    there's no office hours, if I needed to
16    transport somebody to the emergency room, I have
17    to advise them of what I'm doing here.
18 Q  Okay. And what does PA mean?
19 A  Physician's assistant.
20 Q  Was this somebody that you were calling in
21    Anchorage?
22 A  Yes.
23 Q  All right. Just to tell them what happened?
24 A  Yes.
25 Q  All right.

Page 103

1  A  A courtesy call.
2  Q  And then the final entry is from 6:57.
3  A  I just put out. So at the time I believe that's
4     -- I closed the file then.
5  Q  Did you work for the rest of that day?
6  A  No I didn't.
7  Q  What did -- did any nurse work on that day?
8  A  Not to my knowledge.
9  Q  Okay. And was it because you were emotionally
10    distraught that you did not work that day or was
11    there another reason?
12 A  You know, I can't remember. If it was a
13    Saturday, then I would normally not work, so.
14 Q  Right. Let's put the documents aside for a sec.
15    You can refer to them if you need to, but my
16    next questions are not going to be about them.
17    Just confirm for me how many total conversations
18    you had with Dr. Meloche between 7/20/04 and Mr.
19    Wallace's death on 7/24/04
20 A  Two conversations. The one on the -- on 1430 on
21    the 20 -- 21st, and at 4:40 on 24th.
22 Q  Okay. Do you mean 1430 on the 22nd?
23 A  Yeah, uh-huh (Affirmative).
24 Q  Okay, and then the other conversation that
25    you're referring after -- actually took place

Page 104

1     after Mr. Wallace's death, correct?
2  A  Correct.
3  Q  Okay. So one total conversation during the
4     period that Mr. Wallace was in jail, before he
5     died?
6  A  Yes sir.
7  Q  Did you have any written correspondence with Dr.
8     Meloche? Faxes or anything of that nature?
9  A  No.
10 Q  And have you told me today everything that you
11    can remember about your one communication with
12    Dr. Meloche on 7/22/04?
13 A  Can I tell you that I had called him at 1430 to
14    advise him of what I had written on 1400, which
15    is basically that he was very sweaty, he had
16    hand tremors and that he was voicing that there
17    were things moving on top of the counter, his
18    blood pressure of 160 over 104, his pulse of
19    137, tacky, his respiration's easy and that he
20    was talking without sense.
21 Q  And have you told -- do you have any -- any
22    final, independent recollection of anything that
23    occurred during any evaluation that you made on
24    Mr. Wallace other than what we've already gone
25    through today?

Page 105

1  A  It's -- what I have written here is what
2     transpired through my contact with Mr. Wallace.
3  Q  Go ahead, if you would, and look at exhibit
4     number 5. Is that the.....
5  A  The medication sheet.
6  Q  That's the protocol?
7  A  Yes sir.
8  Q  All right. I want to go through that for a
9     minute. Take me through the first page, if you
10    would. I don't want you to just -- that's a bad
11    way to start a bad question. This document was
12    completed by you, is that right?
13 A  Correct.
14 Q  And what is it -- were parts of it filled in at
15    various times throughout the four days or so
16    that Mr. Wallace was here?
17 A  Correct.
18 Q  All right. So if we look at the first page
19    where we have the objective information about
20    his temperature, his pulse, his respiration and
21    his blood pressure. When would that have been
22    filled out?
23 A  It would be -- have been filled out 7/22/04.
24 Q  Okay.
25    MR. LESSMEIER: You're talking about the top

27 (Pages 102 to 105)

SEAK Professional Services, LLC
2415 Hemlock Street, Suite 104, Ketchikan, Alaska 99901

Exhibit 6
page 4 of 10

aeab9ce5-623d-40b4-8df2-a93c87c8565d

Page 114

1    page, which leaves you with seven tablets
2    accounted for that were returned.
3  Q  Okay. So when the tablet is administered,
4    there's somebody initial -- somebody's initial
5    next to the time of day that it's administered,
6    right?
7  A  Correct.
8  Q  Okay. So LM, that's you giving two tablets on
9    7/22, followed later that day by one tablet that
10   S gave, another tablet by S that S gave.
11 A  Yeah, S means self-medicating, meaning to say
12   that he was -- he took the pills without a nurse
13   there.
14 Q  Okay, so a correctional officer would have
15   brought that by on the med cart or whatever?
16 A  Assisted him, yes.
17 Q  And then you gave him two tablets on 7/23, and
18   then he self-medicated later that day?
19 A  Correct.
20 Q  I got you. Okay. Okay, if you could look at
21   exhibit number 9. These are some, what appear
22   to be log book entries, do you recognize these,
23   generally speaking?
24               (Exhibit 9 introduced)
25 A  Yes.

Page 115

1  Q  Are these log book entries?
2  A  Yes. And control.
3  Q  If you look at the page marked DOC 0069 at the
4    bottom right hand corner in tiny little, itty-
5    bitty numbers.....
6  A  Yes.
7  Q  About -- at 12:17, which is near the bottom of
8    the page?
9  A  Yes.
10 Q  7/22/04 it says Nurse Linda out, do you see
11   that?
12 A  Yes.
13 Q  Does that have -- reflected that you were going
14   out for the rest of the day or were you going
15   out to do.....
16 A  Sometimes.....
17 Q  .....an errand, or what?
18 A  I'm sorry. Sometimes we do errands. I couldn't
19   tell you why I was out. But usually what I do
20   is I call them when I leave the building and I
21   call them when I come back in the building.
22 Q  Who do you call?
23 A  The person that's writing all these things in
24   control.
25 Q  The person who's in the control room?

Page 116

1  A  Uh-huh. (Affirmative)
2  Q  So you would call them when you came back in, as
3    well?
4  A  Sometimes I do. I'd like to think that I do,
5    and sometimes I don't.
6  Q  Can you find the entry where it says that you've
7    come in?
8  A  No.
9  Q  Do you -- do you have -- do the corrections
10   officers here at the KCC have numbers that they
11   go by?
12 A  Yes they do.
13 Q  Okay. Do you have a number?
14 A  Yeah, 08.
15 Q  So as you sit here today, is there any reason
16   that can think of why you're shown as being
17   logged out at 12:17 on 7/22, but it doesn't show
18   you coming back in again for the rest of the
19   day?
20 A  I have no explanation for that.
21 Q  Are you supposed to log in and out every time
22   you leave the building or come back?
23 A  Yes.
24 Q  Other than the log book, are there any other
25   documents that you can think of that would

Page 117

1    reflect exactly when you were in the jail
2    between 7/20/04 and 7/24/04?
3  A  I couldn't tell you. No I don't -- I don't
4    know.
5  Q  You don't know.....
6  A  No, I don't know.
7  Q  Did you prepare an incident report?
8  A  No I didn't.
9  Q  How come?
10 A  I never was told that we're supposed to do that.
11 Q  Have you ever done incident reports regarding
12   other inmates?
13 A  I can't remember if I have or not.
14 Q  Other than the materials that we've looked at
15   here today, have ever prepared any other written
16   documents that have anything to do with Troy
17   Wallace?
18 A  No, just what is presented here.
19 Q  Do you recall having any contact with Troy
20   Wallace prior to 7/19/04?
21 A  No.
22 Q  Has there ever been another occasion to -- has
23   there ever been an occasion where an inmate has
24   been transported to the hospital for alcohol
25   withdrawal?

30 (Pages 114 to 117)

SEAK Professional Services, LLC
2415 Hemlock Street, Suite 104, Ketchikan, Alaska 99901

Exhibit G
page 5 of 10

aeab9ce5-623d-40b4-8df2-a93c87c8565d

Page 138

1  A  Correct.
2  Q  Was there -- did you have any difficulty
3     communicating with Mr. Wallace on that day?
4  A  No.
5  Q  He could understand what you were saying?
6  A  Yes.
7  Q  And you could understand what he was saying?
8  A  Yes.
9  Q  He was oriented as to time and place?
10 A  Yes. And I did check on the cognitive oriented
11    times 3.
12 Q  Okay. And at that point, you would have gone
13    through all of the criteria set forth on page
14    three, for example, you would have checked his
15    appearance, his attitude, his motor behavior,
16    his speech, his mood, his effect, his cognitive
17    functioning, his thought process, his thought
18    content, and whether he was having any
19    hallucinations, correct?
20 A  Correct.
21 Q  And all of those were normal, is that correct?
22 A  That's correct.
23 Q  And you thought he was stable?
24 A  Yes.
25 Q  And after you did the screening that is depicted

Page 139

1     in Exhibit 2, particularly on page three, did
2     you see any need to call Dr. Meloche?
3  A  No.
4  Q  Did he have, other than the monitor for
5     withdrawal note that you made, did he have any
6     medical issues that you were aware of?
7  A  No he didn't.
8  Q  One of the things that Mr. Budge asked you about
9     is, if we look at Exhibit 3, he asked you about
10    -- these are the notes that you would have made,
11    correct?
12 A  Correct.
13 Q  The progress notes? About the sweating, hand
14    tremors, things of that nature, and asking you
15    if those were symptoms or signs of DT. He asked
16    you a whole series of questions about that?
17 A  Yes.
18 Q  Are those also symptoms or signs of someone who
19    is just going through alcohol withdrawal?
20 A  Yes. And I just want to really put emphasis on
21    when I say DT, I'm referring to alcohol
22    withdrawal.
23 Q  All right. So it was not your impression that
24    he was actually in a state of DT at this time?
25 A  That's correct.

Page 140

1  Q  This is as of 7/22/04?
2  A  That's correct.
3  Q  All right. And you chart here, your telephone
4     call with Dr. Meloche?
5  A  Yes sir.
6  Q  And do you today have an independent
7     recollection of any part of that telephone call?
8  A  You know, I really cannot recall exactly what
9     transpired in that conversation.
10 Q  Uh-huh (Affirmative).
11 A  But, you know, I wrote to initiate DT protocol
12    and.....
13 Q  Uh-huh (Affirmative).
14 A  .....and I guess that's what was said.
15 Q  But if we -- if we separate out -- if we take
16    away your progress notes.....
17 A  Uh-huh (Affirmative).
18 Q  .....could you here today, are you able to
19    recall any part of the call independently?
20 A  I'm sorry, I can't.
21 Q  Okay. That's fine. And you have documented
22    that -- a telephonic order to initiate the
23    protocol, correct?
24 A  Yes sir.
25 Q  And you did that to the best of your ability?

Page 141

1  A  I did that.
2  Q  And if we look at your entry of 7/23/04 you
3     would have seen -- well, if we back up, you
4     would have called the evening of 7/22/04 to see
5     if he got his medication?
6  A  Correct.
7  Q  And would you have expected the correctional
8     officers to tell you if there was anything
9     unusual going on with him?
10 A  The -- yes.
11 Q  He was in a monitored cell, correct?
12 A  All those cells are all monitored cells.
13 Q  And that means that he is under constant
14    visualization? In other words, someone can
15    observe his activities at any point in time?
16 A  Yes, through a camera monitor in control.
17 Q  And it's someone's job to do that?
18 A  Yes.
19 Q  If he were at the hospital, would he be under
20    that kind of -- of observation?
21 A  I haven't worked in the hospital for years, but
22    I don't know if they have a camera in each of
23    those rooms.
24 Q  So he was in a monitored cell, correct?
25 A  A camera cell.

36 (Pages 138 to 141)

Page 142

1  Q   A camera cell. If they had -- if the
2      correctional officers on the evening of 7/22/04
3      had reported any unusual behavior on his part,
4      would you have noted that in your progress notes
5      just as a matter of process the next morning?
6  A   Most likely so.
7  Q   And did you note any such report?
8  A   No. You know, just hallucinations.
9  Q   Uh-huh (Affirmative). So the next morning you
10     saw him at -- did you see him first thing in the
11     morning, basically, when you came in?
12 A   Yes. Because he was being transferred to
13     another room so he could eat breakfast.
14 Q   And you did an examination of him at what,
15     according to your chart, is approximately 0930
16     hours?
17 A   That's what I have written here.
18 Q   All right. And you noted that he was
19     diaphoretic, so he had some sweating, correct?
20 A   Correct.
21 Q   Is that typical of individuals going through
22     withdrawals in your experience?
23 A   With my experience, they all go through the
24     sweaty, yes.
25 Q   He continued to hallucinate, you noted that.

Page 143

1  A   Yes.
2  Q   And you indicate that he continued to be
3      cooperative.
4  A   Yes.
5  Q   And was he able to interact with you?
6  A   Yes, he -- I mean, I recall giving him a glass
7      of water and he took the glass of water and --
8      without any problems. He was very cooperative
9      with me.
10 Q   Was he oriented as to time and place?
11 A   He knew he was in jail. Some conversations that
12     we had, I can't recall exactly.
13 Q   If he had not been oriented to time and place,
14     would you have noted that as a matter of your
15     standard record keeping practice?
16 A   Yes -- yes.
17 Q   And at that point in time, was he eating and
18     drinking?
19 A   Oh, yes. That was -- that's one of the things
20     that I always put a lot of emphasis in is
21     hydrating them and making sure they eat because
22     sometimes they're not able to eat then which
23     creates more problems.
24 Q   If -- if we look at his vital signs, his blood
25     pressure was 115 over 86, as you recorded.

Page 144

1  A   Yes.
2  Q   And this is at 9:30 on July 23rd, '04?
3  A   Yes.
4  Q   And was that normal in your opinion?
5  A   Yes.
6  Q   And his pulse was 80 and regular?
7  A   Yes.
8  Q   And was that normal in your opinion?
9  A   Yes.
10 Q   His respiration was 20 and easy, again, was that
11     normal in your opinion?
12 A   Yes.
13 Q   And then you indicated that -- and noted here
14     that he -- you have some -- he talked about just
15     getting a job.
16 A   Yes.
17 Q   What was -- from your perspective as a
18     registered nurse who has worked with people who
19     have gone through withdrawal before, what was
20     your impression of how he was responding to
21     protocol at that point in time?
22 A   I based it on the vital signs, the blood
23     pressure, the pulse and the respiration, which
24     is remarkable compared to what I had taken from
25     the day before. So in my nursing judgment, I

Page 145

1      thought he was getting better.
2  Q   Uh-huh (Affirmative). Did you see a need at
3      that point to consult with Dr. Meloche or any
4      other medical specialist regarding Mr. Wallace?
5  A   No, because my basis for not calling Dr. Meloche
6      was the vital signs.
7  Q   And you thought he was improving?
8  A   Yes.
9  Q   It indicates in your progress notes that you
10     checked on him at 1410 hours?
11 A   Yes.
12 Q   And did you see any change that you were able to
13     observe in his condition at that point in time,
14     based on what you had seen before?
15 A   No, he continued to hallucinate and that
16     was.....
17 Q   Uh-huh (Affirmative). If you had had any
18     concerns or a suspicion of a concern that maybe
19     he wasn't responding to the protocol or maybe he
20     was going downhill or there was any question in
21     your mind, what would you have done?
22 A   I would call Dr. Meloche.
23 Q   I think you testified that you called the jail
24     that night?
25 A   Yes.

37 (Pages 142 to 145)

SEAK Professional Services, LLC
2415 Hemlock Street, Suite 104, Ketchikan, Alaska 99901

Exhibit G
Page 7 of 10

aeab9ce5-623d-40b4-8df2-a93c87c8565d

Page 146

1  Q  And that would have been a Friday night?
2  A  Yes.
3  Q  At about 9:00 to 9:30?
4  A  About that time.
5  Q  All right. And at that point in time, was
6     anything said about any kind of unusual behavior
7     on his part at all?
8  A  I -- I don't recall. And, you know, my purpose
9     of that, basically, was to be sure that he got
10    his meds and then told them make sure, you know,
11    make sure he's drinking, how's he doing.....
12 Q  Uh-huh (Affirmative).
13 A  .....and what they told me, you know, I can't
14    remember exactly what it was, but it wasn't
15    something alarming for me to make a decision to
16    come in or to call Dr. Meloche.
17 Q  All right. If they had reported something to
18    you that caused you any concern at all, what
19    would you have done?
20 A  I would come in and evaluate.
21 Q  And if they had reported anything to you that
22    was unusual, would you have noted it in your
23    progress notes some time the next morning, given
24    what transpired within a few hours?
25 A  What I would most likely do is I would put an

Page 147

1     entry, evaluate for officer's concern, da, da,
2     da, da, da, da.
3  Q  That's all the questions I have, thank you very
4     much.
5  A  Okay. Thank you.
6              LINDA MONTECILLO
7  testified as follows on:
8              REDIRECT EXAMINATION
9  BY MR. BUDGE:
10 Q  A few follow up questions.
11 A  Okay.
12 Q  If you look at exhibit number two please. On
13    the second page there's a -- under number nine
14    there, there's an entry for is the remand
15    intoxicated or withdrawing from alcohol or other
16    substances.
17 A  Uh-huh (Affirmative).
18 Q  And then there's a box, you're supposed to check
19    yes or no. Why is it blank?
20 A  You know, I wish I could tell you. I didn't
21    check it. Why I didn't check it, I don't know
22    why.
23 Q  Think of any potential explanation? Potential
24    explanation, maybe you.....
25 A  I forgot.

Page 148

1  Q  ....forgot that -- what?
2  A  Maybe I just forgot, you know.
3  Q  Could you look at exhibit number three please?
4     The third line down under your entry for 7/21/04
5     at 1350 hours, you indicate that you noticed
6     fine hand tremor.
7  A  Uh-huh (Affirmative).
8  Q  Do you see that?
9  A  Yes.
10 Q  Now go to exhibit number two, on the second
11    page, under motor behavior.
12 A  Uh-huh (Affirmative).
13 Q  There's a box you can check if the tremulous,
14    but you didn't check the tremulous box, you
15    checked the normal box. Why is that?
16 A  I don't know.
17 Q  Looking back on it now, do you think that the --
18    in light of your notes in exhibit number three,
19    that the tremulous box.....
20 A  Uh-huh (Affirmative).
21 Q  .....should have been checked?
22    MR. LESSMEIER: Objection, form, foundation.
23 A  You know, when I see tremors, I'm thinking,
24    basically, really, really shaky. I mean,
25    obviously I also checked that he was able to --

Page 149

1     let me see here. That he walked on his own. I
2     mean I don't see anything in here.....
3  Q  No.
4  A  .....that tells me that he, you know -- I mean,
5     tremulous is something that is obvious for me,
6     you know? When I say fine hand tremors and part
7     of my routine assessment for people that are
8     going through alcohol withdrawal is I make their
9     hands go this way, and if they're doing this, so
10    I say that their hand tremors. This -- you
11    know, that part I have never really checked, to
12    my knowledge. I don't think I -- I do that --
13    pay too much attention to that box.
14 Q  How do you know that Mr. Wallace was eating?
15 A  I beg your pardon?
16 Q  How do you know that Mr. Wallace was eating?
17 A  Mr. Meloche?
18 Q  Mr. Wallace.
19 A  Oh, Mr. Wallace, trays are being served,
20    officers are there, he gets a tray all the time.
21    I just assumed that he's eating, otherwise
22    officers would tell me, hey, you know, this
23    person isn't eating or drinking and there was --
24    I don't recall any conversation of that.
25 Q  Did you look at the -- at the log entries that

Page 146

1  Q   And that would have been a Friday night?
2  A   Yes.
3  Q   At about 9:00 to 9:30?
4  A   About that time.
5  Q   All right. And at that point in time, was
6      anything said about any kind of unusual behavior
7      on his part at all?
8  A   I -- I don't recall. And, you know, my purpose
9      of that, basically, was to be sure that he got
10     his meds and then told them make sure, you know,
11     make sure he's drinking, how's he doing.....
12 Q   Uh-huh (Affirmative).
13 A   .....and what they told me, you know, I can't
14     remember exactly what it was, but it wasn't
15     something alarming for me to make a decision to
16     come in or to call Dr. Meloche.
17 Q   All right. If they had reported something to
18     you that caused you any concern at all, what
19     would you have done?
20 A   I would come in and evaluate.
21 Q   And if they had reported anything to you that
22     was unusual, would you have noted it in your
23     progress notes some time the next morning, given
24     what transpired within a few hours?
25 A   What I would most likely do is I would put an

Page 147

1      entry, evaluate for officer's concern, da, da,
2      da, da, da, da.
3  Q   That's all the questions I have, thank you very
4      much.
5  A   Okay. Thank you.
6           LINDA MONTECILLO
7  testified as follows on:
8           REDIRECT EXAMINATION
9  BY MR. BUDGE:
10 Q   A few follow up questions.
11 A   Okay.
12 Q   If you look at exhibit number two please. On
13     the second page there's a -- under number nine
14     there, there's an entry for is the remand
15     intoxicated or withdrawing from alcohol or other
16     substances.
17 A   Uh-huh (Affirmative).
18 Q   And then there's a box, you're supposed to check
19     yes or no. Why is it blank?
20 A   You know, I wish I could tell you. I didn't
21     check it. Why I didn't check it, I don't know
22     why.
23 Q   Think of any potential explanation? Potential
24     explanation, maybe you.....
25 A   I forgot.

Page 148

1  Q   ....forgot that -- what?
2  A   Maybe I just forgot, you know.
3  Q   Could you look at exhibit number three please?
4      The third line down under your entry for 7/21/04
5      at 1350 hours, you indicate that you noticed
6      fine hand tremor.
7  A   Uh-huh (Affirmative).
8  Q   Do you see that?
9  A   Yes.
10 Q   Now go to exhibit number two, on the second
11     page, under motor behavior.
12 A   Uh-huh (Affirmative).
13 Q   There's a box you can check if the tremulous,
14     but you didn't check the tremulous box, you
15     checked the normal box. Why is that?
16 A   I don't know.
17 Q   Looking back on it now, do you think that the --
18     in light of your notes in exhibit number three,
19     that the tremulous box.....
20 A   Uh-huh (Affirmative).
21 Q   .....should have been checked?
22     MR. LESSMEIER: Objection, form, foundation.
23 A   You know, when I see tremors, I'm thinking,
24     basically, really, really shaky. I mean,
25     obviously I also checked that he was able to --

Page 149

1      let me see here. That he walked on his own. I
2      mean I don't see anything in here.....
3  Q   No.
4  A   .....that tells me that he, you know -- I mean,
5      tremulous is something that is obvious for me,
6      you know? When I say fine hand tremors and part
7      of my routine assessment for people that are
8      going through alcohol withdrawal is I make their
9      hands go this way, and if they're doing this, so
10     I say that their hand tremors. This -- you
11     know, that part I have never really checked, to
12     my knowledge. I don't think I -- I do that --
13     pay too much attention to that box.
14 Q   How do you know that Mr. Wallace was eating?
15 A   I beg your pardon?
16 Q   How do you know that Mr. Wallace was eating?
17 A   Mr. Meloche?
18 Q   Mr. Wallace.
19 A   Oh, Mr. Wallace, trays are being served,
20     officers are there, he gets a tray all the time.
21     I just assumed that he's eating, otherwise
22     officers would tell me, hey, you know, this
23     person isn't eating or drinking and there was --
24     I don't recall any conversation of that.
25 Q   Did you look at the -- at the log entries that

38 (Pages 146 to 149)

Page 150

```
 1    talk about the delivery of food and.....
 2  A  No. Un-huh (Negative).
 3  Q  So -- and sitting here today, do you have any
 4    insight or recollection whether Mr. Wallace was
 5    eating or not?
 6  A  I'm going to say that he was eating because I
 7    had instructed the sergeant before I left that
 8    he be cert -- be sure that he would eat and if I
 9    made some kind of notes to the officer for
10    certain things, they will follow up on that and
11    they will tell me otherwise that this person
12    wasn't doing the things that I'm asking them to
13    do.
14  Q  Well you made -- you said that you -- that you
15    consulted with Sergeant Ellis to make certain
16    inmates each eat dinner at 1410 on 7/23/04,
17    right?
18  A  Correct.
19  Q  And then the only other contact you had with Mr.
20    Wallace was after he was dead, correct?
21  A  Correct.
22  Q  Okay. In response to a question from Mr.
23    Lessmeier about getting approval for transport
24    from DOC in Anchorage before an inmate is
25    transported to the hospital?
```

Page 151

```
 1  A  Yes.
 2  Q  Has there ever -- ever been a situation where a
 3    doctor has advised that an inmate should be
 4    transported to the hospital and Anchorage has
 5    denied that?
 6  A  No.
 7  Q  That's all I have.
 8    (Off record)
```

Page 152

```
 1              AFFIDAVIT
 2  State of Alaska        )
 3        ss              )
 4  FIRST JUDICIAL DISTRICT )
 5
 6    I have read my within deposition, and the same
 7  is true and correct save and except for any
 8  CORRECTIONS as noted on the CORRECTION PAGE
 9  immediately following, attached hereto and made part
10  of this deposition transcript.
11                      _____
12                         Linda Monticello
13  SIGNED AND SWORN TO before me, this ____
14  day of _____, 2006
15
16                      _____
17  Notary Public for the State of Alaska
18  My commission expires:_____
```

Page 153

```
 1              CORRECTIONS
 2    Pursuant to Alaska Rules of Civil Procedure,
 3  Rule 30(e), upon review of your deposition you are
 4  entitled to indicate changes or corrections to be
 5  included and made part of the original deposition.
 6    Please make all changes or corrections on this
 7  sheet, showing page and line numbers, the change or
 8  correction and reason for said change or correction.
 9    Use additional sheets if necessary, sign each
10  one at the bottom, and include them with this
11  transcript. If there are no corrections, please
12  write on this sheet "None", and sign at the bottom.
13  PAGE    LINE    CORRECTION/CHANGE and REASON
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23              _____
24               Linda Monticello
    Signature here and notarized signature of "AFFIDAVIT"
```

39 (Pages 150 to 153)

Exhibit G
page 10 of 10