Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

JULIA WALKER, individually )
and as Personal Representative)
of the Estate of TROY WALLACE )
                              )
             Plaintiffs,      )
                              )
      vs.                     )
                              )
                              )
DAVID D. HENDERSON, LAURI A.  )
MURRAY, WALTER T. RUD, SHERRI )
L. DAVIS, EDWIN D. IRIZARRY,  )
LINDA MONTICELLO and ERNEST   )
MELOCHE M.D.                  )
                              )
             Defendants.      )   No.  A05-0176 CV
                              )

DEPOSITION ON ORAL EXAMINATION

OF

LINDA MONTECILLO

8:15 a.m.
September 19, 2006
Ketchikan Correctional Center
1201 Schoenbar Road
Ketchikan, Alaska 99901

Exhibit G

Page 6

```
 1      and I want to make sure that if you don't
 2      understand a question that I ask or if you'd
 3      like clarification, feel free to ask me to
 4      clarify my question and I'll do that.  Okay?
 5   A  Okay.
 6   Q  Do you have any questions about the procedure
 7      before we start?
 8   A  None as of the moment.
 9   Q  Did you do anything to prepare for your
10      deposition today?
11   A  Review the records.
12   Q  All right.  And what records are you referring
13      to?
14   A  The one present in front of me.
15   Q  All right.  Anything other than that?
16   A  No sir.
17   Q  Okay.  What is that file that you have in front
18      of you?  Is that a medical file maintained here
19      at the Ketchikan Correctional Center?
20   A  What it is, it says State of Alaska and on the
21      front it says confidential and it says Wallace -
22      - Troy Wallace -- Wallace, Troy A., OTIS number
23      489521, date of birth 10/31/72.  A manila
24      envelope and it has different forms.
25   Q  Is that a file that's maintained here at the
```

Page 7

```
 1      jail?
 2   A  Some of it is his medical file.  There are other
 3      pieces of information that normally does not
 4      include in the medical file.
 5   Q  All right.  Did you review any other records
 6      other than the materials that you have in front
 7      of you right now?
 8   A  No sir.
 9   Q  Did you have any conversations with anybody
10      about the subject of this deposition before we
11      started today?
12   A  Yes I did.
13   Q  Who was that?
14   A  Paula Jacobson.
15   Q  Anybody else?
16   A  No sir.
17   Q  Okay.  Have you reviewed any documents related
18      to this case in the past two weeks besides what
19      you have in front of you today?
20   A  No sir.
21   Q  Can you take me through your educational history
22      since high school please?
23   A  I graduated high school -- Ketchikan High
24      School, in May, 1975.  I went to nursing school
25      and I graduated nursing school in Sibudokus (ph)
```

Page 8

```
 1      College of Nursing in the Philippines.  I
 2      graduated in April of two -- no, 1982.  And I
 3      received a bachelor's degree in nursing at that
 4      time.
 5   Q  Did you say 1982?
 6   A  Yes.
 7   Q  And when did you graduate from Ketchikan High?
 8   A  1975.  It took me five years to finish.
 9   Q  Oh, I'm sorry.  That's perfectly reasonable.  I
10      just had it confused in my head that you were
11      born in 1975.
12   A  I was born in.....
13   Q  Right.
14   A  .....1956.
15   Q  Got it.  And any other higher education besides
16      nursing school?
17   A  That's it.
18   Q  All right.  Please describe your work history
19      since graduating from nursing school in 1982.
20   A  I worked at the Ketchikan General Hospital,
21      first as a nurse's aid, and then I went into
22      surgery and I was a certified scrub technician
23      for I don't know how many years.  And then I
24      passed the state board -- I can't give you the
25      exact dates, and I worked as a registered nurse
```

Page 9

```
 1      in the hospital.  Most of my experience is in
 2      surgery and I came here to the Department of
 3      Corrections in December of 1991 and I've been
 4      here since then.
 5   Q  Have you worked at any other jails or
 6      correctional facilities other than the Ketchikan
 7      Correctional Center?
 8   A  I put in possibly a week at the jail in Bethel
 9      to fill in.  But it was still under Department
10      of Corrections.
11   Q  Okay.  But other than that one week, your
12      employment with the Department of Corrections
13      has involved your work here at.....
14   A  Correct.
15   Q  .....the Ketchikan Correctional Center?
16   A  Correct.
17   Q  From roughly when to when did you work at the
18      Ketchikan General Hospital?
19   A  From 1982 until 1991.
20   Q  And you said you began as a nurse's aid?
21   A  Yes.
22   Q  And then what was your -- what was your position
23      in surgery?
24   A  I was a certified scrub technician.
25   Q  Okay.  And when did you pass the state board?
```

Page 62

1  A   Hallucinations.
2  Q   What else?
3  A   Tremors.
4  Q   What else?
5  A   Increased blood pressure, vital signs are more
6      elevated than normal.
7  Q   What about excessive sweating?  Is that one sign
8      or symptom of DT?
9  A   Correct.
10 Q   What about excessive pulse rate?  Is that a sign
11     or symptom of DT?
12 A   As stated as the vital signs being elevated.
13 Q   In your view are delirium tremens a serious
14     medical condition?
15     MR. LESSMEIER:  Objection, form, foundation.
16 A   Yes.
17 Q   Why was it that you wrote here observe for DT?
18 A   It's something for me to keep an eye on.  It
19     says other pertinent information.
20 Q   What was it about the way Mr. Wallace presented
21     himself as the post-remand screening that led
22     you to write observe for DT?
23 A   It's based on his response to alcohol
24     withdrawal, that he said he has a history of
25     alcohol withdrawal.  It was more the in -- the

Page 63

1      interview that brought to my attention.
2  Q   Did you have any specific kind of observation in
3      mind when you wrote observe for DT?
4  A   Meaning to say?
5  Q   Well, for example, did you mean, okay, we're
6      going to evaluate him every so many hours, or
7      we're going to, you know, take his vitals on
8      this -- on this -- on this schedule or we're
9      going to put him in a special cell, or we're
10     going to do something.  Was this just sort of a
11     reminder to yourself?
12     MR. LESSMEIER:  Objection, form.
13 A   It's just something for me to be aware of.
14 Q   If you go back to exhibit number one for a
15     minute, did anybody every communicate to you the
16     information as reflected on exhibit number one
17     that, as of booking, Mr. Wallace was shaking and
18     stated that he was withdrawing from alcohol?
19 A   You know, I don't know.  I can't remember.
20 Q   And if you look now on exhibit number two,
21     number three, do you recognize this document?
22 A   Yes.
23             (Exhibit 3 introduced)
24 Q   What is it?
25 A   It's progress notes.

Page 64

1  Q   For Mr. Wallace?
2  A   Yes.
3  Q   Is this all your handwriting?
4  A   Yes.
5  Q   Is this the type of document that you regularly
6      complete?
7  A   Yes.
8  Q   What is the purpose of this document?
9  A   To gather information, put it in writing, the
10     legal piece of paper.
11 Q   So you can have record of what happened?
12 A   Yes.
13 Q   And when you're filling this out, is it
14     important to be as accurate as you can?
15 A   Yes.
16 Q   And did you try to be as accurate as you could
17     when filling out this particular form?
18 A   To my best ability, yes.
19 Q   All right.  I want to focus on the first entry
20     under 7/21/04 at 1350.
21 A   Yes.
22 Q   Please read it for me.
23 A   Remand 07/20/04 to serve time.  Denies history
24     of a positive tuberculosis test.  Given tubersol
25     0.1ml in the left forearm, internal dermal,

Page 65

1      check after four days to 72 hours, vital signs,
2      blood pressure 132 over 96, pulse 87, regular
3      respiration 20, easy, temperature 98.2
4      Fahrenheit, concerned of alcohol withdrawal,
5      noted fine hand tremors, denies any
6      hallucination, assured will follow up as needed
7      for increased symptoms, advised to increase
8      fluids.
9  Q   Was this entry completed in conjunction with the
10     pre-remand.....
11 A   Yes.
12 Q   .....and post-remand screening?
13 A   Yes.
14 Q   Is there anything that you remember about Mr.
15     Wallace on 7/21/04 other than what is reflected
16     in exhibits 2 and 3?
17 A   He was cooperative.
18 Q   Anything else?
19 A   Just what I have written in here.
20 Q   Did you only have a single contact with Mr.
21     Wallace on 7/21/04?
22 A   Face to face contact?
23 Q   Yes.  Did you have any other kind of contact
24     with him on 7/21/04 other than a face to face
25     contact?

Linda Monticello

Page 74

1  in Mr. Wallace's -- of Mr. Wallace's age, for
2  example, if he'd been healthy?
3  A  I would say between 80 to 100.
4  Q  Is high pulse rate, including this particular
5  reading of 137, a symptom of DT?
6  A  A symptom, yes.
7  Q  And you noted that his respirations were
8  20/easy, what does that mean?
9  A  That means he wasn't gasping for air, that means
10  he wasn't hyperventilating, that he was
11  breathing normally.
12  Q  Is 20 respirations per minute high?
13  A  No.
14  Q  So he had normal respirations with a high pulse
15  rate, right?
16  A  Correct.
17  Q  You also noted that he was talking without
18  sense. What do you mean by that?
19  A  Because he told me that there was something
20  moving on the counter.
21  Q  Was there anything moving on the counter?
22  A  I didn't see it.
23  Q  Okay. So did it appear to you that he was
24  delirious to some degree?
25  MR. LESSMEIER: Objection, form, foundation.

Page 75

1  A  He was -- from my point of view he was
2  hallucinating.
3  Q  Did Mr. Wallace appear to be -- other than the
4  fact that he was hallucinating, did he appear to
5  be mentally confused in any other way?
6  A  I'm not a mental person, but I would not say he
7  wasn't. He was not mentally confused, he
8  carried out a conversation, he was seeing
9  something that I didn't see.
10  Q  Okay. But he was answering your questions in a
11  -- what appeared to you to be a rational way?
12  A  Correct.
13  Q  Okay. Going down to your next entry under 1430
14  on 7/22/04, that entry appears to indicate that
15  you made a telephone call to Dr. Meloche, is
16  that right?
17  A  Correct.
18  Q  What was your purpose in making that telephone
19  call?
20  MR. LESSMEIER: Objection, foundation, form.
21  A  To have Dr. Meloche be aware that there's
22  someone that we're concerned about.
23  Q  Was it your intent to get some instructions from
24  Dr. Meloche about how to treat Mr. Wallace?
25  MR. LESSMEIER: Objection, form.

Page 76

1  A  Yes.
2  Q  And it appears to indicate that you made the
3  call to Dr. Meloche within a half hour of your
4  evaluation of Mr. Wallace on that date, is that
5  right?
6  A  If the records show, yes.
7  Q  Do you recall whether you reached Dr. Meloche
8  directly or whether he had to call you back?
9  A  I can't recall exactly the details.
10  Q  Do you know where he was at the time that you
11  called him?
12  A  I don't know.
13  Q  Did you provide information to Dr. Meloche about
14  Mr. Wallace's status?
15  A  My standard of care is I write the things down
16  and when I call him I read what I have written
17  down.
18  Q  Okay. So your standard procedure would have
19  been to provide to Dr. Meloche all of the
20  information under the entry of 7/22/04 at 1400
21  hours?
22  A  Yes.
23  Q  Was this your first communication with Dr.
24  Meloche about Mr. Wallace?
25  A  Yes.

Page 77

1  Q  Was this your first communication with any other
2  medical provider about Mr. Wallace?
3  A  Yes.
4  Q  Did you want to give Dr. Meloche a full and
5  complete picture of Mr. Wallace's condition as
6  you knew it to be as of 7/22/04 at 1400 hours?
7  MR. LESSMEIER: Objection, form, foundation.
8  A  I wanted to relay what I had assessed on the
9  prisoner at that time.
10  Q  And during your call to Dr. Meloche at 1430
11  hours, did you give him the information that you
12  had about Mr. Wallace's medical condition at the
13  time?
14  MR. LESSMEIER: Objection, form, foundation.
15  A  Just what I had written on -- at 1400.
16  Q  Okay. Did you tell Dr. Meloche that Mr. Wallace
17  was very sweaty?
18  A  Most likely I told Dr. Meloche.....
19  MR. LESSMEIER: Let me just object on the basis
20  of foundation. Go ahead.
21  A  .....what I had written on 1400.
22  Q  Okay. Did you tell Dr. Meloche the information
23  that you had obtained from your evaluation of
24  Mr. Wallace on 7/21/04 at 1350?
25  MR. LESSMEIER: Objection, foundation.

20 (Pages 74 to 77)

Page 82

1    initiate DT protocol. Do you understand that
2    question?
3        MR. LESSMEIER: I'm going to object to the form
4    of the question. Go ahead.
5  A  Okay. Basically, the department has policies
6    and procedures and we have an alcohol withdrawal
7    protocol and to initiate the DT protocol
8    translates, for me, to get the piece of paper
9    that has all the instructions on the alcohol
10   withdrawal. Does that answer your question?
11 Q  I think so. Just let me clarify. You don't
12   recall receiving specific information from Dr.
13   Meloche regarding, okay, I want X amount of
14   medication, X kind of medication and on X
15   schedule. Rather, the information was initiate
16   the DT protocol, which you then carried out by
17   going and getting the DT protocol and looking to
18   see when and how that medication was supposed to
19   be administered. Is that right?
20       MR. LESSMEIER: Objection, form.
21 A  Correct.
22 Q  And the DT protocol that you're referring to is
23   a protocol that's maintained by the Department
24   of Corrections?
25 A  Correct.

Page 83

1  Q  Is there just one DT protocol, or are there
2    others depending on the severity of the
3    withdrawal symptoms?
4  A  Just one form.
5  Q  One form for everybody?
6  A  One form for the whole Department of
7    Corrections.
8  Q  Did you understand -- or is it your
9    understanding, I should say, that alcohol
10   withdrawal can vary from mild to severe?
11 A  Yes.
12 Q  Do you know of any DT protocol that is -- how to
13   I phrase this? Are there different DT protocols
14   that are designed to address withdrawal symptoms
15   which are, for example, mild or moderate or
16   severe? Or is there simply one DT protocol that
17   if it's initiated is initiated in every case?
18       MR. LESSMEIER: Objection.....
19       MS. JACOBSON: Are you talking about DOC only?
20       MR. BUDGE: Yes.
21       MR. LESSMEIER: Let me just object for the
22   record. Form, foundation.
23 A  There's only one form that I'm aware of that I
24   use that the Department of Corrections have
25   formulated.

Page 84

1  Q  Do you know whether Dr. Meloche understood what
2    the DT protocol consisted of?
3  A  I don't know what Dr. Meloche knew or
4    understood.
5  Q  Have you had any experience with involving Dr.
6    Meloche in inmate care as it pertained to
7    alcohol withdrawal prior to Mr. Wallace?
8  A  If you're asking me if we had other alcohol
9    withdrawal treatments aside from Wallace?
10 Q  Yeah.
11 A  Yes.
12 Q  Okay. How many times?
13 A  I couldn't give you the number.
14 Q  Can you estimate for me whether it would have
15   been more or less than 10 times prior to Mr.
16   Wallace?
17       MR. LESSMEIER: Objection, foundation, form.
18 A  You know, I don't know. Maybe more than 10,
19   maybe less than 10. I really can't give you a
20   figure.
21   (Whispered conversation)
22 Q  Okay. Under this entry for 7/22/04 at 1430,
23   after you say initiate DT protocol, can you go
24   ahead and read the rest of that entry for me?
25 A  It says, Clorazepate 15 milligrams, Thiamine 100

Page 85

1    milligrams IM/STAT, then Thiamine 100 milligrams
2    PO Q D times four days. TO, telephone order,
3    Dr. Meloche/Linda Montecillo, RN.
4  Q  What does PO Q D times four days mean?
5  A  Oral daily. One tablet.
6  Q  When you wrote down the medication -- this
7    information about medications, were you writing
8    down Dr. Meloche's specific orders or were you
9    getting this information off of the DT protocol
10   sheet?
11 A  I got it out of the DT protocol sheet in a --
12   what I would say, lesser writing version than
13   the whole protocol itself.
14 Q  Okay. And then there's another entry for
15   7/22/04 at 1450. Can you go ahead and read that
16   for me please?
17 A  Given Thiamine 100 milligrams IM left deltoid
18   muscle, tolerated procedure. Clorazepate, 15
19   milligrams, two tablets given. Monitor, follow
20   up, PRN, Linda Montecillo.
21 Q  And what does -- remind me again what PRN means?
22 A  As needed.
23 Q  Okay. And was this simply a record of the
24   medication that you gave Mr. Wallace at that
25   time?

22 (Pages 82 to 85)

Page 86

1  MR. LESSMEIER: Objection, form.
2  A  Yes.
3  Q  Other than your telephone call with Dr. Meloche
4     on 7/22/04 at 1430, did you have any other
5     contact with him on that day?
6  A  No.
7  Q  Do you know whether you had any contact with any
8     other person about Mr. Wallace on that day?
9  A  Perhaps I had spoke with the shift supervisor
10    and, just because I had written monitor, they
11    need to keep an eye on him, and to follow up
12    before I left.
13 Q  But you don't have any specific recollection?
14 A  No. None that's written.
15 Q  Okay. Could you go ahead and look at the -- are
16    you guys okay to go ahead and keep going or do
17    you want to take a break?
18    MS. JACOBSON: Do you want a break? Yeah.
19    MR. LESSMEIER: Yeah, no problem.
20    (Off record)
21 Q  Okay. Let's go back to exhibit number 3 please.
22    I'd like to you take a look at the entry under
23    7/23/04 at 6:10 a.m. Do you see that?
24 A  Yes.
25 Q  Was this your next contact with Mr. Wallace?

Page 87

1  A  Yes.
2  Q  So you had no contact with him between 7/22/04
3     at 1450 and 7/23/04 at 6:10?
4  A  No.
5  Q  And to your knowledge he was not evaluated by
6     any medical provider during that period of time?
7  A  During the time that there was no contact?
8  Q  Right.
9  A  Correct.
10 Q  What does it say? Could you read it for me
11    please, under 7/23/04 at 6:10?
12 A  Observed in room 224, was informed by officer
13    inmate refused to give breakfast tray to cell
14    mate, now placed in room 224.
15 Q  And then go ahead and read the next entry for
16    seven a.m., please.
17 A  Inmate medicated, hand tremors observed,
18    cooperative.
19 Q  And then read what it says under 7:10.
20 A  observed -- escorted to shower, officer
21    observing.
22 Q  All right, and then under 9:30, can you read
23    that please?
24 A  Inmate to exam room, diaphoretic, continues to
25    hallucinate, continues to be cooperative, vital

Page 88

1  signs BP 115 over 84, pulse 80, regular
2  respiration 20 easy. Talks about just got a
3  job. Offered water to inmate, drank fluids
4  without hesitation. Officer Morley present.
5  Q  And did you actually conduct an examination on
6     Mr. Wallace at 9:30 a.m. on 7/23/04?
7  A  That's what I have written on here, yes.
8  Q  And by diaphoretic do you mean that he was
9     continuing to sweat excessively?
10 A  He was continuing to sweat, yes.
11 Q  And you wrote that he continues to hallucinate.
12    Do you have any specific recollection about what
13    caused you to write that?
14 A  You know, specifically what he was hallucinating
15    about, I really don't know, but obviously he did
16    hallucinate because I wrote down that he
17    continues to hallucinate.
18 Q  Do you know if it was auditory or visual
19    hallucinations?
20 A  I couldn't specify and tell you exactly which
21    one.
22 Q  Do you know whether you asked him, are you
23    hallucinating, and he said yes and you wrote it
24    down or, alternatively, whether he just
25    described things that he was seeing that were

Page 89

1  not there?
2  A  Most likely he was seeing things that were not
3     there.
4  Q  His blood pressure is down, correct?
5  A  Correct.
6  Q  His pulse is also down, is that right?
7  A  Correct.
8  Q  What led you to write talked about just got a
9     job?
10 A  Most likely he was telling me that he just got a
11    job, just by conversation he was telling me that
12    he just got a job.
13 Q  Did you write it down because you thought it had
14    some significance to your evaluation?
15 A  Yes.
16 Q  Okay, and why did it have significance to your
17    evaluation?
18 A  Because, most likely, it was not part of our
19    conversation and he just said something about
20    it.
21 Q  Okay, so did it appear that there was some sort
22    of -- in other words, it didn't make sense that
23    he was saying that?
24 A  Correct.
25 Q  And if you could go down under the next entry

23 (Pages 86 to 89)

Case 3:05-cv-00176-RRB    Document 58-8    Filed 12/15/2006    Page 7 of 15

Linda Monticello

Page 90

1  under 1410?
2  A  Observe -- inmate observed sitting on bunk,
3     writer advised inmate to rest, inmate nodding,
4     fixed his blankets. Writer consult with
5     Sergeant Ellis to make certain inmate eats
6     dinner.
7  Q  Why did you write that he was nodding and fixing
8     blankets?
9  A  Nodding, possibly because I had instructed him
10    to rest and he nods, meaning to say that he
11    understood what I was saying, and he was fixing
12    his blanket when he was nodding his head. So it
13    was just something that I just noted.
14 Q  Okay. Did the fact that he was fixing his
15    blankets have any import to your evaluation or
16    was it just something you observed?
17 A  Just something that I observed.
18 Q  Now you said that you consulted with Sergeant
19    Ellis to make sure that he eats dinner. Did you
20    have any concerns about how much he was eating?
21 A  No. I just wanted to be sure that he was
22    hydrated and he had nutrients.
23 Q  Did you have any communications with Dr. Meloche
24    on this day, 7/23/04?
25 A  Not to my recall, no.

Page 91

1  Q  Do you know if anybody at the jail had any
2     communications with Dr. Meloche on that day?
3  A  Not to my knowledge.
4  Q  Did you make any effort to contact Dr. Meloche
5     on 7/23/04?
6  A  No.
7  Q  Do you know whether or not he made any effort to
8     contact you on that day?
9  A  Not to my knowledge.
10 Q  And other than basic back and forth that you
11    made -- that you may have had with corrections
12    officers here at the jail, did you have any
13    other communication with any other person about
14    Mr. Wallace's condition on 7/23/04?
15 A  Actually, I -- I did. It's my standard of care
16    that if there's somebody that I have concerns
17    about, I normally would call, especially in this
18    instance wherein he needed to have medication at
19    night time. And so I called the evening of
20    7/22nd to be sure he got his medicine. I called
21    on the evening of 7/23 to be sure that he got
22    his dose.
23 Q  Meaning that you called the jail from home?
24 A  Yes.
25 Q  But from 1410 on 7/23/04 until his death in the

Page 92

1     early morning hours of 7/24/04 was there any
2     medical provider here at the jail?
3  A  No.
4  Q  Was there any medical provider at the jail in
5     the late afternoon and night that spanned
6     7/22/04 until you came on shift on 7/23/04?
7  A  No.
8  Q  Okay, if you would look at what I'm going to
9     mark as Exhibit 4. Do you recognize this?
10 A  I don't recognize the first two pages.
11              (Exhibit 4 introduced)
12 Q  Okay. And for the record, this exhibit consists
13    of four pages marked in the lower right AWG001
14    through 004. Have you ever seen the first two
15    pages before?
16 A  You know, I can't recall if I have or not.
17 Q  That's not something that you recognize today?
18 A  No. Un-huh (Negative). No.
19 Q  Is part of this document the protocol that you
20    mentioned previously?
21 A  Yes, and I'd like to put a lot of emphasis that
22    it's not a DT protocol, it's an alcohol
23    withdrawal protocol. I guess I had been
24    mentioning DT protocol, but it's actually
25    alcohol withdrawal protocol.

Page 93

1  Q  Okay, so when you have previously been referring
2     to DT protocol.....
3  A  It's.....
4  Q  .....you mean alcohol withdrawal protocol?
5  A  Correct.
6  Q  So is it -- is it that the documents marked
7     AWG003 to AWG004, is this the protocol or is it
8     simply the page marked AWG003?
9     MR. LESSMEIER: Objection, form, foundation.
10 A  I don't know -- I'm sorry. I don't know that
11    AWG004 is part of the protocol.
12 Q  Okay. So you know that AWG003 is part of the
13    protocol?
14    MR. LESSMEIER: Objection, form, foundation.
15 A  Correct.
16 Q  Okay. Let me ask the question a better way. If
17    you go back to exhibit number 3 and under the
18    entry for 7/22/04 at 1430, where it says
19    initiated DT protocol, to what document are you
20    referring when you write initiate DT protocol?
21 A  The alcohol withdrawal protocol.
22 Q  AWG003?
23    MR. LESSMEIER: Objection, form, foundation.
24 A  I'm sorry, I've got different from what you guys
25    got.

24 (Pages 90 to 93)

SEAK Professional Services, LLC
2415 Hemlock Street, Suite 104, Ketchikan, Alaska 99901

aeab9ce5-623d-40b4-8df2-a93c87c8565d


Linda Monticello

Page 94

1  MS. JACOBSON: A blank one.
2  A  Yes, except for I don't have the complete.
3  Q  Tell me, talk to me. What is it?
4  MS. JACOBSON: Tell, yeah.
5  A  My form is different from you guys's because I
6     have this page.
7  Q  You're looking at the wrong exhibit Paula.
8  MS. JACOBSON: No, I understand that. But what
9  -- maybe we need a point of clarification here.  04
10 is a generalized (inaudible) transport, well it's not
11 necessarily inherent to this, and the form that Linda
12 filled out is the one she used. Yes, I know they're
13 different, but this is the one she had on hand and
14 she used.
15 MR. BUDGE: Okay.
16 MS. JACOBSON: They're different in some
17 respects, but they certainly look different. This is
18 the protocol. When I say this is, I mean the one
19 that Linda filled out on 7/19/04, or she started.
20 That's what we're using here.
21 Q  All right, well. Let's mark this as Exhibit 5.
22            (Exhibit 5 introduced)
23 Q  What is Exhibit 5?
24 A  It says alcohol withdrawal, Alaska DOC medical
25    guidelines. Name has Wallace, Troy A. Date of

Page 95

1     birth, 10/31.
2  Q  Is this the protocol that you're referring to?
3  A  Yes sir.
4  Q  All right. So when you said -- or if you go
5     back for a moment to exhibit number 4. Is
6     exhibit number 4 -- does any part of exhibit
7     number 4 a document that you recognize?
8  A  Yes I have -- I have seen this form.
9  Q  And when you referred to the DT protocol in your
10    progress notes on Exhibit 3, were you referring
11    to what we have now marked as Exhibit 5?
12 A  Correct.
13 Q  All right, so let's go with this for the next
14    one, which I think is now six.
15           (Exhibit 6 introduced)
16 Q  Do you have six in front of you?
17 A  Yes sir.
18 Q  All right. Six also appears to be progress
19    notes, right?
20 A  Correct.
21 Q  And what I'm trying to figure out is why are
22    there additional notations on Exhibit 6 that are
23    different -- or in addition to, I should say,
24    what appears on Exhibit 3.
25 A  Did you want me to explain?

Page 96

1  Q  Yeah.
2  A  I remember this. What happened was I came in
3     right after I got the phone call that Mr.
4     Wallace died.
5  Q  Uh-huh (Affirmative).
6  A  And I remember the troopers were here as well
7     too, and during that time that the troopers were
8     here they wanted an immediate copy of his
9     records. So before I could actually finish my -
10    - the information -- the current information, I
11    copied this right away to give to the -- to the
12    troopers.
13 Q  Okay.
14 A  And so what happened was this was given to the
15    troopers, then I finished my charting and Dr.
16    Meloche came in later in the morning and
17    basically signed -- signed off the chart.
18 Q  All right. So these notations, I guess, on the
19    right hand side of the page, on exhibit number 6
20    are Dr. Meloche's either signatures or initials?
21 A  Correct.
22 Q  Okay. Is it -- is it standard that Dr. Meloche
23    signs off on patient's charts?
24 A  Telephone orders, any telephone conversation
25    that I make consult with him that I write down

Page 97

1     TO or telephone order, we would like to have
2     they physician sign off.
3  Q  But in this case he was not signing off until
4     after Mr. Wallace had died, is that right?
5  A  It's standard procedure that because I did a
6     telephone conversation, next time we -- he comes
7     in and do sick call or whatever, we would go
8     over the chart and he would sign them off as
9     part of our legal procedure.
10 Q  What did that supposed to indicate, that he's
11    signing off on?
12 A  Basically that he's confirming that we actually
13    had made contact and we did this.
14 Q  All right. Now if you go down to the entry on
15    7/24/04 -- actually, let me back up for a
16    minute. If you go up four lines from the bottom
17    there's this addition to the progress notes,
18    begins PPD, do you see that?
19 A  Yes.
20 Q  Does that refer to the tuberculosis test?
21 A  Yes.
22 Q  So these were the results of the tuberculosis
23    test coming back after Mr. Wallace had died?
24 A  No. This is -- what happened was, I had logged
25    his tuberculosis arm test as noted PPD log, but

25 (Pages 94 to 97)

Page 102

1  Q  Okay. And go ahead and look at the entry on the
2     following page at 7:00 a.m.
3  A  Telephone call -- or telephone conversation R.
4     Hale, PA, Anchorage on-call staff per medical,
5     writer advised inmate status.
6  Q  Who is R. Hale, PA?
7  A  He's the on-call DOC staff for Department of
8     Corrections.
9  Q  On-call DOC staff?
10 A  Staff.
11 Q  What does that mean?
12 A  That Department of Corrections has a staff
13    that's on-call for all the facilities in the
14    state, so if he -- like, in a weekend where
15    there's no office hours, if I needed to
16    transport somebody to the emergency room, I have
17    to advise them of what I'm doing here.
18 Q  Okay. And what does PA mean?
19 A  Physician's assistant.
20 Q  Was this somebody that you were calling in
21    Anchorage?
22 A  Yes.
23 Q  All right. Just to tell them what happened?
24 A  Yes.
25 Q  All right.

Page 103

1  A  A courtesy call.
2  Q  And then the final entry is from 6:57.
3  A  I just put out. So at the time I believe that's
4     -- I closed the file then.
5  Q  Did you work for the rest of that day?
6  A  No I didn't.
7  Q  What did -- did any nurse work on that day?
8  A  Not to my knowledge.
9  Q  Okay. And was it because you were emotionally
10    distraught that you did not work that day or was
11    there another reason?
12 A  You know, I can't remember. If it was a
13    Saturday, then I would normally not work, so.
14 Q  Right. Let's put the documents aside for a sec.
15    You can refer to them if you need to, but my
16    next questions are not going to be about them.
17    Just confirm for me how many total conversations
18    you had with Dr. Meloche between 7/20/04 and Mr.
19    Wallace's death on 7/24/04
20 A  Two conversations. The one on the -- on 1430 on
21    the 20 -- 21st, and at 4:40 on 24th.
22 Q  Okay. Do you mean 1430 on the 22nd?
23 A  Yeah, uh-huh (Affirmative).
24 Q  Okay, and then the other conversation that
25    you're referring after -- actually took place

Page 104

1     after Mr. Wallace's death, correct?
2  A  Correct.
3  Q  Okay. So one total conversation during the
4     period that Mr. Wallace was in jail, before he
5     died?
6  A  Yes sir.
7  Q  Did you have any written correspondence with Dr.
8     Meloche? Faxes or anything of that nature?
9  A  No.
10 Q  And have you told me today everything that you
11    can remember about your one communication with
12    Dr. Meloche on 7/22/04?
13 A  Can I tell you that I had called him at 1430 to
14    advise him of what I had written on 1400, which
15    is basically that he was very sweaty, he had
16    hand tremors and that he was voicing that there
17    were things moving on top of the counter, his
18    blood pressure of 160 over 104, his pulse of
19    137, tacky, his respiration's easy and that he
20    was talking without sense.
21 Q  And have you told -- do you have any -- any
22    final, independent recollection of anything that
23    occurred during any evaluation that you made on
24    Mr. Wallace other than what we've already gone
25    through today?

Page 105

1  A  It's -- what I have written here is what
2     transpired through my contact with Mr. Wallace.
3  Q  Go ahead, if you would, and look at exhibit
4     number 5. Is that the.....
5  A  The medication sheet.
6  Q  That's the protocol?
7  A  Yes sir.
8  Q  All right. I want to go through that for a
9     minute. Take me through the first page, if you
10    would. I don't want you to just -- that's a bad
11    way to start a bad question. This document was
12    completed by you, is that right?
13 A  Correct.
14 Q  And what is it -- were parts of it filled in at
15    various times throughout the four days or so
16    that Mr. Wallace was here?
17 A  Correct.
18 Q  All right. So if we look at the first page
19    where we have the objective information about
20    his temperature, his pulse, his respiration and
21    his blood pressure. When would that have been
22    filled out?
23 A  It would be -- have been filled out 7/22/04.
24 Q  Okay.
25    MR. LESSMEIER: You're talking about the top

27 (Pages 102 to 105)

Page 106

1  half, Counsel?
2  Q  Yeah. And all of the dosages of medication and
3     vitamins that are indicated -- or, excuse me,
4     all of the dosages of medications and vitamins
5     that Mr. Wallace received while he was here,
6     would they all be recorded on these within the
7     file?
8  A  Yes. Yes.
9  Q  And did you ever have any specific discussion
10    with Dr. Meloche about these specific dosages,
11    time of dosages, manner of administration, etc.?
12    MR. LESSMEIER: Objection, form.
13 A  We didn't specify exactly what the dosages are,
14    no.
15 Q  Okay. And in terms of the amount of medication
16    and/or vitamins and the time and the manner in
17    which they were to be administered, were you
18    basically just following the information
19    contained in the second half of the first page
20    here in Exhibit 5?
21 A  Yes.
22 Q  Okay. And is it the case that some of these
23    medications were administered by you and others
24    were administered by corrections officers?
25 A  I stated in the medication sheet, which is the

Page 107

1  following page.
2  Q  Had you ever, prior to this time, followed this
3     specific protocol before with an inmate?
4  A  Yes.
5  Q  And were there any other negative outcomes or
6     did all of the inmates recover from their
7     condition?
8  A  No.
9  Q  There were no other negative outcomes?
10 A  You mean, like.....
11 Q  Is Mr. Wallace's situation the only time an
12    inmate has had an -- a negative outcome, meaning
13    a death or I supposed there could be some
14    negative outcome short of death, but I can't
15    think of one right now, as a result of alcohol
16    withdrawal? Have all the other inmates
17    recovered?
18 A  Yes.
19 Q  Okay. If Dr. Meloche had directed that Mr.
20    Wallace should be transported to the hospital,
21    is there any reason why you would not have done
22    that?
23    MR. LESSMEIER: Objection, form, foundation.
24 A  There's no reason why I shouldn't. I would
25    definitely follow through what he would ask me

Page 108

1     to do.
2  Q  Did you -- is there any reason that you can
3     think of why you did not contact Dr. Meloche on
4     7/23/04 with an update on Mr. Wallace's status?
5  A  I couldn't tell you.
6  Q  If Dr. Meloche had advised you to contact him
7     with an update on his status, would you have
8     done so?
9  A  Yes sir.
10 Q  And if Dr. Meloche had instructed or advised any
11    other course of treatment besides the initiation
12    of this DT protocol, would you have followed his
13    instructions?
14    MR. LESSMEIER: Objection, form, foundation.
15 A  Yes sir.
16 Q  Who did you consider to be the individual
17    primarily responsible for Mr. Wallace's medical
18    care after he was evaluated by you on 7/22/04
19    and after you contacted Dr. Meloche?
20    MR. LESSMEIER: Objection, form.
21 A  So you're asking who would I account to for
22    Wallace's health care?
23 Q  I'm asking you who you considered to be the
24    individual primarily responsible for directing
25    the manner and method in which he was going to

Page 109

1     be treated.
2     MR. LESSMEIER: Objection, form.
3  A  I would say the Department of Corrections.
4  Q  Any particular individual?
5  A  Just the Department of Corrections.
6  Q  After Mr. Wallace died, at any point, whether it
7     was a week later, a month later, even a year
8     later, have you ever had any conversation with
9     Dr. Meloche about Mr. Wallace or any issues
10    surrounding the medical issues or his death?
11 A  We may have had some casual conversations about
12    the incident itself, of the particulars of what
13    we talked about, I couldn't exaggerate [sic] on
14    what it was all about.
15    MR. LESSMEIER: Did you mean to say elaborate?
16 A  Well, I mean, you know, naturally we talk
17    about.....
18    MR. LESSMEIER: Sure.
19 A  .....you know, nobody feels good about an
20    incident like this. So there's some emotional
21    stuff, you know. So maybe just saying, you
22    know, it's okay.
23 Q  Do you -- you don't have any specific memories?
24    Did you ever hear Dr. Meloche say words to the
25    effect of that if Mr. Wallace had just quit

Page 114

1  page, which leaves you with seven tablets
2  accounted for that were returned.
3  Q  Okay. So when the tablet is administered,
4     there's somebody initial -- somebody's initial
5     next to the time of day that it's administered,
6     right?
7  A  Correct.
8  Q  Okay. So LM, that's you giving two tablets on
9     7/22, followed later that day by one tablet that
10    S gave, another tablet by S that S gave.
11 A  Yeah, S means self-medicating, meaning to say
12    that he was -- he took the pills without a nurse
13    there.
14 Q  Okay, so a correctional officer would have
15    brought that by on the med cart or whatever?
16 A  Assisted him, yes.
17 Q  And then you gave him two tablets on 7/23, and
18    then he self-medicated later that day?
19 A  Correct.
20 Q  I got you. Okay. Okay, if you could look at
21    exhibit number 9. These are some, what appear
22    to be log book entries, do you recognize these,
23    generally speaking?
24            (Exhibit 9 introduced)
25 A  Yes.

Page 115

1  Q  Are these log book entries?
2  A  Yes. And control.
3  Q  If you look at the page marked DOC 0069 at the
4     bottom right hand corner in tiny little, itty-
5     bitty numbers.....
6  A  Yes.
7  Q  About -- at 12:17, which is near the bottom of
8     the page?
9  A  Yes.
10 Q  7/22/04 it says Nurse Linda out, do you see
11    that?
12 A  Yes.
13 Q  Does that have -- reflected that you were going
14    out for the rest of the day or were you going
15    out to do.....
16 A  Sometimes.....
17 Q  .....an errand, or what?
18 A  I'm sorry. Sometimes we do errands. I couldn't
19    tell you why I was out. But usually what I do
20    is I call them when I leave the building and I
21    call them when I come back in the building.
22 Q  Who do you call?
23 A  The person that's writing all these things in
24    control.
25 Q  The person who's in the control room?

Page 116

1  A  Uh-huh. (Affirmative)
2  Q  So you would call them when you came back in, as
3     well?
4  A  Sometimes I do. I'd like to think that I do,
5     and sometimes I don't.
6  Q  Can you find the entry where it says that you've
7     come in?
8  A  No.
9  Q  Do you -- do you have -- do the corrections
10    officers here at the KCC have numbers that they
11    go by?
12 A  Yes they do.
13 Q  Okay. Do you have a number?
14 A  Yeah, 08.
15 Q  So as you sit here today, is there any reason
16    that can think of why you're shown as being
17    logged out at 12:17 on 7/22, but it doesn't show
18    you coming back in again for the rest of the
19    day?
20 A  I have no explanation for that.
21 Q  Are you supposed to log in and out every time
22    you leave the building or come back?
23 A  Yes.
24 Q  Other than the log book, are there any other
25    documents that you can think of that would

Page 117

1     reflect exactly when you were in the jail
2     between 7/20/04 and 7/24/04?
3  A  I couldn't tell you. No I don't -- I don't
4     know.
5  Q  You don't know.....
6  A  No, I don't know.
7  Q  Did you prepare an incident report?
8  A  No I didn't.
9  Q  How come?
10 A  I never was told that we're supposed to do that.
11 Q  Have you ever done incident reports regarding
12    other inmates?
13 A  I can't remember if I have or not.
14 Q  Other than the materials that we've looked at
15    here today, have ever prepared any other written
16    documents that have anything to do with Troy
17    Wallace?
18 A  No, just what is presented here.
19 Q  Do you recall having any contact with Troy
20    Wallace prior to 7/19/04?
21 A  No.
22 Q  Has there ever been another occasion to -- has
23    there ever been an occasion where an inmate has
24    been transported to the hospital for alcohol
25    withdrawal?

Linda Monticello

Page 134

1    provider of services to the inmates?
2  A  Yes.
3     MR. BUDGE: Can I interrupt for just one second,
4  I'm sorry. Do you intend for any part of this to be
5  a perpetuation deposition?
6     MR. LESSMEIER: I don't know that I'd have to
7  make that decision right now.
8     MR. BUDGE: Okay.
9     MR. LESSMEIER: It's possible that I could.....
10    MR. BUDGE: Yeah.
11    MR. LESSMEIER: But I don't think so. It would
12 be my intent to call her live.....
13    MR. BUDGE: Okay.
14    MR. LESSMEIER: .....if it goes to trial, but I
15 don't know yet.
16    MR. BUDGE: Okay. Then, I think I'll make it
17 more efficient and won't make evidentiary objections,
18 but if you think you might use it as a perpetuation
19 deposition, I would make evidentiary objections.
20    MR. LESSMEIER: Okay, All right. In other
21 words, objections other than form, foundation? I
22 don't think you need to make those objections anyway.
23    MR. BUDGE: Right. Unless we're -- you're
24 perpetuating this. Okay.
25    MR. LESSMEIER: I'll stipulate that you don't

Page 135

1  need to make evidentiary objections other than form
2  or foundation.
3     MR. BUDGE: Okay. All right.
4  Q  Was there ever a time that you thought that Dr.
5     Meloche should see someone here at the jail and
6     he didn't come out?
7  A  No.
8  Q  He was always willing to come out?
9  A  Yes.
10 Q  And was ever there a time when you thought that
11    somebody should be transported to the hospital,
12    to the ER, and he didn't do what he could to
13    make that happen?
14 A  No. He always -- I mean, if we needed to take
15    somebody to the hospital, there was no question.
16    That person was sent to the hospital.
17 Q  Now when -- if -- if either you or Dr. Meloche
18    felt that somebody needed to go to the hospital,
19    was that the end of it, or did you need to get
20    approval through the chain of command at the
21    Department of Corrections for someone to be
22    transported?
23 A  It needed approval, but usually they don't
24    question when you send somebody. It was never
25    denied if somebody was to be sent to the

Page 136

1     emergency room or the hospital.
2  Q  But you still had -- even if Dr. Meloche ordered
3     it.....
4  A  Yes.
5  Q  .....you still had to go to someone else and get
6     approval, and that would be the medical staff up
7     in Anchorage at the Department of Corrections?
8  A  Yes.
9  Q  And there also would be occasions when Dr.
10    Meloche would be not available, right?
11 A  Correct.
12 Q  Or either couldn't come out because he was
13    working at the ER, that sort of thing?
14 A  Correct.
15 Q  And when he was not available who would you
16    consult for medical care?
17 A  The on-call staff with the Department of
18    Corrections in Anchorage, if it's not a weekday,
19    otherwise just call Anchorage on a weekday and
20    get an approval.
21 Q  So somebody other than Dr. Meloche would always
22    be available at the Department of Corrections
23    for you to consult with, with respect to medical
24    issues if you needed a medical consultation?
25 A  Correct.

Page 137

1  Q  All right. You were asked a number of questions
2     by Mr. Budge about Exhibit 1.
3  A  Yes.
4  Q  And these are notations that were not made by
5     you, correct?
6  A  Correct.
7  Q  You were not present when these notations were
8     made, were you?
9  A  No.
10 Q  And you have no first-hand knowledge regarding
11    them, do you?
12 A  No.
13 Q  Do you even have a recollection if you've ever
14    seen these notations before he showed them to
15    you?
16 A  No. This isn't part of my medical file.
17 Q  Mr. Budge asked you some questions about Exhibit
18    2.
19 A  Yes.
20 Q  He did not ask you any questions about page two
21    or page three of Exhibit 2. And I just wanted
22    to -- I guess he did ask you about that
23    withdrawal history. But I wanted to ask you
24    about page three. And you would have made these
25    notes on July 21 of 2004?

35 (Pages 134 to 137)

Page 138

1  A   Correct.
2  Q   Was there -- did you have any difficulty
3      communicating with Mr. Wallace on that day?
4  A   No.
5  Q   He could understand what you were saying?
6  A   Yes.
7  Q   And you could understand what he was saying?
8  A   Yes.
9  Q   He was oriented as to time and place?
10 A   Yes. And I did check on the cognitive oriented
11     times 3.
12 Q   Okay. And at that point, you would have gone
13     through all of the criteria set forth on page
14     three, for example, you would have checked his
15     appearance, his attitude, his motor behavior,
16     his speech, his mood, his effect, his cognitive
17     functioning, his thought process, his thought
18     content, and whether he was having any
19     hallucinations, correct?
20 A   Correct.
21 Q   And all of those were normal, is that correct?
22 A   That's correct.
23 Q   And you thought he was stable?
24 A   Yes.
25 Q   And after you did the screening that is depicted

Page 139

1      in Exhibit 2, particularly on page three, did
2      you see any need to call Dr. Meloche?
3  A   No.
4  Q   Did he have, other than the monitor for
5      withdrawal note that you made, did he have any
6      medical issues that you were aware of?
7  A   No he didn't.
8  Q   One of the things that Mr. Budge asked you about
9      is, if we look at Exhibit 3, he asked you about
10     -- these are the notes that you would have made,
11     correct?
12 A   Correct.
13 Q   The progress notes? About the sweating, hand
14     tremors, things of that nature, and asking you
15     if those were symptoms or signs of DT. He asked
16     you a whole series of questions about that?
17 A   Yes.
18 Q   Are those also symptoms or signs of someone who
19     is just going through alcohol withdrawal?
20 A   Yes. And I just want to really put emphasis on
21     when I say DT, I'm referring to alcohol
22     withdrawal.
23 Q   All right. So it was not your impression that
24     he was actually in a state of DT at this time?
25 A   That's correct.

Page 140

1  Q   This is as of 7/22/04?
2  A   That's correct.
3  Q   All right. And you chart here, your telephone
4      call with Dr. Meloche?
5  A   Yes sir.
6  Q   And do you today have an independent
7      recollection of any part of that telephone call?
8  A   You know, I really cannot recall exactly what
9      transpired in that conversation.
10 Q   Uh-huh (Affirmative).
11 A   But, you know, I wrote to initiate DT protocol
12     and.....
13 Q   Uh-huh (Affirmative).
14 A   .....and I guess that's what was said.
15 Q   But if we -- if we separate out -- if we take
16     away your progress notes.....
17 A   Uh-huh (Affirmative).
18 Q   .....could you here today, are you able to
19     recall any part of the call independently?
20 A   I'm sorry, I can't.
21 Q   Okay. That's fine. And you have documented
22     that -- a telephonic order to initiate the
23     protocol, correct?
24 A   Yes sir.
25 Q   And you did that to the best of your ability?

Page 141

1  A   I did that.
2  Q   And if we look at your entry of 7/23/04 you
3      would have seen -- well, if we back up, you
4      would have called the evening of 7/22/04 to see
5      if he got his medication?
6  A   Correct.
7  Q   And would you have expected the correctional
8      officers to tell you if there was anything
9      unusual going on with him?
10 A   The -- yes.
11 Q   He was in a monitored cell, correct?
12 A   All those cells are all monitored cells.
13 Q   And that means that he is under constant
14     visualization? In other words, someone can
15     observe his activities at any point in time?
16 A   Yes, through a camera monitor in control.
17 Q   And it's someone's job to do that?
18 A   Yes.
19 Q   If he were at the hospital, would he be under
20     that kind of -- of observation?
21 A   I haven't worked in the hospital for years, but
22     I don't know if they have a camera in each of
23     those rooms.
24 Q   So he was in a monitored cell, correct?
25 A   A camera cell.

36 (Pages 138 to 141)

Linda Monticello

Page 142

```
 1  Q   A camera cell. If they had -- if the
 2      correctional officers on the evening of 7/22/04
 3      had reported any unusual behavior on his part,
 4      would you have noted that in your progress notes
 5      just as a matter of process the next morning?
 6  A   Most likely so.
 7  Q   And did you note any such report?
 8  A   No. You know, just hallucinations.
 9  Q   Uh-huh (Affirmative). So the next morning you
10      saw him at -- did you see him first thing in the
11      morning, basically, when you came in?
12  A   Yes. Because he was being transferred to
13      another room so he could eat breakfast.
14  Q   And you did an examination of him at what,
15      according to your chart, is approximately 0930
16      hours?
17  A   That's what I have written here.
18  Q   All right. And you noted that he was
19      diaphoretic, so he had some sweating, correct?
20  A   Correct.
21  Q   Is that typical of individuals going through
22      withdrawals in your experience?
23  A   With my experience, they all go through the
24      sweaty, yes.
25  Q   He continued to hallucinate, you noted that.
```

Page 143

```
 1  A   Yes.
 2  Q   And you indicate that he continued to be
 3      cooperative.
 4  A   Yes.
 5  Q   And was he able to interact with you?
 6  A   Yes, he -- I mean, I recall giving him a glass
 7      of water and he took the glass of water and --
 8      without any problems. He was very cooperative
 9      with me.
10  Q   Was he oriented as to time and place?
11  A   He knew he was in jail. Some conversations that
12      we had, I can't recall exactly.
13  Q   If he had not been oriented to time and place,
14      would you have noted that as a matter of your
15      standard record keeping practice?
16  A   Yes -- yes.
17  Q   And at that point in time, was he eating and
18      drinking?
19  A   Oh, yes. That was -- that's one of the things
20      that I always put a lot of emphasis in is
21      hydrating them and making sure they eat because
22      sometimes they're not able to eat then which
23      creates more problems.
24  Q   If -- if we look at his vital signs, his blood
25      pressure was 115 over 86, as you recorded.
```

Page 144

```
 1  A   Yes.
 2  Q   And this is at 9:30 on July 23rd, '04?
 3  A   Yes.
 4  Q   And was that normal in your opinion?
 5  A   Yes.
 6  Q   And his pulse was 80 and regular?
 7  A   Yes.
 8  Q   And was that normal in your opinion?
 9  A   Yes.
10  Q   His respiration was 20 and easy, again, was that
11      normal in your opinion?
12  A   Yes.
13  Q   And then you indicated that -- and noted here
14      that he -- you have some -- he talked about just
15      getting a job.
16  A   Yes.
17  Q   What was -- from your perspective as a
18      registered nurse who has worked with people who
19      have gone through withdrawal before, what was
20      your impression of how he was responding to
21      protocol at that point in time?
22  A   I based it on the vital signs, the blood
23      pressure, the pulse and the respiration, which
24      is remarkable compared to what I had taken from
25      the day before. So in my nursing judgment, I
```

Page 145

```
 1      thought he was getting better.
 2  Q   Uh-huh (Affirmative). Did you see a need at
 3      that point to consult with Dr. Meloche or any
 4      other medical specialist regarding Mr. Wallace?
 5  A   No, because my basis for not calling Dr. Meloche
 6      was the vital signs.
 7  Q   And you thought he was improving?
 8  A   Yes.
 9  Q   It indicates in your progress notes that you
10      checked on him at 1410 hours?
11  A   Yes.
12  Q   And did you see any change that you were able to
13      observe in his condition at that point in time,
14      based on what you had seen before?
15  A   No, he continued to hallucinate and that
16      was.....
17  Q   Uh-huh (Affirmative). If you had had any
18      concerns or a suspicion of a concern that maybe
19      he wasn't responding to the protocol or maybe he
20      was going downhill or there was any question in
21      your mind, what would you have done?
22  A   I would call Dr. Meloche.
23  Q   I think you testified that you called the jail
24      that night?
25  A   Yes.
```

Linda Monticello

Page 146

1  Q  And that would have been a Friday night?
2  A  Yes.
3  Q  At about 9:00 to 9:30?
4  A  About that time.
5  Q  All right. And at that point in time, was
6     anything said about any kind of unusual behavior
7     on his part at all?
8  A  I -- I don't recall. And, you know, my purpose
9     of that, basically, was to be sure that he got
10    his meds and then told them make sure, you know,
11    make sure he's drinking, how's he doing.....
12 Q  Uh-huh (Affirmative).
13 A  .....and what they told me, you know, I can't
14    remember exactly what it was, but it wasn't
15    something alarming for me to make a decision to
16    come in or to call Dr. Meloche.
17 Q  All right. If they had reported something to
18    you that caused you any concern at all, what
19    would you have done?
20 A  I would come in and evaluate.
21 Q  And if they had reported anything to you that
22    was unusual, would you have noted it in your
23    progress notes some time the next morning, given
24    what transpired within a few hours?
25 A  What I would most likely do is I would put an

Page 147

1     entry, evaluate for officer's concern, da, da,
2     da, da, da, da.
3  Q  That's all the questions I have, thank you very
4     much.
5  A  Okay. Thank you.
6           LINDA MONTECILLO
7  testified as follows on:
8           REDIRECT EXAMINATION
9  BY MR. BUDGE:
10 Q  A few follow up questions.
11 A  Okay.
12 Q  If you look at exhibit number two please. On
13    the second page there's a -- under number nine
14    there, there's an entry for is the remand
15    intoxicated or withdrawing from alcohol or other
16    substances.
17 A  Uh-huh (Affirmative).
18 Q  And then there's a box, you're supposed to check
19    yes or no. Why is it blank?
20 A  You know, I wish I could tell you. I didn't
21    check it. Why I didn't check it, I don't know
22    why.
23 Q  Think of any potential explanation? Potential
24    explanation, maybe you.....
25 A  I forgot.

Page 148

1  Q  ....forgot that -- what?
2  A  Maybe I just forgot, you know.
3  Q  Could you look at exhibit number three please?
4     The third line down under your entry for 7/21/04
5     at 1350 hours, you indicate that you noticed
6     fine hand tremor.
7  A  Uh-huh (Affirmative).
8  Q  Do you see that?
9  A  Yes.
10 Q  Now go to exhibit number two, on the second
11    page, under motor behavior.
12 A  Uh-huh (Affirmative).
13 Q  There's a box you can check if the tremulous,
14    but you didn't check the tremulous box, you
15    checked the normal box. Why is that?
16 A  I don't know.
17 Q  Looking back on it now, do you think that the --
18    in light of your notes in exhibit number three,
19    that the tremulous box.....
20 A  Uh-huh (Affirmative).
21 Q  .....should have been checked?
22    MR. LESSMEIER: Objection, form, foundation.
23 A  You know, when I see tremors, I'm thinking,
24    basically, really, really shaky. I mean,
25    obviously I also checked that he was able to --

Page 149

1     let me see here. That he walked on his own. I
2     mean I don't see anything in here.....
3  Q  No.
4  A  .....that tells me that he, you know -- I mean,
5     tremulous is something that is obvious for me,
6     you know? When I say fine hand tremors and part
7     of my routine assessment for people that are
8     going through alcohol withdrawal is I make their
9     hands go this way, and if they're doing this, so
10    I say that their hand tremors. This -- you
11    know, that part I have never really checked, to
12    my knowledge. I don't think I -- I do that --
13    pay too much attention to that box.
14 Q  How do you know that Mr. Wallace was eating?
15 A  I beg your pardon?
16 Q  How do you know that Mr. Wallace was eating?
17 A  Mr. Meloche?
18 Q  Mr. Wallace.
19 A  Oh, Mr. Wallace, trays are being served,
20    officers are there, he gets a tray all the time.
21    I just assumed that he's eating, otherwise
22    officers would tell me, hey, you know, this
23    person isn't eating or drinking and there was --
24    I don't recall any conversation of that.
25 Q  Did you look at the -- at the log entries that

38 (Pages 146 to 149)