Michael L. Lessmeier, AK Bar #7910082
LESSMEIER & WINTERS LLC
3000 Vintage Blvd., Suite 100
Juneau, Alaska  99801
Phone (907) 796-4999
Fax     (907) 796-4998
Attorneys for Defendant Ernest Meloche, MD

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JULIA WALKER, individually and as Personal Representative of the ESTATE OF TROY WALLACE,<br><br>              Plaintiffs,<br><br>     vs.<br><br>DAVID D. HENDERSON, LAURI A. MURRAY, WALTER T. RUD, SHERRI L. DAVIS, EDWIN D. IRIZARRY, LINDA MONTECILLO, and ERNEST MELOCHE, M.D.,<br><br>              Defendants. | Case No. A05-176 CV  (RRB)<br><br><br>**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY ON 42 U.S.C. SEC. 1983 CLAIMS** |

## INTRODUCTION

In her Amended Complaint the Plaintiff added Dr. Meloche as a defendant and alleged his single contact relating to Mr. Wallace subjects him to liability under 42 U.S.C. Sec. 1983.  The focus of a 42 U.S.C. Sec. 1983 claim is on those  who inflict punishment and thus the Supreme Court has long required a plaintiff in a case such as this to show a defendant actually knew of a substantial risk of serious harm to an inmate and then deliberately disregarded that risk by failing to take reasonable measures to abate it.  As the following will show in more detail, Dr. Meloche was contacted regarding Mr. Wallace on a single occasion and gave an order to place Mr.

*Memorandum in Support of Motion for Partial Summary Judgment*
*Walker, Estate of Wallace v. Henderson et al.;*
*Case No. A05-176 CV  (RRB)*                                        Page 1 of  23

Wallace on the State of Alaska Department of Corrections Alcohol Withdrawal Protocol. He expected Mr. Wallace to do well on the protocol and gave instructions to the nurse to contact him if Mr. Wallace did not respond to the protocol or if his condition deteriorated. Mr. Wallace in fact did respond positively to the protocol and his condition then deteriorated. It is undisputed that Dr. Meloche believed Mr. Wallace would do well on the protocol, was not advised of his deterioration, did not know of it and did not have the opportunity to respond to it. Since such knowledge is required for a Sec. 1983 claim and is lacking here, Dr. Meloche respectfully requests the Court enter summary judgment on the Plaintiff's 42 U.S.C. Sec. 1983 claims.

Dr. Meloche also moves for summary judgment on the Estate's damage claims other than those allowed by the Alaska wrongful death and survival statutes. Since Alaska law is not inconsistent with the federal Civil Rights Act, it supplies the appropriate measure of damages here. The Estate's claims for hedonic and other damages not allowed by state law should be dismissed.

## FACTUAL STATEMENT

This case arises from the death of Troy Wallace, who died early on the morning of 24 July 2004, while incarcerated at the State of Alaska Department of Corrections facility in Ketchikan known as the Ketchikan Correctional Center. It is not believed there is any dispute as to the following facts:

1.    On 20 July 2004, Mr. Wallace committed himself to the Ketchikan Correctional Center to serve a 10-day jail sentence.[1]

2.    On 21 July 2004, Mr. Wallace was given a Pre-Remand Screening and a Post-Remand Screening by Linda Montecillo, a registered nurse employed by the

---

[1] Plaintiff's Amended Complaint, paragraph 16.

*Memorandum in Support of Motion for Partial Summary Judgment*
*Walker, Estate of Wallace v. Henderson et al.;*
*Case No. A05-176 CV  (RRB)*                              Page 2 of  23

Ketchikan Correctional Center.[2]

3.     Mrs. Montecillo has been employed by the State of Alaska Department of Corrections at the Ketchikan Correctional Center as a registered nurse since December of 1991.[3]  She received a bachelor's degree in nursing in 1982 and then worked at the Ketchikan General Hospital until she went to work for the Ketchikan Correctional Center.[4]

4.     As a result of the medical screening Mrs. Montecillo did on Wednesday, 21 July 2004, she concluded that Mr. Wallace had no medical issues that warranted calling Dr. Meloche.[5]  His vital signs were normal, and his appearance, speech, thought process, mood, attitude and motor behavior were also all normal.[6]  Mrs. Montecillo noted he had a history of alcohol withdrawal.[7]  She indicated he did not "have any obvious medical or mental problems that require medical attention."[8]  She described his condition as "stable."[9]  She wrote that he should be observed for "DT," which she said is her reference to alcohol withdrawal.[10]

5.     On Thursday, 22 July 2004,  at 1400 hours Mrs. Montecillo evaluated Mr. Wallace for alcohol withdrawal.[11]  Mrs. Montecillo made progress notes of her

---

[2]  A true and accurate copy of the Criminal Remand Screening is attached as Exhibit A.

[3]  Exhibit G - Montecillo Deposition at page 9.

[4]  *Id.* at page 8.

[5]  *Id.* at pages 138-9.

[6]  Exhibit A, page 3.

[7]  *Id.* at page 2.

[8]  *Id.* at page 1.

[9]  *Id.* at page 2.

[10]  Exhibit G - Montecillo Deposition at page 139.

[11]  *Id.*

*Memorandum in Support of Motion for Partial Summary Judgment*
*Walker, Estate of Wallace v. Henderson et al.;*
*Case No. A05-176 CV  (RRB)*                                    Page 3 of  23

contacts with Mr. Wallace.[12]  She wrote that he was very sweaty, had hand tremors, was voicing that things were moving on top of the counter and that he was talking without sense.[13]  She indicated his blood pressure was 160/104, that he had a pulse of 137 and a respiration rate of 20/easy, which she described as normal.[14]  She offered water to him, which he drank.[15]  She indicated  he was not mentally confused and was able to answer her questions in a rational way.[16]  She did not think he was in delirium tremens.[17]

6.      According to her progress note, Mrs. Montecillo called Dr. Meloche at 1430 hours on Thursday, 22 July  2004.[18]  She does not recall the substance of her telephone call with Dr. Meloche.[19]  Her practice was to read her progress note to Dr. Meloche, which is what she believes she did here.[20]  This was Mrs. Montecillo's first communication with Dr. Meloche regarding Mr. Wallace.[21]  This was her only communication with Dr. Meloche regarding Mr. Wallace before he died.[22]

7.      Dr. Meloche is an experienced emergency room physician who has been

---

[12]   *Id.* at pages 63-4.  A true and accurate copy of Mrs. Montecillo's progress notes is attached as Exhibit B.

[13]   Exhibit B, page 1.

[14]   *Id.*  Exhibit G - Montecillo deposition at page 74.

[15]   Exhibit B page 1.

[16]   Exhibit G - Montecillo deposition at page 74-5.

[17]   *Id.* at page 139.

[18]   Exhibit B page 1.

[19]   Exhibit G - Montecillo deposition at page 140.

[20]   *Id.* at page 76, 104-5.

[21]   *Id.*

[22]   *Id.* at page 103-4.

*Memorandum in Support of Motion for Partial Summary Judgment*
*Walker, Estate of Wallace v. Henderson et al.;*
*Case No. A05-176 CV  (RRB)*                                    Page 4 of  23

board certified in emergency medicine since 1984.[23]  He has worked full time as an emergency room physician at the Ketchikan General Hospital since 1989.[24]  He began working as a part-time contract physician for the State of Alaska Department of Corrections at the Ketchikan Correctional Center in 1994.[25]  Dr. Meloche has confirmed it was Mrs. Montecillo's practice to read her progress note to him and that is what he believes occurred here.[26]  Dr. Meloche reviewed and initialed Mrs. Montecillo's progress notes on the morning of Saturday, 24 July 2004.[27] If the chart note did not accurately reflect what he was told by Mrs. Montecillo, he would have so indicated.[28]

       8.    Dr. Meloche has extensive experience in treating patients in alcohol withdrawal.  He estimates he has provided treatment to well over 1000 patients in alcohol withdrawal over the 30 years he has been practicing medicine.[29]  During the ten-year period prior to July of 2004, Dr. Meloche estimates he and the Correctional Center nurses managed without complications well over 100 inmates in alcohol withdrawal.[30]  Mrs. Montecillo was involved in the management of many of these inmates.[31]  She is someone Dr. Meloche found to be highly competent and

---

[23] Exhibit C - Affidavit of Dr. Meloche, Par. 2, 3.

[24] *Id.*

[25] *Id.* at Par. 4.

[26] *Id.* at Par. 8.

[27] Exhibit G - Montecillo Deposition at pages 96-7.

[28] Exhibit C at Par. 8.

[29] *Id.* at Par. 5.

[30] *Id.* at Par. 7.

[31] *Id.*

*Memorandum in Support of Motion for Partial Summary Judgment*
*Walker, Estate of Wallace v. Henderson et al.;*
*Case No. A05-176 CV  (RRB)*                  **Page 5 of  23**

responsible.[32]

9.     The Ketchikan Correctional Center used the State of Alaska Department of Corrections Alcohol Withdrawal protocol, a protocol the State of Alaska used for the entire Department of Corrections.[33]  This same protocol was in effect during the entire time of Dr. Meloche's employment there and had been utilized by Dr. Meloche on many occasions.  His practice when using this protocol was to implement the medication schedule called for in the protocol and to then adjust the dosage of medication based on how the inmate responded.  He had found this protocol to be an extremely effective method of treating alcohol withdrawal.[34]  Mrs. Montecillo had also found the protocol to be effective.[35]

10.     When Dr. Meloche was called by Mrs. Montecillo on the afternoon of Thursday, 22 July 2004, he was working a 24-hour shift at the Ketchikan General Hospital.  This shift began at 8:00 a.m. on Thursday, 22 July 2004, and ended at 8:00 a.m. on Friday, 23 July 2004.  Dr. Meloche would typically spend two to four hours after his shift ended completing his charts.[36]

11.     When Dr. Meloche was called by Mrs. Montecillo on the afternoon of Thursday, 22 July 2004, he gave Mrs. Montecillo a verbal order to initiate the State of Alaska Department of Corrections Alcohol Withdrawal Protocol.  Dr. Meloche made this decision based on his judgment that Mr. Wallace  would do well on the protocol because he was young, had no other known adverse health conditions, had

---

[32]  *Id.*

[33]   Exhibit G - Montecillo Deposition at pages 82-3.  A true and accurate copy of this protocol as utilized for Mr. Wallace is at Exhibit D.

[34]  Ex. C, Par. 10, 11.

[35]  Exhibit G - Montecillo Deposition at page 107.

[36]  Ex. C, Par. 6.

*Memorandum in Support of Motion for Partial Summary Judgment*
*Walker, Estate of Wallace v. Henderson et al.;*
*Case No. A05-176 CV  (RRB)*                                    Page 6 of  23

no fever, was not vomiting, was oriented to time and place and was able to take food, fluids and medication.  Dr. Meloche did not believe Mr. Wallace was in delirium tremens. He knew Mr. Wallace would be in a cell that was continuously monitored via a video monitor by correctional officers who had experience in monitoring individuals going through alcohol withdrawal and that Mrs. Montecillo would be at the Correctional Center for significant parts of each day to assess his condition. For those times when Mrs. Montecillo was not at the Correctional Center, Dr. Meloche knew she was on call.[37]  For all of these reasons, Dr. Meloche believed the risk of serious harm to Mr. Wallace under this treatment plan to be minimal.[38]

12.    During the Thursday, 22 July 2004, conversation, Dr. Meloche told Mrs. Montecillo to call him if Mr. Wallace did not respond to the protocol or if his condition deteriorated.[39] Mrs. Montecillo said she would do so.[40] If Mrs. Montecillo had any concerns about whether he was responding to the protocol or that he might be going downhill, she would have called Dr. Meloche.[41]  This is the only contact Mrs. Montecillo had with Dr. Meloche on Thursday, 22 July 2004.[42]

13.    During this conversation Dr. Meloche also told Mrs. Montecillo he would hold his weekly clinic at the Correctional Center on Saturday, July 24, 2004, and would see Mr. Wallace then, unless she called him earlier.[43]

14.    In her Thursday, 22 July 2004 note, Mrs. Montecillo wrote "monitor"

---

[37]  *Id.* at Par. 12.

[38]  *Id.* at Par. 16.

[39]  *Id.* at Par. 13.

[40]  *Id.*

[41]  Exhibit G - Montecillo deposition at page 145.

[42]  *Id.* at page 86.

[43]  Exhibit C, Par. 13.

*Memorandum in Support of Motion for Partial Summary Judgment*
*Walker, Estate of Wallace v. Henderson et al.;*
*Case No. A05-176 CV  (RRB)*                    Page 7 of  23

which meant the correctional officers needed to watch Mr. Wallace.[44]  Mr. Wallace was in a monitored cell under continuous observation by a correctional officer.[45]

15.   On the evening of Thursday, 22 July 2004, Mrs. Montecillo called the Ketchikan Correctional Center to be sure Mr. Wallace had been given his medication.[46] She would have expected the correctional officers to tell her if anything unusual was going on with Mr. Wallace and would have most likely noted any such report.[47]  Her progress notes contain no indication of any such report.[48]

16.   At 0610 hours on Friday, 23 July 2004, Mrs. Montecillo noted she had observed Mr. Wallace.  She wrote that she had been informed by a correctional officer that Mr. Wallace refused to give a breakfast tray to his cell mate and was thus placed in a different cell.[49]  She gave Mr. Wallace his medication at 0700, noting that he had hand tremors and was cooperative.[50]  She watched as he was escorted to the shower.[51]

17.   At 0930 hours on Friday, 23 July 2004, Mrs. Montecillo examined Mr. Wallace.   She wrote: "I/M to exam room-diaphoretic-continues to hallucinate, continues to be cooperative - VS - BP 115/84 mmHg; P - 80/regular, R - 20/easy; talks about just got a job.  Offered water to inmate, drank fluids without hesitation.

---

[44]  Exhibit G - Montecillo deposition at page 86.

[45]  *Id.* at 141.

[46]  *Id.*

[47]  *Id.* at 141-2.

[48]  Exhibit B, page 1.

[49]  *Id.*

[50]  *Id.*

[51]  *Id.*

*Memorandum in Support of Motion for Partial Summary Judgment*
*Walker, Estate of Wallace v. Henderson et al.;*
*Case No. A05-176 CV  (RRB)*                                    Page 8 of  23

Officer Morley present."[52]

Mr. Wallace was oriented to time and place, was able to interact with Mrs. Montecillo and was drinking fluids and eating.[53] His vital signs were normal.[54] Mrs. Montecillo thought the improvement in his vital signs was "remarkable" when compared to the day before, and testified that "in my nursing judgment, I thought he was getting better."[55] She saw no need at that point to consult with Dr. Meloche or any other medical specialist regarding Mr. Wallace.[56]

18.   Mrs. Montecillo gave Mr. Wallace his medication at 1200 hours on Friday, 23 July 2004.[57] She noted no change in his condition or behavior at that time.[58] At 1410 hours on Friday, 23 July 2004, Mrs. Montecillo checked on Mr. Wallace and again noted no change in his condition or behavior.[59] Mrs. Montecillo documented that she consulted with Sgt. Ellis " to make certain inmate eats dinner."[60]

19.   Mrs. Montecillo called the Correctional Center at 9 to 9:30 p.m. on Friday, 23 July 2004, to be sure Mr. Wallace had been given his medication, to make sure he was drinking and to see how he was doing.[61] While she did not remember exactly what she was told, if she had been told of anything that concerned her, she

---

[52] *Id.*

[53] Exhibit G - Montecillo Deposition at page 142-3.

[54] *Id* at 143-4.

[55] *Id.*

[56] *Id.* at 145.  Mrs. Wallace had the ability to contact not only Dr. Meloche, but the State of Alaska Department of Corrections medical staff on call.  *Id.* at 102.

[57] Exhibit D, page 2.

[58] Exhibit B, page 1.

[59] *Id*.

[60] *Id.*

[61] Exhibit G - Montecillo Deposition at pages 145-7.

*Memorandum in Support of Motion for Partial Summary Judgment*
*Walker, Estate of Wallace v. Henderson et al.;*
*Case No. A05-176 CV  (RRB)*                    **Page 9 of  23**

would have gone in and evaluated Mr. Wallace.[62]

20.   Mrs. Montecillo made no attempt to contact Dr. Meloche on Friday, 23 July 2004.[63]  The only contact she or anyone else had with Dr. Meloche before Mr. Wallace died is the telephone call of Thursday, 22 July 2004.[64]

21.   Mr. Wallace died shortly after 1:00 a.m. on Saturday, 24 July 2004.[65]

22.   Mr. Wallace was given all medication called for by the withdrawal protocol.[66]

23.   Dr. Meloche learned of Mr. Wallace's death early on Saturday morning, 24 July 2004.  He did not learn until after the initiation of this litigation that according to incident reports prepared subsequently by the correctional officers, Mr. Wallace apparently began exhibiting bizarre behavior sometime on Friday evening, 23 July 2004.[67]  He  had not been informed of and did not know of this change in behavior.[68]

## LEGAL ARGUMENT

**I.    42 U.S.C. SEC. 1983 CLAIMS**

The Plaintiff has alleged in a conclusory fashion that the defendants, including Dr. Meloche, acted with "deliberate indifference to Mr. Wallace's serious medical needs" and further that the defendants, including Dr. Meloche, "acted intentionally, knowingly, maliciously, and/or recklessly in violation of Mr. Wallace's well-

---

[62]  *Id.*

[63]  Exhibit G - Montecillo Deposition at page 90-1.

[64]  *Id.* at 103-4.  Exhibit C, Par. 15.

[65]  Amended Complaint, Par. 18.

[66]  Exhibit D.  *See* Exhibit G - Montecillo Deposition at pages 114-5.

[67]  Exhibit C, Par. 18.

[68]  *Id.*

*Memorandum in Support of Motion for Partial Summary Judgment*
*Walker, Estate of Wallace v. Henderson et al.;*
*Case No. A05-176 CV  (RRB)*                                    Page 10 of  23

established constitutional rights under the Eighth Amendment."[69]  The Plaintiff has alleged that all defendants, including Dr. Meloche are liable under 42 U.S.C. Sec. 1983 for these claimed violations.[70]  As the court already knows from other briefing, the Plaintiff has settled all of her claims against the State of Alaska and its employees, leaving Dr. Meloche as the sole remaining defendant.[71]

In *Estelle v. Gamble* the Supreme Court ruled that a prisoner claim of inadequate medical care must allege deliberate indifference to a serious medical need in order to state an Eighth Amendment claim:

> [I]n the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.' Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.  In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.  It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment.[72]

The *Estelle* Court was faced with the question of whether a complaint that alleged a failure to diagnose because of inadequate testing was sufficient to withstand a motion to dismiss.  The Supreme Court ruled that such a complaint was not.[73]

---

[69] Amended Complaint Par. 24.

[70] Amended Complaint Par. 27.

[71] Exhibit D to Memorandum in Support of Motion to Transfer.

[72] 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed. 2d 251 (1976) (citations omitted).

[73] *Id.* 429 U.S. at 107 ("But the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment.  A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.  At most it is medical malpractice, and as such the proper

*Memorandum in Support of Motion for Partial Summary Judgment*
*Walker, Estate of Wallace v. Henderson et al.;*
*Case No. A05-176 CV  (RRB)*                                    Page 11 of 23

Eighteen years later, the case of *Farmer v. Brennan* required the Supreme Court to define the term "deliberate indifference," a term the Court said it had not previously explained.[74]  Farmer argued the Supreme Court should adopt a standard akin to civil-law recklessness, which would find "deliberate indifference" if a prison official knew of  facts which rendered an unreasonable risk obvious.[75]  Brennan argued the Supreme Court should adopt an approach consistent with the criminal law of recklessness, which would find "deliberate indifference" only if a prison official knew of the risk of harm to which the inmate was exposed.[76]  The Supreme Court rejected Farmer's argument for an objective standard, reasoning:

> We reject petitioner's invitation to adopt an objective test for deliberate indifference.  We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; *the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.*  This approach comports best with the text of the Amendment as our cases have interpreted it.  The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'  An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation.  The common law reflects such concerns when it imposes tort liability on a purely objective basis.  But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.[77]

---

forum is the state court. . . ."

[74] *Farmer v. Brennan*, 511 U.S. 825 at 828, 835, 114 S. Ct. 1970, 128 L. Ed.2d 811 (1994).

[75] *Id.,* 511 U.S. at 837, Note 5.

[76] *Id.,* 511 U.S. at 837, Note 6.

[77] *Id.,* 511 U.S. at 837-8. (Citations omitted) (emphasis added).

*Memorandum in Support of Motion for Partial Summary Judgment*
*Walker, Estate of Wallace v. Henderson et al.;*
*Case No. A05-176 CV  (RRB)*                    Page 12 of  23

The Supreme Court went on to explain that such a subjective approach in the Eighth Amendment context "isolates those who inflict punishment."[78]  The Supreme Court then squarely rejected Farmer's argument that a prison official "who was unaware of a substantial risk of harm to an inmate may nevertheless be held liable under the Eighth Amendment if the risk was obvious and a reasonable prison official would have noticed it."[79]

The Ninth Circuit recently applied *Farmer* to a 42 USC Sec. 1983 claim brought by the estate of an inmate against a physician employed by a correctional center.  The Court of Appeals summarized the law on this issue as follows:

> A prison official acts with 'deliberate indifference. . .only if the [prison official] knows of and disregards an excessive risk to inmate health and safety.'  Under this standard, the prison official must not only 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.' 'If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk.'  This 'subjective approach' focuses only 'on what a defendant's mental attitude actually was.'  'Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights.'[80]

The allegations made against Dr. Chung in *Toguchi* are quite similar to those made against Dr. Meloche here.  One of the allegations in *Toguchi* was that Dr. Chung administered medications without assessing Keane's actual medical condition

---

[78] *Id.,* 511 U.S. at 839.

[79] *Id.*, 511 U.S. at 841-2. The Court emphasized the subjective nature of this standard when it said: "When instructing juries in deliberate indifference cases with such issues of proof, courts should be careful to ensure that the requirement of subjective culpability is not lost. It is not enough merely to find that a reasonable person would have known, or that defendant should have known, and juries should be instructed accordingly." *Id.* at 843, Note 8.

[80] *Toguchi v. Soon Hwang Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (citations omitted).

*Memorandum in Support of Motion for Partial Summary Judgment*
*Walker, Estate of Wallace v. Henderson et al.;*
*Case No. A05-176 CV (RRB)*                    Page 13 of 23

and without regard to possible withdrawal symptoms.[81]   The Court of Appeals affirmed  the dismissal of this allegation by the lower court on  summary judgment finding this "accusation to be one of negligence as opposed to deliberate indifference."[82]   The Court said there must instead be a "*conscious* disregard of serious risk of harm for deliberate indifference to exist."[83]   The Court of Appeals concluded by stating that "[d]eliberate indifference is a high legal standard" and it affirmed the grant of summary judgment in favor of Dr. Chung, because "no genuine issue of fact was raised regarding Dr. Chung's subjective knowledge and conscious disregard of a substantial risk of serious injury to Keane."[84]

The Plaintiff's claims here are no different than those found to be insufficient as a matter of law in *Toguchi*.  The essence of the Plaintiff's claim is that Dr. Meloche ordered the withdrawal protocol without assessing Mr. Wallace's actual medical condition and without regard to his symptoms.  As in *Toguchi*, these claims are claims of negligence, not of deliberate indifference.  If anything, the factual foundation for the Plaintiff's claims is weaker than the facts alleged in *Toguchi*, for here, there is no genuine dispute to the following facts:

1)   Dr. Meloche was contacted on a single occasion regarding Mr. Wallace by Mrs Montecillo, an experienced registered nurse Dr. Meloche had worked extensively with and has great respect for.[85]

2)   Based on what he learned from Mrs. Montecillo, Dr. Meloche gave a verbal order for the State of Alaska Department of Corrections Alcohol Withdrawal

---

[81] *Id.* 391 F.3d at 1059.

[82] *Id.*

[83] *Id.*

[84] *Id.* 391 F.3d at 1061.

[85] Exhibit G - Montecillo Deposition at pages 103-4.  Exhibit C, Par. 7, 8, 15.

*Memorandum in Support of Motion for Partial Summary Judgment*
*Walker, Estate of Wallace v. Henderson et al.;*
*Case No. A05-176 CV  (RRB)*                        Page 14 of  23

Protocol, a protocol he had successfully used for many years and which he believed would be effective for Mr. Wallace.[86]  The same or similar treatment plans have been utilized successfully for many years in similar correctional center settings both in and out of Alaska by experienced emergency physicians.[87]

3)    Dr. Meloche knew Mr. Wallace would be in video cell, monitored constantly by corrections officers experienced in working with inmates going through alcohol withdrawal.[88]

4)    Dr. Meloche knew Mrs. Montecillo would be at the Correctional Center for significant periods of each day to assess Mr. Wallace's condition and that she would be on call when she was not.[89]

5)    Dr. Meloche asked Mrs. Montecillo to call him if Mr. Wallace did not respond to the protocol or if his condition deteriorated.  He believed he would be so notified. [90]

6)    For all of these  reasons, Dr. Meloche believed the risk of serious harm to Mr. Wallace under this treatment plan to be minimal.[91]

7)    In Mrs. Montecillo's judgment, Mr. Wallace showed significant improvement on the protocol when she examined him on 23 July 2004.  She saw no reason to call Dr. Meloche again and did not do so.[92]

8)    When Mr. Wallace's condition deterioriated on the evening of 23 July 2004 and that deterioration was apparently observed by the correctional officers, Dr.

---

[86] Exhibit C, Par. 10, 11.

[87] Exhibit E (Dr. Thompson Affidavit) and Exhibit F (Dr. Nipomnik Affidavit).

[88] *Id.* at Par. 12, 16.

[89] *Id.*

[90] *Id.* at Par. 13, 16.

[91] *Id.* at Par. 16.

[92] Exhibit G - Montecillo Deposition at pages 144-5.

*Memorandum in Support of Motion for Partial Summary Judgment*
*Walker, Estate of Wallace v. Henderson et al.;*
*Case No. A05-176 CV  (RRB)*                    Page 15 of  23

Meloche was not contacted, even though he was available.[93]

*Farmer* and *Toguchi* require the Plaintiff to show as part of her prima facie case that Dr. Meloche actually *knew* there was a substantial risk of serious injury to Mr. Wallace if he was placed on the Department of Corrections Withdrawal Protocol in the monitored setting he was in and that he deliberately disregarded that risk. It is not enough under *Farmer* for the Plaintiff to show that Dr. Meloche should have known of a substantial risk of serious harm. Nor is it enough under *Farmer* to show the risk was "obvious and a reasonable prison official would have noticed it."[94] It is not even enough for the Plaintiff to show that Dr. Meloche was grossly negligent in failing to recognize a substantial risk of serious harm.[95]

The evidence here shows that Dr. Meloche did not know there was a substantial risk of serious injury to Mr. Wallace given the protocol he implemented and the setting Mr. Wallace was in. Dr. Meloche has affirmatively testified he believed Mr. Wallace would do well on the protocol and that there was not a significant risk of serious harm given his age, condition and the monitored setting he was in.[96] Dr. Meloche's belief that Mr. Wallace would do well on the protocol and was not subject to a significant risk of serious harm is consistent with his experience in treating many such individuals over the many years of his practice.[97] There is no evidence that his actual belief was anything to the contrary. Dr. Meloche has affirmatively testified he asked to be notified if Mr. Wallace did not respond to the protocol or if his condition deteriorated and that therefore there was a minimal risk

---

[93] Exhibit C, Par. 18.

[94] *Farmer*, 511 U.S. at 841-2.

[95] *Toguchi*, 391 F.3d at 1059.

[96] Exhibit C, Par. 16.

[97] *Id.* at Par. 16, 22.

*Memorandum in Support of Motion for Partial Summary Judgment*
*Walker, Estate of Wallace v. Henderson et al.;*
*Case No. A05-176 CV  (RRB)*                    Page 16 of  23

of serious harm to Mr. Wallace in this setting.[98]  He has also testified he believed he would be so notified as he was available by telephone at all relevant times.[99]  There is no evidence that his actual belief was to the contrary.  That Dr. Meloche believed he would be called is consistent not only with his past experience, but with Mrs. Montecillo's testimony that she would have called Dr. Meloche if she even suspected that Mr. Wallace was not responding appropriately.[100]

Nor is there any genuine issue of deliberate disregard.  Dr. Melcohe did not ignore Mrs. Montecillo's phone call.  Rather he instituted the protocol for alcohol withdrawal adopted by the State of Alaska Department of Corrections in a monitored setting in which he believed Mr. Wallace would be safe.  Dr. Meloche asked to be called if Mr. Wallace did not respond to the protocol or if his condition deteriorated.  Dr. Meloche told Mrs. Montecillo he would see Mr. Wallace on Saturday 24 July 2004 when he held his next clinic unless she called him earlier.  He was at all times available for contact.  At no point did he refuse to respond to a phone call.  At no point did he refuse a request to see Mr. Wallace.[101]

Mr. Wallace was in a State of Alaska Department of Corrections facility.  He was in a cell monitored by Department of Corrections employees whose job it was to watch him and to notify the on call nurse of any changes in his behavior.  He was on the State of Alaska Department of Corrections Alcohol Withdrawal Protocol, a protocol that had been in successful use for many years at the Ketchikan Correctional Center and throughout Alaska.  This protocol was administered by an experienced

---

[98] *Id.* Par. 13, 15, 16.

[99] *Id.*

[100] Exhibit G - Montecillo Deposition at page 145.

[101] Mrs. Monticello testified that Dr. Meloche was always willing to come to the facility and that there had never been a time when he refused to come to the facility when she thought he should come.  Montecillo deposition at page 135.  Nor was there ever a time when Dr. Meloche did not support her request to transport someone to the hospital. *Id.*

*Memorandum in Support of Motion for Partial Summary Judgment*
*Walker, Estate of Wallace v. Henderson et al.;*
*Case No. A05-176 CV  (RRB)*                                    Page 17 of  23

Department of Corrections nurse Dr. Meloche had worked extensively with. This system of monitoring and care had proven by experience to be a safe system. It is easy to see why Dr. Meloche believed this system would be safe for Mr. Wallace here.

The Court of Appeals repeatedly ruled in *Toguchi* that a physician cannot be held liable under 42 U.S.C. Sec. 1983 for following a course of treatment she/he believed would be effective.[102] *Farmer* and *Toguchi* require the Plaintiff here to show that contrary to what he has testified to, Dr. Meloche in fact believed his treatment plan for Mr. Wallace would *not* be effective and that he instituted that treatment plan *knowing* it would subject Mr. Wallace to a significant risk of serious harm. It is one thing to make such a claim and an entirely different thing to support it with admissible evidence. Here there is no admissible evidence to show anything other than what Dr. Meloche has testified to.

## II.    STATE DAMAGE LIMITATIONS

The Defendant also moves for summary judgment on the Estate's claims for damages other than those expressly allowed by A.S. 09.55.580(a) and 570, Alaska's wrongful death and survival statutes.

Plaintiff Julia Walker brought suit both in her individual capacity as the surviving mother of Troy Wallace and in her representative capacity as the personal representative of his estate.[103] In her individual capacity, she is seeking "to recover all damages available under state and federal law as a result of the death of her son, including, but not limited to, damages for the loss of the love, society and

---

[102] The Seventh Circuit engaged in a similar analysis when it upheld the grant of summary judgment in favor of a physician who mistakenly thought an inmate who in fact was suffering from a subarachnoid hemorrhage had overdosed on drugs. *Steele v. Choi*, 82 F.3d 175, 178-9 (7th Cir. 1996). *Cert. denied at 519 U.S. 897 (1996).*

[103] Amended Complaint at Pars. 4 and 5.

*Memorandum in Support of Motion for Partial Summary Judgment*
*Walker, Estate of Wallace v. Henderson et al.;*
*Case No. A05-176 CV  (RRB)*                                    Page 18 of  23

companionship of her son and the destruction of her parent-child relationship with him, damages for severe emotional distress, suffering and grief, and punitive damages."[104]  In her capacity as personal representative, she is seeking to recover "all damages available under state and federal law, including, but not limited to, economic damages, damages for the unnecessary and avoidable physical and mental pain and suffering experienced by Mr. Wallace leading up to and surrounding his death, hedonic damages for the loss of his life and loss of Mr. Wallace's life and loss of his enjoyment of life, and punitive damages."[105] Ms. Walker has "admit[ted] that she was not financially dependant on Troy Wallace for financial support at the time of his death."[106]

Since 42 U.S.C. Sec. 1983 does not expressly specify what damages are recoverable for its violation or whether a cause of action survives the victim's death, courts look to 42 U.S.C. Sec. 1988 on how to enforce the act.  *Garcia v. Superior Court of Los Angeles*, 49 Cal. Rptr. 2d 580, 582-3 (Cal. App. 1996).  If no suitable federal rule exists, courts consider the application of state common law as modified by a state's constitution and statutes so long as that state law is not inconsistent with the federal Constitution and the laws of the United States.  *Id.* at 583.  The court further noted that a state survival statute provides the principal reference point in determining survival of civil rights action.  *Id.*  The court there held that state law appropriately provided the measure of damages for the 1983 claim:

> In conclusion, California law allows the representatives of a decedent's estate to sue on decedent's cause of action arising before death and for punitive damages decedent would have been entitled to had he survived; California law also allows a decedent's survivors to sue for

---

[104] *Id.* at Par. 25.

[105] *Id.*  at Par. 25.

[106] Exhibit H, Plaintiff's Responses to Defendant Meloche's First Requests for Admission and Supplemental Responses at page 3.

*Memorandum in Support of Motion for Partial Summary Judgment*
*Walker, Estate of Wallace v. Henderson et al.;*
*Case No. A05-176 CV  (RRB)*                                    Page 19 of  23

> wrongful death for their pecuniary losses and their loss of decedent's comfort and society.  In our opinion these provisions of state law suffice to fulfill the compensatory and deterrent purposes of the federal Civil Rights Act in a case where the civil rights violation caused the death.  Therefore California law is not inconsistent with the law of the United States.

*Id.* at 586-87.  The court further held that hedonic damages could not be recovered. *Id.*

As explained below, the law of Alaska allows the estate to seek recovery for the decedent's pain and suffering and loss of enjoyment of life prior to his death. Alaska law allows the estate to seek recovery of the pecuniary losses to the estate. Punitive damages are also available in appropriate circumstances in a wrongful death action.[107]  Alaska law thus allows compensation to victims for deprivations of their federal constitutional rights by providing for the recovery of an award of damages for pain and suffering and loss of enjoyment of life experienced by the victim prior to death, by providing recovery of pecuniary losses where the decedent is not survived by any beneficiary, and by providing a wide range of other potential recoveries where the victim is survived by certain enumerated beneficiaries.  Alaska law also provides a deterrent to wrongful conduct by allowing recovery of punitive damages in appropriate cases.  Alaska damage law is therefore not inconsistent with federal civil rights law, and should be utilized by the court here to fashion the appropriate remedies.

Under Alaska law, the Estate's wrongful death claim is limited to the pecuniary loss to the estate.  A.S. 09.55.580(a) provides, in part, that "[w]hen the decedent is survived by no spouse or children or other dependents, the amount recovered shall be administered as other property of the decedent but shall be limited to pecuniary loss."  See also *Macey v. United States*, 454 F. Supp. 684, 686 (D.

---

[107] *Portwood v. Copper Valley Electric Association, Inc.*, 785 P. 2d 541 (Alaska 1990).

*Memorandum in Support of Motion for Partial Summary Judgment*
*Walker, Estate of Wallace v. Henderson et al.;*
*Case No. A05-176 CV  (RRB)*                                          Page 20 of  23

Alaska 1978) (wrongful death damages limited to the pecuniary loss to the estate where the decedent is not survived by statutory beneficiaries); *Matter of Estate of Pushruck*, 562 P. 2d 329, 331 (Alaska 1977) (damages limited to the loss to the estate where the decedent is not survived by any enumerated statutory beneficiary); and *Gillispie v. Beta Const. Co.*, 842 P.2d 1272, 1273 (Alaska 1992) (statute limits recovery to pecuniary losses; parents of minor child cannot claim loss of society damages under wrongful death statute). Thus, the Estate's wrongful death claim is limited to a claim for pecuniary loss to the Estate.  It does not encompass any claim for hedonic or other damages.[108]

The Estate's survival claim made pursuant to A.S. 09.55.570 can include a claim for conscious pain and suffering and loss of enjoyment of life prior to death. However, any such claim is limited to the period of time from injury to the death of the decedent:

> The survival action comes into existence at the time of injury and may compensate the victim only for the period between the time of injury and the time of death.  Unlike wrongful death claims, survivorship claims are wholly derivative of the decedent's pre-existing causes of action and compensate the Estate only for those injuries suffered by the decedent prior to the death; the claims do not compensate the survivors for their own harms.

*Estate of Maldonado*, 117 P.3d 720, 729 (Alaska 2005).  Any survival claim is thus limited to the period of time from the alleged wrongful injury to the time of death. Dr. Meloche therefore requests summary judgment on the Estate's damage claims other than those expressly allowed by A.S. 09.55.580(a) and 570.

In the event the Court grants summary judgment on the Sec. 1983 claims, Julia

---

[108] Most jurisdictions considering the issue have held that hedonic damages are not available in wrongful death actions.  See *Kemp v. Pfizer, Inc.*, 947 F. Supp. 1139, 1146 n. 10 (E.D. Mich. 1996), which contains a list of cases rejecting or limiting hedonic damage claims in wrongful death actions.

*Memorandum in Support of Motion for Partial Summary Judgment*
*Walker, Estate of Wallace v. Henderson et al.;*
*Case No. A05-176 CV  (RRB)*                                Page 21 of  23

Walker in her individual capacity has no remaining state law claim . She has admitted that she was not financially dependant on the decedent, and therefore has no claim in her individual capacity for wrongful death damages pursuant to A.S. 009.55.580(a). A parent cannot claim loss of society under the wrongful death statute. *Gillispie v. Beta Const. Co.*[109] She also has no cause of action pursuant to A.S. 09.15.010 for loss of consortium or other damages because her son was above the age of majority at the time of his death.[110] Dr. Meloche also requests summary judgment on the state law claims asserted by Ms. Walker in her individual capacity.

## CONCLUSION

The purpose of the subjective inquiry of deliberate disregard adopted in *Farmer* and applied by the 9th Circuit in *Toguchi* is to punish those who improperly punish others. There is no evidence here that Dr. Meloche had any motivation or intent to punish Mr. Wallace. The truth of this case is that Dr. Meloche did not believe there was a significant risk of serious harm to Mr. Wallace given the treatment plan he implemented and the setting he was in. There is no genuine issue of material fact on the issue of Dr. Meloche's knowledge given the circumstances present here. Nor is there any genuine dispute of material facts on the issue of deliberate disregard. Dr. Meloche respectfully requests the court enter summary judgment in his favor on the Plaintiff's 42 U.S.C. Sec. 1983 claims in accord with *Farmer* and *Toguchi* because (1) he did not believe there was a significant risk of serious harm to Mr. Wallace given his condition, the treatment plan he implemented and the setting Mr. Wallace was in and/or (2) he did not act in deliberate disregard of any significant risk of serious harm.

Dr. Meloche also requests summary judgment on the Estate's damage claims

---

[109] 842 P.2d 1272, 1273 (Alaska 1992).

[110] *Id.* at 1273-74 (AS 09.15.010 held to provide the appropriate vehicle for recognizing a parent's loss stemming from the injury of death of a child *below the age of majority*.)

*Memorandum in Support of Motion for Partial Summary Judgment*
*Walker, Estate of Wallace v. Henderson et al.;*
*Case No. A05-176 CV  (RRB)*                                      Page 22 of  23

other than those expressly allowed by A.S. 09.55.580(a) and 570. Summary judgment is requested on Ms. Walker's individual claim under state law for loss of consortium and other damages.

DATED this 15th day of December, 2006, at Juneau, Alaska.

LESSMEIER & WINTERS

Attorneys for Defendant Dr. Meloche

By:_____/S/_____
        Michael L. Lessmeier, AK Bar 7910082

The undersigned hereby certifies that on the 15th of December, 2006, a copy of the foregoing document was electronically, served to the following attorneys of record:

Edwin S. Budge, Esq.
Budge & Heipt, PLLC
705  2nd Avenue, #910
Seattle, WA  98104
_____/S/_____
0034-078 MemoMSJ.wpd

*Memorandum in Support of Motion for Partial Summary Judgment*
*Walker, Estate of Wallace v. Henderson et al.;*
*Case No. A05-176 CV  (RRB)*                    Page 23 of  23