**Erik J. Heipt,** *pro hac vice*
erik@budgeandheipt.com
**Edwin S. Budge,** *pro hac vice*
ed@budgeandheipt.com
BUDGE & HEIPT, P.L.L.C.
705 Second Ave., Suite 910
Seattle, WA 98104
Telephone: 206-624-3060
Facsimile: 206-621-7323

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF ALASKA

| | |
|---|---|
| JULIA WALKER, individually and as Personal Representative of the ESTATE OF TROY WALLACE, | ) )  NO. A05-0176 CV (RRB) ) |
| Plaintiffs, | )  PLAINTIFF'S MEMORANDUM IN )  OPPOSITION TO DEFENDANTS' |
| v. | )  MOTION FOR PARTIAL SUMMARY )  JUDGMENT |
| DAVID D. HENDERSON, LAURI A. MURRAY, WALTER T. RUD, SHERRI L. DAVIS, EDWIN D. IRIZARRY, LINDA MONTECILLO AND ERNEST MELOCHE, M.D., | ) ) ) ) ) |
| Defendants. | ) |

### INTRODUCTION

Plaintiff respectfully submits this memorandum in opposition to the motion for partial summary judgment filed by the remaining defendant, Ernest Meloche, M.D. Because genuine issues of material fact preclude summary judgment, Dr. Meloche's motion should be denied.

PLAINTIFF'S RESPONSE                    1

As discussed below, there is overwhelming evidence that Dr. Meloche was deliberately indifferent to Troy Wallace's serious medical needs. Mr. Wallace's medical condition—acute alcohol withdrawal—was a medical emergency of the highest order. As the contract medical provider, charged with responsibility for providing primary medical care to incarcerated individuals at the Ketchikan Correctional Center, Dr. Meloche had a legal duty to take reasonable measures to abate Mr. Wallace's condition. He did not. His medical orders were so utterly insufficient to address the true seriousness of Mr. Wallace's condition, and his failure to take appropriate action was so manifest, that the trier of fact could easily conclude that he was deliberately indifferent.

This brief will begin by addressing general facts concerning the seriousness of alcohol withdrawal. It will then discuss the specific facts of this case, in particular the signs and symptoms presented to Dr. Meloche and the insufficiency of his medical response. The brief will then discuss the law and explain why the evidence is more than sufficient to support a finding of deliberate indifference. Finally, the brief will respond to Dr. Meloche's effort to limit plaintiff's damages and show why, under federal law, the Estate of Troy Wallace is entitled to seek damages for loss of enjoyment of life.

## THE SERIOUSNESS OF ACUTE ALCOHOL WITHDRAWAL

Acute alcohol withdrawal syndrome (also referred to as delirium tremens or DT) is an extremely serious medical condition with a high mortality rate. *See generally* Report of Richard O. Cummins, M.D. ("Cummins Report").[1] When chronic users of alcohol are suddenly deprived of all alcohol (because, for example, of incarceration), they display variable degrees of signs and symptoms that usually peak over the course of 3-5 days. *Id.* The usual progression

---

[1] The Cummins Report is attached to the Declaration of Richard O. Cummins, M.D., submitted herewith.

can include irritability, tremors, insomnia, rapid heart rate, hypertension (high blood pressure), diaphoresis (heavy sweating), anxiety, jitterness, nausea, and decreased appetite. *Id.* at p. 7. Symptoms at more advanced stages include hallucinations and, eventually, seizures. *Id.* at p. 8. Without proper, careful, in-patient treatment, individuals displaying the more advanced symptoms of withdrawal face a significant risk of death. Indeed, without proper in-patient treatment, the mortality rate for acute alcohol withdrawal is as high as 30-40%. Cummins Report at p. 5. Federal courts across the country have long recognized the seriousness of alcohol withdrawal—particularly in the context of incarceration. *See* pp. 16-17, *infra.*

Dr. Meloche's motion does not attempt to dispute the serious medical nature of acute alcohol withdrawal. Nevertheless, it is important for the court (and, eventually, the trier of fact) to appreciate just how serious the condition is so that his medical response (and lack thereof) can be assessed in context. As discussed below, doing *something* to address Mr. Wallace's condition is not enough. In the context of an inmate experiencing a headache, ordering an aspirin might be sufficient. In the context of an inmate experiencing severe chest pains, ordering an aspirin might well be strong evidence of deliberate indifference. So it was in the case of Dr. Meloche's woefully inadequate response to the signs and symptoms he knew Troy Wallace was experiencing while in the Ketchikan jail.

## SPECIFIC FACTS RELATING TO TROY WALLACE

There is no dispute that Troy Wallace was an alcoholic who had been physically dependent on alcohol for many years. On the afternoon of July 20, 2004, Mr. Wallace went to the Ketchikan Correctional Center to serve a ten-day sentence arising from an earlier charge of disorderly conduct. Defendant's Memorandum at p. 2. Mr. Wallace had not had a drink since

the day before. Deposition of Nurse Linda Monticello at 54:22–55:12; Ex. 5. *See also* Cummins Report at p. 4.

At the time of his booking, at 3:00 p.m. on July 20, 2004, Mr. Wallace was already "shaking and stated that he was withdrawing from alcohol." Monticello Dep., Ex. 1; Cummins Report at p. 4. These observations were consistent with the initial stages of alcohol withdrawal. Cummins Report at p. 5.

The Ketchikan Correctional Center requires that inmates receive a medical screening before being accepted for confinement by the jail. Monticello Dep. at 48:23–52:11; Ex. 2. Despite Mr. Wallace's outward symptoms of alcohol withdrawal at the time of booking, the jail accepted him for confinement without a medical screening. *Id.* He received no initial medication, nor professional evaluation for his symptoms. *Id.*

There was only a single nurse working at the Ketchikan Correctional Center between the time of Mr. Wallace's confinement on July 20th and his death in the early morning hours of July 24th. Monticello Dep. at p. 48:6-9. The jail's nurse was named Linda Monticello. *Id.* Nurse Monticello had no specific training or education on the subject of alcohol withdrawal. *Id.* at 59:20-60:15. During the four days in question she worked a shift that began at 6:00 a.m. and ended at 2:00 p.m. *Id.*, 48:12-18. Throughout that period, there was no medical provider on site at the jail between the hours of 2:00 p.m. and 6:00 a.m. *Id.* at 48:19-22. Thus, the jail was without *any* on-site medical provider for sixteen hours a day throughout the duration of Mr. Wallace's confinement.

It was not until the afternoon of July 21st—approximately twenty-four hours after his initial confinement—that Mr. Wallace first received his "pre-remand screening" by Nurse Monticello. Monticello Dep. at 48:23–50:6; p. 50:8-19; Ex. 2   At that time, the nurse

documented that Mr. Wallace was displaying symptoms consistent with alcohol withdrawal. She noted that she was "concerned of alcohol withdrawal," the presence of tremors, the fact that Mr. Wallace had a history of alcohol withdrawal, and that Mr. Wallace should be "observe[d] for DT [delirium tremens]." *Id.*, Exs. 2, 3. This was Stage 1 of the alcohol withdrawal syndrome. Cummins Report at p. 5. Other than advice to increase fluids, nothing was done to reduce Mr. Wallace's symptoms or to prevent him from deteriorating further into alcohol withdrawal. *Id.;* Monticello Dep. at 69:15-17; Ex. 3.

Another day passed. At approximately 2:00 p.m. on July 22nd, Nurse Monticello again saw Mr. Wallace. By now, it was approximately 48 hours after his initial confinement, and 72 hours after his last drink. This time she documented several alarming symptoms which indicated that Mr. Wallace had "deteriorated to more advanced stages[] of the alcohol withdrawal syndrome." Cummins Report at p. 5; Monticello Dep. at 63:20-64:18; 69:1-6; Ex. 3. According to Nurse Monticello's progress notes, made contemporaneously with her 2:00 p.m. examination, Troy Wallace was sweating profusely. Monticello Dep. at 71:5-7; Ex. 3. She recognized this as "a sign and symptom of DT" or delirium tremens. *Id.* at 71:8-9; Ex. 3. His hands were shaking, which she recognized as another sign of DT. *Id.* at 71:10-14; Ex. 3. His pulse rate was extremely high at 137 beats per minute. *Id.* at 73:1-74:6; Ex. 3. She saw this as another symptom of DT. *Id.* at 74:4-6. His blood pressure was elevated to 160 over 104. *Id.* at 71:23-72:4, Ex. 3. She recognized this as another symptom of DT. *Id.* at 72:23-25. He was seeing "things . . . moving on top of [the] counter," which indicated to the nurse that Mr. Wallace "was experiencing visual hallucination." *Id.* at 71:15-20; Ex. 3. She recognized these hallucinations as another "symptom of DT." *Id.* at 71:21-22. She further documented the fact that Mr. Wallace had 20 breaths per minute and was "talking without sense." *Id.* at 74:17-20; Ex. 3.

PLAINTIFF'S RESPONSE                    5

Plaintiff's expert, Dr. Richard Cummins, has reviewed these records, as well as the testimony of Nurse Monticello, and is of the opinion that by July 22, 2004 at 2:00 p.m., Troy Wallace had already descended into the late, serious stages of alcohol withdrawal syndrome. His conclusions in this regard are worth quoting at length:

> By 2pm on July 22 . . . Nurse Monticello recorded multiple signs and symptoms that indicate Mr. Wallace had deteriorated to more advanced stages, of the alcohol withdrawal syndrome: *"eval for poss. DT. Very sweaty—hand tremors—voicing 'things are moving on top of counter.'"* His blood pressure of 160/104 mmHg was significantly higher than it had been the previous day (132/96); heart rate was very rapid at 137 beats per minute; he had rapid breathing at 20 per minute. Nurse Monticello notes *"ta(l)king (without?) sence* (sic)." The combination of marked diaphoresis (very sweaty), elevated heart rate and blood pressure, hallucinations *("things are moving on counter"),* delirium (non-sense speech; global clouding of the sensorium); and hand shaking (hand tremors) are highly indicative of advanced alcohol withdrawal syndrome. In my opinion, Mr. Wallace was now in Stage III of alcohol withdrawal, and he was experiencing a serious complication of the alcohol withdrawal syndrome, *delirium tremens (DTs).*
>
> As of July 22nd at the latest, Mr. Wallace's condition required transfer to an in-patient treatment facility. He required parenteral (IV or IM) medications to control his serious signs and symptoms, as well as rehydration, and nutritional supplementation. He also needed diagnostic evaluation to establish the full severity of his withdrawal, as well as to identify significant co-morbidities (such as pneumonia, pancreatitis, gastritis) that often accompany alcohol withdrawal. The standard of care for Mr. Wallace at this time was in-patient treatment. With such treatment, Mr. Wallace would have been very unlikely to die. His risk of death had he received standard of care in-patient treatment would have been 1% or less. Left without such standard of care treatment at this point Mr. Wallace was at risk for the high level of mortality (up to 30-40%) observed for the delirium tremens syndrome prior to the development of benzodiazepines and other effective medications

Cummins Report at p. 5.

Dr. Meloche was the sole contract physician for the Ketchikan Correctional Center. Monticello Dep. at 32:1-10. He worked pursuant to a written contract with the State of Alaska. Deposition of Ernest Meloche, M.D. at 120:16-24; Ex. 1. The State of Alaska paid Dr. Meloche

PLAINTIFF'S RESPONSE                    6

a flat rate of $4,000 per month. *Id.* at 121:17-19; Ex. 1. Pursuant to the contract, Dr. Meloche was required "to provide primary healthcare services to persons incarcerated in the Ketchikan Correctional Center." *Id.* at 122:24-123:8; Ex. 1.

Dr. Meloche had been the jail's contract physician for many years. Monticello Dep. at 32:25-33:3. He worked at the Ketchikan General Hospital, which is located approximately five minutes away from the Ketchikan jail. *Id.* at 33:14-20. Dr. Meloche was familiar with the jail, its staff, and the fact that there was no on-site medical provider at the jail for many hours every day. *Id.* at 39:13-23. He was specifically aware that "there would not be a nurse onsite at the Ketchikan Correctional Center for a significant portion of every day that Mr. Wallace was there." Meloche Dep. at 75:22-76:2. He knew nothing about the actual medical training and/or experience (*if any*) of the corrections officers who worked at the jail. *Id.* at 80:22-82:13.

As it pertained to the medical needs of inmates, Nurse Monticello was the primary liason between the jail and Dr. Meloche. Monticello Dep. at 39:24-40:2. It was Nurse Monticello's practice to contact Dr. Meloche when she felt it was necessary to involve a physician. *Id.* at 33:21-25. When contacting Dr. Meloche, it was Nurse Monticello's practice to give him as much relevant information as she could about an inmate's medical symptoms. *Id.* at 35:14-18. Nurse Monticello then relied on Dr. Meloche to decide what kind of care or treatment an individual inmate should receive. *Id.* at 41:19-25. She relied on Dr. Meloche to decide whether an inmate's medical condition was such that it merited treatment at the Ketchikan jail or, alternatively, whether the inmate should be transported to the hospital by corrections staff. *Id.* at 42:9-43:9. She regularly followed his instructions on the proper course of treatment and never deviated from his orders. *Id.* at 42:1-16. Sometimes Dr. Meloche came to the Ketchikan jail to personally examine inmates. *Id.* at 38:4-39:2. On other occasions, Dr. Meloche would order that

PLAINTIFF'S RESPONSE                    7

the inmate be transported to the Ketchikan General Hospital which, Nurse Monticello acknowledges, is better equipped to provide medical care in many situations. *Id.* at 40:19-41:4; 43:15-18. The hospital, according to Nurse Monticello, is also better equipped to provide around-the-clock medical care than the jail. *Id.* at 43:19-22.

After evaluating Mr. Wallace at 2:00 p.m. on July 22, 2004 and obtaining his vital signs and the other medical information described above, Nurse Monticello quickly telephoned Dr. Meloche. *See* Monticello Dep. at 75:13-17; Ex. 3. She made the call within thirty minutes of her evaluation of Mr. Wallace, during which she had observed the signs and symptoms of late-stage alcohol withdrawal described in the report of Dr. Cummins. *Id.* at 76:2-6; Ex. 3. Her purpose in making the call was to get instructions from Dr. Meloche about how Mr. Wallace should be treated. *Id.* at 75:23-76:1. Her standard procedure was to provide Dr. Meloche with all relevant information about Mr. Wallace's health status as she recorded it on her progress notes during her evaluation of him at 2:00 p.m. on July 22nd. *Id.* at 76:18-22; Ex. 3. She "wanted to relay what [she] had assessed on [Mr. Wallace] at that time" and gave him the information she had recorded at the time of the evaluation. *Id.* at 77:4-21; 78:3-13. In short, there is no dispute that Dr. Meloche was informed, within half-an-hour, of the signs and symptoms that Mr. Wallace was displaying as of July 22nd at 2:00 p.m. In addition to the signs and symptoms described above, she also reported to Dr. Meloche that Mr. Wallace was anxious and restless—yet additional signs of acute alcohol withdrawal. Meloche Dep. at 70:8-11.

In response to Nurse Monticello's report, "Dr. Meloche should have directed Nurse Monticello to urgently transfer Mr. Wallace to the local hospital for an emergency medical evaluation, initiation of parenteral therapy, and admission for in-patient monitoring and treatment." Cummins Report at p. 6. Moreover, "[i]f the same signs and symptoms were

PLAINTIFF'S RESPONSE                         8

confirmed during this evaluation, the standard of care would mandate that Mr. Wallace be admitted for in-hospital treatment." *Id.* Dr. Meloche failed to do any of this and, as discussed below, his lack of response to the urgent situation was remarkable.

Dr. Meloche was working in the emergency room of the Ketchikan hospital and "had a very busy ER at the moment" he got the telephone call from Nurse Monticello. Meloche Dep. at 7:8-21. Although he does not dispute receiving all of the vital information concerning Mr. Wallace's condition as recorded by Nurse Monticello, he estimates that the entire telephone conversation lasted for merely two minutes. *Id.* at 10:13-15. He made no records or notes of any kind with regard to the telephone call. *Id.* at 13:3-5.

Dr. Meloche did not order or advise that Mr. Wallace be transported to the hospital, even though it was less than five minutes away. Monticello Dep. at 80:19-24. He declined to come to the jail to conduct his own medical evaluation of Mr. Wallace, and Nurse Monticello has no recollection of him even suggesting or offering to do so. *Id.* at 81:2-8; Meloche Dep. at 72:22-73:1. At *no* time during Mr. Wallace's incarceration—between July 20th and his death on July 24th—did Dr. Meloche conduct an in-person evaluation of Mr. Wallace. Meloche Dep., 125:20-23. Dr. Meloche did not seek to obtain *any* additional information about Mr. Wallace's withdrawal history, nor did he instruct Nurse Monticello to do so. *Id.* at 58:15-25; 59:16-19. Dr. Meloche did not consult with any other doctor or health care practitioner. *Id.* at 99:5-11. Nor did he instruct Nurse Monticello about how to monitor Mr. Wallace, how often she should monitor him, what she should tell the corrections officers about continued monitoring of Mr. Wallace, or under what circumstances Mr. Wallace should be transported to the hospital. *Id.* at 72:14-17; 73:2-9; 76:14-17; 62:5-9.

Instead of taking these steps, Dr. Meloche simply told Nurse Monticello that she should initiate treatment (at the jail) according to a written protocol entitled the "DOC Alcohol Withdrawal Guideline." Monticello Dep. at 80:10-14; 81:9-18; Meloche Dep. at Ex. 2.[2] *Critically, the protocol is not a means for treating alcohol withdrawal syndrome.* As plaintiff's expert, Dr. Richard Cummins explains:

> It is important to note that this Alaska DOC Alcohol Withdrawal Guideline is not a guideline for <u>treatment</u> of alcohol withdrawal syndrome. Instead it is a guideline aimed to <u>prevent</u> the onset of alcohol withdrawal syndromes. The differences between protocols to <u>prevent</u> alcohol withdrawal, and the complex protocols needed to <u>treat</u> alcohol withdrawal are profound. Dr. Meloche should have recognized that Mr. Wallace's condition merited far more intensive, in-hospital, treatment and that he had reached the point where initiation of this preventative protocol was totally inappropriate.

Cummins Report at p. 6 (emphasis in original). Telling Nurse Monticello to initiate this *preventative* written protocol at the jail, at this late stage of withdrawal, was, literally, like telling her to give aspirin to a patient showing all the signs of a heart attack.

The written protocol "gives no discretion to the practitioner on the scene to deviate from the set schedule of dosages of medication." Meloche Dep. at 23:2-6. This one-size-fits-all protocol, designed to *prevent* the onset of alcohol withdrawal symptoms, was not tailored in any way to Mr. Wallace's actual condition. Indeed, According to Dr. Cummins:

> Experts recommend identification of the various *stages of alcohol withdrawal,* in order to assist with clinical decision-making and to help answer several important clinical questions. These questions include: which patients urgently need alcohol substitution drugs; whether they require the drugs at high doses or lower doses; whether they require medications intravenously, intramuscularly or orally; and whether they require a more advanced level of supervision and monitoring. These staging guidelines also help clinicians decide which patients can be treated with a closely supervised out-patient approach, and which patients needs urgent hospitalization for general in-patient treatment or even intensive care unit admission.

---

[2]     Nurse Monticello refers to this document in her deposition by the misnomer, "DT Protocol."

PLAINTIFF'S RESPONSE                                      10

Cummins Report at p. 8 (emphasis in original).

Dr. Meloche did not conduct his own assessment of Mr. Wallace's condition even though there were myriad red flags clearly indicating that Mr. Wallace had already descended into the late stages of acute alcohol withdrawal. More remarkably, Dr. Meloche did not even know the specifics of the protocol when he ordered that it be initiated. He played no part in writing the protocol and did not consult the document either during or after ordering that it be initiated. Meloche Dep. at 12:20-23; 13:15-16. During his deposition, he was unable to accurately describe the details of the written protocol and admitted that he "was not certain" what information was contained in the written protocol and what was not. *Id.* at 16:3-6; *compare* Meloche Dep. at 13:25-16:6 *with* Meloche Dep., Ex. 2. *See also* Meloche Dep. at 17:12-20:5. Dr. Meloche testified, for instance, that "even having reviewed it recently, I can't remember the numbers," Meloche Dep. at 19:7-8, and that he did not know if the protocol called for medication to be administered orally or by injection. *Id.* at 26:19-21. Even Nurse Monticello did not know whether Dr. Meloche actually knew or understood what the written protocol consisted of. Monticello Dep. at 84:1-4.

In response to her conversation with Dr. Meloche, Nurse Monticello gave Mr. Wallace an initial dose of medication. Monticello Dep. at 85:14:20; Exs. 3, 5. "The initiation of the preventative protocol at this stage was inadequate and below the standard of care." Cummins Report at p. 9. Then the nurse went home and had no contact with Mr. Wallace for the next fifteen hours. Monticello Dep. at 87:2-4. He stayed confined at the jail and received no medical evaluation by anyone during that time. *Id.* at 87:5-9.

Despite the lack of medical evaluation over the ensuing fifteen hours, Mr. Wallace "continued to suffer serious alcohol withdrawal symptoms" throughout the evening of July 22nd.

Cummins Report at p. 6. This was confirmed by the written report of a jail sergeant, who noted that Mr. Wallace "was experiencing severe shakes and hallucinations during the entire period since I was on shift (Thursday, July 22, 2004) @ 1800 hours." Special Incident Report of Sergeant Henderson, attached as Exhibit C to Declaration of Edwin S. Budge (quoted in Cummins Report at p. 6). Per Dr. Meloche's original orders, Mr. Wallace stayed confined at the jail with no adjustment to his treatment.

The next morning, July 23rd, Mr. Wallace was seen by Nurse Monticello. She gave him the scheduled dose of medicine called for by the preventative protocol ordered by Dr. Meloche. Monticello Dep. at 87:15-18; Exs. 3, 5. Again, there was no deviation from Dr. Meloche's original orders and no adjustment to his "treatment." *Id.*, Ex. 5. Consistent with the preventative nature of the written protocol, he was treated with *smaller* doses than before, issued orally, on an progressively *infrequent* schedule. *Id.*, Exs. 3, 5.

At 9:30 a.m. on July 23rd, Nurse Monticello made additional progress notes about Mr. Wallace. Monticello Dep. at 87:22-89:24; Ex. 3. Although his blood pressure and pulse had dropped, he remained diaphoretic with continued excessive sweating. *Id.* at 88:8-10; Ex. 3. Moreover, according to Nurse Monticello, he "continue[ed] to hallucinate" and was "seeing things that were not there." *Id.* at 88:11-89:3; Ex. 3. Further, he was not conversing rationally with the nurse. *Id.* at 89:8-24; Ex. 3. According to plaintiff's expert, Dr. Cummins:

> [I]t is critical to note that Mr. Wallace continued to hallucinate according to Nurse Monticello's written notes at 9:30 a.m. As long as this deep disturbance of his mental status and cognitive function persists Mr. Wallace must be considered in delirium tremens.

Cummins Report at p. 7.

Dr. Meloche made no effort to follow up with the nurse about Mr. Wallace's progress or lack thereof. Meloche Dep. at 87:14-16. He did not tell the nurse to contact him with an update on Mr. Wallace's status. Monticello Dep. at 108:6-9. As stated, Dr. Meloche had not given any instructions to Nurse Monticello about what to look for in order to determine whether or not Mr. Wallace was responding positively to the minimal therapy he had ordered. Meloche Dep. at 72:14-17. Nor had he given her any instructions about when, or under what circumstances, to change course and get Mr. Wallace to the hospital. *Id.* at 73:2-9. Similarly, Dr. Meloche did not convey any instructions to corrections staff. *Id.* at 76:14-17. Accordingly, Mr. Wallace stayed at the jail under the control of corrections staff, subject to a protocol they had no discretion to change.

Nurse Monticello's final progress note entry occurred at 2:10 p.m. on July 23rd, but there is no indication that she actually evaluated Mr. Wallace for his alcohol withdrawal at that time. Monticello Dep., Ex. 3. She left the jail shortly after 2:10 p.m. on July 23rd. *Id.* at 91:25-92:3. As with the previous day, no medical provider was present at the jail after this time. *Id.*

During the afternoon and evening of July 23rd, Mr. Wallace's condition worsened still. During the course of the evening, Corrections Officer Sharri Davis observed Mr. Wallace "climbing on the bunk," "scratching on the walls and doors," "walking around the cell like he was trying to find something," "stuffing something in his mouth," and repeatedly falling down. Incident Report of Officer Sharri Davis, attached as Ex. D to Budge Decl. Yet, Mr. Wallace remained confined in his cell without the emergency medical care he desperately needed. Adhering to the preventative protocol that Dr. Meloche had ordered, corrections officers simply gave him the scheduled tablet of medication at 9:00 p.m. Monticello Dep. at 114:17-19; Ex. 5.[3]

---

[3]     *See* dosage given at 21:00 hours, July 23rd, 2004 marked "S" for self-administered on Ex. 5.

PLAINTIFF'S RESPONSE                          13

At approximately 10:50 p.m., corrections officers entered Mr. Wallace's cell and found that he had urinated on his shirt, sheets and elsewhere. *See* Incident Report of Edwin Irizzary, attached as Exhibit E to Budge Decl. Corrections officers mopped out his cell and then left him there. Irizzary Report; Davis Report. Per the preventative protocol ordered by Dr. Meloche, the next scheduled dose of medication was not due until 7:00 a.m. the following morning. Monticello Dep., Ex. 5. Corrections officers removed most of Mr. Wallace's urine-soaked clothing. *See* Budge Decl., Ex. D (Davis Report).

The final period of Mr. Wallace's life is recorded on video tape. At approximately 12:57 a.m., on July 24th, Mr. Wallace collapsed to the floor of his cell. Cummins Report at p. 7. Shortly thereafter, he showed "the tonic-clonic, convulsing motions of alcohol withdrawal seizures. . . . [that] are often a precursor to death in the delirium tremens syndrome." *Id.* At 1:12 a.m., "all body motion stop[ed], halting Mr. Wallace in an awkward position on the hard concrete floor." *Id.* "[T]he cessation of all movement, particularly in an awkward position represent[ed] the unconsciousness and unresponsiveness that follows the termination of cardiac and respiratory activity." *Id.*

Troy Wallace died from alcohol withdrawal syndrome. *See* Report of Werner U. Spitz, M.D. at p. 2; Cummins Report at p. 7. His death was imminently preventable and was caused by the actions and inactions of his medical providers, particularly Dr. Meloche who was contractually responsible for overseeing his care. As explained by Dr. Cummins:

> Mr. Wallace was already well into the more advanced stages of alcohol withdrawal by the afternoon of July 22, 2004 when Dr. Meloche was first informed of his condition. From this point forward Mr. Wallace unequivocally displayed signs and symptoms that would require a reasonably prudent physician to:

- start an aggressive alcohol substitution treatment regimen, revolving around high doses of benzodiazepines, the drugs of choice for this syndrome;

- administer these medications either intramuscularly or (preferably) intravenously in a hospital setting; and

- once hospitalized, and under therapy, evaluate the patient for a long list of metabolic, nutritional, hematologic, gastrointestinal, cardiac and neurological co-morbid conditions that invariably accompany chronic alcohol addiction; and which can complicate the more severe alcohol withdrawal syndromes. On a more likely than not basis I think that a number of co-morbidities would have been identified and treated in Mr. Wallace, if searched for by a reasonably prudent physician. Mr. Wallace's eventual death is best explained by some combination of prolonged delirium tremens syndrome, dehydration, multiple electrolyte and acid-base derangements, leading to a form of alcohol withdrawal seizures, occult status epilepticus, terminal cardiac arrhythmia and cardiac arrest.

In my opinion, the responsible medical personnel, primarily nurse Linda Monticello and on-call physician, Dr. Meloche, had a professional duty to recognize the severity of Troy Wallace's alcohol withdrawal syndrome. They needed to appreciate that the onset of delirium and hallucinations defined Mr. Wallace as suffering from delirium tremens, a state of medical emergency with a high potential for significant morbidity and mortality. If treated by the standards of reasonable medical care, the causal chain that led to Troy Wallace's death would have been broken. This death was imminently preventable.

The need for hospital admission, parenteral alcohol substitutes, and metabolic and nutritional corrections was unquestionably present by his early afternoon evaluation on July 22, 2004. The initiation of the *preventative* protocol at this stage was inadequate and below the standard of care. These opinions apply in a similar way to the subsequent 24-hour period of July 23. The fact that he does not display the same severity of withdrawal signs and symptoms on July 23 as he was displaying on July 22, indicates only that the administration of clorazepate was having some benefit. That slight variation in clinical presentation does not indicate the end of his delirium tremens, and the risks that delirium tremens entail. It simply bought Mr. Wallace some extra time during which proper treatment could have saved his life.

Cummins Report at pp. 8-9. Dr. Cummins cannot, of course, offer a legal opinion about whether

Dr. Meloche was "deliberately indifferent." However, his opinions about the totally inadequate

nature of the care, combined with the underlying evidence, is more than enough to raise a genuine issue of material fact on plaintiff's Section 1983 claims. As discussed below, the case must be decided by the trier of fact.

## ARGUMENT

I. **Defendant Meloche is Liable under Section 1983**

Prison inmates are powerless to secure their own medical care. "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). The Supreme Court has long held that Section 1983 applies both to state-employed physicians and also physicians who, by virtue of a contract with the state, provide medical services to inmates. *West v. Atkins*, 487 U.S. 42 (1988) (holding that a physician who is under contract with the state to provide medical services to inmates on part-time basis acts under "color of state law" within the meaning of Section 1983 when he treats an inmate).

To establish an Eighth Amendment violation, a plaintiff must show that (1) the inmate's medical need was "sufficiently serious," and (2) the defendant was "deliberately indifferent" to those needs. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002).

### A. **Mr. Wallace's Medical Need was Sufficiently Serious**

A medical need is serious if the failure to treat it could cause either "further significant injury or the unnecessary and wanton infliction of pain." *Clement*, 298 F.3d at 904 (internal quotations omitted). It is beyond debate that acute alcohol withdrawal, particularly as manifested by Mr. Wallace, is a serious medical need. The facts are more than sufficient to satisfy this element, and many courts have made similar findings. *See, e.g., Lancaster v. Monroe*

*County*, 116 F.3d 1419 (11th Cir. 1997) (finding that alcohol withdrawal is a serious medical need for purposes of deliberate indifference analysis.); *Morrison v. Washington County*, 700 F.2d 678, 686 (11th Cir. 1983) (holding that individual suffering complications of alcohol withdrawal was "seriously ill," subjecting jail officials to liability under Section 1983); *Fielder v. Bosshard*, 590 F.2d 105 (5th Cir. 1979) (hallucinating inmate's withdrawal symptoms sufficiently serious to give rise to Section 1983 liability); *Estate of Perry v. Boone County Sheriff*, No. 05-cv-1153 2006, U.S. Dist. LEXIS 37886, *8 (S.D. Indiana June 7, 2006) ("[F]ederal courts have recognized alcohol withdrawal and delirium tremens as objectively serious medical needs."); *Weaver v. Tipton County*, 41 F. Supp. 2d. 779, 785 (W.D. Tenn. 1999) ("[A]lcohol withdrawal [is] objectively sufficiently serious" to give rise to Section 1983 liability).

**B.    Defendant Meloche was Deliberately Indifferent to Mr. Wallace's Serious Medical Needs**

To show deliberate indifference, a plaintiff "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence[.]" *Id.*

Defendant Meloche argues that he cannot be held liable because he did *something*, ordering a course of medical treatment that he says he believed would be effective. This is incorrect as a matter of law. While it is true that mere medical negligence, in and of itself, does not violate the constitution, it is equally true that "a prisoner is not required to show that he was literally ignored" in his medical care. *Sherrod v. Lingle*, 223 F.3d 605 (7th Cir. 2000). For

example, "[i]f knowing that a patient faces a serious risk of appendicitis, the prison official gives the patient an aspirin and an enema and sends him back to his cell, a jury could find deliberate indifference although the prisoner was not 'simply ignored.'" *Id.* at 611-12. *See also Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005) (reversing summary judgment because the treatment provided "was so blatantly inappropriate as to evidence intentional mistreatment"); *West v. Keve*, 571 F.2d 158, 161 (3d Cir. 1978) (holding that providing over-the-counter pain medication for serious post-operative pain amounted to deliberate indifference); *Lavender v. Lampert*, 242 F. Supp. 2d. 821, 842-43 (D. Or. 2002) (denying summary judgment where inmate was given anti-inflammatory, pain relieving, and muscle relaxing medication, as well as special footwear, orthopedic devices, and regular use of the medical resources because the jail did not "timely respond to or effectively manage" his pain); *Nelson v. Prison Health Services, Inc.*, 991 F. Supp. 1452, 1464-65 (M.D. Fla. 1997) ("Merely plying [inmate] with nitroglycerine when she was suffering recurrent chest pain is treatment so cursory as to amount to deliberate indifference.").

Likewise, the Ninth Circuit has held that to show deliberate indifference, an inmate "need not prove *complete failure* to treat" his medical condition. *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989) (emphasis added). The Ninth Circuit has also held, repeatedly, that "access to medical staff is meaningless unless the staff is competent and can render competent care," *see, e.g., Ortiz*, 884 F.2d at 1314 (citing *Cabrales v. County of Los Angeles*, 864 F.2d 1454, 1461 (9th Cir. 1988)), and that "treatment so cursory as to amount to no treatment at all, may, in the case of serious medical problems, violate the Fourteenth Amendment." *Tolbert v. Eyman*, 434 F.2d 625 (9th Cir. 1970).

The defense does not cite any cases involving alcohol withdrawal and avoids mentioning cases that hold physicians liable under Section 1983 for inadequately managing such withdrawal.

PLAINTIFF'S RESPONSE                                    18

One such case is *McSwine v. Newaygo County*, No. 1:93-CV-750, 1994 U.S. Dist. LEXIS 11036 (W.D. Mich. 1994). There, the estate of a deceased inmate brought a Section 1983 action against a physician who provided medical services to inmates at the county jail. The inmate was arrested for drunk driving and began suffering from alcohol withdrawal while in the jail. The jail summoned the physician, who personally came to the jail, examined him, and administered a medication called Haldol. Later that day, the physician returned to the jail and examined the inmate a second time. The inmate was by now sweating and hallucinating. The physician recognized the inmate's condition as "probably DTs" and administered Valium. The following day, the physician returned for yet a third time, again evaluated the inmate, prescribed more valium, and indicated a treatment plan that involved transferring the inmate to the hospital the next business day. Before he was transferred to the hospital, the inmate died.

The physician sought dismissal of the case, arguing that, at most, it was a case for simple medical malpractice. Although the court agreed that merely negligent care is insufficient to establish an Eighth Amendment violation, the court noted that "seriously substandard treatment can constituted deliberate indifference to serious medical needs and justify relief." *Id.* at *12. The court then declined to dismiss the Section 1983 case against the physician, holding that, although the physician examined the inmate and provided *some* treatment, the delay in securing the inmate's hospitalization was sufficient evidence of deliberate indifference.

In another case, *Liscio v. Warren*, 901 F.2d 274 (2nd Cir. 1990), the court held that a physician was subject to Section 1983 liability because, although he took some action in response to what he believed to be the cause of the inmate's withdrawal, he failed to take *sufficient* action. The defendant-doctor was a contract physician in charge of the medical unit of a state jail. The inmate began behaving in a strange way soon after being booked into the jail.

He was transferred to the infirmary, where the nurse noted that he was having "DTs." Believing he was more likely withdrawing from heroin, however, the physician ordered a withdrawal regimen and psychiatric evaluation. He was not examined by the physician again until three days later. In the meantime, his agitation increased and he began to hallucinate. He was eventually transferred to the hospital, received appropriate medical care, and lived without sustaining permanent damage.

The Second Circuit held that there was sufficient evidence to hold the contract physician liable under Section 1983, even though he personally examined the inmate and ordered a treatment regimen that he believed was appropriate. "[T]he associated mortality rate [with alcohol withdrawal cases] makes them much more serious than heroin withdrawal cases, and in view of the notation on [the inmate's] chart that he was experiencing 'DTs,' a jury could find that [the doctor's] failure to diagnose [the inmate's] alcohol withdrawal constituted deliberate indifference." *Id.* at 277. The court further found that the doctor's failure to examine the inmate for three days after he ordered the misguided treatment regimen was also evidence of deliberate indifference. *Id.* Accordingly, the court reversed the district court's grant of summary judgment.

In the present case, Dr. Meloche's approach was arguably more misguided than in either *McSwine* or *Liscio*. As of Nurse Monticello's telephone call on July 22nd at 2:30 p.m., Dr. Meloche had sufficient information to know that Mr. Wallace was experiencing a true medical crisis of the highest order. The nurse told him about red flag after red flag—visual hallucinations, excessive sweating, extremely high heart rate and pulse, non-sensical speech, anxiety, tremors, rapid respirations, and a past experience with alcohol withdrawal. Despite this clear evidence, and unlike the physicians in either *McSwine* or *Liscio,* Dr. Meloche declined to personally examine or evaluate Mr. Wallace even though the jail was merely five minutes from

PLAINTIFF'S RESPONSE                    20

his location. He did not order that Mr. Wallace be taken to the hospital. He did not seek to obtain any additional information about Mr. Wallace's withdrawal history. He then initiated a written protocol, consisting of *decreasing* dosages of medicine at *increasingly lengthy* intervals; a protocol that was designed to *prevent* the onset of alcohol withdrawal symptoms—not cure them. The protocol gave no discretion to the nurse to deviate from the schedule. Dr. Meloche did not review the protocol and was not even certain of its details. He knew that the jail would be without an on-site medical provider for more than half of every day, but permitted Mr. Wallace to stay there. He did not instruct the nurse how, or how often, to monitor Mr. Wallace. He did nothing to ensure that corrections staff was appraised of the situation, knew what to observe him for, or understood how to care for Mr. Wallace. He did not follow up with the nurse or with the corrections staff or with anyone. He did not make a single note or record of his order, consult any materials, or seek the input of anyone else.

The defense repeatedly emphasizes that Dr. Meloche's total involvement was a two-minute telephone contact with the nurse, as if this somehow evidences that he was not deliberately indifferent. In a real sense, however, *that was the very problem*. Had Dr. Meloche taken *more* than two minutes and paused to address what was unquestionably a life-threatening emergency, Troy Wallace would still be alive today. Two minutes was all he took to deal with an emergency with the potential for a 30% (or higher) mortality rate—a two minute telephone call and no in-person examination. If anything, his *lack* of responsiveness is the best evidence of his deliberate indifference. It bears repeating: it was as if Dr. Meloche received a call from a nurse reporting severe chest pains in a hypertensive inmate with a history of heart attacks, and then ordered aspirin as a remedy.

PLAINTIFF'S RESPONSE                                        21

As in this case, a doctor's *lack* of involvement is often the best evidence of deliberate indifference. *See, e.g., Ortiz v. City of Imperial*, 884 F.2d 1312. In *Ortiz*, the Ninth Circuit found evidence of deliberate indifference on the part of a doctor who, like Dr. Meloche, ordered medications for an inmate after consulting with jail nurses over the telephone (and without physically examining the inmate). Like Troy Wallace, the inmate in *Ortiz* died two days later because the prescribed medications were inappropriate to treat his serious condition. And like Troy Wallace, he would most likely be alive today had the doctor taken the time to properly assess his condition.

The defense ignores analogous alcohol withdrawal cases and overlooks the many cases that hold that an insufficient medical response may, in the case of serious medical conditions, subject the physician to Section 1983 liability. Instead, the defense relies solely on *Toguchi v. Soon Hwang Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004).[4] The undisputed facts in *Toguchi* showed a physician who was highly involved in the inmate's medical care, who constantly adjusted the treatment to changes in the inmate's condition, and who repeatedly observed and personally evaluated the patient over the course of several days. In *Toguchi*, the inmate was placed under the direct care of the jail's physician when the inmate stopped taking his medication and began showing symptoms relating to his use of drugs. The physician had been personally involved in the inmate's care for many years and was familiar with his history. The physician put him in therapeutic lockdown for a two-week period and prescribed four different medications. When the inmate later began displaying unusual behavior, the physician transferred the inmate to the mental health module of the prison, prescribed two additional medications, and discontinued the use of two other medications. Two days later, the physician again examined the

---

[4]    Defendant's Memorandum at 13.

inmate, documented his behavior, and treated him with four different medications.   The physician evaluated the inmate again later in the day, and ordered restraints for the inmate's protection.   The physician personally examined the inmate thereafter and returned to conduct a medical evaluation at regular fifteen minute intervals up until his death.   When the inmate went into respiratory arrest, the physician "ran down" to assist him.   *Id.* at 1058.   The eventual cause of death was unclear.

The court held that there were no obvious risks that the physician ignored nor any evidence that the physician's choice of treatment was medically unacceptable under the circumstances.   The court concluded that the physician could not be liable under a deliberate indifference standard because the evidence clearly showed that she "was consistently responsive to [the inmate's] medical needs."   *Id.* at 1061.   In sum, the *in*action of Dr. Meloche stands in stark contrast to the undisputed responsiveness and high level of involvement displayed by the physician in *Toguchi*.

In his own defense, Dr. Meloche also highlights his "extensive experience in treating patients in alcohol withdrawal," notes that he has treated "well over 1000" such patients  over the years, and claims that the he has successfully used the same DOC protocol many times.   *See* Defendant's Memorandum at 5-6.   This self-serving "evidence" should be given little, if any, weight, for it is far too generalized to be of any material value.   As plaintiff's medical expert, Dr. Cummins, explains, there are several stages of "alcohol withdrawal," ranging from mild on the one hand to severe and life-threatening on the other.   Simply put, there is an enormous difference between early stage alcohol withdrawal and acute alcohol withdrawal or delirium tremens.   The former may be treatable with a preventive protocol; the later requires intensive in-hospital treatment.

PLAINTIFF'S RESPONSE                         23

Because Dr. Meloche provides no specific information about any of the "patients in alcohol withdrawal" that he has treated—no vital signs, no symptoms, no histories, no details of any kind—it is impossible to evaluate the probative value of his experience. While it may be true that Dr. Meloche has used the state's preventive protocol to successfully prevent patients in the early stages of alcohol withdrawal from deteriorating further, there is no evidence that he has successfully used that same protocol to treat a single patient who, like Mr. Wallace, was suffering from late-stage, acute alcohol withdrawal (or delirium tremens) and who was confined in a jail setting without round-the-clock medical care. Indeed, when plaintiff's counsel attempted to obtain more specific information from Dr. Meloche about the patients that he supposedly treated for alcohol withdrawal, he could only remember two names, and he declined to provide them. *See* Meloche Dep. at 149:10-150:4. In light of the above, Dr. Meloche's testimony that he has successfully treated thousands of patients suffering from alcohol withdrawal should be accorded little weight.

In short, the jury is entitled to weigh the evidence and make its own judgment about whether Dr. Meloche acted with deliberate indifference. Summary judgment, in contrast, must be reserved for those cases where there is such a lack of evidence that no reasonable jury could find the defendant liable. This is not one of those cases. Taking the facts in the light most favorable to the plaintiff, and drawing all reasonable inferences in her favor, there is more than enough evidence for the Section 1983 case to proceed to trial.

## II.    The Estate's Damages

The defendant next argues that the Estate of Troy Wallace cannot recover damages for loss of enjoyment of life under federal law because such damages are not recoverable under state

wrongful death and survivorship law.[5]  This argument is without merit.  Under established Supreme Court precedent, state law cannot be applied if it is inconsistent with the policies underlying the federal cause of action at issue.  The policies underlying Section 1983 of the Civil Rights Act of 1871 and the constitutional provisions at issue include compensation and deterrence, as well as an unequivocal concern for protecting human life.  Barring damages for loss of enjoyment of life—in a case where the deprivation of a citizen's constitutional rights caused his death—is inconsistent with these objectives.

Section 1983 itself does not address the damages available for the unlawful death of a citizen at the hands of law enforcement.  In this situation, the Supreme Court has instructed federal courts to look to state wrongful death and survival law, *see Robertson v. Wegmann*, 436 U.S. 584, 590 (1978), but with a critical caveat:  This rule is "subject to the important proviso that state law may not be applied when it is 'inconsistent with the Constitution and the laws of the United States.'"  *Id.* at 590 (quoting 42 U.S.C. § 1988(a)).  If there is an inconsistency, federal courts "must fashion an appropriate remedy to carry out the congressional purposes behind the civil rights legislation."  *Mason v. City of New York*, 949 F. Supp. 1068, 1077 (S.D.N.Y. 1996).  The question here is whether Alaska law, which bars recovery for loss of enjoyment of life, is consistent with federal law.  As set forth below, it is not.

In resolving questions of inconsistency, courts must look not only at particular federal statutes and constitutional provisions but also at the policies behind them.  *Robertson*, 436 U.S. at 590.  "Of particular importance is whether the application of state law 'would be inconsistent with the federal policy underlying the cause of action under consideration.'"  *Id.* (quoting

---

[5]        Plaintiff has submitted to defense counsel an expert report from an economist that addresses the issue of hedonic damages.  Defendant has not attacked this report, nor moved to exclude it in *limine*, despite the December 15, 2006 deadline for doing so.  Accordingly, plaintiff will not address the propriety of the report but only the legal argument advanced by Dr. Meloche's summary judgment motion.

*Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 465 (1975)). "The policies underlying §

1983 include compensation of persons injured by deprivation of federal rights and prevention of

abuses of power by those acting under color of state law." *Id.* (citations omitted). "The

legislative history behind Section 1983 [also] expresses an unequivocal concern for protecting

life." *Bell v. City of Milwaukee*, 746 F.2d 1205, 1239 (7th Cir. 1984).

Numerous federal courts have addressed the precise question at issue here—namely, the

availability of damages for loss of enjoyment of life (sometimes called hedonic damages) in

Section 1983 cases in which the forum state's law barred such damages. These courts have

consistently ruled that when a violation of federal rights causes death, state laws that bar

recovery for loss of enjoyment of life are inconsistent with Section 1983. *See Graham v. Sauk

Prarie Police Comm'n*, 915 F.2d 1085, 1104-05 (7th Cir. 1990) (holding that a decedent's estate

can recover loss of life damages under Section 1983, despite Wisconsin law to the contrary);

*Egebergh v. Village of Mt. Prospect*, No. 96 C 5683, 2004 U.S. Dist. LEXIS 6851, *3 n.1 (N.D.

Ill. Apr. 18, 2004) ("In a section 1983 action resulting in death, the victim's estate may recover

for loss of life, i.e., [decedents's] loss of the enjoyment of his life."); *Banks v. Yokemick*, 177 F.

Supp. 2d 239, 252 (S.D.N.Y. 2001) ("[T]he Court finds that insofar as New York's survivorship

of claims statute would bar recovery of the damages that the jury awarded for [decedent's] loss

of enjoyment of life, the state law fails to take into account policies analogous to the goals

expressed in § 1983."); *Frye v. Akron*, 759 F. Supp. 1320, 1326 (N.D. Ind. 1991) (holding that

the plaintiffs in an action brought under 42 U.S.C. § 1983 "may properly claim as an element of

damages the decedent's loss of enjoyment of life," notwithstanding the fact that state law did not

allow such damages); *Linzie v. City of Columbia*, 651 F. Supp. 740, 743 (W.D. Mo. 1986)

("Missouri law is inconsistent with federal law insofar as it precludes recovery for loss of life

PLAINTIFF'S RESPONSE                    26

and punitive damages. . . . Therefore, Missouri law cannot be applied to preclude the survival of

a § 1983 action seeking actual and punitive damages for [decedent's] loss of life."); *Guyton v.*

*Phillips*, 532 F. Supp. 1154, 1167-68 (N.D. Cal. 1981) (holding that damages for the decedent's

"loss of life" are recoverable under § 1983, notwithstanding California state law to the contrary).

These courts take the view that the policies underlying the Civil Rights Act express an

unambiguous concern for protecting the value of life, separate and apart from any financial

concerns:

> The right to enjoyment of life without its unlawful curtailment has an intrinsic
> worth that necessarily exceeds the dollars-and-cents value of the decedent to his
> beneficiaries. For, implicit in the legislative history and philosophy of § 1983 is
> that the life interest the statute protects is not just the private economic interest of
> the injured person himself to enjoy his own life, but the much more fundamental
> public interest of the rest of society in that the life of any individual not be ended
> by the lawless conduct of state agents.

*Banks*, 177 F. Supp. 2d at 251. *See also Frye*, 759 F. Supp. at 1326 ("The deprivation of life that

is prohibited by the Fourteenth Amendment includes not only of life [itself], but whatever God

has given to everyone with life for its growth and enjoyment. . . . The loss of life means more

than being deprived of the right to exist, or the ability to earn a living; it includes deprivation of

the pleasures of life.") (citations & internal quotations omitted).

Moreover, Section 1983's goal of compensation would be substantially undermined if the

deceased victims of unlawful jail or prison misconduct could not be compensated (through their

estates) for being deprived of the fundamental right to enjoy life. "[I]n light of the sweeping

language of the enactment, to suggest that the Congress had intended that a civil rights

infringement be cognizable only when the victim encounters pain and suffering before his

demise, is absurd." *Jaco v. Bloechle*, 739 F.2d 239, 244 (6th Cir. 1984). It is equally absurd to

limit the available compensatory damages to the projected "future earnings" of the deceased

victim. Indeed, it is often difficult, if not impossible, for a decedent's estate to prove—with any degree of certainty—that the victim would have amassed any particular net financial worth over his or her lifetime.

Alaska law is inconsistent with the Civil Rights Act in other respects as well. For example, Alaska law would bar the parents of a deceased victim of government abuse from recovering damages for loss of society and companionship—unless the parents were financially dependent on the decedent for support; yet, the Ninth Circuit has repeatedly held that parents are entitled to recover for loss of society and companionship, regardless of financial dependence. *See Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir. 2001) (citing *Kelson v. City of Springfield*, 767 F.2d 651, 654-55 (9th Cir. 1985)); *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991); *Ward v. City of San Jose*, 967 F.2d 280 (9th Cir. 1991); *Smith v. Fontana*, 818 F.2d 1411 (9th Cir. 1987), overruled on other grounds by *Hodgers-Durgin v. De La Vina*, 199 F.3d 1037 (9th Cir. 1999); *Strandberg v. Helena*, 791 F.2d 744, 748 (9th Cir. 1986). Thus, the defendant's claim that Alaska damages law is "not inconsistent with federal civil rights law"[6] is incorrect as a matter of well-established Ninth Circuit law.

In support of his argument to bar damages for loss of enjoyment of life, Dr. Meloche cites a decision from an intermediate state appellate court in California, *Garcia v. Superior Court of Los Angeles County*, 42 Cal. App. 4th 177 (1996). This state appellate division did indeed reach the conclusion advanced by the defense, finding California law (which precludes damages for loss of life) to be consistent with the purposes underlying Section 1983. *See Garcia*, 42 Cal. App. 4th at 181-82. However, the *Garcia* decision is at odds with numerous federal courts that have addressed the same issue, including federal district courts within the State of California.

---

[6]     Defendant's Memorandum at 20.

PLAINTIFF'S RESPONSE                    28

Indeed, at least three federal district courts in California have reached a different conclusion than *Garcia* with respect to California's survivorship statute, finding it to be *inconsistent* with the purposes of Section 1983. *See Garcia v. Whitehead*, 961 F. Supp. 230, 233 (C.D. Cal. 1997) ("[T]he Court holds that California's survivorship statute is inconsistent with § 1983 because it excludes damages for pain and suffering of the decedent."); *Williams v. City of Oakland*, 915 F. Supp. 1074 1078-79 (N.D. Cal. 1996) ("[T]his court concludes that California [survivorship law] is inimical to, and therefore inconsistent with, the purpose of section 1983."); *Guyton v. Phillips*, 532 F. Supp. 1154, 1167-68 (N.D. Cal. 1981) (holding that "the only just remedy that carries out the purposes of the Civil Rights Act of 1871 is an award of damages for the actual deprivation of right to life," notwithstanding California law barring such relief). Accordingly, *Garcia* does not represent the prevailing view, *even with respect to California law.*

This Court should decline to follow *Garcia* and should instead join the sound reasoning of the numerous federal courts cited herein in concluding that a state law which bars recovery for loss of the enjoyment of life is inconsistent with the purposes of the Civil Rights Act and the constitutional provisions implicated in this case.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment should be denied.

DATED this 2nd day of January, 2007.

BUDGE & HEIPT, P.L.L.C.

_____
Edwin S. Budge, *pro hac vice*
Erik J. Heipt, *pro hac vice*
Attorneys for Plaintiff

PLAINTIFF'S RESPONSE                          29