**Erik J. Heipt,** *pro hac vice*
erik@budgeandheipt.com
**Edwin S. Budge,** *pro hac vice*
ed@budgeandheipt.com
BUDGE & HEIPT, P.L.L.C.
705 Second Ave., Suite 910
Seattle, WA 98104
Telephone: 206-624-3060
Facsimile: 206-621-7323

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# DISTRICT OF ALASKA

| | |
|---|---|
| JULIA WALKER, individually and as Personal Representative of the ESTATE OF TROY WALLACE,<br><br>Plaintiffs,<br><br>v.<br><br>DAVID D. HENDERSON, LAURI A. MURRAY, WALTER T. RUD, SHERRI L. DAVIS, EDWIN D. IRIZARRY, LINDA MONTECILLO AND ERNEST MELOCHE, M.D.<br><br>Defendants. | NO. A05-0176 CV (RRB)<br><br>DECLARATION OF RICHARD O. CUMMINS, M.D. |

RICHARD O. CUMMINS, M.D. declares as follows:

1. I have been designated by the plaintiff as an expert witness in the above-entitled action.

DECLARATION OF
RICHARD O. CUMMINS, M.D.                                                   1

2. On June 1, 2006 I issued an expert report, a true and correct copy of which is attached hereto as Exhibit A. I incorporate herein, as my testimony under oath, all of the statements and opinions contained in the attached report. If called as an expert witness at trial I will testify under oath as to the matters set forth in the attached report.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

DATED this 20th day of December, 2006 at Seattle, Washington:

*/s/ Richard O. Cummins*

Richard O. Cummins, M.D.

DECLARATION OF
RICHARD O. CUMMINS, M.D.                    2

# Death of Troy Wallace

DOB: Oct 31, 1972 (age: 31)

DOD: July 24, 2004

LOD: Ketchikan Correctional Center; Ketchikan, Alaska

A Medical-Legal Review Prepared at the Request of

Legal Counsel for the Plaintiffs

by

Richard O. Cummins, MD, MPH, MSc

Professor of Medicine

University of Washington

-----------------------------------------------------------------------------------------------------

## INFORMATION REVIEWED

I have reviewed the following documents related to the death of Troy Wallace (deceased)

1. Special Incident Report, Alaska DOC, and related documents;
2. Criminal Remand Screening Form completed by Linda K. Monticello, RN;
3. KCC Medical Notes Sheet by Linda K. Monticello, RN;
4. Observation Cumulative Form;
5. Alaska DOC "Medical Guidelines: Alcohol Withdrawal" form with "Medication Administration Chart" completed by Linka K. Monticello, RN;
6. Autopsy Report for Troy Wallace for autopsy performed on 07/26/2004;
7. A videotape that records events leading up to and surrounding Troy Wallace's death.

## QUALIFICATIONS AND BACKGROUND

My medical training and experience is as follows: I am a duly licensed and practicing physician in the State of Washington, board certified in both Internal Medicine and Emergency Medicine. I have been on the faculty at the University of Washington, in the Department of Medicine, for over 20 years. I am a member of the Division of Emergency Medicine. There I practice internal medicine and emergency medicine, providing direct clinical care, as well as providing instruction and supervision to medical students and residents in specialty training. I am also a member of the faculty for the Madigan Army Medical Center-University of Washington Affiliated Emergency Medicine Residency Program. My current position is Professor of Medicine in the Department of Medicine and Attending Physician in the Emergency Department at the University of Washington Medical Center.

My work distribution is currently that of a "clinician-scholar", at the University of Washington, meaning I provide direct clinical care student and resident clinical teaching (75% of professional time), and conduct activities related to research and scholarship (25% of professional time). My clinical responsibilities comprise providing attending coverage of 8-10 shifts per month at 10 hours per shift. At the University of Washington we have responsibility for training medical students and residents from the four-state "W.A.M.I. Region" (Washington, Alaska, Montana, Idaho). Since many of these students and residents return to the states of the W.A.M.I. region for their medical careers, I am familiar with what the standards of emergency medicine practice should be for those regions.

I attended undergraduate college, courtesy of a John Motley Morehead Scholarship, at the University of North Carolina in Chapel Hill, receiving my undergraduate degree in 1968. While at the University of North Carolina I was elected to the Phi Beta Kappa society. I received my medical degree from Case Western Reserve University Medical School in 1972, graduating with honors from the Alpha

Omega Alpha society. I received residency training in Internal Medicine and Pediatrics at the University of Virginia. I was awarded a two-year Robert Wood Johnson Fellowship to the University of Washington School of Public Health, where I earned a Masters in Public Health degree. I also was awarded a five-year Milbank Memorial Fund Fellowship to the University of London where I obtained a Master of Science Degree. While in England I served as Instructor, Department of Clinical Epidemiology and General Practice, Royal Free Hospital School of Medicine from 1980 to 1981.

In 1981 I joined the faculty of the University of Washington as an Instructor in the Department of Medicine. I was appointed Assistant Professor later that year; Associate Professor in 1985; and full Professor in 1992.

I have been awarded a National "Award of Meritorious Achievement" in 1995 and a Distinguished National Service Award in 1994, both from the American Heart Association. In 2002 I was selected as the recipient of the national "Hans Dahll Award" given once every two years by the Citizen CPR Foundation and the American Heart Association for outstanding contributions to the field of resuscitation.

I have had a number of editorial responsibilities including: *Current Concepts in Emergency Cardiac Care (American Heart Association), Journal of General Internal Medicine Journal of the American Medical Association* and others. I have served on journal manuscript review committees for *American Heart Journal, American Journal of Emergency Medicine, Annals of Emergency Medicine, Chest* and *Circulation*, among others.

I have published more than 75 original research papers in peer-reviewed journals including *Circulation, Journal of the American Medical Association, Annals of Emergency Medicine, Annals of Internal Medicine, New England Journal of Medicine*, and others. I have published more than 40 editorials and reviews, and have written or edited more than 15 books on medical topics, including numerous individual chapters in these books. My research and publications have concentrated on emergency cardiovascular resuscitation and general cardiac care, and has included a variety of other topics in Emergency Medicine, Internal Medicine and Public Health. For additional details, I append my Curriculum Vitae reflecting my various writings and educational and professional accomplishments.

I have served as the Senior Science Editor for Advanced Cardiac Life Support and Emergency Cardiovascular Care for the American Heart Association. I have held national and international positions, including Chairman, AHA's National Emergency Cardiac Care Committee, Chairman, AHA's National Advanced Cardiac Life Support Subcommittee, and I was the co-founder of the International Liaison Committee on Resuscitation.

In 1994, and again in 1997-99 I served as the editor for the AHA's Textbooks of Advanced Cardiac Life Support. These textbooks are used in the national ACLS Training Course which enrolls more than 250,000 students each year. Since 2000, in my capacity as the Senior Science Editor for the

AHA for Advanced Cardiac Life Support, I have been responsible for continued development of the American Heart Association's guidelines for the care and evaluation of patients with life-threatening cardiovascular conditions including cardiac arrest, stroke syndromes, the acute coronary syndromes, acute myocardial infarction, aortic dissection, pulmonary embolism, pericarditis, pneumothorax, and life-threatening toxicologic, electrolyte and acid-base problems. I have recently completed work as the chief editor of the 2003 edition of the two-volume textbook Advanced Cardiac Life Support: the Reference Textbook (volume I: Principles and Practice; volume II: ACLS for Experienced Providers). I have also been co-editor for five editions of the Handbook of Emergency Cardiovascular Care which is regularly updated to provide clinicians with the recommendations and guidelines for evaluating and treating patients with cardiovascular emergencies.

In addition to the above, throughout my years of practice and teaching in Internal Medicine and Emergency Medicine, I have had many occasions to evaluate and treat patients with psychiatric, behavioral and toxicologic emergencies, including the various syndromes associated with alcohol withdrawal. In regards to the evaluation and treatment of patients with these conditions, I am familiar with the standards of care relative to the practice of a reasonably prudent emergency physician as well as registered nurses and other nursing staff.

## MEDICAL EXPERT ACTIVITY; PROFESSIONAL FEES

For the past decade I estimate that I am asked to provide expert medical review for an average of 12 cases per year. I estimate the plaintiff defense distribution of these cases to be 2:1. I do not maintain a summary list of the cases I review, nor the depositions I undergo. I have maintained a list (available on request) of trials in which I have testified from 2001 to the present.

My professional fees are: $275 per hour for record review, teleconferences, interviews, and in-person conferences; $550 per hour for depositions; $750 per hour for trial testimony. If travel out of town is required I request reimbursement for air and ground transportation, lodging and meals.

## SYNOPSIS OF RELEVANT MEDICAL FACTS

### Day 1 (July 20)
Mr. Troy Wallace was a 31 year old, self-acknowledged chronic, alcoholic. He had experienced alcoholic withdrawal in the past. At approximately 3:00 p.m. on July 20, 2004, he voluntarily reported to the Ketchikan Correctional Center to serve a 10-day sentence. He stated he had taken his last drink the day before on July 19. During his booking a corrections officer noted that Mr. Wallace was "shaking and

stated that he was withdrawing from alcohol." These observations are consistent with the initial stages of alcohol withdrawal.

### Day 2 (July 21)

The following day, July 21, Mr. Wallace received a "pre-remand" medical screening by Linda Monticello, RN at approximately 1:50 p.m. Several references were made to signs of alcohol withdrawal syndrome: *"concerned of alcohol withdrawal—noted fine hand tremor—denies any hallucinations."* Also: *"observe for DT."* This was Stage I of the alcohol withdrawal syndrome. Other than advice to increase fluids, nothing was done to reduce his symptoms or to prevent him from deteriorating further into alcohol withdrawal.

### Day 3 (July 22)

By 2pm on July 22, 24 hours later, Nurse Monticello recorded multiple signs and symptoms that indicate Mr. Wallace had deteriorated to more advanced stages, of the alcohol withdrawal syndrome: *"eval for poss. DT. Very sweaty—hand tremors—voicing 'things are moving on top of counter.'"* His blood pressure of 160/104 mmHg was significantly higher than it had been the previous day (132/96); heart rate was very rapid at 137 beats per minute; he had rapid breathing at 20 per minute. Nurse Monticello notes *"ta(l)king (without?) sence* (sic)." The combination of marked diaphoresis (very sweaty), elevated heart rate and blood pressure, hallucinations *("things are moving on counter")*, delirium (non-sense speech; global clouding of the sensorium); and hand shaking (hand tremors) are highly indicative of advanced alcohol withdrawal syndrome. In my opinion, Mr. Wallace was now in Stage III of alcohol withdrawal, and he was experiencing a serious complication of the alcohol withdrawal syndrome, *delirium tremens (DTs)*.

As of July 22nd at the latest, Mr. Wallace's condition required transfer to an in-patient treatment facility. He required parenteral (IV or IM) medications to control his serious signs and symptoms, as well as rehydration, and nutritional supplementation. He also needed diagnostic evaluation to establish the full severity of his withdrawal, as well as to identify significant co-morbidities (such as pneumonia, pancreatitis, gastritis) that often accompany alcohol withdrawal. The standard of care for Mr. Wallace at this time was in-patient treatment. With such treatment, Mr. Wallace would have been very unlikely to die. His risk of death had he received standard of care in-patient treatment would have been 1% or less. Left without such standard of care treatment at this point Mr. Wallace was at risk for the high level of mortality (up to 30-40%) observed for the delirium tremens syndrome prior to the development of benzodiazepines and other effective medications.

Instead of transferring Mr. Wallace to the hospital, at 2:30 pm, Nurse Monticello placed a telephone call to a Dr. Meloche, who was apparently a physician on-call for correctional center medical problems. The details of the report given to Dr. Meloche by Nurse Monticello are unknown. Presumably she would have described Mr. Wallace in the same objective fashion as he is described in her notes: 48-72 hours after last drink, disoriented, delirious, tremulous, hallucinating, sweaty, with high blood pressure, extremely elevated heart rate and rapid respirations. Dr. Meloche should have directed Nurse Monticello to urgently transfer Mr. Wallace to the local hospital for an emergency medical evaluation, initiation of parenteral therapy, and admission for in-patient monitoring and treatment. Similarly, as the professional at the bedside, Nurse Monticello should have specifically requested that Dr. Meloche order an urgent evaluation by a physician. If the same signs and symptoms were confirmed during this evaluation, the standard of care would mandate that Mr. Wallace be admitted for in-hospital treatment.

Unfortunately for Mr. Wallace, the result of this telephone consultation by Nurse Monticello with Dr. Meloche was an authorization to start the "Alcohol Withdrawal" Guideline of the Alaska Department of Corrections. Per this DOC Guideline, Mr. Wallace was started on clorazepate (brand name Tranxene), an alcohol-substitution drug often used to prevent alcohol withdrawal syndrome. He received a total of only 90 mg of clorazepate (brand name Tranxene) over the next 24 hours (2:30 pm=30 mg; 5pm=15mg; 11pm=15mg; 7am=15mg; 12noon=15mg). It is important to note that this Alaska DOC Alcohol Withdrawal Guideline is not a guideline for <u>treatment</u> of alcohol withdrawal syndrome. Instead it is a guideline aimed to <u>prevent</u> the onset of alcohol withdrawal syndromes. The differences between protocols to <u>prevent</u> alcohol withdrawal, and the complex protocols needed to <u>treat</u> alcohol withdrawal are profound. Dr. Meloche should have recognized that Mr. Wallace's condition merited far more intensive, in-hospital, treatment and that he had reached the point where initiation of this preventative protocol was totally inappropriate. The inadequacy of this low-dose, oral medication for treating a person in the later stages of significant alcohol withdrawal syndrome (delirium tremens syndrome), was confirmed by the subsequent death of Mr. Wallace.

Corrections staff noted that Mr. Wallace continued to suffer serious alcohol withdrawal symptoms throughtout the evening of July 22. The Special Incident Report from Sergeant Henderson notes that Mr. Wallace "was experiencing severe shakes and hallucinations during the entire period since I was on shift (Thursday, July 22, 2004) @ 1800 hours.

### Day 3 (July 23)

Mr. Wallace continued to display hand tremors, sweating, and some behavior problems necessitating transfer to a cell where he would be alone. He was medicated with only 45mg of clorazepate on this day (7am=15mg; 12noon=15mg; 9pm=15mg). In four brief notes Nurse Monticello described him as "observed cooperative," "continues to be cooperative," talking about getting a job, sitting on bunk, nodding at advice to rest. At 9:30am his BP has dropped to 115/84mmHg and a regular pulse at 80 beats per minute but continued rapid breathing at 20 per minute and continued to be diaphoretic. Though this clinical picture seems somewhat improved, it is critical to note that Mr. Wallace continued to hallucinate according to Nurse Monticello's written notes at 9:30 a.m. As long as this deep disturbance of his mental status and cognitive function persists Mr. Wallace must be considered in delirium tremens At 2:10 pm, with her last observation, Nurse Monticello notes Mr. Wallace to be fixing his blankets. He receives his last dose of clorazepate at 9 pm., which was apparently self-administered. Sometime after 1:00 a.m. he died.

### Day 4 (July 24 from midnight to 03:15am)

Most of the information about this interval comes from the surveillance videotape and the incident reports of the correctional officers. At approximately 12:57 a.m., he moves to the floor of his cell. His body movements, even when viewed from the distorted perspective of the videotape replay, appear consistent with the tonic-clonic, convulsing motions of alcohol withdrawal seizures. Such seizures are often a precursor to death in the delirium tremens syndrome. At 01:12 am all body motion stops, halting Mr. Wallace in an awkward position on the hard concrete floor. More likely than not the cessation of all movement, particularly in an awkward position represents the unconsciousness and unresponsiveness that follows the termination of cardiac and respiratory activity. Nearly 2 hours later, after 3am, correction officers open the door of his cell. They discover that he is cold, stiff and dead.

## MEDICAL OPINIONS

### Causes of a Preventable Death.

In my medical opinion, Mr. Wallace died from a particularly severe form of the *alcohol withdrawal syndrome* called *delirium tremens*. As people withdraw or detoxify from heavy, prolonged alcohol consumption they display variable degrees of signs and symptoms. The usual progression of signs and symptoms during alcohol withdrawal include irritability, tremors, insomnia, rapid heart rate, hypertension, rapid breathing, diaphoresis (sweating), anxiety, jitteriness, nausea, and decreased appetite.

Signs and symptoms at more advanced stages include hallucinations and seizures. Mr. Wallace displayed most or all of these symptoms within the first 48 hours of his confinement.

Experts recommend identification of the various *stages of alcohol withdrawal,* in order to assist with clinical decision-making and to help answer several important clinical questions. These questions include: which patients urgently need alcohol substitution drugs; whether they require the drugs at high doses or lower doses; whether they require medications intravenously, intramuscularly or orally; and whether they require a more advanced level of supervision and monitoring. These staging guidelines also help clinicians decide which patients can be treated with a closely supervised out-patient approach, and which patients need urgent hospitalization for general in-patient treatment or even intensive care unit admission.

Mr. Wallace was already well into the more advanced stages of alcohol withdrawal by the afternoon of July 22, 2004 when Dr. Meloche was first informed of his condition. From this point forward Mr. Wallace unequivocally displayed signs and symptoms that would require a reasonably prudent physician to:

- start an aggressive alcohol substitution treatment regimen, revolving around high doses of benzodiazepines, the drugs of choice for this syndrome;
- administer these medications either intramuscularly or (preferably) intravenously in a hospital setting; and
- once hospitalized, and under therapy, evaluate the patient for a long list of metabolic, nutritional, hematologic, gastrointestinal, cardiac and neurological co-morbid conditions that invariably accompany chronic alcohol addiction; and which can complicate the more severe alcohol withdrawal syndromes. On a more likely than not basis I think that a number of co-morbidities would have been identified and treated in Mr. Wallace, if searched for by a reasonably prudent physician. Mr. Wallace's eventual death is best explained by some combination of prolonged delirium tremens syndrome, dehydration, multiple electrolyte and acid-base derangements, leading to a form of alcohol withdrawal seizures, occult status epilepticus, terminal cardiac arrhythmia and cardiac arrest.

In my opinion, the responsible medical personnel, primarily nurse Linda Monticello and on-call physician, Dr. Meloche, had a professional duty to recognize the severity of Troy Wallace's alcohol withdrawal syndrome. They needed to appreciate that the onset of delirium and hallucinations defined Mr. Wallace as suffering from delirium tremens, a state of medical emergency with a high potential for significant morbidity and mortality. If treated by the standards of reasonable medical care, the causal chain that led to Troy Wallace's death would have been broken. This death was imminently preventable.

The need for hospital admission, parenteral alcohol substitutes, and metabolic and nutritional corrections was unquestionably present by his early afternoon evaluation on July 22, 2004. The initiation of the *preventative* protocol at this stage was inadequate and below the standard of care. These opinions apply in a similar way to the subsequent 24-hour period of July 23. The fact that he does not display the same severity of withdrawal signs and symptoms on July 23 as he was displaying on July 22, indicates only that the administration of clorazepate was having some benefit. That slight variation in clinical presentation does not indicate the end of his delirium tremens, and the risks that delirium tremens entail. It simply bought Mr. Wallace some extra time during which proper treatment could have saved his life.

Mr. Wallace's condition deteriorated during the evening of July 23 and after midnight on July 24. However, his death was still preventable and his condition reversible if emergency medical care had been provided to him at any point up to, and possibly several minutes after the cessation of body movement after 1:12 a.m. If the responsible correction officers had activated such a response within this deadline, it would have significantly increased his chances of resuscitation and recovery.

## CONCLUSION

All of the medical opinions in this report are made to a reasonable degree of medical certainty. I am prepared to testify to the foregoing opinions in court. Dated this 1st day of June, at Seattle, Washington.

*[signature]*

Richard O. Cummins, MD, MPH, MSc