**Erik J. Heipt,** *pro hac vice*
erik@budgeandheipt.com
**Edwin S. Budge,** *pro hac vice*
ed@budgeandheipt.com
BUDGE & HEIPT, P.L.L.C.
705 Second Ave., Suite 910
Seattle, WA 98104
Telephone: 206-624-3060
Facsimile: 206-621-7323

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## DISTRICT OF ALASKA

| | |
|---|---|
| JULIA WALKER, individually and as Personal Representative of the ESTATE OF TROY WALLACE, | ) ) ) NO. A05-0176 CV (RRB) |
| Plaintiffs, | ) ) DECLARATION OF EDWIN S. BUDGE |
| v. | ) ) |
| DAVID D. HENDERSON, LAURI A. MURRAY, WALTER T. RUD, SHERRI L. DAVIS, EDWIN D. IRIZARRY, LINDA MONTECILLO AND ERNEST MELOCHE, M.D. | ) ) ) ) ) |
| Defendants. | ) ) ) |

EDWIN S. BUDGE declares as follows:

DECLARATION OF
EDWIN S. BUDGE                    1

1.  I am one of the attorneys for the plaintiff in this matter. I have personal knowledge of the matters stated herein and am otherwise competent to testify thereto.

2.  Attached hereto as Exhibit A are true and correct copies of the following pages from the Deposition on Oral Examination of Linda Monticello: 32, 33, 35, 38, 40, 41, 42, 43, 48, 49, 50, 51, 52, 54, 55, 59, 60, 62, 63, 64, 69, 71, 72, 73, 74, 75, 76, 77, 78, 80, 81, 84, 85, 87, 88, 89, 91, 92, 108, 114, Exhibit 1, Exhibit 2, Exhibit 3 and Exhibit 5.

3.  Attached hereto as Exhibit B are true and correct copies of the following pages from the Deposition on Oral Examination of Ernest B. Meloche, M.D.: 7, 10, 12, 13, 14, 15, 16, 17, 18, 19, 20, 23, 26, 58, 59, 62, 70, 72, 73, 75, 76, 80, 81, 82, 87, 99, 120, 121, 122, 123, Exhibit 1, Exhibit 2.

4.  Attached hereto as Exhibit C is a true and correct copy of the Special Incident Report of Sgt. David D. Henderson produced by defendants in discovery in this action.

5.  Attached hereto as Exhibit D is a true and correct copy of the Incident Report of Officer Sharri Davis produced by defendants in discovery in this action.

6.  Attached hereto as Exhibit E is a true and correct copy of the Incident Report of Officer Edwin D. Irzarry produced by defendants in discovery in this action.

7.  Attached hereto as Exhibit F is a true and correct copy of the Incident Report of Officer Lauri A. Murray produced by defendants in discovery in this action.

DECLARATION OF
EDWIN S. BUDGE                    2

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

DATED this 2nd day of January, 2007 at Seattle, Washington.

_____

Edwin S. Budge

DECLARATION OF EDWIN S. BUDGE

EXHIBIT A – EXCERPTS FROM MONTICELLO DEPOSITION

Linda Monticello

```
 1              UNITED STATES DISTRICT COURT

 2                    DISTRICT OF ALASKA

 3   JULIA WALKER, individually    )
     and as Personal Representative)
 4   of the Estate of TROY WALLACE )
                                   )
 5                Plaintiffs,      )
                                   )
 6          vs.                    )
                                   )
 7                                 )
     DAVID D. HENDERSON, LAURI A.  )
 8   MURRAY, WALTER T. RUD, SHERRI )
     L. DAVIS, EDWIN D. IRIZARRY,  )
 9   LINDA MONTICELLO and ERNEST   )
     MELOCHE M.D.                  )
10                                 )
                Defendants.    )   No.  A05-0176 CV
11   _____)_____

12        DEPOSITION ON ORAL EXAMINATION

13                     OF

14             LINDA MONTECILLO

15   _____
                   8:15 a.m.
                September 19, 2006
16         Ketchikan Correctional Center
              1201 Schoenbar Road
17         Ketchikan, Alaska 99901

18

19

20

21

22

23

24

25
                                              Page 1
```

Linda Monticello

```
 1   Q    So, to your understanding, the Department of
 2        Corrections contracts with a physician here in
 3        Ketchikan to provide consultation services
 4        and/or medical care to inmates here at the KCC?
 5   A    To my understanding.
 6   Q    And as of July of 2004, who was that physician
 7        or physicians?
 8   A    Dr. Meloche.
 9   Q    Anybody else?
10   A    No.
11   Q    Is it still Dr. Meloche?
12   A    No.
13   Q    When did Dr. Meloche cease being the contract
14        physician, to your understanding?
15   A    June of 2006.
16   Q    Who is the contract physician now?
17   A    In the process, I would say, Dr. Ritchie, but
18        I'm not really sure.
19   Q    It's not settled in your mind?
20   A    No, it's just legal paperwork.
21   Q    Well who do you call now when you need to
22        consult with.....
23   A    I would call -- I would call Dr. Ritchie and I
24        would also call Dr. Bingham or Dr. Luban.
25   Q    And how long had Dr. Meloche been the contract
```

Page 32

Linda Monticello

```
 1        physician for the KCC to your understanding?
 2   A    Frankly speaking, I don't know.  Many years, I
 3        would say.
 4   Q    Was he -- has he always been the contract
 5        physician for the KCC to your understanding
 6        since you've been nurse?
 7   A    He's been the third contract doctor.
 8   Q    The third that has been the contract doctor
 9        since you've been here?
10   A    Correct.
11   Q    All right.  And I'm referring now to before June
12        of '06, because I know Dr. Meloche to your
13        understanding, is no longer the contract
14        physician.  Where did Dr. Meloche practice when
15        he was not at the KCC, to your understanding?
16   A    Excuse me.  Ketchikan General Hospital emergency
17        room.
18   Q    How far is the Ketchikan General Hospital from
19        the KCC?
20   A    Probably five minutes, give or take.
21   Q    As of July of 2004, was Dr. Meloche your main
22        contact when you felt that it was necessary.....
23   A    Correct.
24   Q    .....to involve a physician?
25   A    Correct.
```

Page 33

Linda Monticello

```
 1    A    He has a cell phone.
 2    Q    And was that the number that you used to contact
 3         him?
 4    A    I would know his schedule because we usually
 5         would speak as far as what his schedule would
 6         be.  So I had pretty good knowledge as to where
 7         I would be able to reach him.
 8    Q    And did you regularly provide information to Dr.
 9         Meloche on the telephone about an inmate's
10         medical condition?
11    A    Correct.
12    Q    As you observed it?
13    A    Correct.
14    Q    And did you -- did you make it a practice to
15         give Dr. Meloche as much relevant information as
16         you could about an inmate's symptoms?
17         MR. LESSMEIER:  Objection, form.....
18    A    Yes.
19         MR. LESSMEIER:  .....foundation.
20    Q    And in the years leading up to July of 2004, had
21         you had regular interaction with Dr. Meloche,
22         either in person or on the telephone about
23         inmate medical needs?
24    A    Before July?
25    Q    Yeah.
```

Page 35

Linda Monticello

```
 1    Q    Did Dr. Meloche sometimes come down to the jail
 2         to look at inmates when it was not sick call?
 3    A    Correct.
 4    Q    Okay.  If an individual inmate had a particular
 5         problem that couldn't wait until the next sick
 6         call, for example?
 7    A    Correct.
 8    Q    Back in 2000 -- in July of 2004, do you remember
 9         what day sick call was usually scheduled for?
10    A    We don't have a particular day.  It's -- when
11         it's available and convenient.
12    Q    So if an inmate submitted a cop out and you put
13         them on the list for sick call, would you be
14         able to tell the inmate when they would be seen?
15    A    Correct.
16    Q    Because you'd be able to look at Dr. Meloche's
17         schedule and look at the inmate's needs and how
18         many there were and come up with a day?
19    A    Correct.
20    Q    So Dr. Meloche did some -- excuse me.  Dr.
21         Meloche did regularly come for sick call before
22         July of 2004, is that right?
23    A    Yes.
24    Q    And he also would come to the jail on a case by
25         case basis, even when not specifically
```

Page 38

Linda Monticello

```
 1         scheduled?
 2    A    Yes.
 3    Q    And did Dr. Meloche use the examination room
 4         when he was looking at patients here at the KCC?
 5    A    Yes.
 6    Q    And he used the medical -- the resources here at
 7         the KCC that you described earlier, the -- as
 8         needed?
 9    A    Correct.
10    Q    Did he bring any of his own equipment or
11         materials with him when he would come?
12    A    Not to my knowledge.
13    Q    Was he, as you observed it, familiar with the
14         staff?
15    A    Yes.
16    Q    And was he also familiar, as you observed it,
17         with the layout of the jail?
18    A    Yes.
19    Q    Do you know if Dr. Meloche was aware of the fact
20         that there was no onsite medical provider here
21         at the KCC between at least the hours of 5:30
22         p.m. and six a.m.?
23    A    Yes.
24    Q    As it pertained to the medical needs of inmates,
25         did you consider yourself the primary liaison
```

Page 39

Linda Monticello

```
 1        between the KCC and Dr. Meloche?
 2    A   Correct.
 3        MR. LESSMEIER:  Dr. Meloche.
 4        MR. BUDGE:  Meloche.  I apologize.  I've done
 5    pretty good this whole deposition and I just let it -
 6    - I just let it slip.
 7    Q   Did anybody else at the KCC have liaison
 8        responsibilities as it pertained to medical
 9        needs of inmates?
10    A   No.
11    Q   Were there ever any occasion where Dr. Meloche
12        would come to the KCC to do an examination and
13        then order that the inmate be transferred to an
14        offsite medical facility?
15    A   Yes.
16    Q   That facility being the Ketchikan General
17        Hospital?
18    A   Correct.
19    Q   Were there ever occasions where Dr. Meloche
20        would listen to your description of an inmate's
21        symptoms on the telephone and then order that
22        the inmate be transferred to an offsite medical
23        facility without even coming down to the jail to
24        do a personal evaluation.
25        MR. LESSMEIER: Objection, form, foundation.
```

Page 40

Linda Monticello

```
 1    A    Yes.

 2    Q    Are there any other hospitals in the Ketchikan

 3         area besides the Ketchikan General Hospital?

 4    A    No.

 5    Q    So if an inmate needed to be transported to the

 6         hospital, as far as you know, is he or she

 7         always taken to the Ketchikan General Hospital?

 8    A    Yes.

 9    Q    Can you give me any examples of any times where

10         Dr. Meloche listened to your description of an

11         inmate's symptoms on the telephone and then

12         ordered that the inmate be transferred to the

13         hospital?

14         MR. LESSMEIER:  Objection to the form of the

15    question.

16    A    I can't remember exact description or what

17         transpired, but there were occasions that right

18         away we sent a person to the emergency room.

19    Q    In cases where an inmate's symptoms were such

20         that they merited that you consult with Dr.

21         Meloche, did you rely on Dr. Meloche to decide

22         what kind of care or treatment the inmate should

23         get?

24         MR. LESSMEIER: Objection, form, foundation.

25    A    Yes.
```

Page 41

Linda Monticello

```
 1    Q    And did you regularly follow his advice and
 2         instructions on the proper course of treatment?
 3         MR. LESSMEIER: Objection, form, foundation.
 4    A    Yes.
 5    Q    To your knowledge, did you ever deviate from Dr.
 6         Meloche's treatment advice or instructions?
 7         MR. LESSMEIER: Objection, form, foundation.
 8    A    No.
 9    Q    In cases where an inmate's symptoms were such
10         that they merited that you consult with Dr.
11         Meloche, did you rely on Dr. Meloche to decide
12         whether the inmate's symptoms were such that
13         they should be treated here at the KCC or,
14         alternatively, at the hospital?
15         MR. LESSMEIER: Objection, form, foundation.
16    A    Yes.
17    Q    Does the KCC have procedures in place for
18         transporting inmates to the hospital?
19    A    The department has policies that KCC basically
20         follows.
21    Q    Does the KCC regularly transport hos -- inmates
22         to the hospital when it's deemed necessary?
23    A    Yes.
24    Q    Okay.  Is it ever the case that inmates are
25         sometimes transported to the hospital and then
```

Page 42

Linda Monticello

```
 1          stay there for several days before returning to
 2          the KCC?
 3     A.   There were instances, yes.
 4     Q    And would you as a nurse ever have any
 5          hesitation in having an inmate transported to
 6          the hospital for evaluation if Dr. Meloche
 7          ordered or advised that that be done?
 8          MR. LESSMEIER:  Objection, form, foundation.
 9     A    No.
10     Q    Are there sometimes situations where, in your
11          judgment, an inmate's medical needs are serious
12          enough that he or she needs to be transported to
13          the hospital to get appropriate medical care?
14     A    Yes.
15     Q    And in your judgment, is the hospital better
16          equipped to provide medical care in many
17          situations?
18     A    Yes.
19     Q    Is the hospital better equipped to provide
20          around the clock medical care than the KCC?
21          MR. LESSMEIER:  Objection, form, foundation.
22     A    Yes.
23     Q    In your job as nurse, are there requirements
24          that you keep records of medical issues as they
25          pertain to inmates?
```

Page 43

Linda Monticello

```
 1   A   The state.

 2   Q   The state, All right.  It also says at the top

 3       that the time of remand is 7/20/04.  Do you see

 4       that?

 5   A   Oh.  Oh, okay.  Yes.

 6   Q   And just for the record, between the dates of

 7       7/20/04 and 7/24/04, were you the only nurse who

 8       was working at the KCC?

 9   A   Correct.

10   Q   Was Nurse Helen off that week?

11   A   She was on vacation.

12   Q   All right.  What were your hours during the week

13       of -- or during the days, I should say, that

14       spanned 7/20/04 through 7/24/04?

15   A   Six in the morning until 2:00 in the afternoon.

16   Q   And was that the shift that you worked on

17       7/20/04, 7/21/04, 7/22/04, 7/23/04, and 7/24/04?

18   A   I do believe it was.

19   Q   During those days, 7/20/04 to 7/24/04, was there

20       any onsite nurse or other medical provider

21       between the hours of 2:00 p.m. and 6:00 a.m.?

22   A   No.

23   Q   Okay.  If you go down about one-third the way

24       down the first page, it says that the pre-remand

25       screening was completed by Linda K. Monticello
```

Page 48

Linda Monticello

```
 1          on 7/21/04 1350, do you see that?

 2    A     Correct.

 3    Q     Why was the pre-remand screening not completed

 4          until the day after Mr. Wallace had been

 5          remanded?

 6    A     I don't know.

 7    Q     Have you ever asked anybody why a pre-remand

 8          screening was not done at the -- at or near the

 9          time of booking on 7/20/04?

10    A     I just don't remember if I did or not.

11    Q     Was it typical that pre-remand screenings would

12          not be done until the following day after

13          remand?

14    A     We would like to have everybody have one of

15          these done as soon as they walk in the door.

16          But sometimes it just happens.

17    Q     Okay.  Then we go down to the post-remand

18          screening, which is about two-thirds down the

19          page.  It says that the post-remand screening is

20          to be completed by medical staff if on duty, if

21          not, then by security staff immediately after

22          accepting the remand.  Do you see that?

23    A     Correct.

24    Q     What does that mean to you, immediately after

25          accepting the remand?
```

Page 49

Linda Monticello

```
1   A   It means that the person walked through the door
2       and the officers that are in charge take the
3       prisoner in.  That's what it means, that we
4       accept them.
5   Q   Okay.  So.....
6   A   And they should have -- and a full screening
7       should be done.
8   Q   If it says that the post-remand screening was
9       completed by you on 7/21/04 at 1350, do you see
10      that at the bottom of the page, or near the
11      bottom of the page?
12  A   Yes I do.
13  Q   So it appears from this document that the quote,
14      pre-remand screening and the post-remand
15      screening were actually conducted at the same
16      time on the same date.  Do you see that?
17  A   Yes.
18  Q   Why was that?
19  A   It just happened.
20  Q   Is that how it's supposed to be done?
21  A   No.
22  Q   How is it supposed to be done?
23  A   As soon as the pa -- the person comes in,
24      they're screened and if a medical staff is on
25      hand, the medical staff will complete the three
```

Page 50

Linda Monticello

```
 1        pages.
 2    Q   So is it the case that this was supposed to have
 3        been done the previous day?
 4        MS. JACOBSON: Wait, wait.  You're mixing up pre
 5    and post.
 6    Q   Okay.  Is it the case that the pre-remand
 7        screening was supposed to have been done the
 8        previous day?
 9    A   The pre, yes.
10    Q   And when should the post-remand screening have
11        been done?
12    A   We have 24 hours to complete the post-remand
13        screening.
14    Q   Okay.  So just for purposes of clarification,
15        earlier in the deposition we were talking about
16        when the pre-remand screening is supposed to be
17        done and I think you said within 24 hours.
18    A   The post-remand screen, you have up to 24 hours
19        to complete.
20    Q   I see.
21    A   The pre-remand screen should be right on the
22        moment that the person comes through the door.
23    Q   Okay.  So the -- just for clarification, the
24        pre-remand screening should be done at the time
25        of booking, right?
```

Page 51

Linda Monticello

```
 1    A    Correct.
 2    Q    And the post-remand screening should be done
 3         within 24 hours?
 4    A    Correct.
 5    Q    All right.  And in this case, the pre-remand
 6         screening is not done until sometime after about
 7         -- after he'd been here for about 20 hours?
 8    A    Correct.
 9    Q    And you don't have an explanation for why that
10         happened?
11    A    No I don't.
12    Q    What -- what does the handwriting on the very
13         bottom of the first page refer to?
14    A    I put a tuberculosis test on July 21st, 2004 at
15         1350 on his left forearm.
16    Q    Okay.  And if you look at the original of that
17         document in your manila folder, it appears to be
18         written in a different color ink.
19    A    I like two different inks.
20         MR. JACOBSON:  I told you the ink question would
21    definitely come up.
22    Q    Yeah.
23    A    Helen liked purple and I liked green.
24    Q    Oh, okay.
25    A    And red basically is a flag that said yeah, he
```

Linda Monticello

| | | |
|---|---|---|
| 1 | | weeks, your entry says, at remand, two days ago. |
| 2 | | Do you see that? |
| 3 | A | Yes. |
| 4 | Q | What do you mean by that? |
| 5 | A | Initially he was scheduled to come in, I do |
| 6 | | believe, a day before we actually accepted him. |
| 7 | | He showed up in the door and he was intoxicated. |
| 8 | | An officer met him and basically told him that |
| 9 | | he needed to sober up before he could come in |
| 10 | | and do his time.  And so what I stated there is |
| 11 | | that two days ago, when he was remanded, there |
| 12 | | was alcohol. |
| 13 | Q | Okay.  But he wasn't really remanded? |
| 14 | A | No. |
| 15 | Q | So, in other words, he presented himself to the |
| 16 | | jail..... |
| 17 | A | Yeah. |
| 18 | Q | .....but the remand was declined..... |
| 19 | A | Yes. |
| 20 | Q | .....at the jail? |
| 21 | A | I'm sorry. |
| 22 | Q | And would this information that you received at |
| 23 | | the time that you completed this form, that he |
| 24 | | had used alcohol at least on 7/19/04? |
| 25 | A | I knew that information because when he |

Page 54

Linda Monticello

```
 1          presented himself the day before, I actually saw
 2          him at the door when they received him.
 3     Q    Okay.  So you were -- you witnessed that
 4          refusal?
 5     A    Yeah.
 6     Q    And have you told me everything you remember
 7          about that interaction where the KCC refused to
 8          accept him for confinement on 7/19/04?
 9     A    He was just at the door out here and basically
10          he was advised he needs to sober up.
11     Q    And then come back?
12     A    Yes.
13     Q    And do you know who the officer was that told
14          him that?
15     A    I can't remember.
16     Q    What was it about the way that Mr. Wallace
17          presented himself that indicated that he was
18          intoxicated?
19     A    He smelled of alcohol.
20     Q    Okay.  So he was actually let through the door
21          and taken into the booking area?
22     A    No.  He was right here, where you presented
23          yourself.
24     Q    The very first time?
25     A    Right there, yeah.
```

Page 55

Linda Monticello

```
 1         complications?
 2         MR. LESSMEIER:  Same objection, form,
 3    foundation.
 4    A    I would say it's not my understanding, but the
 5         potential is there, though.  There would be some
 6         complications.
 7    Q    Do you agree that alcohol withdrawal can be a
 8         serious and potentially fatal condition?
 9         MR. LESSMEIER:  Objection, form, foundation.
10    A    Could you say that question again please?
11    Q    Do you agree that alcohol withdrawal can be a
12         serious and potentially fatal condition?
13         MR. LESSMEIER:  Objection, form, foundation.
14    A    It would depend on the severity of the
15         complications.
16    Q    Okay.  And what about in severe cases?
17         MR. LESSMEIER:  Same objection, form,
18    foundation.
19    A    It could possibly be.
20    Q    What training have you received with respect to
21         alcohol withdrawal, if any?
22    A    The only training I have is based on experiences
23         that went through the door here.
24    Q    Have -- is it the case that you've not received
25         any specific medical or nursing training on the
```

Page 59

Linda Monticello

```
 1        issue of alcohol withdrawal?
 2        MR. LESSMEIER:  Objection.
 3        MS. JACOBSON:  Clarify, only nurse -- she's a
 4   nurse.
 5   Q    Yeah, okay.
 6   A    The only experience I have is what I have dealt
 7        with as they come in.  I have no specific
 8        written certificate that states that I have
 9        training on alcohol withdrawal.
10   Q    And if you look back through your educational
11        history, both in nursing school and even after
12        nursing school, have you ever had any classes or
13        courses or instruction on the issue of alcohol
14        withdrawal?
15   A    No.
16   Q    All right.  If you go back now to that entry
17        under withdrawal history where it says alcohol
18        withdrawal, were you informed at or about the
19        time that you completed this form that Mr.
20        Wallace had a history of alcohol withdrawal?
21   A    I had written alcohol withdrawal.  My standard
22        of interviewing is have you had any history of
23        alcohol withdrawal and since I wrote down
24        alcohol withdrawal, he most likely had stated
25        that he had a history of alcohol withdrawal.
```

Page 60

Linda Monticello

```
 1   A   Hallucinations.

 2   Q   What else?

 3   A   Tremors.

 4   Q   What else?

 5   A   Increased blood pressure, vital signs are more

 6       elevated than normal.

 7   Q   What about excessive sweating?  Is that one sign

 8       or symptom of DT?

 9   A   Correct.

10   Q   What about excessive pulse rate?  Is that a sign

11       or symptom of DT?

12   A   As stated as the vital signs being elevated.

13   Q   In your view are delirium tremens a serious

14       medical condition?

15       MR. LESSMEIER:  Objection, form, foundation.

16   A   Yes.

17   Q   Why was it that you wrote here observe for DT?

18   A   It's something for me to keep an eye on.  It

19       says other pertinent information.

20   Q   What was it about the way Mr. Wallace presented

21       himself as the post-remand screening that led

22       you to write observe for DT?

23   A   It's based on his response to alcohol

24       withdrawal, that he said he has a history of

25       alcohol withdrawal.  It was more the in -- the
```

Page 62

Linda Monticello

```
 1          interview that brought to my attention.
 2     Q    Did you have any specific kind of observation in
 3          mind when you wrote observe for DT?
 4     A    Meaning to say?
 5     Q    Well, for example, did you mean, okay, we're
 6          going to evaluate him every so many hours, or
 7          we're going to, you know, take his vitals on
 8          this -- on this -- on this schedule or we're
 9          going to put him in a special cell, or we're
10          going to do something.  Was this just sort of a
11          reminder to yourself?
12          MR. LESSMEIER:  Objection, form.
13     A    It's just something for me to be aware of.
14     Q    If you go back to exhibit number one for a
15          minute, did anybody every communicate to you the
16          information as reflected on exhibit number one
17          that, as of booking, Mr. Wallace was shaking and
18          stated that he was withdrawing from alcohol?
19     A    You know, I don't know.  I can't remember.
20     Q    And if you look now on exhibit number two,
21          number three, do you recognize this document?
22     A    Yes.
23                              (Exhibit 3 introduced)
24     Q    What is it?
25     A    It's progress notes.
```

Page 63

Linda Monticello

```
 1    Q    For Mr. Wallace?

 2    A    Yes.

 3    Q    Is this all your handwriting?

 4    A    Yes.

 5    Q    Is this the type of document that you regularly

 6         complete?

 7    A    Yes.

 8    Q    What is the purpose of this document?

 9    A    To gather information, put it in writing, the

10         legal piece of paper.

11    Q    So you can have record of what happened?

12    A    Yes.

13    Q    And when you're filling this out, is it

14         important to be as accurate as you can?

15    A    Yes.

16    Q    And did you try to be as accurate as you could

17         when filling out this particular form?

18    A    To my best ability, yes.

19    Q    All right.  I want to focus on the first entry

20         under 7/21/04 at 1350.

21    A    Yes.

22    Q    Please read it for me.

23    A    Remand 07/20/04 to serve time.  Denies history

24         of a positive tuberculosis test.  Given tubersol

25         0.1ml in the left forearm, internal dermal,
```

Page 64

Linda Monticello

```
 1    Q    Okay.  Go -- go now if you would to the next
 2         entry, 7/22/04 at 1400 hours, on exhibit number
 3         3.  This appears to indicate that you evaluated
 4         Mr. Wallace on 7/22/04 at 1400 hours.  Is that
 5         accurate?
 6    A    Correct.
 7    Q    Did you have any contact with Mr. Wallace
 8         between the hours of 1350 on 7/21/04 and 1400 on
 9         7/22/04?
10         MS. JACOBSON:  Do you mean direct contact?
11         MR. BUDGE:  Yeah.
12    A    Just possibly during medication time and the
13         slots are open and, you know, I most likely had
14         seen him there.
15    Q    Did you evaluate him between 7/21/04 at 1350
16         hours and 7/22/04 at 1400 hours?
17    A    No.
18    Q    By the way, did you do any evaluations of Mr.
19         Wallace that are not reflected in exhibit number
20         3?
21    A    What's here is what I did.
22    Q    Okay.
23    A    The third page.....
24    Q    Right.
25    A    .....again, yeah.
```

Page 69

Linda Monticello

```
 1   Q   And, again, when you say that you're evaluating

 2       for possible DT, by that you mean delirium

 3       tremens?

 4   A   Correct.

 5   Q   You noted in your evaluation that he was very

 6       sweaty?

 7   A   Yes.

 8   Q   Is excessive sweating a sign and symptom of DT?

 9   A   Correct.

10   Q   And you also noted hand tremors?

11   A   Yes.

12   Q   Are hand tremors a sign and symptom of DT?

13       MR. LESSMEIER:  Objection, form.

14   A   Yes.

15   Q   You also noted voicing, quote, things are moving

16       on top of counter, end quote.  Do you see that?

17   A   Yes.

18   Q   Did that suggest to you that Mr. Wallace was

19       experiencing visual hallucination?

20   A   Correct.

21   Q   Are visual hallucinations a symptom of DT?

22   A   Yes.

23   Q   You took Mr. Wallace's blood pressure at this

24       time, is that right?

25   A   Yes.
```

Page 71

Linda Monticello

```
 1   Q   And you noted that it was 160 over 104, correct?

 2   A   Correct.

 3   Q   Is that high?

 4   A   Yes.

 5   Q   Can you describe for me how high it is in

 6       relation to the blood pressure that you'd expect

 7       if he'd have been a healthy individual?

 8   A   I -- I based it on my initial blood pressure,

 9       which was 132 over 96, so it was high compared

10       to that, so.

11   Q   Would you say that it was markedly elevated?

12       MR. LESSMEIER:  Objection, form.

13   A   I would say it's elevated.  I wouldn't say the

14       way you say, markedly elevated.

15   Q   Oh.  I don't know how blood pressure works.  I

16       think I explained that before.  If somebody

17       comes in who's, you know, in his mid-thirties,

18       and shows a blood pressure of 160 over 104, is

19       that something that would cause concern as a

20       nurse?

21       MR. LESSMEIER:  Objection, form, foundation.

22   A   It would depend on the person, his history.

23   Q   Is elevated blood pressure a symptom of DT?

24       MR. LESSMEIER:  Objection, form.

25   A   It's a symptom.
```

Page 72

Linda Monticello

```
 1   Q   Okay.  It also says his pulse is 137, is that
 2       right?
 3   A   Correct.
 4   Q   Is that beats per minute?
 5   A   I beg your pardon?
 6   Q   Is that 137 beats per minute?
 7   A   Yes.
 8   Q   Did you take his pulse?
 9   A   I did take his pulse so far as touching it.  I
10       based it on the blood pressure monitor, which is
11       also incorporated with a pulse monitor.
12   Q   Okay.  So that you gives you a pulse rate, or
13       read out, right?
14   A   Correct.
15   Q   And was that a resting pulse rate of 137 beats
16       per minute?
17   A   I wouldn't know if it was a resting.  It was the
18       pulse that was taken at the same time that the
19       blood pressure was taken.  It was registered on
20       the machine and what the machine printed out was
21       -- not printed out, but showed was what I wrote
22       here.
23   Q   Is 137 beats per minute a high pulse rate?
24   A   Yes it is.
25   Q   What -- what is a normal pulse rate for somebody
```

Page 73

Linda Monticello

```
 1          in Mr. Wallace's -- of Mr. Wallace's age, for
 2          example, if he'd been healthy?
 3      A   I would say between 80 to 100.
 4      Q   Is high pulse rate, including this particular
 5          reading of 137, a symptom of DT?
 6      A   A symptom, yes.
 7      Q   And you noted that his respirations were
 8          20/easy, what does that mean?
 9      A   That means he wasn't gasping for air, that means
10          he wasn't hyperventilating, that he was
11          breathing normally.
12      Q   Is 20 respirations per minute high?
13      A   No.
14      Q   So he had normal respirations with a high pulse
15          rate, right?
16      A   Correct.
17      Q   You also noted that he was talking without
18          sense.  What do you mean by that?
19      A   Because he told me that there was something
20          moving on the counter.
21      Q   Was there anything moving on the counter?
22      A   I didn't see it.
23      Q   Okay.  So did it appear to you that he was
24          delirious to some degree?
25          MR. LESSMEIER:  Objection, form, foundation.
```

Page 74

Linda Monticello

```
 1   A    He was -- from my point of view he was
 2        hallucinating.
 3   Q    Did Mr. Wallace appear to be -- other than the
 4        fact that he was hallucinating, did he appear to
 5        be mentally confused in any other way?
 6   A    I'm not a mental person, but I would not say he
 7        wasn't.  He was not mentally confused, he
 8        carried out a conversation, he was seeing
 9        something that I didn't see.
10   Q    Okay.  But he was answering your questions in a
11        -- what appeared to you to be a rational way?
12   A    Correct.
13   Q    Okay.  Going down to your next entry under 1430
14        on 7/22/04, that entry appears to indicate that
15        you made a telephone call to Dr. Meloche, is
16        that right?
17   A    Correct.
18   Q    What was your purpose in making that telephone
19        call?
20        MR. LESSMEIER:  Objection, foundation, form.
21   A    To have Dr. Meloche be aware that there's
22        someone that we're concerned about.
23   Q    Was it your intent to get some instructions from
24        Dr. Meloche about how to treat Mr. Wallace?
25        MR. LESSMEIER:  Objection, form.
```

Page 75

Linda Monticello

```
 1    A    Yes.
 2    Q    And it appears to indicate that you made the
 3         call to Dr. Meloche within a half hour of your
 4         evaluation of Mr. Wallace on that date, is that
 5         right?
 6    A    If the records show, yes.
 7    Q    Do you recall whether you reached Dr. Meloche
 8         directly or whether he had to call you back?
 9    A    I can't recall exactly the details.
10    Q    Do you know where he was at the time that you
11         called him?
12    A    I don't know.
13    Q    Did you provide information to Dr. Meloche about
14         Mr. Wallace's status?
15    A    My standard of care is I write the things down
16         and when I call him I read what I have written
17         down.
18    Q    Okay.  So your standard procedure would have
19         been to provide to Dr. Meloche all of the
20         information under the entry of 7/22/04 at 1400
21         hours?
22    A    Yes.
23    Q    Was this your first communication with Dr.
24         Meloche about Mr. Wallace?
25    A    Yes.
```

Page 76

Linda Monticello

```
 1    Q    Was this your first communication with any other
 2         medical provider about Mr. Wallace?
 3    A    Yes.
 4    Q    Did you want to give Dr. Meloche a full and
 5         complete picture of Mr. Wallace's condition as
 6         you knew it to be as of 7/22/04 at 1400 hours?
 7         MR. LESSMEIER:  Objection, form, foundation.
 8    A    I wanted to relay what I had assessed on the
 9         prisoner at that time.
10    Q    And during your call to Dr. Meloche at 1430
11         hours, did you give him the information that you
12         had about Mr. Wallace's medical condition at the
13         time?
14         MR. LESSMEIER:  Objection, form, foundation.
15    A    Just what I had written on  -- at 1400.
16    Q    Okay.  Did you tell Dr. Meloche that Mr. Wallace
17         was very sweaty?
18    A    Most likely I told Dr. Meloche.....
19         MR. LESSMEIER:  Let me just object on the basis
20    of foundation.  Go ahead.
21    A    .....what I had written on 1400.
22    Q    Okay.  Did you tell Dr. Meloche the information
23         that you had obtained from your evaluation of
24         Mr. Wallace on 7/21/04 at 1350?
25         MR. LESSMEIER:  Objection, foundation.
```

Page 77

Linda Monticello

```
 1    A    I -- I don't know.
 2    Q    Would that have been your standard practice?
 3    A    What I -- you know, I really don't know, and
 4         most likely to give him an up to date on this
 5         person, I most likely would have said this guy
 6         came in, so and so days ago.....
 7    Q    Okay.
 8    A    .....he was here to do his time, and then right
 9         now he is very sweaty, hand tremors, he's seeing
10         things moving on top of the counter, his blood
11         pressure is 160 over 104, his pulse is 137.  I
12         would read the stuff that I have written here
13         and relay that message to Dr. Meloche.
14    Q    Okay.  Would it.....
15         MR. LESSMEIER:  Just for the record, I've
16    written here you're referring to your 1400 hour
17    entry.....
18    A    Correct.
19         MR. LESSMEIER:  .....on 7/22/04.
20    Q    Would it have been your standard practice to
21         give him information from the previous day?
22         MR. LESSMEIER:  Objection form, foundation.
23    A    Like I had stated early, I would say this guy
24         came in a couple days ago.....
25    Q    Okay.
```

Page 78

Linda Monticello

```
 1         standard of care?
 2    A    Yes, it would.
 3    Q    Would it have been consistent with the standard
 4         of care to give Dr. Meloche the information
 5         contained in the progress notes for 7/21/04 at
 6         1350?
 7         MR. LESSMEIER:  Objection, form, foundation.
 8    A    Basically, told him he's been here how many
 9         days, vital signs are now this.
10    Q    Can you remember what Dr. Meloche said to you
11         during your conversation with him on 7/22/04?
12    A    I can't remember exactly what he said.
13    Q    Can you remember generally what he said?
14    A    To initiate DT protocol.
15    Q    And are you remembering that from your own mind
16         or are you remembering that from the form that
17         you filled out?
18    A    That's what I wrote here.
19    Q    Did Dr. Meloche order or advice that Mr. Wallace
20         be transported to the hospital?
21    A    No.
22    Q    If he had done so, would you have followed that
23         advice?
24    A    Yes.
25         MR. LESSMEIER:  Objection, form.
```

SEAK Professional Services, LLC
2415 Hemlock Street, Suite 104, Ketchikan, Alaska 99901

Linda Monticello

```
 1    A    Yes.

 2    Q    Did Dr. Meloche suggest or say that he would

 3         come to the jail to personally evaluate Mr.

 4         Wallace?

 5         MR. LESSMEIER:  Objection, foundation.

 6    A    I don't remember that conversation exactly.

 7    Q    Do you remember anything of that kind?

 8    A    No.

 9    Q    Was initiating the DT protocol the sum total of

10         what Dr. Meloche told you?

11         MR. LESSMEIER:  Objection, foundation.

12    A    It -- you know, I don't know exactly how many

13         words he relayed to me, but that's all I wrote

14         down.

15    Q    Okay.  If he had given you any other medical

16         instructions or advice for treating Mr. Wallace

17         would have written it down?

18    A    I -- yes.

19    Q    Okay.  When we talk about initiate the DT

20         protocol, I'm wondering whether Dr. Meloche

21         specifically said initiate the DT protocol or

22         whether he gave you specific information about

23         the kind of medication that Mr. Wallace was to

24         receive and on what schedule and then you

25         translated that in your mind and wrote down.
```

Page 81

Linda Monticello

| 1 | Q | Do you know whether Dr. Meloche understood what |
| 2 | | the DT protocol consisted of? |
| 3 | A | I don't know what Dr. Meloche knew or |
| 4 | | understood. |
| 5 | Q | Have you had any experience with involving Dr. |
| 6 | | Meloche in inmate care as it pertained to |
| 7 | | alcohol withdrawal prior to Mr. Wallace? |
| 8 | A | If you're asking me if we had other alcohol |
| 9 | | withdrawal treatments aside from Wallace? |
| 10 | Q | Yeah. |
| 11 | A | Yes. |
| 12 | Q | Okay.  How many times? |
| 13 | A | I couldn't give you the number. |
| 14 | Q | Can you estimate for me whether it would have |
| 15 | | been more or less than 10 times prior to Mr. |
| 16 | | Wallace? |
| 17 | | MR. LESSMEIER:  Objection, foundation, form. |
| 18 | A | You know, I don't know.  Maybe more than 10, |
| 19 | | maybe less than 10.  I really can't give you a |
| 20 | | figure. |
| 21 | | (Whispered conversation) |
| 22 | Q | Okay.  Under this entry for 7/22/04 at 1430, |
| 23 | | after you say initiate DT protocol, can you go |
| 24 | | ahead and read the rest of that entry for me? |
| 25 | A | It says, Clorazepate 15 milligrams, Thiamine 100 |

Page 84

Linda Monticello

```
 1          milligrams IM/STAT, then Thiamine 100 milligrams
 2          PO Q D times four days.  TO, telephone order,
 3          Dr. Meloche/Linda Montecillo, RN.
 4     Q    What does PO Q D times four days mean?
 5     A    Oral daily.  One tablet.
 6     Q    When you wrote down the medication -- this
 7          information about medications, were you writing
 8          down Dr. Meloche's specific orders or were you
 9          getting this information off of the DT protocol
10          sheet?
11     A    I got it out of the DT protocol sheet in a --
12          what I would say, lesser writing version than
13          the whole protocol itself.
14     Q    Okay.  And then there's another entry for
15          7/22/04 at 1450.  Can you go ahead and read that
16          for me please?
17     A    Given Thiamine 100 milligrams IM left deltoid
18          muscle, tolerated procedure.  Clorazepate, 15
19          milligrams, two tablets given.  Monitor, follow
20          up, PRN, Linda Montecillo.
21     Q    And what does -- remind me again what PRN means?
22     A    As needed.
23     Q    Okay.  And was this simply a record of the
24          medication that you gave Mr. Wallace at that
25          time?
```

Page 85

Linda Monticello

```
 1   A    Yes.

 2   Q    So you had no contact with him between 7/22/04

 3        at 1450 and 7/23/04 at 6:10?

 4   A    No.

 5   Q    And to your knowledge he was not evaluated by

 6        any medical provider during that period of time?

 7   A    During the time that there was no contact?

 8   Q    Right.

 9   A    Correct.

10   Q    What does it say?  Could you read it for me

11        please, under 7/23/04 at 6:10?

12   A    Observed in room 224, was informed by officer

13        inmate refused to give breakfast tray to cell

14        mate, now placed in room 224.

15   Q    And then go ahead and read the next entry for

16        seven a.m., please.

17   A    Inmate medicated, hand tremors observed,

18        cooperative.

19   Q    And then read what it says under 7:10.

20   A    observed -- escorted to shower, officer

21   observing.

22   Q    All right, and then under 9:30, can you read

23        that please?

24   A    Inmate to exam room, diaphoretic, continues to

25        hallucinate, continues to be cooperative, vital
```

Page 87

Linda Monticello

```
 1          signs BP 115 over 84, pulse 80, regular
 2          respiration 20 easy.  Talks about just got a
 3          job.  Offered water to inmate, drank fluids
 4          without hesitation.  Officer Morley present.
 5     Q    And did you actually conduct an examination on
 6          Mr. Wallace at 9:30 a.m. on 7/23/04?
 7     A    That's what I have written on here, yes.
 8     Q    And by diaphoretic do you mean that he was
 9          continuing to sweat excessively?
10     A    He was continuing to sweat, yes.
11     Q    And you wrote that he continues to hallucinate.
12          Do you have any specific recollection about what
13          caused you to write that?
14     A    You know, specifically what he was hallucinating
15          about, I really don't know, but obviously he did
16          hallucinate because I wrote down that he
17          continues to hallucinate.
18     Q    Do you know if it was auditory or visual
19          hallucinations?
20     A    I couldn't specify and tell you exactly which
21          one.
22     Q    Do you know whether you asked him, are you
23          hallucinating, and he said yes and you wrote it
24          down or, alternatively, whether he just
25          described things that he was seeing that were
```

Page 88

Linda Monticello

```
 1        not there?
 2    A   Most likely he was seeing things that were not
 3        there.
 4    Q   His blood pressure is down, correct?
 5    A   Correct.
 6    Q   His pulse is also down, is that right?
 7    A   Correct.
 8    Q   What led you to write talked about just got a
 9        job?
10    A   Most likely he was telling me that he just got a
11        job, just by conversation he was telling me that
12        he just got a job.
13    Q   Did you write it down because you thought it had
14        some significance to your evaluation?
15    A   Yes.
16    Q   Okay, and why did it have significance to your
17        evaluation?
18    A   Because, most likely, it was not part of our
19        conversation and he just said something about
20        it.
21    Q   Okay, so did it appear that there was some sort
22        of -- in other words, it didn't make sense that
23        he was saying that?
24    A   Correct.
25    Q   And if you could go down under the next entry
```

Page 89

Linda Monticello

```
 1    Q    Do you know if anybody at the jail had any
 2         communications with Dr. Melcone on that day?
 3    A    Not to my knowledge.
 4    Q    Did you make any effort to contact Dr. Melcone
 5         on 7/23/04?
 6    A    No.
 7    Q    Do you know whether or not he made any effort to
 8         contact you on that day?
 9    A    Not to my knowledge.
10    Q    And other than basic back and forth that you
11         made -- that you may have had with corrections
12         officers here at the jail, did you have any
13         other communication with any other person about
14         Mr. Wallace's condition on 7/23/04?
15    A    Actually, I -- I did.  It's my standard of care
16         that if there's somebody that I have concerns
17         about, I normally would call, especially in this
18         instance wherein he needed to have medication at
19         night time.  And so I called the evening of
20         7/22nd to be sure he got his medicine.  I called
21         on the evening of 7/23 to be sure that he got
22         his dose.
23    Q    Meaning that you called the jail from home?
24    A    Yes.
25    Q    But from 1410 on 7/23/04 until his death in the
```

Page 91

Linda Monticello

```
 1          early morning hours of 7/24/04 was there any
 2          medical provider here at the jail?
 3    A     No.
 4    Q     Was there any medical provider at the jail in
 5          the late afternoon and night that spanned
 6          7/22/04 until you came on shift on 7/23/04?
 7    A     No.
 8    Q     Okay, if you would look at what I'm going to
 9          mark as Exhibit 4.  Do you recognize this?
10    A     I don't recognize the first two pages.
11                                  (Exhibit 4 introduced)
12    Q     Okay.  And for the record, this exhibit consists
13          of four pages marked in the lower right AWG001
14          through 004.  Have you ever seen the first two
15          pages before?
16    A     You know, I can't recall if I have or not.
17    Q     That's not something that you recognize today?
18    A     No.  Un-huh (Negative).  No.
19    Q     Is part of this document the protocol that you
20          mentioned previously?
21    A     Yes, and I'd like to put a lot of emphasis that
22          it's not a DT protocol, it's an alcohol
23          withdrawal protocol.  I guess I had been
24          mentioning DT protocol, but it's actually
25          alcohol withdrawal protocol.
```

Page 92

Linda Monticello

```
 1          to do.
 2     Q    Did you -- is there any reason that you can
 3          think of why you did not contact Dr. Meloche on
 4          7/23/04 with an update on Mr. Wallace's status?
 5     A    I couldn't tell you.
 6     Q    If Dr. Meloche had advised you to contact him
 7          with an update on his status, would you have
 8          done so?
 9     A    Yes sir.
10     Q    And if Dr. Meloche had instructed or advised any
11          other course of treatment besides the initiation
12          of this DT protocol, would you have followed his
13          instructions?
14          MR. LESSMEIER:  Objection, form, foundation.
15     A    Yes sir.
16     Q    Who did you consider to be the individual
17          primarily responsible for Mr. Wallace's medical
18          care after he was evaluated by you on 7/22/04
19          and after you contacted Dr. Meloche?
20          MR. LESSMEIER:  Objection, form.
21     A    So you're asking who would I account to for
22          Wallace's health care?
23     Q    I'm asking you who you considered to be the
24          individual primarily responsible for directing
25          the manner and method in which he was going to
```

Page 108

Linda Monticello

```
 1          page, which leaves you with seven tablets
 2          accounted for that were returned.
 3     Q    Okay.  So when the tablet is administered,
 4          there's somebody initial -- somebody's initial
 5          next to the time of day that it's administered,
 6          right?
 7     A    Correct.
 8     Q    Okay.  So LM, that's you giving two tablets on
 9          7/22, followed later that day by one tablet that
10          S gave, another tablet by S that S gave.
11     A    Yeah, S means self-medicating, meaning to say
12          that he was -- he took the pills without a nurse
13          there.
14     Q    Okay, so a correctional officer would have
15          brought that by on the med cart or whatever?
16     A    Assisted him, yes.
17     Q    And then you gave him two tablets on 7/23, and
18          then he self-medicated later that day?
19     A    Correct.
20     Q    I got you.  Okay.  Okay, if you could look at
21          exhibit number 9.  These are some, what appear
22          to be log book entries, do you recognize these,
23          generally speaking?
24                                  Exhibit 9 introduced.
25     A    Yes.
```

Page 114

Linda Monticello

```
1                    C E R T I F I C A T E
2    STATE OF ALASKA        )
3                           ) ss:
4    First District         )
5         I, Judy A. Zenge, a Notary Public in and for the
6    State of Alaska, residing at Ketchikan, Alaska, do
7    hereby certify that the annexed and foregoing
8    deposition upon oral examination of the witness,
9    Rhonda Scott, appearing at the instance and request
10   of the defendant, in the above entitled and numbered
11   cause of action, pursuant to a Notice of Taking, was
12   taken before me on Tuesday, the 19th day of September
13   2006, those appearing having assembled at the hour of
14   8:15 a.m. thereof at the offices of Ketchikan
15   Correctional Center, 1201 Schoenbar Road, Ketchikan,
16   Alaska 99901;
17        I further certify that the above named witness,
18   before examination, was by me duly sworn to testify
19   truthfully;
20        I further certify that the examination of the
21   witness comprising of this deposition and was by me
22   personally electronically recorded from the witness,
23   and was thereafter reduced to typewriting by myself
24   or at my direction;
25        I further certify that I am not a relative or
```

Page 154

Linda Monticello

1    employee of any of the parties to said action, or a

2    relative or employee of any such attorney or counsel,

3    and that I am not financially interested in the said

4    action or the outcome thereof;

5        I further certify that said deposition upon oral

6    examination, as above transcribed, is a correct and

7    full transcript of the testimony of said witness,

8    including all questions and answers, and all

9    objections, motions and exceptions made and taken at

10   the time of the foregoing examination; and,

11       That all documents and/or items marked for

12   identification as exhibits to the deposition have

13   been annexed to and included with said deposition,

14   unless orally waived by the witness and the

15   respective counsel.

16       I further certify that the original of this deposition

17   has been sealed by me and delivered to the deposing attorney

18   for the purpose of filing the same with the Clerk of the above

19   entitled Court, according to law.

20       IN WITNESS WHEREOF, I have hereunto set my hand and

21   affixed my Notarial seal this ____ day of _____, 2006.

22

23                    _____

24                    Notary Public for the State of Alaska

25                    Commission expires: February 1, 2009

                                              Page 155

## OBSERVATION CUMULATIVE

| NAME: | OTIS#: | DOB: | KETCHIKAN CORRECTIONAL CENTER |
|---|---|---|---|
| WALLACE, Troy A. | 489521 | 10/31/1972 | |

| DATE/TIME | INITIAL | REMARKS |
|---|---|---|
| 03/19/2004 @ 0218 | Headley | Subject remanded by KPD Walker on warrant # 1KE-C04-50 FTC(DC-CITY) bail $100  Cooperative with booking and medical, both completed without incident  There was a strong odor of intoxicants on or about his person . Placed into cell 224 to await his bail. |
| 3-19-04 . @ 0305 | Headley | Subject released CIB |
| 7/20/04 0(500 | Miller | Subject Self commit to serve 10 days for 1KE-C04-50 Prob CDC). Subject was shaking and stated that he was withdrawing from alcohol. Subject completed the booking process and was dressed out and placed in 2... . |
| ~Approx 7.26.2004 @ 0300 | B.Shift | Subject Found Deceased in cell, See Reports. |

PLAINTIFF'S EXHIBIT
1

Criminal Remand Screening                    State of Alaska - Department of Corrections

NAME  WALLACE, TROY A.    OB# 480021    Date of Birth 10/31/72    Facility  Ketchikan

1 of TIME of Remand: 7/21/04

A.   **Pre-Remand Screening** to be completed prior to accepting the remand:

1.   Yes  (No)    Evidence of serious injury or medical problem requiring immediate medical attention?
2.   Yes  (No)    Remand fails to respond to voice or touch (unconscious)?
3.   Yes   No     BRAC more than 300 and remand has not been approved by DOC medical staff or telenurse?

BRAC: _____  (Should be done if remand appears substantially intoxicated unless section B below has been completed

If any answer to 1 – 3 is yes and section B (below) has not been completed, staff shall advise the remanding officer
take the remand to a responsible medical authority, such as an emergency room physician.

Pre-Remand screening completed by Linda K Montecillo RN       Date: 7/21/04  Time: 1350

B.   **External Assessment** by responsible medical authority (for medical assessment outside of D.O.C.)

The individual named above has been assessed at this facility and is medically appropriate for commitment to
correctional facility that may not have medical staff on duty.

_____    _____    Date: _____  Time: _____
  Medical Facility          Medical provider's Signature

C.   **Post-Remand Screening** to be completed by medical staff if on duty; if not, then by security staff immediately aft
accepting the remand (notify medical ASAP if any Yes answers). These 4 questions may be skipped if Health Ca
Screening is completed immediately.

1.   Yes  (No)    Does the remand have any obvious medical or mental problems that require medical attention?
2.   Yes  (No)    Does the remand report that he/she is on prescription medication that must be taken within the ne
                  several hours?
3.   Yes  (No)    Does the remand appear to have any serious communicable diseases?
4.   Yes  (No)    Does the remand have any thoughts of wanting to kill himself/herself?  (If "Yes" take suicid
                  precautions immediately)

Post-Remand Screening completed by: Linda K Montecillo RN       Date: 7/21/04  Time: 1350

PPD 7/21/04 @ 1350 Ⓕ F A

BD7 14A  revd Dec12/01  1 of 3


PLAINTIFF'S
EXHIBIT
2

Criminal Remand Screening                    State of Alaska - Department of Corrections

NAME: _WALLACE, TROY L_    DOB# _684521_

☐ Health Care Screening

Vital Signs  Blood Pressure: _132 / 96_    Pulse _87_    Temperature _98.2_    Abnormal Breathing _____

To be completed by medical personnel. Each issue must be addressed with every remand.

Resp Rate _____        O2 Sat _____ (optional)    BRAC: _____ (if repeated)

| | | | |
|---|---|---|---|
| ☑ Conscious | ☐ Swelling/Deformity | ☐ Bleeding | |
| ☐ Unconscious | ☐ Head injury | ☐ Cough | ☐ Hemoptysis |
| ☐ Obvious pain | ☐ Assaultive | ☐ Hearing impaired | ☐ Vision impaired |
| ☐ Skin sores | ☐ Vermin | ☐ Obvious infection | ☐ Penile/Vaginal discharge |
| ☐ Nightsweats | ☐ Blood in emesis | ☐ Blood in stool | ☐ Painful urination |
| ☐ Recent use of Rx or Non-Rx drugs | | ☐ Brought medications | |
| ☐ Influence of alcohol | ☐ Influence of drugs | ☐ Signs of alcohol/drug withdrawal | |

History

| | | | |
|---|---|---|---|
| ☐ Asthma | ☐ Bone/Joint trouble | ☐ Diabetes | ☑ Dental problems |
| ☐ IV drug user | ☐ Sex with IVDU | ☐ HIV/AIDS | ☐ Wants HIV Test |
| ☑ Sex, opposite | ☐ Sex, same | ☑ Protection (specify) _condoms_ | ☐ Multiple partners |
| ☐ Hepatitis | ☐ Syphilis or gonorrhea | ☐ Medical diet | ☐ Hospitalized in past 30 days |
| ☐ Hx positive TB Test | ☐ Treated for TB | ☑ Date and results of last PPD _2003_ | |
| ☐ Heart trouble | ☐ High BP | ☐ Skin problems | ☐ Arthritis |
| ☐ LMP | ☐ Women-Pelvic Pain | ☐ Pregnant | ☐ Recent delivery |
| ☐ Seizures | ☐ Ulcer | ☐ Cancer | ☐ Arthritis |

Allergies: _NKDA_

Current Conditions: _Stable_

Medications/Dose _None_

Private Physician(s): _None_

Alcohol/Drug Use Past Few Weeks: _@ Remand 2 day ago_

Withdrawal History: _Alcohol w/drawal_

Other Pertinent Information: Injuries, Accidents, Head Trauma, Observations, TB Symptoms, Comments. _Observe for DT_

PPD Given  ☑ Yes applied to _____    ☐ No explain reason: _____

807 14A   revised edition 3 of 3

Criminal Remand Screening                    State of Alaska - Department of Corrections

Name WALLACE, TROY A.   DOB 6/8/62

| | | | | | |
|---|---|---|---|---|---|
| Appearance | ☑ normal | Speech | ☑ normal rate and vol | Thought Process | ☑ normal |
| | ☐ alcohol on breath | | ☐ pressured | | ☐ rambling/loose |
| | ☐ poor hygiene | | ☐ slurred | | ☐ incoherent |
| | ☐ dilated pupils | | ☐ loud | | ☐ slow |
| | ☐ disheveled | | ☐ low volume | | ☐ paranoid |
| | | | ☐ mute | | |
| Attitude: | ☑ cooperative | Mood/Affect: | ☑ euthymic (normal) | Thought Content: | ☑ appropriate |
| | ☐ uncooperative | | ☐ anxious | | ☐ delusional |
| | ☐ suspicious or guarded | | ☐ angry/agitated | | ☐ homicidal |
| | | | ☐ elated/euphoric | | ☐ suicidal |
| | ☐ hostile | | ☐ sad | | ☐ shame |
| | | | ☐ fearful | | ☐ grandiose |
| Motor Behavior: | ☑ normal | Cognitive: | ☑ oriented X 3 | Hallucinations: | ☑ patient denies |
| | ☐ lethargic | | ☐ confused | | ☐ auditory |
| | ☐ unsteady gait | | ☐ disoriented | | ☐ visual |
| | ☐ tense/rigid | | ☐ fluctuating levels of consciousness | | ☐ smell |
| | ☐ tremulous | | | | ☐ tactile |

## SUICIDE RISK SCREENING

|  |  | YES | NO |
|---|---|---|---|
| 7/2 /71 | Has the Remand had suicidal ideation, threats, or significant self-destructive behavior within the past 24 hours? | ☐ | ☑ |
| ... | Does the Remand want to kill him/herself now?  (Current suicidal ideation.) | ☐ | ☑ |
| 3. | Is the Remand hearing voices urging self-harm? | ☐ | ☑ |
| 4. | Does the Remand have a history of suicide attempts? | ☐ | ☑ |
| 5. | Is the Remand convinced that his/her life situation is hopeless? Does the remand feel there is nothing to look forward to, that life is hopeless or that things will never get better? | ☐ | ☑ |
| 6. | Is the Remand extremely anxious, feeling desperate, or behaving in a destructive manner? | ☐ | ☑ |
| 7. | Has the criminal allegation and arrest produced extreme shame in this remand? | ☐ | ☑ |
| 8. | Is this the Remand's first time in jail or prison? | ☐ | ☑ |
| 9. | Is the Remand intoxicated or withdrawing from alcohol or other substances? | ☐ | ☑ |

[1-3 are usually definite indications of risk.  A suicidal Remand who wants to conceal a plan to kill self will deny 1-3, but usually will have a number of indicators in 4-9.]

## ASSESSMENT AND INTERVENTION

|  | YES | NO |
|---|---|---|
| Is this Remand a suicide risk? *If YES, implement appropriate suicide precautions, complete form 807.20A, and refer to Mental Health or IHCO for follow-up evaluation.* | ☐ | ☐ |
| Does this Remand require assessment by Mental Health Staff due to psychiatric history or symptoms?  *If YES, refer to Mental Health for further evaluation.* | ☐ | ☐ |
| Is medical segregation medically necessary due to medical status (communicable disease, severe intoxication delirium, or other medically unstable condition?  *If YES, notify shift supervisor (15 min observations).* | ☐ | ☐ |

Other Interventions: _____

_____

Screener's signature: Linda K. Markula   Title: LN   Date/Time: 7/21/04 @ 1355

IHCO Review: (if abnormal)   Date/Time:

807-116   Attachment 2 of 2

WALLACE Roy A.                                    #289521
                                                  10/31/72

| DATE | TIME | KEY MEDICAL COMMENTS |
|---|---|---|
| 7/21/04 | 1850 | Remand ordidat to serve time. Denies hx ⊕ PPD. given TuBeTest 0.1ml/L F.A. IC T/L 48.72° Vs BP 137/76mmHg; P. 87/reg; R. 20/easy T. 98.2° concerned of alcohol withdrawal - noted fine hand tremor - denies any hallucination - assured will F/U PRN & symptom. Advised & fluids ——— Linda K. Monteillota |
| 7/22/04 | 1400 | Eval. for Poss. DT. Very sweaty - hand tremors Voicing "things are moving on top of counter" BP. 160/104mmHg P. 137/tachy R. 20/easy taking ē Sence, offered water & drank advised will F/U ē R/ |
| | 1430 | Telephr call to Dr. Meloche Writer updating Ellis status. To initiate DT Protocol - CLORAZEPATE 15mg - THIAMINE 100 mg IM Stat then THIAMINE 100 mg po ē D X 4 days. — To Dr. Meloche/Lmonteillo Rn |
| 7/22/04 | 1450 | Given - THIAMINE 100mg IM (L) deltoid muscle - tolerated procedure CLORAZEPATE 15mg II p.o. given. - Monitor - F/U PRN — Lmonteillota |
| 7/27/04 | 0610 | Observed in #224. Was informed by Officer inmate refused to give breakfast tray to cellmate had placed in Rm 224 |
| | 0700 | Inmate medicated hand tremors observed cooperative |
| | 0710 | Escorted to shower officer observing |
| | 0930 | I/M to exam room - diaphoretic - continues to hallucinate continues to be cooperative - VS - BP 115/84mmHg; P - 80/REGULAR R. 20/easy. talks about i just got a job. Offered water to inmate drank fluids ē hesitation. Officer Morley present |
| | 1410 | I/M observed sitting on bunk - writer advised inmate to rest inmate nodding fixes blankets. Writer consults ē SGT. Ellis to make certain inmate eats dinner ——— Linda K. Morlew |

PLAINTIFF'S
EXHIBIT
3

Name: _WALLACE_ _____   DATE _____

## ALASKA DOC MEDICAL GUIDELINE

## ALCOHOL WITHDRAWAL

**Subjective:**
Time of Last Drink _07·19·04_
Amount, duration, and frequency of alcohol consumed prior to incarceration _CANNOT LECALL_

Other meds taken _NONE_
Hx of diabetes ☐ hypertension ☐ seizures ☐ Other _____
Patient complains of:
☐ Nausea   ☑ Vomiting   ☐ Feelings of nervousness
☐ Headache   ☑ Tremors Where? _Hands_
☑ Visual Disturbances   ☐ Tactile Disturbances   ☐ Auditory Disturbances
☐ Oriented to day, place, person   ☑ Hallucinations

**Objective:**
Vital Signs: BRAC ____ Temp _97·5_ Pulse _137_ Resp _20_ B/P _160/104_ Wt ____
Blood Sugar _____
Oriented x 3:   ☐ Alert   ☑ Hallucinating
Evidence of sweating:   ☐ Mild   ☐ Mod   ☑ Severe _____
Evidence of tremors:   ☐ mild   ☑ Mod   ☐ Severe _____
Irritability:   ☑ Mild   ☐ Mod   ☐ Severe _____
Diarrhea: Color/frequency _____
☐ Seizure: Description _____
Affect: ☐ Labile   ☑ Stable

**Assessment Decision:**   Acute Alcohol Withdrawal
Dx: _____
Dx: _____

**Plan:**   Place inmate on bottom bunk or on the floor. Repeat vital signs with each med. administration.

| DATE | | | | | | | DATE | 7/22 | 7/23 | | | | |
|------|---|---|---|---|---|---|------|------|------|---|---|---|---|
| TIME | 1 | 2 | 3 | 4 | 5 | 6 | TIME | 1 | 2 | 3 | 4 | 5 | 6 |
| BP/PULSE | 160/<br>104 | 115/<br>84 | | | | | Thiamine 100 mg IM stat. | LM | | | | | |
| | 137 | 86 | | | | | Thiamine 100 mg PO q day for 4 days | | LM | | | | |

| DATE | | | | | | 7/22 | 7/23 | 7/24 | | | |
|------|---|---|---|---|---|------|------|------|---|---|---|
| TIME | | | | | | 1 | 2 | 3 | 4 | 5 | 6 |
| Clorazepate 30 mg PO stat. | | | | | | LM | | | | | |
| Clorazepate 15 mg PO q 6 hours on day 1 | | | | | | | LM | | | | |
| Clorazepate 15 mg. PO q 8 hours on day 2. | | | | | | | | | | | |
| Clorazepate 15 mg PO q 8 hours on day 3. | | | | | | | | | | | |
| Clorazepate 15 mg PO q 12 hours on day 4. | | | | | | | | | | | |
| Clorazepate 15 mg at HS on day 5. | | | | | | | | | | | |
| Clorazepate 15 mg one dose PRN on day 1 and 2 in addition to doses prescribed above. | | | | | | | | | | | |

| DATE | | | | | | | |
|------|---|---|---|---|---|---|---|
| TIME | | | | 1 | 2 | 3 | 4 | 5 | 6 |
| Clonidine 0.1 mg tid if pulse or diastolic blood pressure is above 100 for 5 days. | | | | | | | |

Provider contacted: _DR. Meloche_                              _07/22/04_
                                                                          Time
Orders received: _T.O. initiate CLORAZEPATE 15mg PROTOCOL_
                                        Name

PLAINTIFF'S
EXHIBIT
5
DOC 0011

STATE OF ALASKA

# MEDICATION ADMINISTERING CHART    Year _2004_

| ame + OBSCIS# | | D.O.B. | INSTITUTION: | ALLERGIES |
|---|---|---|---|---|
| WALLACE, TROY A. | #489521 | 10/31/72 | Ketchikan Corr. Center | NKOA |

Self-Medication (SM-ML) is documented by the Officer writing an "S" in the appropriate block for each dose. Refused doses are to be circled.

## SIGNATURE INITIAL SECTION

All persons initialing as administering medications on this sheet (front or back) must enter
their initials below (signature and printed name). Enter both first and last names as well as title.

| | | | | | |
|---|---|---|---|---|---|
| | | | Linda K. Monticello RN /LMonticello | | LM |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

ENTER PRESCRIPTION, DATE OF PRESCRIPTION, STOP DATE, FREQUENCY, and AUTHORIZED BY: DR. Meloche 7/22/04

Clorazepate 15mg: take 2 tablets now

| TIME JULY | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | | X | X | LM | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | 1430 | | | | | | | | | |

ENTER PRESCRIPTION, DATE OF PRESCRIPTION, STOP DATE, FREQUENCY, and AUTHORIZED BY: DR. Meloche 7/22/04

Clorazepate 15mg: take one tablet every 6 Hours DAY #1

| TIME JULY | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1700 | | | | | | | | | | | | | | | | | | | | | X | S | X | X | | | | | | | |
| 2300 | | | | | | | | | | | | | | | | | | | | | X | S | X | X | | | | | | | |

ENTER PRESCRIPTION, DATE OF PRESCRIPTION, STOP DATE, FREQUENCY, and AUTHORIZED BY: DR. Meloche 7/22/04

Clorazepate 15mg: take one tablet every 8 Hours DAY #2 & DAY #3

| TIME JULY | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0700 | | | | | | | | | | | | | | | | | | | | | X | X | LM | | X | | | | | | |
| 1200 | | | | | | | | | | | | | | | | | | | | | X | X | LM | | X | | | | | | |
| 2100 | | | | | | | | | | | | | | | | | | | | | X | X | S | | X | | | | | | |

ENTER PRESCRIPTION, DATE OF PRESCRIPTION, STOP DATE, FREQUENCY, and AUTHORIZED BY: DR. Meloche 7/22/04

Clorazepate 15mg: take one tablet ever 12 Hours DAY #4

| TIME JULY | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0700 | | | | | | | | | | | | | | | | | | | | | | | | X | | X | | | | | |
| 2100 | | | | | | | | | | | | | | | | | | | | | | | | X | | X | | | | | |

| Name • CSC/S# | | | | |
|---|---|---|---|---|
| WALLACE TROY A | 2952 | 10/31/72 | Institute Center | HICDA |

ENTER PRESCRIPTION, DATE OF PRESCRIPTION, STOP DATE, FREQUENCY, and AUTHORIZED BY: Dr. Meloche 7/22/04

LORAZEPATE 15mg: Take one tablet @ bedtime     DAY #5

| TIME JULY | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 21 | | | | | | | | | | | | | | | | | | | | | | X | X | | X | X | | | | | |

ENTER PRESCRIPTION, DATE OF PRESCRIPTION, STOP DATE, FREQUENCY, and AUTHORIZED BY: Dr. Meloche 7/22/04

THIAMINE 100mg: IM stat

| TIME | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | | IM | | | | | | | | | | |

ENTER PRESCRIPTION, DATE OF PRESCRIPTION, STOP DATE, FREQUENCY, and AUTHORIZED BY: Dr. Meloche 7/22/04

Vit. B-1 100mg: take one tablet daily     x 4 days

| TIME JULY | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0700 | | | | | | | | | | | | | | | | | | | | X | X | IM | | | X | X | | | | | |

ENTER PRESCRIPTION, DATE OF PRESCRIPTION, STOP DATE, FREQUENCY, and AUTHORIZED BY:

| TIME | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

ENTER PRESCRIPTION, DATE OF PRESCRIPTION, STOP DATE, FREQUENCY, and AUTHORIZED BY:

| TIME | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

| ITEM | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WEIGHT | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| BP | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| BLOOD-SUGAR | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |