DECLARATION OF EDWIN S. BUDGE

EXHIBIT B – EXCERPTS FROM MELOCHE DEPOSITION

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA


```
                              )
JULIA WALKER, individually    )
and as Personal Representative)
 of the ESTATE OF TROY WALLACE )
                              )
                              )
            Plaintiffs,        )
                              )
        vs.                    )
                              )
                              )
DAVID D. HENDERSON, LAURI A.   )
MURRAY, WALTER T. RUD, SHERRI  )
 L. DAVIS, EDWIN D. IRIZARRY,  )
LINDA MONTICELLO AND ERNEST    )
 MELOCHE, M.D.,                )
                              )
            Defendants,        )No.  A05-0176 CV (RRB)
                              )
```

DEPOSITION ON ORAL EXAMINATION

OF

ERNEST B. MELOCHE, M.D.

8:59 a.m.
December 8, 2006
SEAK Professional Services
2415 Hemlock Street, Suite 104
Ketchikan, Alaska 99901

5b277d78-a4c4-475e-84ac-b07ed8574d8d

1    July 20th and the time that he died sometime
2    after 1:00 a.m. on the 24th, you had only one
3    communication with anybody about him, is that
4    correct?
5    MR. LESSMEIER:  Objection.  Form.
6  A    I believe that's the question you just asked.
7    Yes.
8  Q    Where were you when you received the call from
9    Nurse Monticello?
10 A    I was working in emergency with Ketchikan
11    General Hospital as an emergency physician.
12 Q    Do you remember anymore specifically where you
13    were at the time you received the call?
14 A    It's been some time since I -- since I -- since
15    these events and I was in the emergency room.  I
16    -- I can't remember exactly at this point in
17    time.
18 Q    Okay.
19 A    There's a vague recollection that I was
20    somewhere around room five but I had a very busy
21    ER at the moment.
22 Q    All right.  Were you with a patient at the time?
23 A    No.
24 Q    What were you doing immediately before the call?
25 A    I don't recall.

1    Q    Was it very busy compared to normal?

2    A    No.  It was a night shift or it was afternoon

3         shift and there were patients who were waiting

4         to be seen.

5    Q    Do you happen to remember whether there were

6         patients that were waiting to be seen who were

7         in need of critical care at that time?

8    A    I have no independent recollection of that but I

9         can state that it's my practice that -- that I

10        would not take a telephone call if there were

11        patients in need of anything more -- anything

12        critical.

13   Q    Do your best to estimate how long the telephone

14        discussion with Nurse Monticello lasted.

15   A    Best of my recollection about two minutes.

16   Q    Do you have a recollection as you sit here today

17        about what was said during the telephone

18        conversation with Nurse Monticello?

19   A    I don't have a specific recollection of the --

20        the exact words that were said but I have a

21        fairly good recollection of the substance of

22        what was said.

23   Q    All right.  Do your best to take me through the

24        telephone discussion in as much detail as you

25        can remember from the time the discussion began

1    Benzodiazepines as prescribed in the protocol to
2    place him in a situation where he's going to be
3    observed to make sure that he takes fluids and
4    food and that he's monitored with blood
5    pressure, pulse, and temperature, and general
6    condition and to see if he responds to the
7    protocol, and I gave her further instructions to
8    be -- that I was to be contacted if there was
9    any indication that he was not responding to
10   protocol or if there were any questions or
11   problems and we would deal with those when they
12   came up, and that was the essence of it, as I
13   recall.
14 Q  Is there anything else that you can remember
15   about the substance of the call other than what
16   you've just stated?
17 A  No, that was -- that was pretty much it, in
18   essence.  I don't remember the exact words but
19   that was the substance of what we talked about.
20 Q  Did you consult any written materials during the
21   telephone conversation or immediately
22   thereafter?
23 A  No.
24 Q  Did you consult with any other person during the
25   telephone conversation or immediately

5b277d78-a4c4-475e-84ac-b07ed8574d8d

1      thereafter?

2   A  No.

3   Q  Did you make any notes or record of any kind

4      with regard to the telephone call that you got?

5   A  No.

6   Q  What did you do immediately after the call?

7   A  I don't recall.  I went back to practicing

8      medicine in the emergency room.

9   Q  Went back to attending to patients?

10  A  Yes.

11  Q  The protocol that you mentioned, was that the

12     Department of Corrections protocol that relates

13     to alcohol withdrawal?

14  A  Yes, it was.

15  Q  Did you play any part in writing that protocol?

16  A  No, I did not.

17  Q  Prior to your telephone conversation with Nurse

18     Monticello, when was the last time that you

19     reviewed that protocol?

20  A  I don't recall.

21  Q  Describe.....

22  A  We've -- we've used it on other patients.  We've

23     been using it for 10 years and it hasn't changed

24     to the best of my knowledge.

25  Q  Describe the protocol in as much detail as you

1    can.

2  A  Do you have a copy of it there?

3  Q  No, I don't.

4  A  Protocol uses a drug called Tranxene, it

5     initiates a primary dose of Tranxene and then

6     monitors the blood pressure and pulse and

7     temperature and response with each dose of

8     Tranxene, skipping every 12 hours, and there are

9     instructions to make sure that the patient is

10     eating and drinking with fluids I believe.  And

11     then the dose is changed based upon, you know,

12     decreased based upon the patient's response to

13     therapy at 24 hours, each 24 hours  there's a --

14     there's a consideration for alteration of

15     dosage.  There's instructions to give Thiamine

16     intramuscular often or I believe the

17     intramuscular is the route that we've used and

18     there's instructions to give multi-vitamins and

19     that the patient's to be placed under some

20     degree of direct observation by the correctional

21     officers who are instructed to notify the

22     medical personnel if there's any problems with

23     the patient taking their medications or any

24     change in the patient condition.

25  Q  What dosages of Tranxene does the protocol call

1     for?

2  A    It starts with 30 milligrams and then reduces it

3     to 15 and then reduces it I think it's 15 twice

4     a day and then down below that as -- as needed

5     over a period of time.

6  Q    Do you believe that the protocol calls for an

7     adjustment of the amount of Tranxene depending

8     on how the patient responds?

9  A    The essence of the protocol the way I understand

10     it to be and the way I've used it and the way

11     it's being used is that the medications are

12     administered and then the patient is followed to

13     see if they respond to the protocol and the

14     things that are monitored is blood pressure, the

15     pulse, and the patient condition whether they're

16     able to continue participating or whether they

17     deteriorate into an ability to communicate or

18     lose orientation.  And if any of those

19     conditions apply, then the medical team is

20     notified and I get notified and we decide what

21     to do at that point in time.

22  Q    And do you believe that that is all contained

23     within the written protocol?

24  A    It is the standard practice that we've used at

25     the -- at the jail and when Linda and I apply

5b277d78-a4c4-475e-84ac-b07ed8574d8d

1    this protocol that's how we apply it and --

2    that's how we apply it.

3  Q   Okay.  Is it contained within the written

4    protocol?

5    (Pause)

6  A   I'm not certain.

7  Q   Does the written protocol call for medication

8    that is Tranxene to be administered according to

9    a set schedule or does the written protocol

10   provide for the healthcare practitioner to

11   adjust the schedule of medication according to

12   how the individual responds?

13  A   The protocol as written is a fixed dosage and --

14   and the way we have applied the protocol and it

15   was my full expectation that the essence of the

16   protocol was that Nurse Monticello and the

17   correctional officers would be observing the

18   patient and if the patient for any reason as was

19   stated in my telephone call with her does not

20   respond to the protocol they were to notify me

21   and then we'd adjust the dosage.  And so when I

22   have informed the medical -- the medical team at

23   the jail, which in this case was Nurse

24   Monticello, that we were going to apply the

25   protocol to a specific patient it was my

5b277d78-a4c4-475e-84ac-b07ed8574d8d

1    absolute expectation that that protocol would be
2    applied and that any failure to respond to the
3    protocol which was observed by people who had
4    been taking care of patients in this setting for
5    many years would be brought to my attention,
6    they would call me and that we would make any
7    modifications in therapy that were necessary.
8    And it actually has been my practice that any
9    time I get a second telephone call from the jail
10   I just go out there right away I -- if I'm -- if
11   I'm free.
12 Q  What is the specific schedule of medication
13   called for by the written protocol in terms of
14   dosages, how it is to be administered, and how
15   frequently it's to be administered?
16   MR. LESSMEIER:  Objection.  Form.
17 A  It starts with 30 milligrams and then 15
18   milligrams thereafter.
19 Q  How soon thereafter?
20 A  I believe the next dose -- I've forgotten.
21 Q  Okay.
22 A  I'm sorry, the stress of this event and how I've
23   -- I've reviewed this protocol and would it be
24   possible -- I -- I -- I'm sorry, I have to just
25   state that it's the protocol that has been in

1    place for 10 years and they reduce those, they

2    apply the dosages and I'm aware of the fact that

3    I need to give specific days and times but it's

4    a oral protocol of medications which is reduced

5    and which has worked so effectively that -- in

6    my -- and I -- I realize I'm grasping at this

7    point.  I'm sorry, I -- I don't know exactly how

8    to frame this but there was a six-hour

9    scheduling and then a eight-hour scheduling and

10    then a 12-hour scheduling, and -- and that that

11    was changed every 24 hours.

12 Q    Let me just ask you this and maybe we can look

13    beyond these questions.  At the time that you

14    instructed Nurse Monticello to begin treatment

15    according to the written protocol, did you know

16    in your mind precisely what that written

17    protocol called for?

18 A    At the time that I instituted the protocol I

19    knew that I was administering an oral protocol

20    to a young man who I had every belief was going

21    to respond well to the protocol and that I was

22    actually looking forward to meeting on Saturday.

23    And I knew that it required an initial dose that

24    was fairly high but that we did not want to --

25    that it was set up in such a way such that you

5b277d78-a4c4-475e-84ac-b07ed8574d8d

1      did not provide so much medication that you

2      masked the individual's awareness so that you

3      didn't decrease their neurologic function and I

4      believed it was 30 and 15 every six hours and

5      then 15 every eight hours but that's what I --

6      that's what I was under the impression of.  And

7      at this moment, having -- even having reviewed

8      it recently, I can't remember the numbers and I

9      apologize for that, but the truth is it was oral

10     protocol that we've used for so many years and I

11     knew that what I was saying and what we were

12     saying was let's put this person on some oral

13     medications, let's not slow them too much and

14     let's follow their -- their mental status and

15     their vital signs for the next few days and if

16     you need me, give me a call and I will be there.

17 Q   Okay.  I appreciate your answer.  Let me ask the

18     questions again.  At the time that you directed

19     Nurse Monticello to begin treatment according to

20     the written protocol, did you know in your mind

21     precisely what that written protocol called for

22     with regard to medication, how frequently it was

23     to be administered, in what dosages, and how it

24     was to be administered?

25 A   I knew that the dosages were 30 milligrams

5b277d78-a4c4-475e-84ac-b07ed8574d8d

1  initially and then 15 milligrams and I.....

2 Q Again, did you know any more precisely than

3  that?

4 A And I knew that the next dose was 15 milligrams

5  and I -- and I knew that was between six and

6  eight hours later.

7 Q Did you know precisely beyond that?

8 A I knew that Nurse Monticello was going to

9  monitor this patient as were the guards and that

10  they were going to call me if the patient did

11  not respond to the protocol.

12 Q So beyond an initial dosage of 30 milligrams

13  dosage of Tranxene followed by.....

14 A Fifteen milligrams six to eight hours later.

15 Q Okay.

16 A And then another 15 milligram dosage beyond

17  that.

18 Q Okay.  And after that did you know anymore

19  precisely in your mind what it called for in

20  terms of medication?

21 A I believe -- I mean, I knew that they were going

22  to decrease the dosage as -- as the patient

23  responded to therapy over the next 72 hours.

24 Q Anything else?

25 A No.

5b277d78-a4c4-475e-84ac-b07ed8574d8d

Page 23

1       was the only question.

2   Q   So is it the case then that without contacting

3       you, the protocol gives no discretion to the

4       practitioner on the scene to deviate from the

5       set schedule of dosages of medication?

6   A   That is correct.

7   Q   Does the written protocol contain any direction

8       or explanation to the on-scene practitioner

9       about how a failure to respond to the medication

10      is to be measured?  In other words, what are we

11      looking for in terms of a response?  What would

12      be considered a failure to respond?  What would

13      be considered a appropriate and expected and

14      hoped response on behalf of the patient?

15  A   I don't believe the protocol includes those

16      details.

17  Q   Did you provide any specific information to

18      Nurse Monticello about what she should look for

19      in Mr. Wallace in order to determine whether he

20      was or was not responding to the regime?

21  A   The.....

22  Q   I should say regimen.

23  A   The medications were to be administered, the

24      vital signs were to be followed, and -- and the

25      condition of the patient was to be monitored by

5b277d78-a4c4-475e-84ac-b07ed8574d8d

1    twice a day.

2  Q   Do you know if it is once or twice a day?

3  A   I think it's twice a day.  No, it's once a day.

4      I don't.....

5      MR. BUDGE:  Did you catch that last part?

6      THE REPORTER: I did.

7  A   I don't know.

8  Q   Well.....

9  A   I said once a day and then I said that I wasn't

10     sure whether it was once or twice a day.  I know

11     that the first dose is the critical one.  After

12     that once or twice a day is adequate and I

13     believe it's once a day at this point in time

14     but I don't know for certain.

15  Q   Is it oral or by injection?

16  A   I think -- we give -- I often will give the

17     first injection and then -- then it can be oral

18     but it can be oral or injection, either.

19  Q   Do you know if the protocol calls for it to be

20     administered orally or by injection?

21  A   No.

22      (Pause)

23  Q   Okay.  Are you familiar with the term acute

24      alcohol withdrawal?

25  A   Yes.

1       be.....

2   A   I'm -- I'm.....

3   Q   .....more useful at this point.  But when Nurse

4       Monticello contacted you, did you obtain any

5       specific information about Mr. Wallace's

6       withdrawal history?

7   A   Just that he was an -- that he was a known

8       alcoholic and that he had some problems with --

9       that he had had alcohol withdrawal problems and

10      that he withdrew hard and that we wanted to

11      institute the therapy and see how that worked

12      and what his vital signs were, that he was

13      taking no medications, that he was not taking

14      any other drugs.

15  Q   Did you ask anymore specifically of Nurse

16      Monticello, what is this man's withdrawal

17      history?

18  A   No.

19  Q   Did you.....

20      MR. LESSMEIER:  Excuse me.  Were you done with

21  your answer?

22  A   I was going to say that it's -- it's often not

23      very available or very reliable, I mean, so it's

24      like -- no, I didn't.  I just -- nor did I know

25      him.

5b277d78-a4c4-475e-84ac-b07ed8574d8d

1    Q    Did you instruct Nurse Monticello to obtain any
2         more specific information about this man's
3         withdrawal history?
4    A    No.  No, at the point that we finished our
5         conversation I was under the impression that the
6         man was young, no significant -- I've said this
7         before, that the findings that she gave me that
8         I reported to you in the initial conversation
9         were present and that it was my assessment that
10        he -- he should be able to tolerate withdrawal
11        well as long as we provided him with some
12        Benzodiazepines.
13   Q    So the answer to my question is no?
14   A    I think it is but could you repeat the question
15        just to make sure I'm not screwing it up?
16   Q    You did not instruct Nurse Monticello to obtain
17        any more specific information about this man's
18        withdrawal history?
19   A    No, I didn't think anything further was needed.
20   Q    Did you obtain any information about Mr.
21        Wallace's body size?
22   A    No.
23   Q    Did you instruct Nurse Monticello to obtain any
24        information about his body size?
25   A    No.

5b277d78-a4c4-475e-84ac-b07ed8574d8d

1  Q    Okay.  So the answer to my specific question was
2       no?
3  A    That is correct.
4  Q    Did you tell her specifically what she should
5       evaluate Mr. Wallace for in order to determine
6       his response to the protocol?
7  A    No.  It was my expectation that she would use
8       her nursing judgment, she -- and -- and respond
9       accordingly.
10 Q    How often do you believe Mr. Wallace should have
11      been evaluated?
12 A    At least each time he got his medications and I
13      think that placing him an observing --
14      observation status and doing an evaluation when
15      anything unusual happened would have been
16      warranted.
17 Q    Do you believe that it was sufficient to
18      evaluate Mr. Wallace each time that he got his
19      meds and no more?
20      MR. LESSMEIER:  Objection.  Form.
21 A    I believe when a person's in an observed setting
22      by people who are -- are, such as the
23      correctional officers or the people at the KAR
24      House and they're being observed and given
25      medications that when -- that the approach to

5b277d78-a4c4-475e-84ac-b07ed8574d8d

1    A    She said he was sweating.

2    Q    Did she tell you that he was sweating a lot?

3    A    I don't have any specific recollection of that.

4    Q    In your conversation with Nurse Monticello did

5         you seek to learn from her whether or not Mr.

6         Wallace was feeling nervous or anxious?

7    A    It was apparent that he was anxious from the

8         conversation.

9    Q    Did you seek to learn from Nurse Monticello

10        whether he was fidgety or restless?

11   A    He was.

12   Q    Did you seek to learn from Nurse Monticello

13        whether he was experiencing auditory

14        disturbances?

15   A    I didn't probe it but it was not reported to me.

16   Q    Did you ask her?

17   A    No.

18   Q    Did you give her any instructions about whether

19        she should seek to learn this information?

20   A    No.

21   Q    Did you seek to learn from Nurse Monticello

22        whether Mr. Wallace was experiencing a headache

23        or fullness in the head?

24   A    She did not report that he was experiencing that

25        symptom at the time.

5b277d78-a4c4-475e-84ac-b07ed8574d8d

1    whether Mr. Wallace was responding to therapy?

2    MR. LESSMEIER:  Objection.  Form.  Go ahead.

3  A  Once again, I -- I told her to evaluate the

4    patient and use her -- I didn't -- I didn't tell

5    her how to do her job.

6  Q  Did you specifically.....

7  A  I did not give her any -- any more specific

8    instruction on a two-minute phone call on how to

9    be a better nurse.

10  Q  Did you specifically tell.....

11  A  I did not.

12  Q  I have to complete the question fully.

13  A  I'm sorry.

14  Q  Did you specifically tell her what to look for

15    in order to determine whether or not he was

16    responding to therapy?

17  A  I did not.

18  Q  Did you at any time interview Mr. Wallace?

19  A  During January of that year?

20  Q  July of that year, yes, I'm sorry.

21  A  No.

22  Q  You did not conduct any in person evaluation or

23    examination.....

24  A  I did not.

25  Q  .....of him at that time?

5b277d78-a4c4-475e-84ac-b07ed8574d8d

Page 73

1    A    I'm sorry, I did not.

2    Q    Did you give Nurse Monticello any specific

3         instructions at the time of the phone call about

4         the circumstances under which Mr. Wallace -- let

5         me strike the question.  Did you give Nurse

6         Monticello any specific instructions about under

7         what circumstances Mr. Wallace should be

8         transported to the hospital?

9    A    I did not.

10   Q    Did you give Nurse Monticello any instructions

11        about when she should report back to you about

12        Mr. Wallace or did you just simply say, you

13        know, get back to me if he's not responding?

14   A    I followed the practice that I followed for many

15        years with a team that I trusted.  I said if

16        you're at all concerned, if there's any problems

17        that you have, and if the patient's not

18        responding to therapy, please give me a call.  I

19        get off duty at 8:00 o'clock in the morning,

20        which she knew as did the guards.

21   Q    As of the time that Nurse Monticello contacted

22        you, what information did you have about how

23        many hours out of the day there would be a nurse

24        onsite at the Ketchikan Correctional Center?

25   A    I knew that she was not working 24 hours a day

SEAK Professional Services, LLC
2415 Hemlock Street, Suite 104, Ketchikan, Alaska 99901

5b277d78-a4c4-475e-84ac-b07ed8574d8d

1  of hours I do not -- I -- I don't know, I never

2  did know.  It was less important to me than just

3  knowing that the patient was under the care of

4  these people that I trusted.

5  Q  Did you know that for a significant portion of

6     every day that there would not be a nurse onsite

7     at the Ketchikan Correctional Center?

8     MR. LESSMEIER:  Objection.  Asked and answered.

9  Q  Did you know that?

10    MR. LESSMEIER:  You can answer it again.

11 A  I was aware that the patient was being placed

12    under close observation by the system designed

13    by the State of Alaska to manage patients of

14    this type and that that included some portion of

15    time when the patient was being observed by

16    correctional officers and video monitoring and

17    that the nurse was available 24 hours a day,

18    seven days a week, by telephone when she was

19    directly on site or when she was caring for

20    other patients.  And that is the answer I gave

21    previously.

22 Q  Did you know that there would not be a nurse

23    onsite at the Ketchikan Correctional Center for

24    a significant portion of every day that Mr.

25    Wallace was there?

Page 76

1    MR. LESSMEIER:  Asked and answered.  Go ahead.

2  A    Yes.

3  Q    Thank you.  How far is the Ketchikan General

4        Hospital from the Ketchikan Correctional Center?

5  A    I don't know.

6  Q    How long does it take you to drive the distance?

7  A    Five, 10 minutes.

8  Q    Did you have any conversation with any of the

9        jail personnel regarding Mr. Wallace before he

10       died?

11  A    Other than Linda Monticello?

12  Q    Yes.

13  A    No.

14  Q    Did you tell Nurse Monticello what, if anything,

15       she should give in the way of instructions to

16       the correctional staff concerning Troy Wallace?

17  A    No.

18  Q    Do you know David Henderson?

19  A    Yes.

20  Q    Do you know anything specifically about his

21       experience dealing with inmates who are

22       suffering from alcohol withdrawal?

23  A    I know he's part of the team of correctional

24       officers that is there and that the State of

25       Alaska has the responsibility to maintain the

5b277d78-a4c4-475e-84ac-b07ed8574d8d

1    alcohol withdrawal?

2  A    In -- in -- in each.....

3  Q    Do you know, that's my question.  I don't mean

4       to interrupt.  Go ahead.

5  A    In the 10 years that I worked at the Ketchikan

6       Correctional Center, we are not atypical and

7       approximately somewheres between 15 and 30

8       percent of the individuals that are

9       incarcerated, if not more, are involved with

10      some degree of alcohol and drug withdrawal and -

11      - and it involves some degree of substance abuse

12      and some layering of that and all of the staff

13      that you're talking about are people who are

14      experienced in this and they're -- that was my

15      understanding and belief.

16      MR. LESSMEIER:  We've been going for about two

17   hours.  Can we take a break for 10 or 15 minutes?

18      MR. BUDGE:  Sure.  Absolutely.

19      THE REPORTER:  Off record.

20      (Off record)

21      THE REPORTER:  We're on record.

22  Q    Do you know anything specific about the medical

23      training and experience for any of the following

24      individuals:  James Campbell?

25  A    Nothing specific.

5b277d78-a4c4-475e-84ac-b07ed8574d8d

1    Q    Patrick Casson?

2    A    Nothing specific.

3    Q    Holly Cloudy?

4    A    Nothing specific.

5    Q    Kenneth Comstock?

6    A    Nothing specific.

7    Q    Audie Ellis?

8    A    Nothing specific.

9    Q    David Gregory?

10   A    Nothing specific.

11   Q    Anthony Haan?

12   A    Nothing specific.

13   Q    Walter Hedley?

14   A    No.

15   Q    Edward Hendricks?

16   A    No.

17   Q    Darrell Halderman?

18   A    No.

19   Q    Jason Kern?

20   A    No.

21   Q    Brian Miller?

22   A    No.

23   Q    Kevin Morly?

24   A    No.

25   Q    Michael Ross?

Page 82

1    A    No.

2    Q    Al David?

3    A    No.

4    Q    Ed Irizarry?

5    A    No.

6    Q    Sherri Davis?

7    A    No.

8    Q    Walter Rud?

9    A    No.

10   Q    Lauri Murray?

11   A    No.

12   Q    David Henderson?

13   A    No.

14   Q    Knowing what you know now, was there a point in

15        time where you believe that you should have been

16        contacted again with regard to Mr. Wallace's

17        situation?

18   A    Are you asking me knowing now that -- knowing

19        that he's died so I'm asked in retrospect to

20        believe with regard to his death?

21   Q    Yeah, is there, as you sit here today knowing

22        what you know now including the fact that he

23        died, was there -- can you pinpoint any point in

24        time where you think that the situation was such

25        that you should have been contacted again?

5b277d78-a4c4-475e-84ac-b07ed8574d8d

1    attempt to convince him to quit drinking on

2    Saturday when I was -- that was my next

3    scheduled clinic.  And it wasn't even a

4    scheduled clinic.  We were actually going to do

5    a clinical follow in a week but I said given the

6    circumstance I'll either see him tomorrow or on

7    Saturday, call me, and I did not call her at

8    that point in time because I trusted her in the

9    system that I had the patient in.

10   Q    Did you ever attempt to contact Nurse

11        Monticello?

12   A    I did not see the need to do so based upon our

13        prior practice.

14   Q    Did you ever attempt to contact Nurse

15        Monticello?

16   A    I did not.

17   Q    As of July of 2004 was there -- would there have

18        been any set of symptoms that an inmate might

19        display with regard to alcohol withdrawal that

20        would have caused you to order that the inmate

21        be brought to the Ketchikan General Hospital?

22   A    Without my going in to see him?

23   Q    Yeah.

24   A    Clearly I think if the patient seized, that

25        would be something that would cause him to go to

1    when I would recommend that a patient be

2    transported the people with the authority to

3    transport the patient would most often take my

4    advice.

5  Q  With regard to any of your decisions pertaining

6    to Mr. Wallace, did you consult with any other

7    healthcare practitioner besides Nurse

8    Monticello?

9    MR. LESSMEIER:  You've already asked that once,

10 Counsel.

11 A  No.

12 Q  When you were contacted by Nurse Monticello, did

13    you know in your mind that this was somebody

14    that I've seen at the hospital before?

15 A  No.

16 Q  Okay.

17 A  I -- I had no recollection that I'd ever

18    encountered this individual at all.

19 Q  Did you review any of those records from the

20    Ketchikan General Hospital in connection with

21    any of your decisions in response to the call

22    from Nurse Monticello?

23 A  No, I did not.

24 Q  Is there anything about the conduct of the

25    corrections officers on duty that as it relates

5b277d78-a4c4-475e-84ac-b07ed8574d8d

Page 120

1    Q    You were sued by another individual in the last

2         year or so, were you not?

3    A    That's correct.

4    Q    How did that case turn out?

5    A    It was settled in my favor.

6         MR. LESSMEIER:  It wasn't settled.

7    A    No, I mean, it was -- it was -- I went to court

8         and there was a jury trial and there was a

9         unanimous verdict in seven minutes in my favor.

10   Q    Yeah.  I didn't know it was seven minutes but I

11        knew there was a verdict in your favor.  In July

12        of 2004, were you under contract with the State

13        of Alaska to provide medical services to inmates

14        confined at the Ketchikan Correctional Center?

15   A    I was.

16   Q    Okay.  I'm going to show you, I think it's a

17        copy of a contract, and this will be marked as

18        plaintiff's exhibit number 1.  Take a minute and

19        look at it but my question is as far as you can

20        tell does that appear to be a copy of the

21        contract that was in place with the amendments?

22   A    That is my signature and it's been a long time

23        since I've reviewed that contract but, yes, it

24        appears like it would be.

25                              (Plaintiff's exhibit 1)

SEAK Professional Services, LLC
2415 Hemlock Street, Suite 104, Ketchikan, Alaska 99901

5b277d78-a4c4-475e-84ac-b07ed8574d8d

1    Q    How did it work in terms of payment?  Did you
2         get a set sum every year or did you bill?
3    A    I billed them once a month and I got a fixed
4         rate each month.
5    Q    Okay.  Regardless of how many patients you saw
6         that month?
7    A    That's correct.
8    Q    It was always the same?
9    A    That's correct.
10   Q    Estimate if you could for me as of 2004 what
11        percentage of your income came from this
12        contract?
13        MR. LESSMEIER:  Let me just object to the
14   question and also object on the basis of relevance.
15   A    Twenty percent, I guess, or less.  Twenty
16        percent.
17   Q    And in 2004 you were billing for $4,000 a month
18        under the contract?
19   A    That's correct.
20   Q    If you'd look at the -- you mind if I just draw
21        your attention to one of the pages of the
22        contract.  I'll try to do my best to identify
23        for the record what page it is.  At the top it's
24        appendix B, Indemnity and Insurance and more
25        specifically toward the bottom of the page under

1            insurance, Section 2.4, professional liability

2            insurance, do you see that general area that I'm

3            referring to?

4      A    I do.

5      Q    Did you, in fact, maintain professional

6            liability insurance?

7      A    Yes, I do.

8      Q    And who is your insurance carrier?

9      A    Medical Insurance Exchange of California.

10     Q    Has the defense of this case been tendered to

11           them?

12     A    Yes.

13     Q    And are they covering you?

14     A    Yes.

15     Q    What are your limits?

16     A    I believe it's three million total, one million

17           per case.

18     Q    Okay.  Do you have any reason to believe that

19           they would not cover you in the event that a

20           judgment were to be entered on behalf of the

21           plaintiff in this case?

22           MR. LESSMEIER:  Objection.  Form.  Foundation.

23     A    No.

24     Q    If you could look at the top of appendix C which

25           is on the very next page it says that the

1       purpose of this contract is for Ernest Meloche,

2       M. D. to provide primary healthcare services to

3       persons incarcerated in the Ketchikan

4       Correctional Center, KCC, Ketchikan, Alaska.

5       Was that in fact your understanding that you

6       were providing primary healthcare services to

7       inmates at the Ketchikan Correctional Center?

8   A   That's correct.

9   Q   And as you understood it was the standard of

10      medical care to be provided by you to inmates

11      any different than the standard of medical care

12      to be provided by you to members of the general

13      public?

14      MR. LESSMEIER:  Objection.  Form.  Foundation.

15  Go ahead.

16  A   No.

17  Q   And in terms of recommending whether an

18      individual needed to be hospitalized for

19      whatever condition that he or she had, did you

20      see your duty being any different depending on

21      whether that person was an inmate.....

22  A   No.

23  Q   .....or a free citizen?

24  A   Absolutely not.

25  Q   Would you ever order that an inmate receive

5b277d78-a4c4-475e-84ac-b07ed8574d8d

- the -- the care that was being delivered at
the Ketchikan Correctional Center was not able
to meet the care that was needed from an in-
patient setting, the patient would be -- I would
advocate strongly for and insist upon that
patient being transferred to the hospital for
in-patient care.

Q    In practice how long -- how often did you visit
the jail for purposes of attending to the
medical needs of inmates?

A    Once or twice a week, sometimes more often.
Sometimes once or twice a day but most often it
was once or twice a week.

Q    Did you visit the jail at any time between July
20, 2004, and July 24, 2004?

A    I went to the jail the morning after -- of July
24th.

Q    After he died, after Troy died?

A    After he died, yes.

Q    Did you visit the Ketchikan Correction Center at
any time between July 20, 2004, and the time
that Troy Wallace died?

A    No, I did not.

Q    Tell me what happened when you went to the jail
on July 24th after Troy Wallace died.

```
 1          I consider the people that I work with part of
 2          my team and I care about them all.
 3    Q     Okay.  Other than the testimony that you've
 4          already given, particularly with regard to Dr.
 5          Kernberg and Nurse Monticello, have you
 6          discussed the situation regarding Troy Wallace
 7          with anybody else that you can remember besides
 8          your lawyer?
 9    A     Not other than I've already said.
10    Q     Can you identify by name any other inmate who
11          you had any responsibility for treating for
12          alcohol withdrawal in the jail cell?
13    A     I cannot remember anybody by name and if I could
14          I probably wouldn't be allowed to mention it.
15    Q     But you can't remember anybody else by name?
16          MR. LESSMEIER:  Answer that question yes or no.
17    A     Actually, yes, I can remember several.
18    Q     Okay.  How many?
19    A     Only have two by name.  I can't believe that.  I
20          intentionally forget names. It's something I
21          discovered is possible so I intentionally forget
22          names so I don't discuss people's medical
23          problems out on the street.  But I can remember
24          two people specifically by name.
25          MR. BUDGE:  And if I ask him for the names is
```

1   the instruction not to answer?

2   MR. LESSMEIER:  Yeah.

3   A   And I wouldn't be able to answer because of

4       medical confidentiality.  I'm sorry.

5   Q   That's all right.

6   A   Regardless of what he told me I wouldn't do it.

7   Q   All right.  Have you understood all my questions

8       today except for the ones that you asked me to

9       clarify which I've been hopefully clarifying?

10   A   I've understood the English involved and at

11      times I've had a hard time figuring exactly what

12      the answers were supposed to be but I -- I

13      believe I understood enough to give the best

14      answers I could.

15   Q   Do you want to add to or change any of your

16      testimony?

17   A   Not at this time.

18   Q   Okay.

19   A   Just the -- the only thing -- well.....

20   Q   We can have a discussion off the record if you

21      want.  But my question is do you want to add to

22      or change any of the testimony that you've given

23      today?

24   A   Can I ask you a question?

25   MR. LESSMEIER:  No.  If you want to say

1               A F F I D A V I T

2   State of Alaska

3              ss

4   FIRST JUDICIAL DISTRICT

5

6       I have read my within deposition, and the same

7   is true and correct save and except for any

8   CORRECTIONS as noted on the CORRECTION PAGE

9   immediately following, attached hereto and made part

10  of this deposition transcript.

11                          _____

12                          ERNEST MELOCHE, M.D.

13      SIGNED AND SWORN TO before me, this _____

14  day of _____, 2006

15

16                          _____

17              Notary Public for the State of Alaska

18              My commission expires:_____

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2    STATE OF ALASKA      )

3                         ) ss:

4    First District       )

5        I, Clyde E. Pasterski, a Notary Public in and

6    for the State of Alaska, residing at Ketchikan,

7    Alaska, do hereby certify that the annexed and

8    foregoing deposition upon oral examination of the

9    witness, Ernest B. Meloche, M.D., appearing at the

10   instance and request of the plaintiff, in the above

11   entitled and numbered cause of action, pursuant to a

12   Notice of Taking, was taken before me on Friday, the

13   8th day of December 2006, those appearing having

14   assembled at the hour of 8:59 a.m. thereof at the

15   office of SEAK Professional Services, 2415 Hemlock

16   Avenue, Suite 104, Ketchikan, Alaska 99901;

17       I further certify that the above named witness,

18   before examination, was by me duly sworn to testify

19   truthfully;

20       I further certify that the examination of the

21   witness comprising of this deposition and was by me

22   personally electronically recorded from the witness,

23   and was thereafter reduced to typewriting by myself

24   or at my direction;

25       I further certify that I am not a relative or

1   employee of any of the parties to said action, or a

2   relative or employee of any such attorney or counsel,

3   and that I am not financially interested in the said

4   action or the outcome thereof;

5       I further certify that said deposition upon oral

6   examination, as above transcribed, is a correct and

7   full transcript of the testimony of said witness,

8   including all questions and answers, and all

9   objections, motions and exceptions made and taken at

10  the time of the foregoing examination; and,

11      That all documents and/or items marked for

12  identification as exhibits to the deposition have

13  been annexed to and included with said deposition,

14  unless orally waived by the witness and the

15  respective counsel.

16      I further certify that the original of this

17  deposition has been sealed by me and delivered to the

18  deposing attorney for the purpose of filing the same

19  with the Clerk of the above entitled Court, according

20  to law.

21      IN WITNESS WHEREOF, I have hereunto set my hand and

22  affixed my Notarial seal this ____ day of _____, 2006.

23

24      _____

24          Notary Public for the State of Alaska

25          Commission expires: February 1, 2009

AUG-15-2005 MON 03:26 PM KETCHIKAN CORRECTIONAL C    FAX NO. 907  5 7031    P. 02

06/12/2005 16:58 FAX 907 266  345    DEPT OF CORRECTION ADMIN    002
06/16/2004 16:08 FAX 907 269 7940    DEPT OF CORRECTION ADMIN & SCOPE    002

JUN-15-2004 21:44    ER    1 907 229 8333    P.81

| | |
|---|---|
| 1. Agency Contract Number | 2024818 |
| 2. ADFA Number | 2002-2000-8072 |
| 3. Optional Renewal? Yes [X] No [ ] Year's remaining: 0 | |
| 4. Financial Coding | 20081626-15205-76700005-73242 |
| 5. Agency Assigned Encumbrance Number | 2024818 |
| 6. Attachment No. | Three (3) |

STATE OF ALASKA

AMENDMENT TO PROFESSIONAL SERVICE CONTRACT

7. Department of
   Corrections

8. Contractor
   Ernest Maloche, M.D.

Mailing Address: Street or P.O. Box: P.O. Box 8058    City: Ketchikan    State: AK    ZIP Code: 99901-1053

9. Original period of performance: FROM: March 1, 2002  TO: June 30, 2004
10. Amended period of performance: FROM: July 1, 2004  TO: June 30, 2005

11. Previous amount of contract to date: $112,000.00
12. Amount of this amendment: $48,000.00
13. This amended contract shall not exceed a total of $160,000.00

14. In accordance with the provisions of the above referenced contract, the parties to that contract agree that the services to be performed by the contractor under the contract are stipulated as follows: All other terms and conditions of the contract remain in effect. (Use reverse for continuation of amendment provisions if necessary.)

The purpose of this contract amendment is to increase the period of performance beginning July 1, 2004 through June 30, 2005 and the funds encumbered under the contract to cover the additional period of service. All other work requirements as specified in the attached appendices remain unchanged.

In full consideration of the contractor's performance under and including this amendment, the State shall pay the contractor a new total not to exceed $ 160,000.00

The period of performance under this contract is increased by _Twelve Months_ to _June 30, 2005_.
IN WITNESS WHEREOF the parties hereto have executed this amendment.
NOTICE: This amendment has no effect until signed by the head of the contracting agency, procurement official or designee.

15. Contractor
Name of Firm:
Ernest Maloche, M.D.

Signature of Authorized Representative:    Date: 6-13-04

Typed or Printed Name of Authorized Representative:
Ernest Maloche, M.D.

Title:
Medical Doctor

16. Contracting Agency
Department/Division:
Corrections / Administrative Services

Signature of Project Director:    Date: 6-16-04

Typed or Printed Name of Project Director:
Jerry Burnett

Title:
Director    JKR

17. CERTIFICATION: I certify that the funds herein and on supporting documents are correct, that this voucher constitutes a legal charge against funds and appropriations noted, that sufficient funds are encumbered to pay this obligation, or that there is a sufficient balance in the appropriation cited to cover this obligation. I can mean that by knowingly make or allow false entries or alterations on a public record, or knowingly destroy, mutilate, suppress, conceal, remove or otherwise injure the validity, legibility or availability of a public record constitutes tampering with public records punishable under AS 11.56.815 - .860. Other disciplinary action may be taken up to and including dismissal.

Signature of Head Contracting Agency or Designee    Date: 6-21-04

Typed or Printed Name of Authorizing Official:
Sharon Prescott

Title:
Procurement Officer

02-118 (Rev. 09/94)    ATPSC.PFM

PLAINTIFF'S
EXHIBIT

AUG-15-2005 MON 03:29 PM KETCHIKAN CORRECTIONAL C    FAX NO. 90   45 7031    P. 04

06/12/2005 18:56 FAX 907 26. .345    DEPT OF CORRECTION ADMIN    @004
08/11/01 TUE 16:16 FAX 907 383 7344    DEPT OF CORRECTION ADMIN +++ JUNEAU CENTRAL    @003
08/11/01 WED 17:05    KCH CR Dept    (907)228 8533    P.1
08/24/01 MON 10:20 FAX 007 :   @9345    DEPT OF CORRECTION ADMIN   @002

STATE OF ALASKA

AMENDMENT TO PROFESSIONAL SERVICES CONTRACT

| Field | Value |
|---|---|
| 1. Agency Contract Number | 2024518 |
| 2. ABAR Number | 2002-2000-3072 |
| 3. Optional Renewal? Yes [X] No [ ] Years remaining 2 yrs. |
| 4. Financial Coding | 2025 1235 18351 75700005 73212 |
| 5. Agency Assigned Encumbrance Number | 2024518 |
| 6. Amendment No. | One (1) |

7. Department: Corrections

8. Contractor: Ernest Melocha, M.D.

P.O. Box 9058, Ketchikan, AK, 99901-1058

9. FROM: March 1, 2002 TO: June 30, 2002
10. Amended period FROM: July 1, 2002 TO: June 30, 2003

11. Previous amount of contract to date: $18,000.00
12. Amount of this amendment: $49,000.00
13. $84,000.00

14. The purpose of this contract amendment is to increase the period of performance beginning July 1, 2002 through June 30, 2003 and the funds encumbered under the contract to cover the additional period of service. All other work requirements as specified in the attached appendices remain unchanged.

Ernest Melocha, M.D. — Medical Doctor — 6/24/02

Corrections / Institutions — Sam Edwards — Acting Director of Institutions — 6/25/02

Joseph Reeves — Administrative Services Manager — 6-25-02

AUG-15-2005 MON 03:28 PM KETCHIKAN CORRECTIONAL C    FAX NO 907... 3 7031    P. 06
08/12/2005 17:00 FAX 907 26. .345    DEPT OF CORRECTION ADMIN    ☎006

## STANDARD AGREEMENT FORM

| 1. Agency Contract Number 2024816 | 2. ARPS Number 2002-2000-3072 | 3. Financial Coding 20561825-15305-75700005-73242 | 4. Agency Assigned Encumbrance Number 2024816 |
|---|---|---|---|
| 5. Vendor Number | | 6. Alaska Business License Number 196410 | |

| 7. Department of Corrections | Division Institutions, Inmate Health Care | hereafter the State |
|---|---|---|

| 8. and, Ernest Meloche, M.D. | | | hereafter the Contractor |
|---|---|---|---|
| Mailing Address | Street or P.O. Box P.O. Box 6058 | City Ketchikan, | State AK | ZIP+4 99901-1058 |

9.  ARTICLE 1.    Appendices. Appendices referred to in this contract and attached to it are considered part of it.

ARTICLE 2.    Performance of Service:
2.1   Appendix A (General Provisions), Articles 1 though 16, governs the performance of services under this contract.
2.2   Appendix B sets forth the liability and insurance provisions of this contract.
2.3   Appendix C sets forth the services to be performed by the contractor.

ARTICLE 3.    Period of Performance: The period of performance for this contract begins March 1, 2002 and ends June 30, 2002.
ARTICLE 4.    Consideration:
4.1   In full consideration of the contractor's performance under this contract, the State shall pay the contractor a sum not to exceed $16,000.00   in accordance with the provisions of Appendix D.
4.2   When billing the State, the contractor shall refer to the Authority Number or the Agency Contract Number and send the billing to:

| 10. Department of Corrections | Attention: Institutions, Inmate Health Care |
|---|---|
| Mailing Address 4500 Diplomacy Drive, Suite 109, Anchorage, AK 99508 | Attention: Health Care Administrator |

| Name of Firm Ernest Meloche, M.D. | | 13. CERTIFICATION: I certify that the facts herein and on supporting documents are correct, that this voucher constitutes a legal charge against funds and appropriations cited, that sufficient funds are encumbered to pay this obligation, or that there is a sufficient balance in the appropriation cited to cover this obligation. I am aware that to knowingly make or allow false entries or alterations on a public record, or knowingly destroy, mutilate, suppress, conceal, remove or otherwise impair the veracity, legibility or availability of a public record constitutes tampering with public records punishable under AS 11.56.815 - 820. Other disciplinary action may be taken up to and including dismissal. |
|---|---|---|
| Signature of Authorized Representative | Date | |
| Typed or Printed Name of Authorized Representative Ernest Meloche, M.D. | | |
| Title Medical Doctor | Employer ID No. (EIN) or SSN 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 | |
| | | Signature of Head of Contracting Agency or Procurement Officer / designee | Date |
| Department/Division Corrections/Institutions | Date | |
| Signature of Project Director | | Typed or Printed Name of Authorizing Official Joseph Reeves |
| Typed or Printed Name of Project Director Allen Cooper | | Title Administrative Services Manager |
| Title Director of Institutions | | |

Notice: This contract has no effect until signed by the head of contracting agency or designee.
02-093 (02/94)

AUG-15-2005 MON 03:30 PM KETCHIKAN CORRECTIONAL C    FAX NO. 907___5 7031    P. 09

08/12/2005 17:05 FAX 907 26. /345    DEPT OF CORRECTION ADMIN    @008

## APPENDIX B¹
### INDEMNITY AND INSURANCE

### Article 1.  Indemnification

The Contractor shall indemnify, hold harmless, and defend the contracting agency from and against any claim of, or liability for error, omission or negligent act of the Contractor under this agreement.  The Contractor shall not be required to indemnify the contracting agency for a claim of, or liability for the independent negligence of the contracting agency.  If there is a claim of, or liability for, the joint negligent error or omission of the Contractor and the independent negligence of the Contracting agency, the indemnification and hold harmless obligation shall be apportioned on a comparative fault basis.  "Contractor" and "Contracting agency", as used within this and the following article, include the employees, agents and other contractors who are directly responsible, respectively, to each.  The term "independent negligence" is negligence other than in the Contracting agency's selection, administration, monitoring, or controlling of the Contractor and in approving or accepting the Contractor's work.

### Article 2.  Insurance

Without limiting Contractor's indemnification, it is agreed that Contractor shall purchase at its own expense and maintain in force at all times during the performance of services under this agreement the following policies of insurance.  Where specific limits are shown, it is understood that they shall be the minimum acceptable limits.  If the Contractor's policy contains higher limits, the state shall be entitled to coverage to the extent of such higher limits.  Certificates of insurance must be furnished to the Contracting Officer prior to beginning work and must provide for a 30-day prior notice of cancellation, nonrenewal or material change of conditions.  Failure to furnish satisfactory evidence of insurance or lapse of the policy is a material breach of this contract and shall be grounds for termination of the Contractor's services.  All insurance policies shall comply with, and be issued by insurers licensed to transact the business of insurance under AS 21.

2.1 Workers' Compensation Insurance:  The Contractor shall provide and maintain, for all employees engaged in work under this contract, coverage as required by AS 23.30.045, and; where applicable, any other statutory obligations including but not limited to Federal U.S.L.&H. and Jones Act requirements.  The policy must waive subrogation against the State.

2.2. Commercial General Liability Insurance:  covering all business premises and operations used by the Contractor in the performance of services under this agreement with minimum coverage limits of $300,000 combined single limit per occurrence.

2.3. Commercial Automobile Liability Insurance:  covering all vehicles used by the Contractor in the performance of services under this agreement with minimum coverage limits of $300,000 combined single limit per occurrence.

2.4. Professional Liability Insurance:  covering all errors, omissions or negligent acts in the performance of professional services under this agreement.  Limits required per the following schedule:

| Contract Amount | Minimum Required Limits |
| --- | --- |
| Under $100,000 | $300,000 per Occurrence/Annual Aggregate |
| $100,000-$499,999 | $500,000 per Occurrence/Annual Aggregate |
| $500,000-$999,999 | $1,000,000 per Occurrence/Annual Aggregate |
| $1,000,000 or over | Refer to Risk Management |

02-093 B¹ (Rev. 10/93)

AppB¹.doc

AUG-15 2005 MON 03:31 PM KETCHIKAN CORRECTIONAL C   FAX NO. 907   7031   P. 10

08 12 2005 15:05 FAX 807 26. /545   DEPT OF CORRECTION ADMIN   ☑013

3.  Code of Ethics: The Contractor will assure that all individuals providing services under the terms of this contract receive and read Department Policy and Procedure 202.01, Code of Ethics and Standards of Conduct. Contractor employees are expected to work under the same standards as those applying to State employees. A copy of Department Policy and Procedure 202.01, Code of Ethics and Standards of Conduct is available for Contractor reference upon request.

4.  ADA: The Contractor shall comply with the requirements of the Americans with Disabilities Act, as amended, in employing staff, serving clients and as otherwise appropriate. A copy of the American with Disabilities Act (P.L. 101-336) is available upon request.

5.  Subcontracting: The Contractor shall not subcontract any portion of the contracted service without prior written permission from the Health Care Administrator, or designee. Resumes, licenses and other information will be required by the Department prior to any written approval being granted for any subcontracting arrangement. All subcontracting arrangements will be reviewed, and a written decision issued, within thirty (30) days. Subcontractors will also be required to comply with background investigations and/or security checks. All subcontractors who have received the approval of the Department to provide services under the terms of the contract will be bound by all conditions specified in Appendix C and Appendix D.

6.  Transition: The Contractor agrees to assist the Department and any subsequent provider in facilitating the transition between providers in the event of termination or completion of this contract. This agreement is a condition precedent to the Contractor's right to receive any final payment of funds under this contract.

7.  Records: The records and other information compiled by the Contractor in accordance with the duties and responsibilities of this contract shall be the property of the Department of Corrections and copies of such records shall be provided to the Department within a reasonable period, upon request.

8.  Format of Reports and Data. Department of Corrections (DOC) is currently re-engineering its management, reporting and data gathering information systems. The Contractor will be expected to utilize electronic medical records and MIS systems developed and/or utilized by the DOC.

9.  Personnel: New personnel hired, to work under the terms of this contract, must meet the minimum qualifications stipulated in existing, approved, position descriptions. Resumes and other pertinent information must be submitted by the Contractor prior to Department consideration for approval of any new personnel. New personnel hired during this contract period may be required to comply with background investigations and security checks.

10. Performance Evaluation: The Department reserves the right to audit and/or evaluate the services being provided by the Contractor under this contract. The Contractor will be responsible for developing a plan of action to address any areas of concern raised through an evaluation process. The action plan must be approved by the Health Care Administrator, or designee.

11. Insurance: The State Department of Administration, Division of Risk Management, has established minimum insurance requirements for professional services contractors. These

---

#2002-2000-3072/#2024816                    5                    Ernest Malocha/KCC

AUG-15-2005 MON 03:32 P.. KETCHIKAN CORRECTIONAL C     FAX NO. 907 ...5 7031     P. 12

06/12 2005 17:07 FAX 007 28. 845     DEPT OF CORRECTION ADMIN     ⓺ 012

Enforcement Administration (DEA) registration number.

(4)  Have, or obtain, admitting privileges at local hospital

18.  Physician Work Requirements: The Contractor will be the Ketchikan Correctional Center physician. This physician will be available via telephone or other means at all times. If, at any time, the contract physician will be away from the Ketchikan area, the contract physician will notify the HCA of the absence at least 14 days in advance.

(a)  The number of physicians' visits to the facility will be up to three per week based on patient load and need. During one visit each month it is essential that the physician visit with the facility superintendent, and nurse to discuss the status of the facility inmate health care program. The Contractor agrees to meet actual requirements with the understanding that the actual number of hours involved could be more or less than anticipated. The total time required of the physician is not expected to exceed _three_ hours of in-facility direct delivery primary health care per visit and two hours of other duties i.e. hospital admits, visits, releases, etc. per week

(b)  See only those inmates referred by the facility medical staff or those requiring treatment follow-up by the contract physician. Record these visits on the Sick Call Activity Report (form 20-807.11A), and note each patient's Progress Note (form 20-807.05A) as a minimum.

(c)  Maintain a liaison with local emergency rooms and hospitals for back-up emergency service and in-patient care as it becomes necessary.

(d)  Accomplish all necessary physician hospital _admits_, _patient visits_ and _discharges_ of all prisoners requiring hospitalization in Ketchikan and other medical facilities as appropriate, unless a specialist includes these services as part of a procedure fee. The number of hospital visits made will be that number considered essential by a prudent physician. The primary purpose of these visits is to reduce the amount of hospital time to the minimum essential commensurate with in-facility care capability of the correctional center.

• Accomplish as many procedures/treatments as possible in the facility, the objective being to keep out-of-facility care and treatment to a minimum. Assure that all efforts to provide in-facility care are exhausted before a prisoner is transported for treatment. Security of transports must be approved by the institution superintendent (Policy and Procedure, 807.02).

(e)  Obtain the prior approval of the DOC Anchorage Central Office, utilizing Health Care Request forms, for all routine out of facility referrals to recognized specialists and service providers, including all surgical procedures.

(f)  Work within the framework of the DOC Policies and Procedures. Assure that all lab work, x-rays and special diagnostic testing are processed according to the institution and DOC Policies and Procedures.

(g)  Maintain a close working relationship with those ultimately responsible for prisoner health care, i.e., the HCOO, the facility Superintendent, and the HCA.

(h)  Assist in the development of policies and procedures when requested and make

---

#2002-2000-3072/#2024818                    7                    Ernest Meloche/KCC

AUG-15-2005 MON 03:33 PM KETCHIKAN CORRECTIONAL C     FAX NO. 907 __5 7031     P. 14

08/12/2005 17:08 FAX 907 26b .348     DEPT OF CORRECTION ADMIN     ☒014

## APPENDIX D
### Cost and Provision for Payment and Reports

#### PHYSICIAN SERVICES
#### KETCHIKAN CORRECTIONAL CENTER, KETCHIKAN, ALASKA

#### ERNEST B. MELOCHE, M.D.
#### FY02

1.  The State, in full consideration of the Contractor's performance, shall pay the Contractor for services provided under this contract.  Payment will be made in accordance with the following budget categories and expenditure levels:

    (a)  Direct Costs:  The Contractor will be paid a flat rate of $4,000.00 per month for physician services as specified in Appendix C of this contractual agreement.

    (b)  Indirect Costs:  Indirect costs (taxes, insurance, administrative, etc.) are figured into the direct cost monthly rate.  No other fees or costs are billable.

2.  Any changes in budget categories or budget allocations must receive prior written approval from the Health Care Administrator, or designee.

3.  The Department may modify the content and format of fiscal reports during the course of the contract period.  Prior to the implementation of any new reporting requirements, the Department will consider the resources necessary to implement any new change. The Contractor will be required to comply with any new reporting requirements. Failure to comply with reporting requirements may result in withholding of final payment for services under the terms of the contract.

4.  To receive payment under this contract, the Contractor must submit billings for services with support documentation to demonstrate provision of services sufficient to meet the following requirements:

    (a)  All billings must be certified (signed) by the Contractor.

    (b)  Billings must contain sufficient information in support of all billable charges to allow proper review and authorization.

    (c)  Monthly activity report/billing invoice will be submitted by the Contractor, through the HCDO, to the Administrative Manager.  The mailing address is Department of Corrections, Health Care Services, 4500 Diplomacy Drive, Suite 109, Anchorage, AK 99508-5927.

5.  The State reserves the right, at a reasonable time and place, to audit the books and records of the Contractor to the extent that the books and records relate to this professional services contract. A person or firm receiving a contract, change order, or contract modification for which cost or pricing data is required, shall maintain books and records that relate to the cost or pricing data for three years after the date of final payment under the contract. Audits will be conducted by departmental personnel or contract agents of the Department of Corrections.

---

#2002-2000-3072/#2024816                    9                    Ernest Meloche/KCC

AUG-15-2005 MON 03:33 PM KETCHIKAN CORRECTIONAL C    FAX NO. 907 225 7031    P. 16

08/12/2005 17:08 FAX 907 269 .545    DEPT OF CORRECTION ADMIN    ☒016

## CORRECTIONAL INSTITUTION MEDICAL CLAIMS DEFENSE AGREEMENT

The Department of Corrections provides medical care for inmates through a combination of its own employees and contract care providers. Experience has shown that inmates bring a greater number and percentage of frivolous claims of medical malpractice or negligence than do non-incarcerated patients. The cost of defending those frivolous claims has been born in part by contractors and their medical insurers, which translates into higher premiums to the contractors, higher contract prices to the State, and most troubling, an unwillingness of practitioners to care for inmates.

The State seeks to reduce the cost to its contractors of these frivolous claims, while still requiring those contractors to bear the risk and cost of legitimate allegations of their malpractice and negligence. That exposure provides an incentive to contractors and their insurers to provide the highest quality of medical care to inmates. By shifting the cost of frivolous claims to the State, it hopes that its contractors are subjected to the same costs of insurance as are those practitioners in similar specialties who do not provide care for inmates.

Therefore, the following is agreed:

1.  "Claim" is defined to mean a demand letter or lawsuit made or brought on behalf of a former or present inmate in the custody of the Department of Corrections that alleges a contractor engaged in medical malpractice; provided negligent medical care; or during the course of providing medical care, engaged in conduct, whether by commission or omission, that violated the eighth amendment of the United States Constitution. Furthermore, a "claim" includes a demand letter or lawsuit directed at a contractor for its liability for the conduct of a Physician Assistant who is not an employee of the contractor, but for whom the contractor is the collaborating physician.

2.  "Contractor" is defined to be an individual or entity, or the employee of such individual or entity, that contracts with the State of Alaska to provide medical care to inmates in the custody of the Department of Corrections.

3.  "Final decision maker" is defined to mean the body, whether an expert advisory panel pursuant to AS 09.55.536, a jury or a judge sitting without a jury, that makes the ultimate decision that the claim is valid or not valid. If a claim is presented to an expert advisory panel and later submitted to a judge or jury, then the judge or jury is the final decision maker.

4.  Within thirty days of receipt by the Director of the Division of Risk Management of the State of Alaska of written notice of a claim, the State shall give written notice of the claim to the contractor.

5.  Within ninety days of the distribution of the notice described in paragraph 4 above, the State shall provide written notice to the contractor of its determination that the claim is not frivolous.

6.  If the State does not make the timely notice described in paragraph 5 above, then the State shall defend the claim at no cost to the contractor or its insurer, subject to the provisions of paragraph 8 below.

7.  If the State does make the timely notice described in paragraph 5 above, then the contractor or its insurer shall provide the defense of the claim.

---

#2002-2000-3072/#2024816    11    Ernest
Malocha/KCC

AUG-15-2005 MON 03:34 PM KETCHIKAN CORRECTIONAL C     FAX NO. 907 225 7031     P. 18

08/12/2005 17:11 FAX 907 269 7345     DEPT OF CORRECTION ADMIN     ☒018

**BILLING INVOICE FORMAT:**

Ernest B. Meloche, M.D.
Statement for Collaborating Physician Services
Ketchikan Correctional Center

Contractor Name:   Ernest Meloche, MD.
Mailing Address:   P.O. Box 6058
                 Ketchikan, AK 99901-1058
Phone:            (907) 247-8058

FIN/EID/SSN: 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
Vendor Code: ERM32202
Contract Number: 2024816
RASPS #: 2002-2000-3072

Date of Invoice:

| Time Period         through | | |
|---|---|---|
| Physician Services - Flat Rate of $4,000/month (prorated if absent) | | |
| Physician - Dates of visits | N/A | N/A |
| Number of consultations/calls Other services: | | |
| | $ | |

I certify that the above billing is a true and accurate accounting of dates of services provided under professional services contract #2024816 for the provision of Health Care Support Services at Ketchikan Correctional Center.

Contractor Signature _____     Date _____

KCC Health Care Supervisor _____     Date _____

Health Care Administrator Approval _____     Date _____

#2002-2000-3072/#2024816              13              Ernest
Meloche/KCC

Name _____    _____    DISC#: _6952_
                                                        DATE

## ALASKA DOC MEDICAL GUIDELINE

## ALCOHOL WITHDRAWAL

**Subjective:**    Time of Last Drink  _07-19-04_

Amount, duration, and frequency of alcohol consumed prior to incarceration.  _CANNOT RECALL_

Other meds taken  _NONE_

Hx of diabetes ☐ hypertension ☐ seizures ☐ Other _____

Patient complains of:

☐ Nausea    ☐ Vomiting    ☐ Feelings of nervousness

☐ Headache    ☑ Tremors Where?  _Hands_

☑ Visual Disturbances    ☐ Tactile Disturbances    ☐ Auditory Disturbances

☐ Oriented to day, place, person    ☑ Hallucinations

**Objective:**    Vital Signs: BRAC ____ Temp _97.5_  Pulse _137_  Resp _20_  B/P _160/104_  Wt ____

Blood Sugar _____

Oriented x 3:    ☐ Alert    ☑ Hallucinating

Evidence of sweating:    ☐ Mild    ☐ Mod    ☑ Severe

Evidence of tremors:    ☐ mild    ☑ Mod    ☐ Severe

Irritability:    ☑ Mild    ☐ Mod    ☐ Severe

Diarrhea: Color/frequency _____

☐ Seizure: Description _____

Affect: ☐ Labile    ☑ Stable

**Assessment Decision:**    Acute Alcohol Withdrawal

Dx: _____

Dx: _____

**Plan:**    Place inmate on bottom bunk or on the floor. Repeat vital signs with each med. administration.

| DATE | | | | | | | | DATE | 7/22 | 7/23 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TIME | 1 | 2 | 3 | 4 | 5 | 6 | | TIME | 1 | 2 | 3 | 4 | 5 | 6 |
| BP/PULSE | 160/ | 115/ | | | | | | Thiamine 100 mg IM stat. | LM | | | | | |
| | 104 | 84 | | | | | | Thiamine 100 mg PO q day for 4 days | | LM | | | | |
| | 137 | 80 | | | | | | | | | | | | |

| DATE | | | | | | DATE | 7/22 | 7/23 | 7/24 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TIME | | | | | | TIME | 1 | 2 | 3 | 4 | 5 | 6 |
| Clorazepate 30 mg PO stat. | | | | | | | LM | | | | | |
| Clorazepate 15 mg PO q 6 hours on day 1 | | | | | | | | LM | | | | |
| Clorazepate 15 mg. PO q 8 hours on day 2. | | | | | | | | | | | | |
| Clorazepate 15 mg PO q 8 hours on day 3. | | | | | | | | | | | | |
| Clorazepate 15 mg PO q 12 hours on day 4. | | | | | | | | | | | | |
| Clorazepate 15 mg at HS on day 5. | | | | | | | | | | | | |
| Clorazepate 15 mg one dose PRN on day 1 and 2 in addition to doses prescribed above. | | | | | | | | | | | | |

| DATE | | | | | | |
|---|---|---|---|---|---|---|
| TIME | | 1 | 2 | 3 | 4 | 5 | 6 |
| Clonidine 0.1 mg tid if pulse or diastolic blood pressure is above 100 for 5 days. | | | | | | |

Provider contacted:  _DR. Meloche_    _07/22/04_

                              Name    Time

Orders received:  _T.O. initiate CLORAZEPATE 15mg PROTOCOL_

PLAINTIFF'S
EXHIBIT
17

STATE OF ALASKA                                                      DEPARTMENT OF CORRECTIONS

## MEDICATION ADMINISTERING CHART                        Year 200*4*

| ame - OBSCIS# | | D.O.B. | INSTITUTION: | ALLERGIES |
|---|---|---|---|---|
| WALLACE, TROY A.  #489521 | | 10/31/72 | Ketchikan Corr. Center | NKDA |

Self-Medication (SM-ML) is documented by the Officer writing an "S" in the appropriate block for each dose. Refused doses are to be circled.

### SIGNATURE INITIAL SECTION

All persons initialing as administering medications on this sheet (front or back) must enter

their initials below (signature and printed name). Enter both first and last names as well as title.

| | | | |
|---|---|---|---|
| | | Linda K. Monticello RN / LMonticello | LM |
| | | | |
| | | | |
| | | | |
| | | | |

---

ENTER PRESCRIPTION, DATE OF PRESCRIPTION, STOP DATE, FREQUENCY, and AUTHORIZED BY: DR. Meloche 7/22/04

CLORAZEPATE 15mg: take 2 tablets now

| TIME JULY | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | X | X | LM | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | 1430 | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

---

ENTER PRESCRIPTION, DATE OF PRESCRIPTION, STOP DATE, FREQUENCY, and AUTHORIZED BY: DR. Meloche 7/22/04

CLORAZEPATE 15mg: take one tablet every 6 Hours  DAY #1

| TIME JULY | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1700 | | | | | | | | | | | | | | | | | | | | X | S | X | X | | | | | | | | |
| 2300 | | | | | | | | | | | | | | | | | | | | X | S | X | X | | | | | | | | |

---

ENTER PRESCRIPTION, DATE OF PRESCRIPTION, STOP DATE, FREQUENCY, and AUTHORIZED BY: DR. Meloche 7/22/04

CLORAZEPATE 15mg: take one tablet every 8 Hours  DAY #2 & DAY #3

| TIME JULY | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0100 | | | | | | | | | | | | | | | | | | | | | X | X | LM | | X | | | | | | |
| 1200 | | | | | | | | | | | | | | | | | | | | | X | X | LM | | X | | | | | | |
| 2100 | | | | | | | | | | | | | | | | | | | | | X | X | S | | X | | | | | | |

---

ENTER PRESCRIPTION, DATE OF PRESCRIPTION, STOP DATE, FREQUENCY, and AUTHORIZED BY: DR. Meloche 7/22/04

CLORAZEPATE 15mg: take one tablet ever 12 Hours  DAY #4

| TIME JULY | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0700 | | | | | | | | | | | | | | | | | | | | | | | | X | | X | | | | | |
| 2100 | | | | | | | | | | | | | | | | | | | | | | | | X | | X | | | | | |

Department of Corrections Form #807.05A

| Name - OBSCIS# | | D.O.B. | | |
|---|---|---|---|---|
| WALLACE, TROY A | 89521 | 10/31/72 | Hiland Lincoln Graduation Center | HICOA |

ENTER PRESCRIPTION, DATE OF PRESCRIPTION, STOP DATE, FREQUENCY, and AUTHORIZED BY: Dr. Meloche 7/22/04

LORAZEPATE 15mg: take one tablet @ bedtime    Day #5

| TIME JULY 21 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | | | | | X | X | | X | X | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

ENTER PRESCRIPTION, DATE OF PRESCRIPTION, STOP DATE, FREQUENCY, and AUTHORIZED BY: Dr. Meloche 7/22/04

THIAMINE 100mg: IM stat

| TIME | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | | | IM | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

ENTER PRESCRIPTION, DATE OF PRESCRIPTION, STOP DATE, FREQUENCY, and AUTHORIZED BY: Dr. Meloche 7/22/04

Vit. B-1 100mg: take one tablet daily     x 4 days

| TIME JULY 0700 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | X | X | IM | | | | | X | X | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

ENTER PRESCRIPTION, DATE OF PRESCRIPTION, STOP DATE, FREQUENCY, and AUTHORIZED BY:

| TIME | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

ENTER PRESCRIPTION, DATE OF PRESCRIPTION, STOP DATE, FREQUENCY, and AUTHORIZED BY:

| TIME | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

| ITEM | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WEIGHT | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| BP | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| BLOOD-SUGAR | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

DECLARATION OF EDWIN S. BUDGE

EXHIBIT C – SPECIAL INCIDENT REPORT OF SGT.
HENDERSON

# SPECIAL INCIDENT REPORT
## ALASKA DEPARTMENT OF CORRECTIONS

| Date and Time of Incident | Location (Facility/Office) | TYPE OF REPORT |
|---|---|---|
| **07/24/2004   03:05** | **Ketchikan Correctional Center** | ☒ Initial   ☐ Follow-up |

**CLASS "A" INCIDENTS**
Require Oral Report within an hour

☐ Death/unnatural causes
Specify: _____
☐ Death of Employee on Duty
☐ Riot
☐ Hostage situation
☐ Demonstration / general disturbance
☐ Discharge of firearm (outside of training) during course of duty
☐ Assault causing serious injury
☐ Confiscation of explosives, guns, etc.
☐ Escape or attempted escape
☐ Serious fire resulting in serious injury or requiring evacuation
☐ Act of nature resulting in serious injury, threatening security of facility or requiring evacuation
☐ Other (specify)

### SECTION B:   PRINCIPALS INVOLVED

Codes:    V = Victim    A = Aggressor    W = Witness    S = Suspect    P = Prisoner
R = 1ˢᵗ Employee present    EW = Employee Witness    O = Other

| Position or OBSCIS # | CODE | NAME |
|---|---|---|
| 489521 | V | WALLACE, Troy Alvin |
| Shift Supervisor | EW | Sgt. David D. HENDERSON, COIII |
| Booking Officer | EW | Ofc. Lauri A. MURRAY, COII |
| Correctional Officer | R | Ofc. Walter T. RUD, COI |
| Correctional Officer | EW | Ofc. Sherri L. DAVIS, COII |
| Correctional Officer | EW | Ofc. Edwin D. IRIZARRY, COI |

### SECTION C:   NOTIFICATION PROCESS

| Date | Time | Individual & Agency | Notified by whom |
|---|---|---|---|
| 07/24/2004 | 03:18 | DOC/DOI Director of Institutions | Sgt. David D. Henderson, COIII |
| 07/24/2004 | 03:10 | KCC Superintendent | Ofc. Sherri L. Davis, COII |
| 07/24/2004 | 03:08 | KPD EMT (911) | Sgt. David D. Henderson, COIII |
| 07/24/2004 | 03:19 | KCC On-Call Nurse | Ofc. Sherri L. Davis, COII |
| 07/24/2004 | 03:20 | Alaska State Troopers | Sgt. David D. Henderson, COIII |

**CLASS "B" INCIDENTS**
Notification by next business day

☒ Death / natural causes
☐ Sexual Assault
☐ Life threatening suicide attempt
☐ Failure to return from furlough
☐ Use of force resulting in a need for medical treatment
☐ Use of firearms, tasers, or chemical agents for other than training purposes
☐ Use of dogs in other than routine duty or training situations
☐ Declared medical epidemic
☐ A felony resulting in an arrest, committed by a prisoner/offender while incarcerated; on supervised release program; or under community supervision
☐ Confiscation of significant amounts of drugs from anyone
☐ Fire resulting in minor injury or damage
☐ Property damage or loss exceeding $250 occurring from any cause not listed above
☐ Any other incident not listed here but considered by the Superintendent or Chief Probation Officer to warrant notification to Higher authority

### SECTION D:   MEDICAL STATUS

Include description of injuries claimed; Name of medical attendant; where treatment was provided, i.e. in-house, hospital, etc,;

### SECTION E:   STRUCTURAL AND/OR PROPERTY DAMAGE

Describe extent and estimated costs for repair or replacement:
None

### SECTION F:   INCIDENT DISPOSITION

☐ Change of Housing Status for Inmate(s)
☒ Incident referred to State Troopers for Investigation
☐ Warrant obtained
☐ Family(s) notified
☐ No further action required
☐ Other (specify) _____
☐ Incident referred to Disciplinary Committee
☐ Incident referred to District Attorney
☐ Services Restored
☐ Law Enforcement notified
☐ Pending

COMMENTS:

_____
Signature of reporting Employee

Sgt. David D. Henderson, COIII
Name and Title

*NOTE:  Attach additional pages, if necessary, to complete Sections B through G*

DOC 0110

# SPE__AL INCIDENT REPORT · g 2
## ALASKA DEPARTMENT OF CORRECTIONS

| ate and Time of Incident<br>07/24/2004   03:05 | Location (Facility/Office)<br>Ketchikan Correctional Center | TYPE OF REPORT<br>☒ Initial      ☐ Follow-up |
|---|---|---|

## SECTION G:  INCIDENT

DESCRIPTION OF INCIDENT (Who, What, When, Where, Why and How):
*Note: Abbreviations and codes are not to be used in the narrative.*
At approximately 03:05 hours on Saturday, July 24, 2004 while on duty as the Shift Supervisor (Post-7), I was approached by Officer's Murray and Rud who informed me that inmate WALLACE, Troy A. (OTIS: 489521) appeared to have finally setteled down and appeared asleep. Inmate WALLACE was being housed in the Intake Unit cell #217 and was serving a 10-day sentence (7 to serve) on a Probation Violation. Upon his arrival at KCC he was observed to have severe shakes and stated that he was withdrawing from alcohol which was later confirmed by medical staff. Officer's Murray, Rud, and myself were observing the inmate on the Booking Office monitor and discusing that we should probably move him to a more confortable positon (he was observed sitting on the floor at the end of the left side bunk near the cell door wearing only his undershorts) and I decided that we should probably place him on a mattress on the floor for safety sake. Upon opening the cell door Officer's Rud, Murray, and myself observed that the inmate's legs were discolored and bruised looking. As Officer Rud had gloves on I asked him to check the inmat's breathing and pulse. When Officer Rud advised that he could not detect any, I instructed him to move the inmate to a position lying on his back and had Officer Murray go get resusication equipment. I immediately went to a phone and called 911 (KFD EMTs). Within minutes of the EMT's arrival (at approximately 03:15) Fire Protection Specialists Ken Holms, EMT1, advised me that inmate WALLACE was dead. At this time the Superintendent was notified and the Alaska State Troopers were called.

It should be noted that Inmate WALLACE was housed by himself at this time and that he had had only three cellmates previous, as follows:  BODDEN, Orlington J. (DOB: 11/21/1978) from 07/21/03 @ 12:30 to 07/22/04 @ 23:00; CRAWFORD, Chris A. (DOB: 11/19/60) from 7/22/04 @ 01:16 to 07/22/04 @ 07:00; and BELLIS, David T. DOB: 10/24/79) from 07/22/04 @ 22:40 to 07/23/04 @ 16:30.

EVENTS LEADING TO OR CAUSING INCIDENT:
Possibly resulting from the subject's medical condition (i.e. Delirium Tremens).  Subject was experiencing sever shakes and halucinations during the entire period since I was on shift (Thursday, July 22, 2004 @ 1800 hours).

FORCE USED - WHAT TYPE:
None - Subject was simply secured in a camera cell and under medical attention and routine observation for persons with his condition.

LIST ATTACHMENTS  (Witness statements, Diagrams, Law Enforcement reports, etc.):
1)Incident Report - Booking Officer Lauri A Murray, COII        4)Incident Report - Officer Sherri L. Davis, COII
2)Incident Report - Correctional Officer Walter T. Rude, COI   5)Medical Documents - Ms. Linda Montecillo, RN
3)Incident Report - Correctional Officer Edwin D. Irizarry, COI  6)Booking Records & Incident Time Lines Sheet

*NOTE:  Attach additional pages, if necessary, to complete Sections B through G*

DECLARATION OF EDWIN S. BUDGE

EXHIBIT D – INCIDENT REPORT OF OFFICER DAVIS

64-5774D

STATE OF ALASKA                    **INCIDENT REPORT**              DEPARTMENT OF CORRECTIONS
Case #:                                                            DIVISION OF INSTITUTIONS

| Prisoner: **WALLACE, Troy A.** | Custody/Status: | Institution: | Date: **7/24/2004** |
|---|---|---|---|
| OBSCIS #: **489521**    DOB: **10/31/1972** | **UN/SM** | **Ketchikan Correctional Center** | Time: **3:08** |

MARK COURSE OF ACTION (To be determined and entered by the Assistant Superintendent):
☐ Disciplinary                              ☐ Information

**Infraction Citation & Title:** 22 AAC 05.400 ( INF ) **Infraction Level:** Informational
Informational Report

**NARRATIVE:**

Approximately 03:08 hours on Saturday, July 24, 2004 while on duty as the Control Room Officer (Post-1), I observed Officer Murray and Officer Rud enter 217, they were going to try to move subject to make him comfortable. They came out of the cell and informed Sgt. Henderson of something. Sgt. Henderson went back, he came back out and called an ambulance.

At approximately 0310 Supt. Bailey was called and informed of what was happening.

At approximately 0315 the ambulance crew arrived.

At approximately 0318 Director of Institutions Addington called here. The call was then transferred out to Sgt. Henderson.

During the course of shift I observed Inmate WALLACE, Troy A. in the camera. He was climbing on the bunk, scratching on the walls and doors. He kept walking around the cell like he was trying to find something. He had fallen a few times as well. Sgt. Henderson went back to check on him and told him to lay on bunk and try to sleep.

I also observed subject stuffing something in his mouth and informed Sgt. Henderson. Sgt. Henderson, Officer Irizarry and Officer Murray went to his cell. They opened the door and removed the extra mattresses, toilet paper and some of the clothing from his cell. He had one blanket, his shirt and underwear remaining with him. Before they left his cell, Officer Irizarry had to clean it. He mopped the floor and left the area when done.

Approximately 0330 Nurse Monticello arrived

| Copy of Report to Prisoner: | REPORTING STAFF'S SIGNATURE: | |
|---|---|---|
| Date: _____ Time: **0:00** | X _Sharri Davis_   Date: **7/24/2004** | |
| | Name: **Sharri Davis**   Title: **Correctional Officer II**   **B - Shift** | |

| Disposition: | Disciplinary committee | |
|---|---|---|
| _____ | Chairperson: _____ | |
| _____ | Member: _____ | |
| _____ | Member: _____ | |

On matters referred to the Disciplinary Committee as a result of this report, see the Written Report of the Disciplinary Decision relative to this incident.

Final Copy to Prisoner: _____ _____          Staff Signature: _____

Form 20-809.03  Rev. 1/87 (KCC 5/01)                                        Front

AST- 00021

DECLARATION OF EDWIN S. BUDGE

EXHIBIT E – INCIDENT REPORT OF OFFICER IRZARRY

04-57780

STATE OF ALASKA

Case #: _____

**INCIDENT REPORT**

DEPARTMENT OF CORRECTIONS
DIVISION OF INSTITUTIONS

| Prisoner: **WALLACE, Troy A.** | Custody/Status: | Institution: | Date: 7/24/2004 |
|---|---|---|---|
| OBSCIS #: **489521**   DOB: **10/31/1972** | **UM/SM** | **Ketchikan Correctional Center** | Time: 04:00 |

MARK COURSE OF ACTION (To be determined and entered by the Assistant Superintendent):

☐ Disciplinary                    ☐ Information

**Infraction Citation & Title:** 22 AAC 05.400 ( INF )    **Infraction Level:** Informational
Informational Report

---

**NARRATIVE:**
Approximately 22:50 hours on Friday, July 23, 2004 while on duty as the Roving Security Officer (Post-4),  As I was returning with Inmate CLARK from using the restroom to cell 224 SGT Henderson had opened Cell 217 where inmate WALLACE, Troy A. (OBSCIS# 489521).  SGT Henderson started to remove the extra mattress's from the cell along with some sheets and a T-shirt that appeared to have been urinated on by the smell of it. I then secured inmate CLARK in cell 224 and returned to help SGT Henderson. We removed the extra items from cell 217.  Inmate WALLACE was sitting on the lower left bunk as directed by SGT Henderson so we could sweep out the cell and mop it clean. Officer Murray returned with a mop and bucket and once I finished sweeping out cell 217 I then mopped the cell clean.  All the time I directed Inmate WALLACE to stay on his bunk and he did so.  Upon finishing the job SGT Henderson removed an extra cup from the cell. SGT Henderson then grabbed Inmate WALLACE'S cup and filled it with water from the sink and gave it to inmate WALLACE with a directive to drink some water.  Inmate WALLACE then drank the water. After securing the cell door I continued final clean up just outside his cell.  I continued with my usual duties. At approximately 0120 I started the Formal count of C-Dorm, B-Dorm and also Intake.  As I entered Hallway 221 I could see inmate WALLACE through the opened tray slot. He was sitting with his back to the wall and had his eyes open and was moving his head from side to side and moving his lips like he was talking to himself.  I then finished the count of Intake and reported my count to SGT Henderson. Once the Formal count was cleared I then continued on with our duties of cleaning up the Institution by supervising the inmate workers that are assigned Janitorial duties. At approximately 0300 hours I arrived into A-Dorm to relieve Officer Rud.  I assumed the duties of Post 5 and Officer Rud was then the Roving Security Officer (Post 4). Approximately at 0330 hours Officer Davis informed by via phone line of what had transpired with Inmate WALLACE.  I have since then continued to supervise the janitorial work that is in progress and now have finished this report. E.O.R.

---

| Copy of Report to Prisoner: | REPORTING STAFF'S SIGNATURE: | | |
|---|---|---|---|
| Date: _____ Time: 00:00 | X _____ | Date: 7/24/2004 | |
| | Name: **Edwin D. Tizarr** | Title: Correctional Officer I | A - Shift |

| Disposition: | Disciplinary committee |
|---|---|
| | Chairperson: _____ |
| | Member: _____ |
| | Member: _____ |

COPY

On matters referred to the Disciplinary Committee as a result of this report, see the Written Report of the Disciplinary Decision relative to this incident.

Final Copy to Prisoner: _____ _____        Staff Signature: _____

Form 20-809.03  Rev. 1/87 (KCC 5/01)

Front

AST- 00023

DECLARATION OF EDWIN S. BUDGE

EXHIBIT F – INCIDENT REPORT OF OFFICER MURRAY

04-5 7780

STATE OF ALASKA
Case #: _____

**INCIDENT REPORT**

DEPARTMENT OF CORRECTIONS
DIVISION OF INSTITUTIONS

| Prisoner: **WALLACE, Troy A.** | Custody/Status: | Institution: | Date: 7/24/2004 |
|---|---|---|---|
| OBSCIS #: **489521** DOB: **10/31/1972** | **UN/SM** | **Ketchikan Correctional Center** | Time: 5:15 |

MARK COURSE OF ACTION (To be determined and entered by the Assistant Superintendent):
☐ Disciplinary ☐ Information

**Infraction Citation & Title:** 22 AAC 05.400 ( INF ) **Infraction Level:** Informational
Informational Report

**NARRATIVE:**
Approximately 03:00 hours on Saturday, July 24, 2004 while on duty as the Booking Officer (Post-2), Officer Rud entered the Booking office and made a comment about Inmate Wallace, Troy A. having settled down. I told him that he'd finally fallen asleep and I was not inclined to go back and wake him after he'd been awake so long. Officer Rud went back and looked through the tray slot of cell 217 at Wallace. I follwed him and looked myself. Inmate Wallace appeared to be sleeping and I mentioned that maybe we should lay him down on a mattress so he'd be more comfortable. Officer Rud and I then went to talk to Sgt. Henderson about moving him from his sitting position against the wall onto a mattress so he'd be more comfortable. Sgt. Henderson advised that we put the mattress on the floor so he wouldn't fall off the bunk. At approximately 0305 Officer Rud and I went back to do so. When we opened the door Sgt. Henderson asked if he was breathing. Officer Rud checked by putting his hand on Wallace's chest and then looked at me and shook his head no. We informed Sgt. Henderson that the subject was not breathing. At this time, with the light coming in from the hallway I noticed the mottled skin color of his legs. Sgt. Henderson instructed me to get the resuscitation equipment and for Officer Rud and I to pull him out of the cell. As we did so I also noticed the mottled skin color of his hands and lower arms and how stiff he was. We pulled him out into the hallway and put him on a blanket. I then went to get the resuscitation equipment. Upon returning and seeing Wallace in the full light I realized that he was beyond resuscitation. Sgt. Henderson had called 911 and I asked Officer Davis in Control to call Mr. Bailey and Nurse Montecillo. When the ambulance and the E.M.T.s they checked him out and said that they couldn't do anything for him.

COPY

| Copy of Report to Prisoner: Date: _____ Time: 0:00 | REPORTING STAFF'S SIGNATURE: _Lauri A. Murray_ Name: **Lauri A. Murray** Title: **Correctional Officer II** | Date: 7/24/2004 B - Shift |
|---|---|---|

| Disposition: | Disciplinary committee Chairperson: _____ Member: _____ Member: _____ |
|---|---|

On matters referred to the Disciplinary Committee as a result of this report, see the Written Report of the Disciplinary Decision relative to this incident.

Final Copy to Prisoner: _____ Staff Signature: _____

Form 20-809.03 Rev. 1/87 (KCC 5/01)

Front

AST- 00019