# Death of Troy Wallace

DOB: Oct 31, 1972 (age: 31)

DOD: July 24, 2004

LOD: Ketchikan Correctional Center; Ketchikan, Alaska

A Medical-Legal Review Prepared at the Request of

Legal Counsel for the Plaintiffs

by

Richard O. Cummins, MD, MPH, MSc

Professor of Medicine

University of Washington

---

Exhibit A
page 1 of 3

Signs and symptoms at more advanced stages include hallucinations and seizures. Mr. Wallace displayed most or all of these symptoms within the first 48 hours of his confinement.

Experts recommend identification of the various *stages of alcohol withdrawal,* in order to assist with clinical decision-making and to help answer several important clinical questions. These questions include: which patients urgently need alcohol substitution drugs; whether they require the drugs at high doses or lower doses; whether they require medications intravenously, intramuscularly or orally; and whether they require a more advanced level of supervision and monitoring. These staging guidelines also help clinicians decide which patients can be treated with a closely supervised out-patient approach, and which patients need urgent hospitalization for general in-patient treatment or even intensive care unit admission.

Mr. Wallace was already well into the more advanced stages of alcohol withdrawal by the afternoon of July 22, 2004 when Dr. Meloche was first informed of his condition. From this point forward Mr. Wallace unequivocally displayed signs and symptoms that would require a reasonably prudent physician to:

- start an aggressive alcohol substitution treatment regimen, revolving around high doses of benzodiazepines, the drugs of choice for this syndrome;
- administer these medications either intramuscularly or (preferably) intravenously in a hospital setting; and
- once hospitalized, and under therapy, evaluate the patient for a long list of metabolic, nutritional, hematologic, gastrointestinal, cardiac and neurological co-morbid conditions that invariably accompany chronic alcohol addiction; and which can complicate the more severe alcohol withdrawal syndromes. On a more likely than not basis I think that a number of co-morbidities would have been identified and treated in Mr. Wallace, if searched for by a reasonably prudent physician. Mr. Wallace's eventual death is best explained by some combination of prolonged delirium tremens syndrome, dehydration, multiple electrolyte and acid-base derangements, leading to a form of alcohol withdrawal seizures, occult status epilepticus, terminal cardiac arrhythmia and cardiac arrest.

In my opinion, the responsible medical personnel, primarily nurse Linda Monticello and on-call physician, Dr. Meloche, had a professional duty to recognize the severity of Troy Wallace's alcohol withdrawal syndrome. They needed to appreciate that the onset of delirium and hallucinations defined Mr. Wallace as suffering from delirium tremens, a state of medical emergency with a high potential for significant morbidity and mortality. If treated by the standards of reasonable medical care, the causal chain that led to Troy Wallace's death would have been broken. This death was imminently preventable.

The need for hospital admission, parenteral alcohol substitutes, and metabolic and nutritional corrections was unquestionably present by his early afternoon evaluation on July 22, 2004. The initiation of the *preventative* protocol at this stage was inadequate and below the standard of care. These opinions apply in a similar way to the subsequent 24-hour period of July 23. The fact that he does not display the same severity of withdrawal signs and symptoms on July 23 as he was displaying on July 22, indicates only that the administration of clorazepate was having some benefit. That slight variation in clinical presentation does not indicate the end of his delirium tremens, and the risks that delirium tremens entail. It simply bought Mr. Wallace some extra time during which proper treatment could have saved his life.

Mr. Wallace's condition deteriorated during the evening of July 23 and after midnight on July 24. However, his death was still preventable and his condition reversible if emergency medical care had been provided to him at any point up to, and possibly several minutes after the cessation of body movement after 1:12 a.m. If the responsible correction officers had activated such a response within this deadline, it would have significantly increased his chances of resuscitation and recovery.

## CONCLUSION

All of the medical opinions in this report are made to a reasonable degree of medical certainty. I am prepared to testify to the foregoing opinions in court. Dated this 1st day of June, at Seattle, Washington.

*[signature]*

Richard O. Cummins, MD, MPH, MSc