Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

JULIA WALKER, individually and
as Personal Representative of
the ESTATE OF TROY WALLACE,

    Plaintiffs,

  -vs-                    No. A05-176 CV (RRB)

DAVID D. HENDERSON, LAURI A.
MURRAY, WALTER T. RUD, SHERRI
L. DAVIS, EDWIN D. IRIZARRY,
LINDA MONTECILLO, and ERNEST
MELOCHE, M.D.,

    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION UPON ORAL EXAMINATION OF

RICHARD O. CUMMINS, M.D.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

11:15 a.m.

December 1, 2006

1601 Fifth Avenue, Suite 860

Seattle, Washington


SUSAN CANNON, CCR                MOBURG & ASSOCIATES

COURT REPORTER                   (206) 622-3110

Exhibit B
page 1 of 3

Page 66

1  regimen decreasing are under the prevention
2  subheading.
3       Q.  Do you believe that different practitioners
4  would or could look at Mr. Wallace's symptoms and
5  signs on the 23rd as they were taken by Nurse
6  Montecillo at 9:30 in the morning which include normal
7  pulse, normal blood pressure and conclude that he was
8  not in delirium?
9       MR. BUDGE:  Can I have the question read
10 back?
11      MR. LESSMEIER:  I will re-ask it.
12      Q.  Doctor, do you believe that reasonable
13 practitioners could look at the signs and symptoms as
14 described by Linda Montecillo on the 23rd at 9:30 and
15 conclude that Mr. Wallace was not in delirium tremens
16 at that point?
17      A.  And they were looking at his record?
18      Q.  Yes.
19      A.  Including the fact that he died?
20      Q.  Well, the 23rd nobody knows that he is
21 going to die; right?  I mean you couldn't --
22      A.  That's not the way you asked it.  You said
23 somebody is looking at his records.  For example --
24      Q.  Let me ask the question again.  I don't
25 want to argue with you.  And I want you to just answer

Page 67

1  the question I have asked you.
2       What I want to focus on are her description
3  of signs and symptoms at 9:30 in the morning.  Now,
4  Mr. Wallace has not died because he doesn't die until
5  about 1 a.m. on the 24th; right?
6       A.  Correct.
7       Q.  So could reasonable practitioners look at
8  his signs and symptoms at 9:30 in the morning as
9  recorded by Nurse Montecillo and conclude that he was
10 not in a state of delirium tremens at that point in
11 time?
12      A.  No, I don't think they would be reasonable
13 if they ignored his continued hallucinations and his
14 other system abnormalities of diaphoresis.
15      Q.  And you do not believe that they could
16 conclude that that was due to alcohol withdrawal and
17 that while he was in a state of alcohol withdrawal he
18 was not yet in a state or not in a state of delirium
19 tremens?
20      A.  You are quibbling over semantics now.  And
21 that is there is something about those individuals'
22 definition of delirium tremens that he is not
23 fulfilling for them.  I would have to know exactly
24 what they mean when they say he is not in DTs.  It may
25 be the critical element of that definition is

Page 68

1  confusion and disorientation.  And they may say nobody
2  who is still oriented, talking to people and eating
3  can possibly be in DTs.  Whether he meets somebody's
4  specific criteria or not is irrelevant to what is
5  going on with this gentleman right here.  He is
6  clearly showing multi-system abnormalities associated
7  with alcohol withdrawal and he needs to be evaluated.
8       Q.  He was evaluated by a nurse; correct?
9       A.  Well, yes.  She collected information, gave
10 a series of facts to Dr. Meloche and --
11      Q.  I'm talking about the 23rd.
12      MR. BUDGE:  Let him finish the answer.
13      A.  She gathered information, she measured
14 blood pressure, she recorded history.  You are saying
15 evaluation.  I don't think she had the obligation to
16 integrate that information and make a clinical
17 decision.  That was Dr. Meloche's obligation.
18      Q.  So you are not at all critical of Nurse
19 Montecillo?
20      A.  The records as they exist give me enough
21 information to say that the breakdown in the care here
22 was Dr. Meloche's response to the information she gave
23 him.
24      Q.  Do you have any criticisms of Nurse
25 Montecillo at all?

Page 69

1       A.  I think there are several ways of answering
2  that.  I think the information she gave was sufficient
3  for her to have in a sense transfer the responsibility
4  for ultimate decision-making for Dr. Meloche.  He had
5  elements of information given to him that I think the
6  standard of care required him to evaluate this patient
7  further.
8       She could have provided additional
9  information in a manner that could have ultimately
10 resulted in Dr. Meloche bringing the patient over.
11 That's all issues that's not necessarily required of
12 her.  An example of that would be, you're a crazy fool
13 not to have this patient brought over here.  I don't
14 want to leave him here in this place with him getting
15 worse without a doctor seeing him.  And I think he
16 would have responded probably.
17      Q.  I'm going to move to strike as being
18 nonresponsive to my question.  I will ask you again.
19      MR. BUDGE:  I object to that.
20      Q.  Do you have any criticisms of Nurse
21 Montecillo?
22      A.  No.
23      Q.  Do you have any criticisms of the
24 correctional staff?
25      A.  No.

Exhibit B
page 2 of 3

18 (Pages 66 to 69)

Page 70

1    Q. Has your opinion on that changed since you
2 wrote your report?
3    A. On the medical staff?
4    Q. Yes. On the correctional center staff
5 and/or Nurse Montecillo?
6    A. I at some point shifted my focus on to Dr.
7 Meloche so I would have to kind of review the
8 information again to actually answer that question.
9    Q. Are you aware of any evidence in this case
10 that Dr. Meloche actually knew that he wouldn't be
11 called if Mr. Wallace didn't respond to the protocol?
12    A. I don't know anything more than what's in
13 the record. You mean his expectation that he would be
14 called if he didn't get any better?
15    Q. Yes.
16    A. I don't have that information.
17    Q. Are you aware of any evidence that Dr.
18 Meloche actually knew that Mr. Wallace wouldn't
19 respond to the protocol?
20    A. I don't have any information other than
21 what's there in the records.
22    Q. And are you aware of any evidence that Dr.
23 Meloche actually believed that when he was called by
24 Nurse Montecillo that Mr. Wallace was in fact in a
25 state of delirium tremens?

Page 71

1    A. I don't have any information that addresses
2 that question.
3    Q. In your report you indicate that Mr.
4 Wallace's condition deteriorated during the evening of
5 July 23rd and after midnight on July 24th. At what
6 point during the evening of July 23rd did his
7 condition deteriorate, sir?
8    A. You mean obvious information that says
9 that?
10    Q. Yes.
11    A. He died.
12    Q. And he died a little after 1 o'clock in the
13 morning?
14    A. Correct.
15    Q. So before 1 o'clock in the morning are you
16 aware of any evidence that allows you to pinpoint with
17 more specificity when his condition deteriorated that
18 evening?
19    A. No.
20    Q. Were there any co-morbidities for Mr.
21 Wallace identified when he entered the Ketchikan
22 Correctional Center on July 20, 2004?
23    A. Co-morbidities for alcohol withdrawal
24 syndrome? I think the primary one that he had a
25 history of previous alcohol withdrawal syndrome.

Page 72

1    Q. Any others?
2    A. That really multiplies the risk for this
3 episode.
4    Q. Would you state your answer again? He had
5 a history of what?
6    A. Alcohol withdrawal syndrome.
7    Q. Do you ever get involved after seeing
8 patients at the emergency room in determining what
9 dosage of benzodiazepines they should be on as they go
10 through the withdrawal process?
11    A. I'm not sure what you mean by get involved.
12 I certainly have initiated a first dose of
13 benzodiazepine. Sometimes the patients are for a
14 variety of reasons still in the emergency department
15 hours later and so we have to get involved with how
16 they are responding whether to increase, leave it the
17 same, supplement.
18    Q. And how do you make the determination of
19 what dosage to use?
20    A. It's a first dose intervenous usually,
21 maybe oral and then we observe the findings that
22 caused us to initiate that therapy; tremulousness,
23 abnormal vital signs, diaphoresis, level of anxiety,
24 agitation, escalation of hallucinations and concerns.
25 And so we look usually an hour, every hour and how do

Page 73

1 they respond to the first dose, getting worse, getting
2 better, about the same.
3    Q. And what do you use for a first dose?
4    A. Usually in the emergency department it is a
5 very short acting Ativan as the benzodiazepine. And
6 always give it intravenously.
7    Q. In what amount?
8    A. Two to four milligrams IV first dose.
9    Q. Do you have any experience in using the
10 benzodiazepine that was used for Mr. Wallace?
11    A. No, never used it.
12    Q. Do you have any idea, Doctor, whether it is
13 common for correctional centers or other outpatient
14 treatment centers to rely on either nurses or staff
15 people who are not even nurses to monitor patients who
16 may be undergoing alcohol withdrawal, or inmates?
17    MR. BUDGE: Object to the form of the
18 question. Go ahead.
19    A. Am I aware that some places use the nurses
20 as a primary assessment?
21    Q. Yes.
22    A. Yes, sure.
23    Q. And that the coverage provided by nurses in
24 some correctional centers may not be 24-hour coverage?
25    A. Correct.

Exhibit B
page 3 of 3

19 (Pages 70 to 73)