Michael L. Lessmeier, AK Bar #7910082
LESSMEIER & WINTERS LLC
3000 Vintage Blvd., Suite 100
Juneau, Alaska   99801
Ph: 907-796-4999, Fx: 907-796-4998
l-w@gci.net
Attorneys for Defendant Ernest Meloche, MD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

JULIA WALKER, individually and as
Personal Representative of the
ESTATE OF TROY WALLACE,

        Plaintiffs,

    vs.

DAVID D. HENDERSON, LAURI A. MURRAY,
WALTER T. RUD, SHERRI L. DAVIS, EDWIN
D. IRIZARRY, LINDA MONTECILLO,
and ERNEST MELOCHE, M.D.,

        Defendants.

Case No. A05-176 CV  (RRB)

**REPLY TO PLAINTIFF'S OPPOSITION TO MOTION FOR PARTIAL SUMMARY ON 42 U.S.C. SEC. 1983 CLAIMS**

## INTRODUCTION

    The Plaintiffs 29 page Opposition is an exercise in avoidance.  She evades the holding of the 9th Circuit in *Toguchi*[1] and she evades the issue presented by Dr. Meloche's Motion: that summary judgment should be entered on the Plaintiff's 42 U.S.C. Sec. 1983 claims because Dr. Meloche never believed there was a substantial risk of serious injury to Mr. Wallace given the treatment plan he ordered and the setting Mr. Wallace was in, nor did he consciously disregard any such risk.  The essential facts upon which Dr. Meloche's motion is based have not been disputed.  Dr. Meloche was contacted on a single occasion, gave orders for a treatment plan he believed would be successful in a setting where he knew Mr. Wallace would be continuously monitored, asked that he be called if Mr. Wallace did not respond to the treatment plan or deteriorated and intended to see Mr. Wallace when he conducted his next clinic at the facility.  The Plaintiff cites no authority to show summary judgment is not warranted given these undisputed facts.  While the Plaintiff argues that Dr.

---

[1] *Toguchi v. Chung*, 391 F.3d 1051 (9th Cir. 2004).

*Reply to Opposition to Motion for Partial Summary Judgment*
*Walker, Estate of Wallace v. Henderson et al.; Case No. A05-176 CV  (RRB)*    **Page 1 of  25**

Meloche's judgment and treatment plan were deficient, she nowhere addresses the *Farmer*[2] and *Toguchi* requirements that there must be evidence that Dr. Meloche *knew* there was a substantial risk of serious injury to Mr. Wallace given the treatment plan he ordered and the setting he was in and then *consciously* disregarded that risk. There is no genuine issue regarding either of these essential elements of the Plaintiff's prima facie case. Dr. Meloche respectfully requests the Court enter summary judgment on the plaintiff's 42 U.S.C. Sec.1983 claims.

## I.     The Issues Are Whether Dr. Meloche Actually Knew of a Substantial Risk of Serious Injury and Consciously Disregarded that Risk.

Even though *Farmer* and *Toguchi* are controlling legal precedent, in an attempt to avoid this controlling authority, the Plaintiff relies on authorities which are either outdated and thus contrary to both, or authorities which if anything, support Dr. Meloche's position. As the Court of Appeals said in *Toguchi*, "[d]eliberate indifference is a high legal standard."[3] In analyzing the issue of deliberate indifference, the *Toguchi* court engaged in what it described as a "subjective approach" which "focuses only 'on what a defendant's mental attitude actually was.'"[4] In language directly applicable to the present case, it found summary judgment had been properly entered in favor of Dr. Chung because "no genuine issue of fact was raised regarding Dr. Chung's subjective knowledge and conscious disregard of a substantial risk of serious injury. . . ."[5] The same issues are before the court here: whether Dr. Meloche actually knew there was a substantial risk of serious injury to Mr. Wallace given the treatment plan he initiated and the setting he was in and if so, whether Dr. Meloche consciously disregarded that risk.

Rather than fairly addressing *Toguchi* and *Farmer*, the Plaintiff first cites a variety of cases as authority for her implicit argument that the Court should not apply *Farmer* as interpreted by the Court of Appeals in *Toguchi*. The Plaintiff's argument should be rejected for several reasons. First, *Toguchi* is controlling legal precedent. In light of such controlling authority, there is no justification for looking to other authorities which engage in different legal reasoning. Second, with the exception of a single case from another circuit, the authorities cited by the Plaintiff were decided prior to *Toguchi*, and in most cases, even prior to *Farmer*. Most do not engage in the subjective analysis both mandate. There is no reason to look to authorities decided without the guidance of

---

[2] *Farmer v. Brennan*, 511 U.S. 825 at 828, 835 114 S. Ct. 1970, 128 L. Ed.2d 811 (1994).

[3] *Toguchi*, 391 F.3d at 1060.

[4] *Id.* at 1057, *quoting Farmer*, 511 U.S. at 839, 114 S.Ct. 1970.

[5] *Id.* at 1061.

*Toguchi* and in many instances without the guidance of *Farmer*. In fact, to the extent such authorities are cited for a different legal standard, it would be improper to rely on them. Third, the subjective analysis mandated by *Farmer* and *Toguchi* is unique to each case, for the analysis focuses on what the health care provider's subjective thought process actually was. This is a process that is inherently case specific in nature, and unless there is a strikingly similar fact pattern, it is hard to see what assistance can be gained from looking at other cases, especially those decided before *Toguchi* and *Farmer*.

The Plaintiff does not address *Toguchi* until page 22 of her Opposition and even then does not accurately characterize its holding. She claims *Toguchi* held "there were no obvious risks the physician ignored, nor any evidence the physician's choice of treatment was medically unacceptable." Her representation of *Toguchi* is plainly wrong for there was expert testimony presented by the plaintiffs that the involved physician acted inappropriately.[6] Thus it would not have been possible for the Court of Appeals to hold as the Plaintiff claims. Again contrary to what the Plaintiff asserts, the *Toguchi* court, referring to the defendant, Dr. Chung, said, "[w]hether her responses were medically reasonable given Kean's medical condition and background is a question we do not reach."[7] The Court emphasized this when it said "[i]t does not matter whether Dr. Chung's assumptions and conclusions were reasonable."[8] It decided each substantive issue by looking at whether there was a factual issue regarding the involved physician's "subjective knowledge and conscious disregard of a substantial risk of serious injury. . . ."[9] It affirmed the grant of summary judgment to Dr. Chung because there was no such factual issue, not because there was a lack of evidence that the physician's choice of treatment was medically unacceptable.[10]

The Plaintiff's factual description of *Toguchi* is a similar attempt to avoid its holding. The facts of *Toguchi* are relevant to the analysis by the Court of Appeals only to the extent of its inquiry into the subjective knowledge of Dr. Chung, for as set forth above, the Court repeatedly said it did not matter whether Dr. Chung's actions were reasonable. The Court found no evidence of subjective knowledge of a serious risk and conscious disregard of that risk even though there was evidence that Dr. Chung, among other things, failed to evaluate the inmate's actual condition and failed to conduct

---

[6] *Toguchi* at 1056.

[7] *Id.* at 1061.

[8] *Id.* at 1060.

[9] *Id.* at 1061.

[10] *Id.*

a differential diagnosis.  What was important to the Court of Appeals was not whether Dr. Chung's actions or inactions were reasonable, but whether she subjectively *knew* her treatment plan posed a serious risk of harm to the inmate, and then consciously chose to disregard that risk.  The same is true here.  The question raised by Dr. Meloche's motion is whether there is a genuine dispute about whether he *knew* there was a substantial risk of serious injury to Mr. Wallace given the treatment plan he instituted and the setting Mr. Wallace was in and if so, whether he *consciously* disregarded that risk.  This can only be answered by looking to the facts before the Court here.[11]

Nor does the Plaintiff address *Steele v. Choi,* cited at page 18 of Dr. Meloche's opening brief.[12]  The inmate there sued a physician who initially diagnosed him as suffering from a drug overdose when he had a subarachnoid hemorrhage.  Summary judgment was entered by the district court, and after noting that the "basic flaw" in the inmate's argument "is its failure to follow the subjective test for an Eighth Amendment violation that the Supreme Court established in *Farmer,"* the Court affirmed:

> Steele's argument boils down to the proposition that a minimally competent doctor, looking at the symptoms Dr. Choi saw, would have known that a subarachnoid hemorrhage was possible and would therefore have ordered the necessary tests to confirm the diagnosis.  The problem is that this approach, looking as it does to the 'reasonable doctor,' is an objective test, not a subjective one.  *Farmer* however, explicitly adopts a subjective test, and it makes no exceptions for medical treatment cases[13]

The Plaintiff's argument here has the same "basic flaw" for it does not address the subjective test of *Farmer* as applied in *Toguchi.*

Instead of fairly addressing *Toguchi,* the Plaintiff has sought to avoid it.  But there is no legal basis for doing so, for it is recent, squarely on point and is controlling authority.  Since *Toguchi* was

---

[11] If anything, a comparison between the facts of the present case and those of *Toguchi* supports Dr. Meloche's request for summary judgment.  Here Dr. Meloche is a part-time, contract physician who was contacted on a single occasion, gave instructions for a protocol he believed would be successful and asked that he be called if the inmate did not respond.  Here the inmate was in a monitored cell, subject to continuous observation.  The inmate improved initially and then deteriorated.  Despite his request that he be contacted, he was not.  In contrast, Dr. Chung was evidently on site and had the primary responsibility of monitoring the inmate, who was not in a monitored cell.  Surely she had far more actual knowledge of the inmate's past history and ongoing condition than did Dr. Meloche here.  Yet summary judgment was granted and affirmed by the Court of Appeals.  It should be granted here too.

[12] 82 F.3d 175 (7th Cir. 1996) (*Rehearing and Suggestion for Rehearing En Banc Denied* May 30, 1996).

[13] *Id.,* 82 F.3d at 178, 179.

*Reply to Opposition to Motion for Partial Summary Judgment*
*Walker, Estate of Wallace v. Henderson et al.; Case No. A05-176 CV  (RRB)*      Page 4 of  25

decided little more than 2 years ago, it has been cited extensively and followed by the courts in this circuit. Westlaw shows scores of cases from this circuit that rely on *Toguchi*. The subjective analysis it sets forth has been consistently followed. There is no legal or logical basis for the Plaintiff's argument that this Court should do otherwise.[14]

### A.    The Pre *Farmer* Authority Cited By Plaintiff

Because the law has changed and the analysis mandated by *Farmer* and *Toguchi* is a subjective analysis, the pre *Farmer* authority cited by the Plaintiff offers little support for her position. But because the Plaintiff mentions a number of such cases, they will be addressed. *Liscio v. Warren*[15] was decided more than four years before *Farmer* and contains no analysis of what the physician actually knew. The court there found a question of fact because the physician was "on notice that Liscio might be suffering from ailments other than withdrawal from the heroin addiction" and that the ailment "might be alcohol withdrawal."[16]    Such reasoning is squarely rejected by *Toguchi* and *Farmer*, for it is not enough that a prison official is "'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'"[17] No such analysis was engaged in by the *Liscio* court and in light of *Toguchi* and *Farmer*, it is difficult to see how this case is of much assistance to the Plaintiff here.

*McSwine v. Newaygo*[18] is another such case cited by the Plaintiff in which there was no discussion by the district court of the subjective knowledge of the physician. While *McSwine* was decided seventeen days after the Supreme Court issued its decision in *Farmer*, the case contains no mention of *Farmer*. The reasoning of the district court was limited to its statement that a "failure to transfer an inmate to a hospital for immediate care of a serious medical need that requires immediate care, simply because it occurred on a weekend, states a claim."[19]    The physician there

---

[14] While the Plaintiff criticizes Dr. Meloche for his reliance on *Toguchi*, this criticism is little more than another attempt to avoid its holding. The holding of *Toguchi* was not dictated by the specific medical breach alleged, but whether there was a factual issue on the subjective knowledge of the defendant physician. Dr. Melcohe relies on *Toguchi* because it is the most recent, controlling authority and was issued in the context of allegations at least similar to those made here. He believes it far more applicable than case law from other jurisdictions cited by Plaintiff that was decided without the guidance of *Toguchi* and in many instances without the guidance of *Farmer*.

[15] 901 F.2d 274 (2nd Cir. 1990)

[16] *Id.,* 901 F.2d at 276.

[17] *Toguchi*, 391 F.3d at 1057 *citing Farmer*, 511 U.S. 837, 114 S.Ct. 1970.

[18] 1994 US. Dist. Lexis 11036 (W.D. Mich. 1994).

[19] *Id*. at Headnote 13.

evidently knew the inmate needed to be transferred to a hospital because of a serious medical need, but did not do so because he reached this conclusion on a weekend. There is no other explanation of why the inmate was not transferred, so there is no way of knowing if the result would be the same under *Farmer* and *Toguchi*. In contrast here, Dr. Meloche at no point delayed treatment he thought Mr. Wallace should receive. At no point did he believe Mr. Wallace needed further treatment, but withhold that treatment. Without such evidence, and there is none, there is no genuine issue of material fact.

*Tolbert v. Eyman*[20] is another pre *Farmer* case cited by Plaintiff. The case was before the Court of Appeals after the grant of a motion to dismiss in favor of the prison warden for failure to state a claim by the district court. The Court of Appeals reversed, finding the prisoner's claim that the warden "refused to allow him authorized medicine that he needed to prevent serious harm to his health" stated a viable claim against the warden.[21] There is no evidence here that Dr. Meloche withheld medication or treatment Mr. Wallace had been authorized to receive. In any event, since this case came to the Court of Appeals on the appeal of the grant of a motion to dismiss and without the guidance of *Farmer* and *Toguchi*, it is difficult to see how it adds anything to the analysis necessary here.

*Ortiz v. City of Imperial*[22] is another pre *Farmer* case and is cited by Plaintiff as holding an inmate need not show complete failure to treat his medical condition to establish deliberate indifference. But that was not the holding of *Oritz*, for the Court reversed the grant of summary judgment to 3 nurses and a physician because they "knew of Oritz's head injury but disregarded evidence of complications to which they had been specifically alerted and, without an examination, prescribed sedatives that were contraindicated. . . ."[23] There are insufficient facts set forth in the opinion to assess whether the ruling would have been the same if it had been made with the benefit of *Farmer* and *Toguchi*, but even if so, this case supports Dr. Meloche's argument, for there is no evidence here that Dr. Meloche knew his treatment plan would not be effective or knew he would not be called if Mr. Wallace failed to respond, as he requested.

---

[20] 434 F.2d 625 (9th Cir. 1970).

[21] *Id.*, 434 F.2d at 626.

[22] 884 F.2d 1312 (9th Cir. 1989).

[23] *Id.*, 884 F.2d at 1314.

*Cabrales v. County of Los Angeles*[24] is a pre *Farmer* municipal liability case cited by the Plaintiff as holding access to medical staff is meaningless unless the staff is competent.  The legal standard for Sec. 1983 municipal liability requires a showing that injuries are caused pursuant to a municipality's custom or policy and the comments referenced by the Plaintiff were made in this context.  The test for establishing Sec. 1983 against an individual such as Dr. Meloche is different, and as set forth in *Toguchi*, requires subjective knowledge of a substantial risk of serious injury which is consciously disregarded.[25]  As such, it is difficult to see how this case adds anything of value.

*West v. Keve*[26] is the final  pre *Farmer* case cited by Plaintiff, who claims it held that over-the-counter pain medication prescribed for serious post-operative pain amounted to deliberate indifference.  That is not the holding of *West*.[27]  There the district court sua sponte sought briefing on whether the Plaintiff's complaint against the Director of the Division of Adult Corrections and the correctional center superintendent was moot because the Plaintiff ultimately received the operation he sought and whether the complaint was barred by the 11th Amendment.  The district court then dismissed the complaint, an order the 3rd Circuit reversed, at least in part because the record showed surgery was recommended to correct a condition the plaintiff had, but that surgery was not available at the prison hospital and the defendants refused to allow him to obtain the treatment at a private hospital.  The complaint further alleged the defendants denied the plaintiff recommended medical treatment.[28]  No claim was made against a health care provider and there was no discussion of the subjective analysis adopted by the Supreme Court in *Farmer*. In contrast, here

---

[24] 864 F.2d 1454 (9th Cir. 1988).  *Cabrales* was reversed by *County of Los Angeles v. Cabrales,* 409 U.S. 1187, 109 S.Ct. 2425 (1989) because of the Supreme Court's ruling in *City of Canton, Ohio v. Harris,* 489 U.S. 378, 389, 109 S.Ct. 1197, 1205 (1989) ("Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality-a 'policy' as defined by our prior cases-can a city be liable for such a failure under Sec. 1983.").

[25] *See also Farmer*, 511 U.S. at 841-2, 114 S. Ct. at 1981. ("*Canton's* objective standard, however, is not an appropriate test for determining the liability of prison officials under the Eighth Amendment as interpreted in our cases.")

[26] 571 F.2d 158 (3rd Cir. 1978).

[27] The Plaintiff again does not accurately reference either what the court said ("[a]lthough the plaintiff has been provided with aspirin, this may not constitute adequate medical care") or what the court actually held.  The Court held only that "dismissal of the complaint was improper at this stage" because the complaint alleged denial of recommended medical treatment and denial of post-operative treatment.  *Id.,* 571 F.2d at 161-2.

[28]*Id.,* 571 F.2d at 160.

there is no evidence that Dr. Meloche refused to allow Mr. Wallace any recommended medical treatment and the Court has the benefit of *Farmer* as applied by the Court of Appeals in *Toguchi*.

## B.    The Post *Farmer* Cases Cited By Plaintiff

Nor are the post *Farmer* cases cited by the Plaintiff supportive of her argument, for none of these cases are binding and if anything, each supports the grant of summary judgment to Dr. Meloche, for each concerns the repeated failure over time of a health care provider to respond to a serious medical condition he/she actually knew about, facts which are not present here.  In *Sharrod v. Lingle*[29] the prison medical staff refused repeated requests of a prisoner suffering from severe abdominal pain to be taken to a hospital and did not do the tests necessary to rule out appendicitis even though the staff noted that such tests should be done.   One of the defendant physicians refused a nurse's request for approval to send the prisoner to the hospital, and another ordered an X-ray but never reviewed the report.  One of the defendants later admitted she knew the prisoner was suffering from appendicitis.[30]  The Court of Appeals found the defendants knew of the risk that the plaintiff was suffering from appendicitis, but "never performed the tests needed to rule out appendicitis." [31]

The facts of *Greeno v. Daley*[32] show a similar repeated failure over time of a health care provider to respond to a serious medical condition he/she actually knew about.  In *Greeno*, the prisoner claimed the defendants refused to investigate his condition or provide him with effective treatment over a two year period despite his repeated complaints.  The evidence there consisted of a failure of the staff to respond to repeated complaints that the medication he was given was not effective, that he needed to be placed on a different diet, that over a 2-year period of time he was refused referral to a specialist or an endoscopy, that a referral request for a specialist made by a physician was refused, and that he was punitively denied pain medication.  Finding there was evidence of repeated denial of reasonable requests for medical treatment, the court there reversed the trial court's grant of summary judgment.[33]

In *Nelson v. Prison Health Services, Inc.*[34] the district court framed the issue as  whether there was evidence that each defendant "'[knew] that certain treatment was necessary' for Diane

---

[29] 223 F.3d 605 (7th Cir. 2000)

[30] *Id.,* 223 F.3d at 608-9.

[31] *Id.,* 223 F.3d at 611.

[32] 414 F.3d 645 (7th Cir. 2005).

[33] *Id.,* 411 F.3d at 653-6.

[34] 991 F. Supp 1452 (D.Ct. Fla. 1997)

Nelson, but refused to provide that treatment, or so delayed in providing it, as to be 'deliberately indifferent' to her serious need for medical care."[35]   The court there found that several of the defendant nurses knew the inmate had a history of cardiac problems for which she was prescribed medication, yet they refused without apparent explanation to obtain and provide that medication to her.[36]  The court found sufficient evidence of deliberate indifference to deny summary judgment for those defendants who had such knowledge and failed to promptly act on it.

In *Lavender v. Lampert,*[37] the district court denied summary judgment because there was evidence that an inmate's health care providers, who knew he suffered from chronic pain, repeatedly allowed his pain medication prescriptions to lapse and then on at least two occasions his medication was "discontinued or reduced when he was placed in disciplinary segregation so that he suffered from increased pain."  The district court noted that it "appears that the infliction of pain was, by its very nature, punitive."[38]

Even if this Court were to follow any one of the post *Farmer* cases cited by the Plaintiff, summary judgement would still be appropriate, for each such case found summary judgment to be inappropriate because there was evidence that a defendant actually knew of a serious risk to an inmate's health and then inexplicably disregarded that risk.  Without such evidence, and given the appropriate analysis mandated by *Toguchi*, the outcome in each case surely would be different.  Here, such  evidence is not present, and thus the outcome should be different.  But there is little reason to look to these cases when there is recent, binding authority from our Court of Appeals which is squarely on point.   *Toguchi* clearly and explicitly dictates the analysis the Court should engage in.  That analysis is a subjective analysis based on what Dr. Meloche actually knew.[39]

[35] *Id.,* 991 F. Supp at 1463.

[36] *Id.*

[37] 242 F. Supp. 2d at 821 (D.Ct. Or. 2002).

[38] *Id.,* 242 F. Supp. 2d at 847-8.

[39]The Plaintiff cites a number of failure to treat cases at pages of 16-17, for the proposition that Mr. Wallace's medical need was sufficiently serious to subject Dr. Meloche to Sec. 1983 liability. But the cases the Plaintiff cites are fact specific and were decided in the context of a failure to provide medical treatment, not the case here.  In *Lancaster v Monroe*, 116 F.3d 1419 (11th Cir. 1997), no medical treatment was provided even though the defendants had been told Lancaster had a history of seizures when going through alcohol withdrawal, that these seizures were life threatening and that he would go into delirium tremens if deprived of alcohol.  In *Morrison v Washington County*, 700 F.2d 678 (11th Cir. 1983), the inmate went to the hospital for treatment of a diabetic condition, was diagnosed as being in delirium tremens and was discharged to a jail without any medical followup.  The primary issues before the Court there were whether the hospital

## II.    The Facts of Dr. Meloche's Subjective Knowledge Are Not in Dispute.

While the Plaintiff has submitted a lengthy statement of facts, many are simply assertions that are entitled to no weight.[40]  Most importantly, none show Dr. Meloche believed anything other than that Mr. Wallace could be safely treated in the setting he was in and that he would be called if Mr. Wallace did not respond or his condition deteriorated.

1.    At page 2 the Plaintiff asserts, without citation,  that Mr. Wallace's medical condition was a medical emergency of the highest order.  This is merely an assertion.  This was not Nurse Monticello's judgment at any point in time.[41]  If she had any concerns about how he was responding, she would have called Dr. Meloche.[42]  It was not the judgment of other experienced physicians who have reviewed this case.[43]  Most importantly, this was not Dr. Meloche's judgment.[44]

2.    At page 3, Plaintiff asserts that Dr. Meloche does not dispute the serious medical nature of acute alcohol withdrawal.  The statement again is without citation and is at best over broad.  Insofar as this case is concerned, Dr. Meloche believed, based on the information he obtained from Nurse Monticello, that Mr. Wallace could be safely treated for alcohol withdrawal in the monitored setting Mr. Wallace was in and also believed that if he did not respond to the protocol, he would be

---

and physician could be the subject of Sec. 1983 liability.  *Fielder v Basshard*, 590 F.2d 105, 108 (5th Cir. 1979) is another case where no medical treatment was provided even though "each defendant knew of the extremity of Fielder's illness."  In *Weaver v Tipton County*, 41 F. Supp. 2d 779 (W.D. Tenn. 1999), a psychologist examined the inmate and recommended he be taken to the hospital emergency room for treatment of his alcohol withdrawal.  Yet this recommendation was inexplicably not followed.  In each of these cases no medical treatment was provided even though the defendant knew the inmate had a serious medical need.  In contrast here treatment was given and here Dr. Meloche did not believe there was substantial risk of serious harm to Mr. Wallace given the treatment he ordered, the monitored setting he was in and his request to be called if Mr. Wallace did not respond or his condition deteriorated.   None of these cases change the analysis mandated by *Toguchi*.

[40] *Toguchi,* 391 F.3d 1058 ("'Conclusory allegations unsupported by factual data will not create a triable issue of fact.'") *citing Marks v. United States,* 578 F.2d 261, 263 (9th Cir. 1978).

[41] Mrs. Monticello did not call Dr. Meloche after her call of 22 July 2004 because of her judgment that Mr. Wallace was responding appropriately to the protocol.  Monticello deposition at 143-4 (Exhibit A).

[42] *Id.* at 145.

[43] Exhibit E (Dr. Thompson Affidavit) and F (Dr. Nipomnik affidavit)  to Memorandum In Support of Motion for Summary Judgment.

[44] Meloche Affidavit at Par. 12, 16.  (Exhibit C to Memorandum In Support of Motion for Summary Judgment.)

notified, as he requested.[45]  Nurse Monticello did not think Mr. Wallace was in delirium tremens.[46] Nor did Dr. Meloche, or the other experienced physicians who have reviewed the record.[47]

3.     At page 3, the Plaintiff claims that Dr. Meloche's position is that doing "something" entitles him to summary judgment.  This is merely a straw argument created by the Plaintiff.  Dr. Meloche's position has consistently been that he believed Mr. Wallace would do well on the treatment plan he instituted given the information he obtained, and the setting Mr. Wallace was in. He also believed he would be called, as he requested, if Mr. Wallace did not do well on the treatment plan.[48]

4.     At page 4, the Plaintiff claims that Mr. Wallace was shaking at the time of his booking on 20 July 2004 referencing Exhibit 1 to her deposition.  Nurse Monticello had no knowledge of this and this is inconsistent with her own observations made at the time of her medical examination on 21 July 2004.[49]  How this information is relevant is unclear, as information Nurse Monticello did not know of at the time could not have been relayed by her to Dr. Meloche.

5.     At page 4, the Plaintiff claims Nurse Monticello had no specific training relating to alcohol withdrawal, implying that she was somehow not qualified.  But as set forth in Dr. Meloche's opening memorandum, Nurse Monticello is an experienced registered nurse who had worked at the Ketchikan Correctional Center since December of 1991.[50]  She had worked 10 years with Dr. Meloche.[51]  Since inmates in varying stages of alcohol or drug withdrawal are a significant percentage of the population at this facility, she was highly experienced in managing such patients.[52] The Plaintiff does not explain how relying on her could be evidence of deliberate indifference.

6.     At page 5, the Plaintiff claims Nurse Monticello described various signs  or symptoms

---

[45] *Id.*

[46] Monticello Deposition at 139-40 (Exhibit A).

[47] Meloche Affidavit at Par. 12, 17 (Exhibit C to Memorandum In Support of Motion for Summary Judgment.); Exhibit E (Dr. Thompson Affidavit) and F (Dr. Nipomnik affidavit) to Memorandum In Support of Motion for Summary Judgment.

[48] Meloche Affidavit at Par. 12, 16. (Exhibit C to Memorandum In Support of Motion for Summary Judgment.)

[49] Monticello Deposition at 137 (Exhibit A).  *See also* Exhibit A to Memorandum In Support of Motion for Summary Judgment.

[50] *Id.* at 8-9.

[51] Meloche Affidavit, Par. 7. (Exhibit C to Memorandum In Support of Motion for Summary Judgment.)

[52] *Id.*  Meloche Deposition at 80. (Exhibit B.)

of delirium tremens that she recognized in Mr. Wallace.  What the Plaintiff does not say is that each of these signs or symptoms is a sign or symptom of alcohol withdrawal and that she did not believe Mr. Wallace was in delirium tremens.[53]  For example, Nurse Monticello testified that all who go through alcohol withdrawal have sweating.[54]  She also testified that in her medical judgment, Mr. Wallace improved after the protocol was initiated and that because of this she saw no reason to contact Dr. Meloche again after her initial call and did not do so.[55]  As set forth above, Dr. Meloche did not believe Mr. Wallace was in delirium tremens and believed he could be safely treated in the setting he was in, as did other experienced physicians who have reviewed this record.

7.    At page 7, the Plaintiff claims Dr. Meloche knew nothing about the actual medical training and/or experience of the correctional officers at the jail.  While Dr. Meloche did not know the specific training of the correctional officers he testified:

> In the 10 years that I worked at the Ketchikan Correctional Center, we are not atypical and approximately somewhere between 15 and 30 percent of the individual that are incarcerated, if not more, are involved with some degree of alcohol and drug withdrawal and- and- it involves some degree of substance abuse and some layering of that and all of the staff that you're talking about are people who are experienced in this and they're –that was my understanding and belief. [56]

In his affidavit, Dr. Meloche testified he knew Mr. Wallace "would be in a cell that was continuously monitored via a video monitor by correctional officers who had experience in monitoring individuals going through alcohol withdrawal. . . ."[57]  He also testified that in his experience, the correctional officers competently performed their monitoring responsibilities.[58]  Again, the Plaintiff offers no evidence to show how Dr. Meloche's belief could be deliberately indifferent.

8.    At page 8, the Plaintiff claims that in response to Nurse Monticello's call, Mr. Wallace should have been transferred to the hospital.  But it was Dr. Meloche's judgment and belief that Mr. Wallace could be safely treated in the monitored setting at the jail and that if Mr. Wallace did not

---

[53] Monticello Deposition at 139-40. (Exhibit A.)

[54] *Id.* at 142.

[55] *Id.* at 144-5.

[56] Meloche Deposition at 80 (Exhibit B).

[57] Meloche Affidavit at Par. 12. (Exhibit C to Memorandum In Support of Motion for Summary Judgment.)

[58] Meloche Affidavit at Par. 21. (Exhibit C to Memorandum In Support of Motion for Summary Judgment.)

respond or his condition deteriorated, he would be called, as he explained in detail in his affidavit.[59] While the Plaintiff's experts have disagreed with the judgment Dr. Meloche made, as the Court of Appeals made clear in *Toguchi*, a "'difference of medical opinion...[is] insufficient, as a matter of law, to establish deliberate indifference."[60]  The Court of Appeals also there said ""[i]t does not matter whether Dr. Chung's assumptions and conclusions were reasonable."[61]  The Plaintiff has offered no evidence to show Dr. Meloche's belief was anything but what he has testified to.  Since Dr. Meloche did not believe there was a serious risk of harm to Mr. Wallace his conduct cannot constitute deliberate indifference.[62]

9.    At page 9, the Plaintiff engages in similar criticism of Dr. Meloche claiming he "declined" to come to the jail and did not give Nurse Monticello or the correctional officers monitoring instructions.  Dr. Meloche never "declined" any request to examine Mr. Wallace, for no such request was made.[63]  For the reasons he has explained in his affidavit, Dr. Meloche did not see the need to do so given the treatment he ordered,  the monitored setting Mr. Wallace was in and his request to be called if Mr. Wallace did not respond to the protocol.  Nurse Monticello did not make such a request or even contact Dr. Meloche again because of her belief that Mr. Wallace was responding to the treatment plan.[64]

Similar criticisms were raised in *Toguchi*, where there was expert opinion evidence that medication was administered "without assessing Keane's actual medical condition and without regard to possible withdrawal systems."[65]  The Court of Appeals found these to be allegations of negligence, not of deliberate indifference.  The same is true of the allegations that Dr. Meloche should have examined Mr. Wallace himself or should have told Nurse Monticello and the correctional center staff, professionals he had worked with for years and believed to be competent, what to look for.

---

[59] Meloche Affidavit, Par. 12-14, 16. (Exhibit C to Memorandum In Support of Motion for Summary Judgment.)

[60] *Toguchi*, 391 F3d at 1058 (*quoting Jackson v. McIntosh*, 93 F.3d 330, 332 (9th Cir. 1996).

[61] *Id.* at 1060.

[62] *Id.* at 1058  ("Because she did not believe that Cogentin use presented a serious risk of harm to Keane, her conduct cannot constitute deliberate indifference.")

[63] Meloche Affidavit, Par. 14. (Exhibit C to Memorandum In Support of Motion for Summary Judgment.)

[64] Monticello deposition at 144-5.  (Exhibit A.)

[65] *Toguchi*, 391 F.3d at 1059.

10.    At page 10, the Plaintiff claims the only thing Dr. Meloche told Nurse Monticello was to initiate the State's Alcohol Withdrawal Protocol.  The Plaintiff ignores the facts which are a matter of record.  Those facts show that in addition, Dr. Meloche told Nurse Monticello to call him if Mr. Wallace did not respond to the protocol or if his condition deteriorated.[66] He also told Nurse Monticello that he intended to hold his weekly clinic on Saturday, 24 June 2004 and would see Mr. Wallace then, unless she called him earlier.[67]   He was continually available by telephone from the time of this call until Mr. Wallace died, approximately 34 hours later.[68]  The Plaintiff has not even tried to explain how Dr. Meloche could be deliberately indifferent in light of these  facts.

11.    At page 11, the Plaintiff claims the State's Alcohol Withdrawal Protocol was a protocol for prevention, and that the Protocol did not allow the practitioner on scene to deviate from the schedule.  The Protocol nowhere states it is to be used only for prevention, nor does it state that it is to be used only for minor cases of withdrawal.[69]  Dr. Meloche's practice was to start patients on the Protocol, and then adjust the medication schedule based on how the individual patient responded.[70]  To argue this is a preventative protocol, while ignoring the evidence of how it was in fact used, proves nothing.  The evidence shows this protocol had been used by the State of Alaska throughout the entire State of Alaska Department of Corrections.[71]  It had been approved by for use by the State of Alaska Department of Corrections physicians and was the Protocol approved for use in the Ketchikan Correctional Center the entire 10 years of Dr. Meloche's employment.[72]  With this protocol, Dr. Meloche has successfully treated many patients in varying stages of alcohol withdrawal.[73]  In his 30 years of practice, Dr. Meloche does not recall a patient of his in Mr. Wallace's age range and condition having any significant complications when going through alcohol

---

[66] Meloche affidavit, Par. 13.  (Exhibit C to Memorandum In Support of Motion for Summary Judgment.)

[67] *Id.*

[68] Meloche affidavit, Par. 15.(Exhibit C to Memorandum In Support of Motion for Summary Judgment.)

[69] Exhibit D to Memorandum in Support of Motion for Summary Judgment.

[70] Meloche Affidavit, Par. 10, 11. (Exhibit C to Memorandum In Support of Motion for Summary Judgment.)

[71] Monticello Deposition at 82-3. (Exhibit A.)

[72] Meloche Affidavit, Par. 10. (Exhibit C to Memorandum In Support of Motion for Summary Judgment.)

[73] Meloche Affidavit, Par. 11, 22. (Exhibit C to Memorandum In Support of Motion for Summary Judgment.)

withdrawal on this or a similar treatment plan.[74] Nurse Monticello had no knowledge of any other negative outcomes when using this protocol.[75] Other experienced providers have had the same experience in using this and similar protocols.[76]

The Plaintiff's claim that the protocol did not allow the on site practitioner to deviate from the dosage schedule is likewise incorrect. The protocol specifically allowed "Clorazepate 15 mg one dose PRN [as needed] on day 1 and 2 in addition to doses prescribed above." While Dr. Meloche testified he did not believe Nurse Monticello would change the dosage without his approval, the protocol as written does allow such a change.[77]

12. The Plaintiff next claims at page 11 that Dr. Meloche did not know the exact dosage schedule of the protocol from memory. Dr. Meloche accurately testified from memory that the protocol "starts with 30 milligrams [of Traxene] and then reduces it to 15 and then reduces it to 15 twice a day. . ."[78] More importantly, Dr. Meloche testified:

> The essence of the protocol the way I understand it to be and the way I've use it and the way it's being used is that the medications are administered and then the patient is followed to see if they respond to the protocol and the things that are monitored is (sic) blood pressure, the pulse, and the patient condition whether they're able to continue participating or whether they deteriorate into an ability to communicate or lose orientation. And if any of those conditions apply, then the medical team is notified and I get notified and we decide what to do at that point in time.[79]

This is a protocol Dr. Meloche, as well as other experienced practitioners have used to treat patients in alcohol withdrawal for many years. He believed it would be successful here. He also believed that if Mr. Wallace did not respond or deteriorated, he would be so notified as he had requested. As such, there is no basis for Sec. 1983 liability under *Toguchi*.

13. The plaintiff claims at page 12 that after Dr. Meloche was contacted on 22 July 2004, Mr. Wallace remained confined at the jail with no adjustment to his treatment pursuant to Dr.

---

[74] Meloche Affidavit, Par. 22. (Exhibit C to Memorandum In Support of Motion for Summary Judgment.)

[75] Monticello Deposition at 107. (Exhibit A)

[76] Exhibit E (Dr. Thompson Affidavit) and F (Dr. Nipomnik affidavit) to Memorandum In Support of Motion for Summary Judgment.

[77] Meloche Deposition at 152-3. (Exhibit B.)

[78] Meloche Deposition at 15. (Exhibit B.) The protocol calls for 30 mg of Clorazepate (Traxene) initially and then 15 mg every 6 hours for the remainder of the first day, and 15 mg every 8 hours on the 2nd and 3rd days, and 15 mg every 12 hours on the 4th day.

[79] *Id.*

Meloche's orders. The Plaintiff again ignores the fact that Dr. Meloche asked that he be called if Mr. Wallace did not respond or if his condition deteriorated. Nurse Monticello called the jail on the evening of 22 July 2004 to be sure Mr. Wallace was given his medication. She was not told of any abnormal behavior on his part.[80] On 23 July 2004, she observed Mr. Wallace when she came to the Correctional Center at 0610, gave him his medication at 0700 and examined him at 0930.[81] At that time his vital signs had returned to normal, he was oriented to time and place and was drinking fluids and eating. She believed he was getting better and saw no reason to contact Dr. Meloche and thus did not.[82] Nurse Monticello called the facility at approximately 9:00 p.m. that evening to check on Mr. Wallace. She was not told of any unusual behavior on his part.[83] While the Plaintiff's expert retrospectively disagrees with Nurse Monticello's assessment, there can be no dispute that an experienced registered nurse believed that Mr. Wallace was responding appropriately to the protocol and for that reason did not again contact Dr. Meloche.

14.    At page 13, Plaintiff claims Dr. Meloche made no effort to follow up with Nurse Monticello. Dr. Meloche did not call Nurse Monticello because he had specifically asked her to contact him if Mr. Wallace did not respond to the protocol or if his condition deteriorated.[84] He knew Mr. Wallace was in a monitored setting and his expectation was that he would be so notified if Mr. Wallace did not respond or his condition deteriorated, an expectation that was consistent with his experience.[85] This is an expectation that other experienced practitioners have testified is reasonable.[86] The Plaintiff has nowhere addressed this evidence, or explained how a legitimate issue of fact can exist under *Toguchi* in light of such a request.

15.    At page 13, Plaintiff claims Mr. Wallace's condition deteriorated during the afternoon of 23 July 2004. There is no evidence to support that statement. There is evidence that Mr. Wallace began to act bizarrely during the evening of 23 July 2004. But the evidence is undisputed that Dr.

---

[80] Monticello Deposition at 141-2. (Exhibit A.)

[81] Exhibit B, page 1 to Memorandum In Support of Motion for Partial Summary Judgment.

[82] Monticello Deposition at 142-4. (Exhibit A.)

[83] Monticello Deposition at 145-7. (Exhibit A.)

[84] Meloche Affidavit at Par. 13, 14. (Exhibit C to Memorandum In Support of Motion for Summary Judgment.)

[85] Meloche Affidavit at Par. 20, 21. (Exhibit C to Memorandum In Support of Motion for Summary Judgment.)

[86] Exhibit E (Dr. Thompson Affidavit) and F (Dr. Nipomnik affidavit) to Memorandum In Support of Motion for Summary Judgment.

Meloche was not informed of this and did not know of it. Since the subjective knowledge that is a prerequisite to liability under *Toguchi* is lacking, summary judgment is appropriate.

### III.    The Facts Dr. Meloche Relies On Have Not Been Disputed.

Dr. Meloche set forth the facts he believes warrant summary judgment in his opening memorandum at pages 14-5. The Plaintiff has had an ample opportunity to show these facts are disputed. Yet she has not submitted evidence to dispute even one of these facts. These facts show there is no dispute regarding Dr. Meloche's subjective knowledge. At no point did he in the language of *Farmer* "draw the inference" that Mr. Wallace was at substantial risk of serious injury. At no point did he consciously disregard such a risk. These facts show summary judgment should be entered in accord with *Toguchi*.

### IV.    The Plaintiff's Arguments Do Not Raise A Genuine Issue of Material Fact.

The Plaintiff's entire Opposition is based on her assertion that Dr. Meloche seeks summary judgment because he did "something" (as opposed to nothing) to address Mr. Wallace's condition and that Dr. Meloche's argument is wrong as a matter of law. But as the Plaintiff surely knows, this mis-characterizes Dr. Meloche's argument, for this argument nowhere appears in Dr. Meloche's opening brief or anywhere else. Dr. Meloche's argument has always been that he was contacted on a single occasion regarding Mr. Wallace, gave orders for a treatment protocol he believed would be effective and asked to be called if Mr. Wallace did not respond or if his condition deteriorated. He did not believe there was a substantial risk of serious harm to Mr. Wallace given his condition, the treatment plan instituted, the monitored setting he was in and his request to be contacted if Mr. Wallace's did not respond or condition deteriorated. Dr. Meloche has consistently argued that because he did not believe there was a substantial risk of serious harm to Mr. Wallace, nor did he consciously disregard any such a risk, he is entitled to summary judgment under *Toguchi*. The Plaintiff has offered no facts to show anything to the contrary. She has offered no legal authority which would find a genuine issue given these facts. She has not even argued that Dr. Meloche *knew* there was a substantial risk of serious harm to Mr. Wallace and *consciously* disregarded that risk, which is what *Toguchi* requires her to show to avoid summary judgment.

The Plaintiff next argues that Mr. Wallace's condition mandated that he be immediately hospitalized as of the time Dr. Meloche was called, relying on her expert witness. But this was not Dr. Meloche's belief. Nor is it the belief of other experienced physicians who have reviewed this case. The critical inquiry, under *Toguchi* is not whether Dr. Melcohe made a judgment the Plaintiff claims to be in error, but whether he knew Mr. Wallace was at substantial risk of serious harm given

the setting he was in and the treatment protocol he initiated, and then consciously disregarded this risk.[87] As the Court of Appeals in *Toguchi* said, "[i]f a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk."[88] Again, because of how she chose to characterize the issue, the Plaintiff does not even argue there are facts to show Dr. Meloche believed there was a substantial risk of serious injury to Mr. Wallace and then consciously disregarded that risk. As such, summary judgment is appropriate.

The Plaintiff next argues without any supporting authority the Court should discount Dr. Meloche's experience because he does not identify by name any specific patients in alcohol withdrawal he has seen over the 30 year course of his practice or detail their symptoms. But the Plaintiff's argument is wrong in two significant respects. First, it ignores the record, for in his affidavit, Dr. Meloche specifically stated he has over the course of his years of practice treated well over 1000 patients in varying stages of alcohol withdrawal.[89] Contrary to the Plaintiff's assertion, there is specific evidence that Dr. Meloche has provided treatment to a wide range of patients going through alcohol withdrawal during the course of his 30 year career as an emergency room physician and his 10 year care as a part-time physician at the Ketchikan Correctional Center.

The second flaw in this argument is that regardless of how one quibbles about the level of Dr. Meloche's experience, it cannot be disputed that Dr. Meloche's experience is significant. Nor can it be disputed that his judgment is a product of his experience and his judgment, based on his experience, was that Mr. Wallace would do well on this protocol and that there was no substantial risk of serious injury to him in the setting he was in.[90] Indeed, that is the judgment of other long time practitioners who have reviewed the record in this case.[91] It is this judgment by Dr. Meloche that is the focus of the inquiry under *Toguchi*, and while the Plaintiff has argued this judgment was

---

[87] Since many issues in medicine are issues of judgment, to accept Plaintiff's argument would mean that every such disagreement of judgment would give rise to a cruel and unusual punishment claim. But that is not the law under *Farmer* or *Toguchi*. Each court went to great lengths to explain that such claims do not, as a matter of law, create Sec. 1983 liability.

[88] *Toguchi*, 391 F.2d at 1057 *quoting Gibson*, 290 F.3d at 1188.

[89] Meloche Affidavit at Par. 5, 22. (Exhibit C to Memorandum In Support of Motion for Summary Judgment.)

[90] Meloche Affidavit at Par. 12, 16, 19-20. (Exhibit C to Memorandum In Support of Motion for Summary Judgment.)

[91] Exhibit E (Dr. Thompson Affidavit) and F (Dr. Nipomnik affidavit) to Memorandum In Support of Motion for Summary Judgment.

wrong she has nowhere submitted any facts to show Dr. Meloche's judgment was anything other than what he has testified it was.

In *Toguchi*, the Court said that if Dr. Chung had assessed the inmate, determined he was suffering from withdrawal and in the face of that knowledge administered drugs she *knew* to be life-threatening, the deliberate indifference standard might be met. This is a guide for what the Plaintiff must show to create a factual question here. If there was evidence to show Dr. Meloche *knew* the treatment plan he ordered for Mr. Wallace presented a substantial risk of serious injury to him and that he *consciously* disregarded that knowledge, the deliberate indifference standard might be met. But to know this, Dr. Meloche would have to know Mr. Wallace would not respond to the treatment plan. Dr. Meloche would also have to then know he would not be informed of Mr. Wallace's deterioration and thus would not have the opportunity to adjust his medication level or take other appropriate action. Dr. Meloche has presented clear, uncontradicted evidence that he believed Mr. Wallace would do well on the protocol given his age, lack of other health problems and the monitored setting he was in. He has presented clear, uncontradicted testimony that he asked to be contacted if Mr. Wallace did not respond to the protocol or his condition deteriorated. His belief that Mr. Wallace would do well on the protocol is corroborated by the observations of an experienced registered nurse, who believed Mr. Wallace was in fact doing well on the protocol, which is why she only called Dr. Meloche a single time. Unlike the cases the Plaintiff has cited, there is no evidence that Dr. Meloche denied or delayed treatment he knew was necessary. In light of this showing and the holding of *Toguchi*, the Plaintiff had the obligation to submit admissible evidence to dispute Dr. Meloche's belief to avoid summary judgment. She has not done so and as such, summary judgment is appropriate.

## V.    The Plaintiffs' Damage Claims Should Be Determined by State Laws.

The Plaintiffs acknowledge that the Court must look first to state wrongful death and survival law as required by 42 U.S.C. Sec.1988.[92] The Plaintiffs do not dispute that A.S. 09.55.570 and 580 generally provide a broad range of survival and wrongful death damage claims for the Estate and certain beneficiaries, including claims for economic losses, pre-death pain and suffering and loss of enjoyment of life, and other claims by beneficiaries. Both statutes allow punitive damage claims. The only damage issue is whether omission of a state law claim for post-death loss of enjoyment of life damages makes state damage law inconsistent with the policies of Sec. 1983. Neither the 9th Circuit Court of Appeals or the United States Supreme Court has addressed this issue in a case

---

[92]Plaintiff's Opposition at p. 25.

where the Sec. 1983 violation caused the death.

The Court in *Robertson v. Wegmann*, 436 U.S. 584, 590 (1978) made several points relevant to this determination in a case involving a Sec. 1983 claim which did not cause the death of the plaintiff. First, the Court explained that "[d]espite the broad sweep of Sec.1983, we can find nothing in the statute or its underlying policies to indicate that a state law causing abatement of a particular action should invariably be ignored in favor of a rule of absolute survivorship."[93] Second, after concluding that it was "difficult to see how any of Sec.1983's policies would be undermined if Shaw's action were to abate," the Court explained that "the goal of compensating those injured by a deprivation of rights provides no basis for requiring compensation of one who is merely suing as the executor of the deceased's estate."[94] Third, the Court noted there was "no contention that Louisiana's decision to restrict certain survivorship rights in this manner is an unreasonable one."[95] The Court then upheld the application of Louisiana state law which caused the plaintiff's civil rights action to abate upon his death without leaving a spouse, children, parents or siblings. Alaska law is therefore not inconsistent simply because it does not allow a post-death loss of enjoyment of life claim as compensation to the estate. Any award for post-death loss of enjoyment of life would not compensate the decedent but only his estate. Alaska law is not unreasonable in restricting such a claim while allowing numerous other compensatory and punitive damage claims.

The California Supreme Court in *County of Los Angeles v. Superior Court,* 981 P. 2d 68 (Cal.1999), relied upon the *Robertson* decision to hold that California state law which prohibited a deceased plaintiff's estate from recovering damages for pain, suffering, or disfigurement, was not inconsistent with the dual policies of federal civil rights law to provide compensation of persons injured and to prevent abuses of power by those acting under color of state law:

> In not allowing the estate to recover damages for the deceased plaintiff's pain and suffering, our law does not undermine the federal civil rights law's goal of "compensation of persons injured by deprivation of federal rights" (Robertson v. Wegmann, supra, 436 U.S. 584, 591, 98 S.Ct. 1991, 56 L. Ed. 2d 554), for California's limitation on damages affects only the estate, not the party actually injured by the constitutional deprivation. As the high court pointed out in Robertson: "The goal of compensating those injured by a deprivation of rights provides no basis for requiring compensation of one who is merely suing as the executor of the deceased's estate." (Id. at 592, 998 S.Ct. 1991.)

---

[93] *Id.* at 590-91.

[94] *Id.* at 592.

[95] *Id.* at 592.

981 P. 2d at 75. The Court further held that "the California Legislature's decision to disallow a deceased plaintiff's estate from recovering such particularly personal elements of damages as pain and suffering was not 'an unreasonable one.'" 981 P. 2d at 76, citing *Robertson v. Wegmann* 436 U.S. 584, 592 (1978). The Court held that state law was not inconsistent even if its application barred all recovery for this particular plaintiff.[96]

Both *Robertson* and *County of Los Angeles* were cases where the deaths of the plaintiffs were unrelated to the Sec. 1983 violations. Federal court decisions have not "consistently ruled" that when a violation causes death that state law barring recovery for loss of enjoyment of life is inconsistent with Sec. 1983, as claimed by plaintiffs.[97] The 6th Circuit Court of Appeals applied *Robertson* recently in *Frontier Insurance Company v. Blaty*, 454 F. 3d 590 (6th Cir. 2006), and held that "federal law does not require, in a section 1983 action, recovery of hedonic damages stemming from a person's death." *Id.* at 600. The Court there explained that Michigan's wrongful death act was consistent with the compensatory purposes of Sec.1983 since it authorized compensation for losses including hedonic losses that were experienced by the decedent prior to death. *Id.* at 601. The Court noted that there was "no requirement under federal law that a state go further than this in providing damages for wrongful death":

> The loss of enjoyment caused by death is not "actual," in the sense that is relevant here, because it is not consciously experienced by the decedent. *See Tinch*, 77 F. 3d 483, 1996 W. L. 77445, at 3 ("the actual harm suffered by the decedent" does not include the loss of enjoyment of life rendered unavailable by death). There being no means of making the decedent whole, recovery of damages for this (or any other) post-death loss is not required to advance (sic) would not advance section 1983's compensatory policy. *See Robertson*, 436 U.S. at 592, 98 S. Ct. 1991 ("The goal of compensating those injured by a deprivation of rights provides no basis for requiring compensation of one who is merely suing as the executor of the deceased's estate").

*Id.* at 601. The Court further held that the deterrent purposes of Sec.1983 were also fulfilled by the potential for damage claims for injuries suffered by the decedent's survivors and by hedonic damages suffered before death. *Id.* Finally, the court noted that it "should not disturb a state remedy

---

[96] "Nothing in <u>Robertson</u> suggests to us that by precluding an estate from recovering damages for the deceased plaintiff's emotional distress, California's survival law would be inconsistent with the compensation and deterrence policies of the federal civil rights statute even if the damages limitation were to eliminate all recovery in some sexual harassment cases. As the high court said in <u>Robertson v. Wegmann</u>, <u>supra</u>, 436 U.S. at page 593, 98 S.Ct. 1991: 'A state statute cannot be considered 'inconsistent' with federal law merely because [it] causes the plaintiff to lose the litigation.'" 981 P. 2d at 77.

[97] Plaintiffs' Opposition at p. 26.

unless it is clear that such remedy is wholly inconsistent with the Constitution and the goals of Sec.1983."[98]

The District Court in *Alexander v. Bobeale Street Blues Company, Inc.*, 108 F. Supp. 2d 934 (W. D. Tenn. 1999) also held that a Tennessee state law "that does not allow for the recovery of hedonic damages is not inconsistent with federal law, or more specifically, the purposes of Sec.1983." *Id.* at 950, citing *Tinch v. City of Dayton*, 77 F. 3d 483 (6th Cir. 1996) (unpublished decision) (the law of the forum state should determine whether hedonic damages are recoverable under Sec. 1983.)

In *Venerable v. City of Sacramento*, 185 F. Supp. 2d 1128 (E.D. Cal. 2002), a case involving the shooting death of the decedent by police officers, the District Court explained after reviewing the legislative history of the California survival statute:

> It is fair to conclude from this legislative history that the California legislature's adherence to a limitation on pain and suffering was neither a product of anachronistic formalism nor inattention, but represents a considered judgment as to the appropriate balance among a number of competing considerations. In this instance, the legislature apparently concluded that whatever increment of deterrence would be achieved by permitting a claim for pain and suffering to survive is outweighed by other considerations.
>
> While one may disagree with the legislature's policy judgment, it is difficult to argue that the judgment is without a sound basis.

*Id.* at 1132. The District Court rejected the argument that the deterrence provided by the California survival statute was inadequate because a denial of pain and suffering damages when the injured person dies would put the tortfeasor in a better position than when the injury is the most severe. The Court reasoned that:

> In the absence of reliable empirical evidence to the contrary, the Court declines to adopt a cynical proposition that law enforcement officers generally prefer to run the

---

[98] "As a federal court applying a state law remedy, this Court's hands are tied to some degree in scrutinizing the type of available damages. Although we might be inclined to think that it would be a better policy decision to make available damages for the loss of enjoyment of life in a wrongful death suit, or that such damages might further advance the objectives of federal law, Section 1988 only allows us to modify the state damages scheme if it is *inconsistent* with federal law. Given Congress's choice to incorporate state law damage provisions for section 1983 cases – and to only provide additional damages when state remedies are entirely insufficient with the policies of compensation and deterrence – we do not have the discretion to hold that damages beyond those made available by the state should be allowed simply by deciding that such a remedy would be preferable. The only basis to supplement the state law damages scheme is a determination that it is inconsistent with the purposes of federal law, and we see no basis for making such determination here." *Id.* at 603.

> risk of inflicting death than of merely maiming a victim because death cuts off a claim for pain and suffering by the decedent. As the Supreme Court noted in Robertson, "[a] state official contemplating illegal activity must always be prepared to face the prospect of §1983 action being filed against him.

*Id.* at 1133.

The District Court in *Peacock v. Terhune*, 2002 WL 459810 (E.D. Cal. 2002), in a case involving the death of an inmate, held that California state law, which allowed recovery for compensatory and punitive damages but not for pain and suffering, was not inconsistent with Sec.1983's goals of compensation and deterrence:

> To say that the unavailability of pain and suffering damages diminishes the deterrent effect of the statute is to assume that a state actor would rather kill a person than injure him to avoid paying damages for pain and suffering. This assumption requires a fanciful view of human nature. "A state official contemplating illegal activity must always be prepared to face the prospect of a §1983 action being filed against him. In light of this prospect, even an official aware of the intricacies of [state] survivorship law would hardly be influenced in his behavior by its provisions." Robertson, 436 U.S. at 592.

*Id.* at p. 4.

The state appeals court in *Garcia v. Superior Court of Los Angeles*, 49 Cal. Rptr. 580 (Cal. App. 1996), reasoned that the deterrent purposes of the Civil Rights Act was satisfied by state law expressly allowing punitive damages the decedent would have been entitled to recover had he survived. *Id.* at 1585. With respect to the compensatory purpose of the federal Civil Rights Act, the court held that California law "represents the Legislature's reasonable judgment that, once deceased, the decedent cannot in any practical way be compensated for his injuries or pain or suffering, or be made whole." *Id.* at 586. (Citation omitted.) Finally, the court held that "the real possibility of a civil rights victim having no surviving heirs is not a significant factor in determining whether state law is inconsistent with federal law." *Id.* at 586. (Citation omitted.) The court found California state law prohibiting hedonic damages was not inconsistent with the purposes of Sec.1983.

Julia Walker's own individual claim for loss of consortium made pursuant to Sec. 1983, to the extent allowed by the law of the 9th Circuit, does not make the Estate's claim for post-death loss of enjoyment of life inconsistent with state law. Rather, that claim provides additional support for the argument that Sec. 1983 compensatory and deterrence goals are satisfied. An actor contemplating the commission of a civil rights violation would theoretically face additional exposure to the victim's non-dependent family members.

Under Alaska law the estate and beneficiaries of a plaintiff killed by wrongful conduct retain a broad range of potential compensatory and punitive damage claims which serve to compensate the estate and certain beneficiaries and to deter future wrongful contact. All pre-death claims except those involving defamation survive. A.S. 09.55.570. Troy Wallace's pre-death claims for pain and suffering, and for loss of enjoyment of life, thus survive. The decedent's estate, spouse, children, and other dependents may recover for the deprivation of pecuniary benefits, loss of support, loss of assistance or services, loss of consortium, loss of training and education, and medical and funeral expenses. A.S. 09.55.580. When the decedent has no dependents, the recovery is limited to his pecuniary loss. *Id.* Troy Wallace, once deceased, cannot in any practical way be compensated for his post-death loss of enjoyment of life. Punitive damages are potentially available to punish and deter. This statutory scheme is not unreasonable and is not inconsistent with the purposes of federal law. State damage law should be applied. The Estate's claim for post-death loss of enjoyment of life should be dismissed.

## CONCLUSION

Because the purpose of a Sec. 1983 claim is to punish those who punish others, the Supreme Court and the 9th Circuit have drawn a very clear line at the requirement of deliberate indifference to delineate those cases which subject one to Sec. 1983 liability. The 9th Circuit has said the deliberate indifference standard is a "high legal standard" and has specifically held the standard requires subjective knowledge of a substantial risk of serious injury and conscious disregard of that substantial risk. The 9th Circuit has also held that summary judgment is appropriate when a physician believes his/her choice of treatment did not subject the inmate to a substantial risk of serious injury. The undisputed facts here show that Dr. Meloche believed there was no substantial risk of serious injury to Mr. Wallace, nor did he ever act in conscious disregard of any such risk. Under these facts, summary judgment is appropriate and Dr. Meloche respectfully requests the Court, in accord with *Toguchi*, so rule.

DATED this 17th day of January, 2007, at Juneau, Alaska.

LESSMEIER & WINTERS

Attorneys for Defendant Dr. Meloche

By:_____/S/_____
Michael L. Lessmeier, AK Bar 7910082

The undersigned hereby certifies that on the 17th of January, 2007, a copy of the

*Reply to Opposition to Motion for Partial Summary Judgment*
*Walker, Estate of Wallace v. Henderson et al.; Case No. A05-176 CV  (RRB)*     Page 24 of  25

foregoing document was electronically served to the following attorneys of record:

Edwin S. Budge, Esq.
Budge & Heipt, PLLC
705  2nd Avenue, #910
Seattle, WA  98104

/S/ Michael L. Lessmeier
0034-078 ReplyOppMSJ.wpd