Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

JULIA WALKER, individually     )
 and as Personal Representative)
of the Estate of TROY WALLACE  )
                               )
            Plaintiffs,        )
                               )
     vs.                       )
                               )
                               )
DAVID D. HENDERSON, LAURI A.   )
MURRAY, WALTER T. RUD, SHERRI  )
 L. DAVIS, EDWIN D. IRIZARRY,  )
LINDA MONTICELLO and ERNEST    )
 MELOCHE M.D.                  )
                               )
            Defendants.        )  No.  A05-0176 CV
_____)

DEPOSITION ON ORAL EXAMINATION

OF

LINDA MONTECILLO

8:15 a.m.
September 19, 2006
Ketchikan Correctional Center
1201 Schoenbar Road
Ketchikan, Alaska 99901

Exhibit A
page 1 of 8

SEAK Professional Services, LLC
2415 Hemlock Street, Suite 104, Ketchikan, Alaska 99901

Page 6

1    and I want to make sure that if you don't
2    understand a question that I ask or if you'd
3    like clarification, feel free to ask me to
4    clarify my question and I'll do that. Okay?
5  A  Okay.
6  Q  Do you have any questions about the procedure
7    before we start?
8  A  None as of the moment.
9  Q  Did you do anything to prepare for your
10   deposition today?
11 A  Review the records.
12 Q  All right. And what records are you referring
13   to?
14 A  The one present in front of me.
15 Q  All right. Anything other than that?
16 A  No sir.
17 Q  Okay. What is that file that you have in front
18   of you? Is that a medical file maintained here
19   at the Ketchikan Correctional Center?
20 A  What it is, it says State of Alaska and on the
21   front it says confidential and it says Wallace -
22   - Troy Wallace -- Wallace, Troy A., OTIS number
23   489521, date of birth 10/31/72. A manila
24   envelope and it has different forms.
25 Q  Is that a file that's maintained here at the

Page 7

1    jail?
2  A  Some of it is his medical file. There are other
3    pieces of information that normally does not
4    include in the medical file.
5  Q  All right. Did you review any other records
6    other than the materials that you have in front
7    of you right now?
8  A  No sir.
9  Q  Did you have any conversations with anybody
10   about the subject of this deposition before we
11   started today?
12 A  Yes I did.
13 Q  Who was that?
14 A  Paula Jacobson.
15 Q  Anybody else?
16 A  No sir.
17 Q  Okay. Have you reviewed any documents related
18   to this case in the past two weeks besides what
19   you have in front of you today?
20 A  No sir.
21 Q  Can you take me through your educational history
22   since high school please?
23 A  I graduated high school -- Ketchikan High
24   School, in May, 1975. I went to nursing school
25   and I graduated nursing school in Sibudokus (ph)

Page 8

1    College of Nursing in the Philippines. I
2    graduated in April of two -- no, 1982. And I
3    received a bachelor's degree in nursing at that
4    time.
5  Q  Did you say 1982?
6  A  Yes.
7  Q  And when did you graduate from Ketchikan High?
8  A  1975. It took me five years to finish.
9  Q  Oh, I'm sorry. That's perfectly reasonable. I
10   just had it confused in my head that you were
11   born in 1975.
12 A  I was born in.....
13 Q  Right.
14 A  .....1956.
15 Q  Got it. And any other higher education besides
16   nursing school?
17 A  That's it.
18 Q  All right. Please describe your work history
19   since graduating from nursing school in 1982.
20 A  I worked at the Ketchikan General Hospital,
21   first as a nurse's aid, and then I went into
22   surgery and I was a certified scrub technician
23   for I don't know how many years. And then I
24   passed the state board -- I can't give you the
25   exact dates, and I worked as a registered nurse

Page 9

1    in the hospital. Most of my experience is in
2    surgery and I came here to the Department of
3    Corrections in December of 1991 and I've been
4    here since then.
5  Q  Have you worked at any other jails or
6    correctional facilities other than the Ketchikan
7    Correctional Center?
8  A  I put in possibly a week at the jail in Bethel
9    to fill in. But it was still under Department
10   of Corrections.
11 Q  Okay. But other than that one week, your
12   employment with the Department of Corrections
13   has involved your work here at.....
14 A  Correct.
15 Q  .....the Ketchikan Correctional Center?
16 A  Correct.
17 Q  From roughly when to when did you work at the
18   Ketchikan General Hospital?
19 A  From 1982 until 1991.
20 Q  And you said you began as a nurse's aid?
21 A  Yes.
22 Q  And then what was your -- what was your position
23   in surgery?
24 A  I was a certified scrub technician.
25 Q  Okay. And when did you pass the state board?

3 (Pages 6 to 9)

Exhibit A
page 2 of 8

SEAK Professional Services, LLC
2415 Hemlock Street, Suite 104, Ketchikan, Alaska 99901

aeab9ce5-623d-40b4-8df2-a93c87c8565d

Linda Monticello

Page 82

1   initiate DT protocol. Do you understand that
2   question?
3   MR. LESSMEIER: I'm going to object to the form
4   of the question. Go ahead.
5 A  Okay. Basically, the department has policies
6   and procedures and we have an alcohol withdrawal
7   protocol and to initiate the DT protocol
8   translates, for me, to get the piece of paper
9   that has all the instructions on the alcohol
10  withdrawal. Does that answer your question?
11 Q  I think so. Just let me clarify. You don't
12  recall receiving specific information from Dr.
13  Meloche regarding, okay, I want X amount of
14  medication, X kind of medication and on X
15  schedule. Rather, the information was initiate
16  the DT protocol, which you then carried out by
17  going and getting the DT protocol and looking to
18  see when and how that medication was supposed to
19  be administered. Is that right?
20  MR. LESSMEIER: Objection, form.
21 A  Correct.
22 Q  And the DT protocol that you're referring to is
23  a protocol that's maintained by the Department
24  of Corrections?
25 A  Correct.

Page 83

1 Q  Is there just one DT protocol, or are there
2   others depending on the severity of the
3   withdrawal symptoms?
4 A  Just one form.
5 Q  One form for everybody?
6 A  One form for the whole Department of
7   Corrections.
8 Q  Did you understand -- or is it your
9   understanding, I should say, that alcohol
10  withdrawal can vary from mild to severe?
11 A  Yes.
12 Q  Do you know of any DT protocol that is -- how to
13  I phrase this? Are there different DT protocols
14  that are designed to address withdrawal symptoms
15  which are, for example, mild or moderate or
16  severe? Or is there simply one DT protocol that
17  if it's initiated is initiated in every case?
18  MR. LESSMEIER: Objection.....
19  MS. JACOBSON: Are you talking about DOC only?
20  MR. BUDGE: Yes.
21  MR. LESSMEIER: Let me just object for the
22  record. Form, foundation.
23 A  There's only one form that I'm aware of that I
24  use that the Department of Corrections have
25  formulated.

Page 84

1 Q  Do you know whether Dr. Meloche understood what
2   the DT protocol consisted of?
3 A  I don't know what Dr. Meloche knew or
4   understood.
5 Q  Have you had any experience with involving Dr.
6   Meloche in inmate care as it pertained to
7   alcohol withdrawal prior to Mr. Wallace?
8 A  If you're asking me if we had other alcohol
9   withdrawal treatments aside from Wallace?
10 Q  Yeah.
11 A  Yes.
12 Q  Okay. How many times?
13 A  I couldn't give you the number.
14 Q  Can you estimate for me whether it would have
15  been more or less than 10 times prior to Mr.
16  Wallace?
17  MR. LESSMEIER: Objection, foundation, form.
18 A  You know, I don't know. Maybe more than 10,
19  maybe less than 10. I really can't give you a
20  figure.
21  (Whispered conversation)
22 Q  Okay. Under this entry for 7/22/04 at 1430,
23  after you say initiate DT protocol, can you go
24  ahead and read the rest of that entry for me?
25 A  It says, Clorazepate 15 milligrams, Thiamine 100

Page 85

1   milligrams IM/STAT, then Thiamine 100 milligrams
2   PO Q D times four days. TO, telephone order,
3   Dr. Meloche/Linda Montecillo, RN.
4 Q  What does PO Q D times four days mean?
5 A  Oral daily. One tablet.
6 Q  When you wrote down the medication -- this
7   information about medications, were you writing
8   down Dr. Meloche's specific orders or were you
9   getting this information off of the DT protocol
10  sheet?
11 A  I got it out of the DT protocol sheet in a --
12  what I would say, lesser writing version than
13  the whole protocol itself.
14 Q  Okay. And then there's another entry for
15  7/22/04 at 1450. Can you go ahead and read that
16  for me please?
17 A  Given Thiamine 100 milligrams IM left deltoid
18  muscle, tolerated procedure. Clorazepate, 15
19  milligrams, two tablets given. Monitor, follow
20  up, PRN, Linda Montecillo.
21 Q  And what does -- remind me again what PRN means?
22 A  As needed.
23 Q  Okay. And was this simply a record of the
24  medication that you gave Mr. Wallace at that
25  time?

22 (Pages 82 to 85)

Exhibit A
page 3 of 8

Linda Monticello

### Page 106

1  half, Counsel?
2  Q  Yeah. And all of the dosages of medication and
3     vitamins that are indicated -- or, excuse me,
4     all of the dosages of medications and vitamins
5     that Mr. Wallace received while he was here,
6     would they all be recorded on these within the
7     file?
8  A  Yes. Yes.
9  Q  And did you ever have any specific discussion
10     with Dr. Meloche about these specific dosages,
11     time of dosages, manner of administration, etc.?
12     MR. LESSMEIER: Objection, form.
13  A  We didn't specify exactly what the dosages are,
14     no.
15  Q  Okay. And in terms of the amount of medication
16     and/or vitamins and the time and the manner in
17     which they were to be administered, were you
18     basically just following the information
19     contained in the second half of the first page
20     here in Exhibit 5?
21  A  Yes.
22  Q  Okay. And is it the case that some of these
23     medications were administered by you and others
24     were administered by corrections officers?
25  A  I stated in the medication sheet, which is the

### Page 107

1     following page.
2  Q  Had you ever, prior to this time, followed this
3     specific protocol before with an inmate?
4  A  Yes.
5  Q  And were there any other negative outcomes or
6     did all of the inmates recover from their
7     condition?
8  A  No.
9  Q  There were no other negative outcomes?
10  A  You mean, like.....
11  Q  Is Mr. Wallace's situation the only time an
12     inmate has had an -- a negative outcome, meaning
13     a death or I supposed there could be some
14     negative outcome short of death, but I can't
15     think of one right now, as a result of alcohol
16     withdrawal? Have all the other inmates
17     recovered?
18  A  Yes.
19  Q  Okay. If Dr. Meloche had directed that Mr.
20     Wallace should be transported to the hospital,
21     is there any reason why you would not have done
22     that?
23     MR. LESSMEIER: Objection, form, foundation.
24  A  There's no reason why I shouldn't. I would
25     definitely follow through what he would ask me

### Page 108

1     to do.
2  Q  Did you -- is there any reason that you can
3     think of why you did not contact Dr. Meloche on
4     7/23/04 with an update on Mr. Wallace's status?
5  A  I couldn't tell you.
6  Q  If Dr. Meloche had advised you to contact him
7     with an update on his status, would you have
8     done so?
9  A  Yes sir.
10  Q  And if Dr. Meloche had instructed or advised any
11     other course of treatment besides the initiation
12     of this DT protocol, would you have followed his
13     instructions?
14     MR. LESSMEIER: Objection, form, foundation.
15  A  Yes sir.
16  Q  Who did you consider to be the individual
17     primarily responsible for Mr. Wallace's medical
18     care after he was evaluated by you on 7/22/04
19     and after you contacted Dr. Meloche?
20     MR. LESSMEIER: Objection, form.
21  A  So you're asking who would I account to for
22     Wallace's health care?
23  Q  I'm asking you who you considered to be the
24     individual primarily responsible for directing
25     the manner and method in which he was going to

### Page 109

1     be treated.
2     MR. LESSMEIER: Objection, form.
3  A  I would say the Department of Corrections.
4  Q  Any particular individual?
5  A  Just the Department of Corrections.
6  Q  After Mr. Wallace died, at any point, whether it
7     was a week later, a month later, even a year
8     later, have you ever had any conversation with
9     Dr. Meloche about Mr. Wallace or any issues
10     surrounding the medical issues or his death?
11  A  We may have had some casual conversations about
12     the incident itself, of the particulars of what
13     we talked about, I couldn't exaggerate [sic] on
14     what it was all about.
15     MR. LESSMEIER: Did you mean to say elaborate?
16  A  Well, I mean, you know, naturally we talk
17     about.....
18     MR. LESSMEIER: Sure.
19  A  .....you know, nobody feels good about an
20     incident like this. So there's some emotional
21     stuff, you know. So maybe just saying, you
22     know, it's okay.
23  Q  Do you -- you don't have any specific memories?
24     Did you ever hear Dr. Meloche say words to the
25     effect of that if Mr. Wallace had just quit

28 (Pages 106 to 109)

Exhibit A page 4 of 8

Page 134

1  provider of services to the inmates?
2  A  Yes.
3     MR. BUDGE: Can I interrupt for just one second,
4  I'm sorry. Do you intend for any part of this to be
5  a perpetuation deposition?
6     MR. LESSMEIER: I don't know that I'd have to
7  make that decision right now.
8     MR. BUDGE: Okay.
9     MR. LESSMEIER: It's possible that I could.....
10    MR. BUDGE: Yeah.
11    MR. LESSMEIER: But I don't think so. It would
12 be my intent to call her live.....
13    MR. BUDGE: Okay.
14    MR. LESSMEIER: .....if it goes to trial, but I
15 don't know yet.
16    MR. BUDGE: Okay. Then, I think I'll make it
17 more efficient and won't make evidentiary objections,
18 but if you think you might use it as a perpetuation
19 deposition, I would make evidentiary objections.
20    MR. LESSMEIER: Okay, All right. In other
21 words, objections other than form, foundation? I
22 don't think you need to make those objections anyway.
23    MR. BUDGE: Right. Unless we're -- you're
24 perpetuating this. Okay.
25    MR. LESSMEIER: I'll stipulate that you don't

Page 135

1  need to make evidentiary objections other than form
2  or foundation.
3     MR. BUDGE: Okay. All right.
4  Q  Was there ever a time that you thought that Dr.
5     Meloche should see someone here at the jail and
6     he didn't come out?
7  A  No.
8  Q  He was always willing to come out?
9  A  Yes.
10 Q  And was ever there a time when you thought that
11    somebody should be transported to the hospital,
12    to the ER, and he didn't do what he could to
13    make that happen?
14 A  No. He always -- I mean, if we needed to take
15    somebody to the hospital, there was no question.
16    That person was sent to the hospital.
17 Q  Now when -- if -- if either you or Dr. Meloche
18    felt that somebody needed to go to the hospital,
19    was that the end of it, or did you need to get
20    approval through the chain of command at the
21    Department of Corrections for someone to be
22    transported?
23 A  It needed approval, but usually they don't
24    question when you send somebody. It was never
25    denied if somebody was to be sent to the

Page 136

1     emergency room or the hospital.
2  Q  But you still had -- even if Dr. Meloche ordered
3     it.....
4  A  Yes.
5  Q  .....you still had to go to someone else and get
6     approval, and that would be the medical staff up
7     in Anchorage at the Department of Corrections?
8  A  Yes.
9  Q  And there also would be occasions when Dr.
10    Meloche would be not available, right?
11 A  Correct.
12 Q  Or either couldn't come out because he was
13    working at the ER, that sort of thing?
14 A  Correct.
15 Q  And when he was not available who would you
16    consult for medical care?
17 A  The on-call staff with the Department of
18    Corrections in Anchorage, if it's not a weekday,
19    otherwise just call Anchorage on a weekday and
20    get an approval.
21 Q  So somebody other than Dr. Meloche would always
22    be available at the Department of Corrections
23    for you to consult with, with respect to medical
24    issues if you needed a medical consultation?
25 A  Correct.

Page 137

1  Q  All right. You were asked a number of questions
2     by Mr. Budge about Exhibit 1.
3  A  Yes.
4  Q  And these are notations that were not made by
5     you, correct?
6  A  Correct.
7  Q  You were not present when these notations were
8     made, were you?
9  A  No.
10 Q  And you have no first-hand knowledge regarding
11    them, do you?
12 A  No.
13 Q  Do you even have a recollection if you've ever
14    seen these notations before he showed them to
15    you?
16 A  No. This isn't part of my medical file.
17 Q  Mr. Budge asked you some questions about Exhibit
18    2.
19 A  Yes.
20 Q  He did not ask you any questions about page two
21    or page three of Exhibit 2. And I just wanted
22    to -- I guess he did ask you about that
23    withdrawal history. But I wanted to ask you
24    about page three. And you would have made these
25    notes on July 21 of 2004?

35 (Pages 134 to 137)

Page 138

1   A   Correct.
2   Q   Was there -- did you have any difficulty
3       communicating with Mr. Wallace on that day?
4   A   No.
5   Q   He could understand what you were saying?
6   A   Yes.
7   Q   And you could understand what he was saying?
8   A   Yes.
9   Q   He was oriented as to time and place?
10  A   Yes. And I did check on the cognitive oriented
11      times 3.
12  Q   Okay. And at that point, you would have gone
13      through all of the criteria set forth on page
14      three, for example, you would have checked his
15      appearance, his attitude, his motor behavior,
16      his speech, his mood, his effect, his cognitive
17      functioning, his thought process, his thought
18      content, and whether he was having any
19      hallucinations, correct?
20  A   Correct.
21  Q   And all of those were normal, is that correct?
22  A   That's correct.
23  Q   And you thought he was stable?
24  A   Yes.
25  Q   And after you did the screening that is depicted

Page 139

1       in Exhibit 2, particularly on page three, did
2       you see any need to call Dr. Meloche?
3   A   No.
4   Q   Did he have, other than the monitor for
5       withdrawal note that you made, did he have any
6       medical issues that you were aware of?
7   A   No he didn't.
8   Q   One of the things that Mr. Budge asked you about
9       is, if we look at Exhibit 3, he asked you about
10      -- these are the notes that you would have made,
11      correct?
12  A   Correct.
13  Q   The progress notes? About the sweating, hand
14      tremors, things of that nature, and asking you
15      if those were symptoms or signs of DT. He asked
16      you a whole series of questions about that?
17  A   Yes.
18  Q   Are those also symptoms or signs of someone who
19      is just going through alcohol withdrawal?
20  A   Yes. And I just want to really put emphasis on
21      when I say DT, I'm referring to alcohol
22      withdrawal.
23  Q   All right. So it was not your impression that
24      he was actually in a state of DT at this time?
25  A   That's correct.

Page 140

1   Q   This is as of 7/22/04?
2   A   That's correct.
3   Q   All right. And you chart here, your telephone
4       call with Dr. Meloche?
5   A   Yes sir.
6   Q   And do you today have an independent
7       recollection of any part of that telephone call?
8   A   You know, I really cannot recall exactly what
9       transpired in that conversation.
10  Q   Uh-huh (Affirmative).
11  A   But, you know, I wrote to initiate DT protocol
12      and.....
13  Q   Uh-huh (Affirmative).
14  A   .....and I guess that's what was said.
15  Q   But if we -- if we separate out -- if we take
16      away your progress notes.....
17  A   Uh-huh (Affirmative).
18  Q   .....could you here today, are you able to
19      recall any part of the call independently?
20  A   I'm sorry, I can't.
21  Q   Okay. That's fine. And you have documented
22      that -- a telephonic order to initiate the
23      protocol, correct?
24  A   Yes sir.
25  Q   And you did that to the best of your ability?

Page 141

1   A   I did that.
2   Q   And if we look at your entry of 7/23/04 you
3       would have seen -- well, if we back up, you
4       would have called the evening of 7/22/04 to see
5       if he got his medication?
6   A   Correct.
7   Q   And would you have expected the correctional
8       officers to tell you if there was anything
9       unusual going on with him?
10  A   The -- yes.
11  Q   He was in a monitored cell, correct?
12  A   All those cells are all monitored cells.
13  Q   And that means that he is under constant
14      visualization? In other words, someone can
15      observe his activities at any point in time?
16  A   Yes, through a camera monitor in control.
17  Q   And it's someone's job to do that?
18  A   Yes.
19  Q   If he were at the hospital, would he be under
20      that kind of -- of observation?
21  A   I haven't worked in the hospital for years, but
22      I don't know if they have a camera in each of
23      those rooms.
24  Q   So he was in a monitored cell, correct?
25  A   A camera cell.

Page 142

1   Q   A camera cell. If they had -- if the
2       correctional officers on the evening of 7/22/04
3       had reported any unusual behavior on his part,
4       would you have noted that in your progress notes
5       just as a matter of process the next morning?
6   A   Most likely so.
7   Q   And did you note any such report?
8   A   No. You know, just hallucinations.
9   Q   Uh-huh (Affirmative). So the next morning you
10      saw him at -- did you see him first thing in the
11      morning, basically, when you came in?
12  A   Yes. Because he was being transferred to
13      another room so he could eat breakfast.
14  Q   And you did an examination of him at what,
15      according to your chart, is approximately 0930
16      hours?
17  A   That's what I have written here.
18  Q   All right. And you noted that he was
19      diaphoretic, so he had some sweating, correct?
20  A   Correct.
21  Q   Is that typical of individuals going through
22      withdrawals in your experience?
23  A   With my experience, they all go through the
24      sweaty, yes.
25  Q   He continued to hallucinate, you noted that.

Page 143

1   A   Yes.
2   Q   And you indicate that he continued to be
3       cooperative.
4   A   Yes.
5   Q   And was he able to interact with you?
6   A   Yes, he -- I mean, I recall giving him a glass
7       of water and he took the glass of water and --
8       without any problems. He was very cooperative
9       with me.
10  Q   Was he oriented as to time and place?
11  A   He knew he was in jail. Some conversations that
12      we had, I can't recall exactly.
13  Q   If he had not been oriented to time and place,
14      would you have noted that as a matter of your
15      standard record keeping practice?
16  A   Yes -- yes.
17  Q   And at that point in time, was he eating and
18      drinking?
19  A   Oh, yes. That was -- that's one of the things
20      that I always put a lot of emphasis in is
21      hydrating them and making sure they eat because
22      sometimes they're not able to eat then which
23      creates more problems.
24  Q   If -- if we look at his vital signs, his blood
25      pressure was 115 over 86, as you recorded.

Page 144

1   A   Yes.
2   Q   And this is at 9:30 on July 23rd, '04?
3   A   Yes.
4   Q   And was that normal in your opinion?
5   A   Yes.
6   Q   And his pulse was 80 and regular?
7   A   Yes.
8   Q   And was that normal in your opinion?
9   A   Yes.
10  Q   His respiration was 20 and easy, again, was that
11      normal in your opinion?
12  A   Yes.
13  Q   And then you indicated that -- and noted here
14      that he -- you have some -- he talked about just
15      getting a job.
16  A   Yes.
17  Q   What was -- from your perspective as a
18      registered nurse who has worked with people who
19      have gone through withdrawal before, what was
20      your impression of how he was responding to
21      protocol at that point in time?
22  A   I based it on the vital signs, the blood
23      pressure, the pulse and the respiration, which
24      is remarkable compared to what I had taken from
25      the day before. So in my nursing judgment, I

Page 145

1       thought he was getting better.
2   Q   Uh-huh (Affirmative). Did you see a need at
3       that point to consult with Dr. Meloche or any
4       other medical specialist regarding Mr. Wallace?
5   A   No, because my basis for not calling Dr. Meloche
6       was the vital signs.
7   Q   And you thought he was improving?
8   A   Yes.
9   Q   It indicates in your progress notes that you
10      checked on him at 1410 hours?
11  A   Yes.
12  Q   And did you see any change that you were able to
13      observe in his condition at that point in time,
14      based on what you had seen before?
15  A   No, he continued to hallucinate and that
16      was.....
17  Q   Uh-huh (Affirmative). If you had had any
18      concerns or a suspicion of a concern that maybe
19      he wasn't responding to the protocol or maybe he
20      was going downhill or there was any question in
21      your mind, what would you have done?
22  A   I would call Dr. Meloche.
23  Q   I think you testified that you called the jail
24      that night?
25  A   Yes.

37 (Pages 142 to 145)

Exhibit A
page 7 of 8

Linda Monticello

Page 146

```
1   Q   And that would have been a Friday night?
2   A   Yes.
3   Q   At about 9:00 to 9:30?
4   A   About that time.
5   Q   All right.  And at that point in time, was
6       anything said about any kind of unusual behavior
7       on his part at all?
8   A   I -- I don't recall.  And, you know, my purpose
9       of that, basically, was to be sure that he got
10      his meds and then told them make sure, you know,
11      make sure he's drinking, how's he doing.....
12  Q   Uh-huh (Affirmative).
13  A   .....and what they told me, you know, I can't
14      remember exactly what it was, but it wasn't
15      something alarming for me to make a decision to
16      come in or to call Dr. Meloche.
17  Q   All right.  If they had reported something to
18      you that caused you any concern at all, what
19      would you have done?
20  A   I would come in and evaluate.
21  Q   And if they had reported anything to you that
22      was unusual, would you have noted it in your
23      progress notes some time the next morning, given
24      what transpired within a few hours?
25  A   What I would most likely do is I would put an
```

Page 147

```
1       entry, evaluate for officer's concern, da, da,
2       da, da, da, da.
3   Q   That's all the questions I have, thank you very
4       much.
5   A   Okay.  Thank you.
6              LINDA MONTECILLO
7       testified as follows on:
8              REDIRECT EXAMINATION
9   BY MR. BUDGE:
10  Q   A few follow up questions.
11  A   Okay.
12  Q   If you look at exhibit number two please.  On
13      the second page there's a -- under number nine
14      there, there's an entry for is the remand
15      intoxicated or withdrawing from alcohol or other
16      substances.
17  A   Uh-huh (Affirmative).
18  Q   And then there's a box, you're supposed to check
19      yes or no.  Why is it blank?
20  A   You know, I wish I could tell you.  I didn't
21      check it.  Why I didn't check it, I don't know
22      why.
23  Q   Think of any potential explanation?  Potential
24      explanation, maybe you.....
25  A   I forgot.
```

Page 148

```
1   Q   ....forgot that -- what?
2   A   Maybe I just forgot, you know.
3   Q   Could you look at exhibit number three please?
4       The third line down under your entry for 7/21/04
5       at 1350 hours, you indicate that you noticed
6       fine hand tremor.
7   A   Uh-huh (Affirmative).
8   Q   Do you see that?
9   A   Yes.
10  Q   Now go to exhibit number two, on the second
11      page, under motor behavior.
12  A   Uh-huh (Affirmative).
13  Q   There's a box you can check if the tremulous,
14      but you didn't check the tremulous box, you
15      checked the normal box.  Why is that?
16  A   I don't know.
17  Q   Looking back on it now, do you think that the --
18      in light of your notes in exhibit number three,
19      that the tremulous box.....
20  A   Uh-huh (Affirmative).
21  Q   .....should have been checked?
22      MR. LESSMEIER:  Objection, form, foundation.
23  A   You know, when I see tremors, I'm thinking,
24      basically, really, really shaky.  I mean,
25      obviously I also checked that he was able to --
```

Page 149

```
1       let me see here.  That he walked on his own.  I
2       mean I don't see anything in here.....
3   Q   No.
4   A   .....that tells me that he, you know -- I mean,
5       tremulous is something that is obvious for me,
6       you know?  When I say fine hand tremors and part
7       of my routine assessment for people that are
8       going through alcohol withdrawal is I make their
9       hands go this way, and if they're doing this, so
10      I say that their hand tremors.  This -- you
11      know, that part I have never really checked, to
12      my knowledge.  I don't think I -- I do that --
13      pay too much attention to that box.
14  Q   How do you know that Mr. Wallace was eating?
15  A   I beg your pardon?
16  Q   How do you know that Mr. Wallace was eating?
17  A   Mr. Meloche?
18  Q   Mr. Wallace.
19  A   Oh, Mr. Wallace, trays are being served,
20      officers are there, he gets a tray all the time.
21      I just assumed that he's eating, otherwise
22      officers would tell me, hey, you know, this
23      person isn't eating or drinking and there was --
24      I don't recall any conversation of that.
25  Q   Did you look at the -- at the log entries that
```

38 (Pages 146 to 149)