UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

JULIA WALKER, individually )
and as Personal Representative)
of the ESTATE OF TROY WALLACE )
)
)
    Plaintiffs,   )
)
    vs.   )
)
)
DAVID D. HENDERSON, LAURI A.  )
MURRAY, WALTER T. RUD, SHERRI )
L. DAVIS, EDWIN D. IRIZARRY,  )
LINDA MONTICELLO AND ERNEST   )
MELOCHE, M.D.,   )
)
    Defendants,   )No.  A05-0176 CV (RRB)
                  )

DEPOSITION ON ORAL EXAMINATION

OF

ERNEST B. MELOCHE, M.D.

8:59 a.m.
December 8, 2006
SEAK Professional Services
2415 Hemlock Street, Suite 104
Ketchikan, Alaska 99901

Exhibit B
page 1 of 4

Page 14

```
 1     can.
 2  A  Do you have a copy of it there?
 3  Q  No, I don't.
 4  A  Protocol uses a drug called Tranxene, it
 5     initiates a primary dose of Tranxene and then
 6     monitors the blood pressure and pulse and
 7     temperature and response with each dose of
 8     Tranxene, skipping every 12 hours, and there are
 9     instructions to make sure that the patient is
10     eating and drinking with fluids I believe. And
11     then the dose is changed based upon, you know,
12     decreased based upon the patient's response to
13     therapy at 24 hours, each 24 hours there's a --
14     there's a consideration for alteration of
15     dosage. There's instructions to give Thiamine
16     intramuscular often or I believe the
17     intramuscular is the route that we've used and
18     there's instructions to give multi-vitamins and
19     that the patient's to be placed under some
20     degree of direct observation by the correctional
21     officers who are instructed to notify the
22     medical personnel if there's any problems with
23     the patient taking their medications or any
24     change in the patient condition.
25  Q  What dosages of Tranxene does the protocol call
```

Page 15

```
 1     for?
 2  A  It starts with 30 milligrams and then reduces it
 3     to 15 and then reduces it I think it's 15 twice
 4     a day and then down below that as -- as needed
 5     over a period of time.
 6  Q  Do you believe that the protocol calls for an
 7     adjustment of the amount of Tranxene depending
 8     on how the patient responds?
 9  A  The essence of the protocol the way I understand
10     it to be and the way I've used it and the way
11     it's being used is that the medications are
12     administered and then the patient is followed to
13     see if they respond to the protocol and the
14     things that are monitored is blood pressure, the
15     pulse, and the patient condition whether they're
16     able to continue participating or whether they
17     deteriorate into an ability to communicate or
18     lose orientation. And if any of those
19     conditions apply, then the medical team is
20     notified and I get notified and we decide what
21     to do at that point in time.
22  Q  And do you believe that that is all contained
23     within the written protocol?
24  A  It is the standard practice that we've used at
25     the -- at the jail and when Linda and I apply
```

Page 16

```
 1     this protocol that's how we apply it and --
 2     that's how we apply it.
 3  Q  Okay. Is it contained within the written
 4     protocol?
 5     (Pause)
 6  A  I'm not certain.
 7  Q  Does the written protocol call for medication
 8     that is Tranxene to be administered according to
 9     a set schedule or does the written protocol
10     provide for the healthcare practitioner to
11     adjust the schedule of medication according to
12     how the individual responds?
13  A  The protocol as written is a fixed dosage and --
14     and the way we have applied the protocol and it
15     was my full expectation that the essence of the
16     protocol was that Nurse Monticello and the
17     correctional officers would be observing the
18     patient and if the patient for any reason as was
19     stated in my telephone call with her does not
20     respond to the protocol they were to notify me
21     and then we'd adjust the dosage. And so when I
22     have informed the medical -- the medical team at
23     the jail, which in this case was Nurse
24     Monticello, that we were going to apply the
25     protocol to a specific patient it was my
```

Page 17

```
 1     absolute expectation that that protocol would be
 2     applied and that any failure to respond to the
 3     protocol which was observed by people who had
 4     been taking care of patients in this setting for
 5     many years would be brought to my attention,
 6     they would call me and that we would make any
 7     modifications in therapy that were necessary.
 8     And it actually has been my practice that any
 9     time I get a second telephone call from the jail
10     I just go out there right away I -- if I'm -- if
11     I'm free.
12  Q  What is the specific schedule of medication
13     called for by the written protocol in terms of
14     dosages, how it is to be administered, and how
15     frequently it's to be administered?
16     MR. LESSMEIER: Objection. Form.
17  A  It starts with 30 milligrams and then 15
18     milligrams thereafter.
19  Q  How soon thereafter?
20  A  I believe the next dose -- I've forgotten.
21  Q  Okay.
22  A  I'm sorry, the stress of this event and how I've
23     -- I've reviewed this protocol and would it be
24     possible -- I -- I -- I'm sorry, I have to just
25     state that it's the protocol that has been in
```

5 (Pages 14 to 17)

Exhibit B
page 2 of 4

**Page 78**

1  many people who have gone through alcohol
2  withdrawal and their responsibilities are -- are
3  when patients are placed on protocols for
4  medications and for -- for -- for observation
5  are as part of a team that assists Nurse
6  Monticello and myself in caring for patients and
7  it's fully expected that they would -- and I
8  expected -- and with years of experience of
9  working with these people that they were able to
10 assess and -- and determine the -- the nature of
11 the patients or other inmates that were in the
12 system. And -- and they were just -- it worked
13 for many years.
14 Q  Specifically what experience does Walter Rud
15    have?
16 A  I don't know.
17 Q  Okay. Do you know if he has any experience
18    dealing with individuals who are suffering from
19    alcohol withdrawal?
20 A  I don't.
21 Q  Do you know if Sherri Davis has any experience
22    dealing with individuals who are suffering from
23    alcohol withdrawal?
24 A  I don't.
25 Q  Do you know if Ed Irizarry has any experience

**Page 79**

1     dealing with individuals who are suffering from
2     alcohol withdrawal?
3  A  I don't know.
4  Q  Do you know if Alan Bailey has any experience
5     dealing with individuals who are suffering from
6     alcohol withdrawal?
7  A  I don't know specifics about any of these
8     people. I do know that -- that many if not all
9     of them have been working at the jail for a long
10    period of time and that is -- that managing
11    patients with different types of alcohol and
12    drug related problems as part of their daily
13    operations. It's what they do.
14 Q  Do you believe that these people have training
15    dealing with individuals who are suffering from
16    alcohol withdrawal?
17    MR. LESSMEIER: The question was experience,
18 Counsel.
19 A  You said (indiscernible) didn't you? You said
20    experience, I'm sorry.
21    MR. BUDGE: Perhaps I did. If I did, I
22 apologize. Now that I look at my notes you might be
23 right.
24 Q  So you believe that Alan Bailey has experience
25    dealing with individuals who are suffering from

**Page 80**

1     alcohol withdrawal?
2  A  In -- in -- in each.....
3  Q  Do you know, that's my question. I don't mean
4     to interrupt. Go ahead.
5  A  In the 10 years that I worked at the Ketchikan
6     Correctional Center, we are not atypical and
7     approximately somewheres between 15 and 30
8     percent of the individuals that are
9     incarcerated, if not more, are involved with
10    some degree of alcohol and drug withdrawal and -
11    - and it involves some degree of substance abuse
12    and some layering of that and all of the staff
13    that you're talking about are people who are
14    experienced in this and they're -- that was my
15    understanding and belief.
16    MR. LESSMEIER: We've been going for about two
17 hours. Can we take a break for 10 or 15 minutes?
18    MR. BUDGE: Sure. Absolutely.
19    THE REPORTER: Off record.
20    (Off record)
21    THE REPORTER: We're on record.
22 Q  Do you know anything specific about the medical
23    training and experience for any of the following
24    individuals: James Campbell?
25 A  Nothing specific.

**Page 81**

1  Q  Patrick Casson?
2  A  Nothing specific.
3  Q  Holly Cloudy?
4  A  Nothing specific.
5  Q  Kenneth Comstock?
6  A  Nothing specific.
7  Q  Audie Ellis?
8  A  Nothing specific.
9  Q  David Gregory?
10 A  Nothing specific.
11 Q  Anthony Haan?
12 A  Nothing specific.
13 Q  Walter Hedley?
14 A  No.
15 Q  Edward Hendricks?
16 A  No.
17 Q  Darrell Halderman?
18 A  No.
19 Q  Jason Kern?
20 A  No.
21 Q  Brian Miller?
22 A  No.
23 Q  Kevin Morly?
24 A  No.
25 Q  Michael Ross?

21 (Pages 78 to 81)

Exhibit B
page 3 of 4

SEAK Professional Services, LLC
2415 Hemlock Street, Suite 104, Ketchikan, Alaska 99901

5b277d78-a4c4-475e-84ac-b07ed8574d8d

Page 150

1 the instruction not to answer?
2     MR. LESSMEIER: Yeah.
3  A  And I wouldn't be able to answer because of
4     medical confidentiality. I'm sorry.
5  Q  That's all right.
6  A  Regardless of what he told me I wouldn't do it.
7  Q  All right. Have you understood all my questions
8     today except for the ones that you asked me to
9     clarify which I've been hopefully clarifying?
10 A  I've understood the English involved and at
11    times I've had a hard time figuring exactly what
12    the answers were supposed to be but I -- I
13    believe I understood enough to give the best
14    answers I could.
15 Q  Do you want to add to or change any of your
16    testimony?
17 A  Not at this time.
18 Q  Okay.
19 A  Just the -- the only thing -- well.....
20 Q  We can have a discussion off the record if you
21    want. But my question is do you want to add to
22    or change any of the testimony that you've given
23    today?
24 A  Can I ask you a question?
25    MR. LESSMEIER: No. If you want to say

Page 151

1  something go ahead and feel free to in response to
2  the question.
3  A  Yes, I -- I because there -- I don't know, I
4     can't remember how I answered the question but
5     there's a question about the protocol as to
6     whether I understood the protocol at the time I
7     -- I answered Linda's question and at the time I
8     was and even now I'm so tense that -- that if it
9     were a written exam I'd have a hard time
10    actually writing everything down. But I -- I
11    was aware of the protocol and how Linda
12    administered it and at the time that I -- that I
13    told her to do so and I had reviewed protocols
14    and we had gone over things like that before so
15    at the time that I asked her to administer the
16    protocol I was aware of its content and dosing.
17    The thing that I was unclear about in my memory
18    today was exactly when it switched from six to
19    eight and eight to 12 hours in -- in the timing
20    today and at the time I -- I was -- I -- I knew
21    what the protocol was and I believe I
22    administered it in an appropriate setting.
23    MR. BUDGE: That's all I have.
24    MR. LESSMEIER: Don't forget Mark Thistle's ??
25 exhibit 2, the deposition, and I don't have an extra

Page 152

1  copy.
2     MR. BUDGE: Can we make a copy of the copy
3  machine so I can have one to look at while we're
4  asking questions?
5     THE REPORTER: Let me walk to the back and make
6  a copy, it's quicker.
7     (Off record)
8        ERNEST B. MELOCHE M.D.
9  testified as follows on:
10        CROSS EXAMINATION
11 BY MR. LESSMEIER:
12 Q  Doctor Meloche, I've shown you what we're going
13    to mark as exhibit 2 to this deposition which is
14    entitled Alaska DOC Medical Guideline Alcohol
15    Withdrawal, is that the protocol that you
16    expected Mr. Wallace to be placed on?
17 A  Yes, it was.
18 Q  Is that the protocol that had been in use during
19    the time that you provided medical consultation
20    to Ketchikan Correctional Center?
21 A  Yes, it was.
22 Q  And one of the things I want to point out to
23    you, this protocol at the bottom talks about
24    clorazepate 15 milligrams one dose PRN on day
25    one and two in addition to doses prescribed

Page 153

1     above.
2  A  Yes.
3  Q  Were you familiar with that?
4  A  I had not been aware of that line in the
5     protocol because any time Linda administered an
6     additional dose she would call me.
7  Q  Okay.
8  A  And so I was not really aware that that line was
9     there. I believe that this is actually that
10    she's used these for documentation so.
11 Q  All right.
12 A  But that line was clearly part of the protocol
13    and it was part of Linda's practice as well but
14    any time she would give an additional medication
15    she would call me.
16 Q  And this protocol indicates that the vital signs
17    are to be repeated with each medication
18    administration?
19 A  Absolutely.
20 Q  And was it your expectation that that would
21    happen?
22 A  Yes.
23 Q  Was it your expectation that Linda Monticello
24    would relate to you fully and completely her
25    assessment of the patient, including the

39 (Pages 150 to 153)

Exhibit B
Page 4 of 4

SEAK Professional Services, LLC
2415 Hemlock Street, Suite 104, Ketchikan, Alaska 99901

5b277d78-a4c4-475e-84ac-b07ed8574d8d