UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | |
|---|---|
| JULIA WALKER, individually and as Personal Representative of the ESTATE OF TROY WALLACE,<br><br>                Plaintiffs,<br><br>        vs.<br><br>DAVID D. HENDERSON; LAURI A. MURRAY; WALTER D. RUD; SHERRI L. DAVIS; EDWIN D. IRIZARRY; LINDA MONTECILLO; and ERNEST MELOCHE, M.D.,<br><br>               Defendants. | Case No. 3:05-cv-00176-RRB<br><br><br>**MEMORANDUM DECISION AND ORDER RE DOCKET 58** |

## I.  MOTION PRESENTED

At Docket 58, Defendant Ernest Meloche, M.D. ("Dr. Meloche") has moved for partial summary judgment in his favor on the civil rights (42 U.S.C. § 1983) claim.  At Docket 66, Plaintiff Julia Walker ("Ms. Walker") opposed the motion, and at Docket 76, Dr. Melouche replied.  Neither party has timely requested oral argument and, after reviewing the moving and opposing papers, the Court has determined that oral argument would not assist in deciding the motion.

## II.  BACKGROUND/FACTS/JURISDICTION

This case arises out of the death of Troy Wallace while incarcerated as an inmate at the Ketchikan Correctional Facility, Ketchikan, Alaska.  The action was brought against various Defendants employed by the State of Alaska at the Ketchikan Correctional Facility, including Dr. Meloche,[1] by Ms. Walker, the mother of the decedent in her capacity as an individual and as representative of the estate of the decedent.  Dr. Meloche is employed full-time as an emergency room physician at Ketchikan General Hospital and part-time as a contract physician for the State of Alaska at the Ketchikan Correctional Facility.[2]  Germane to the motion at bar, the Amended Complaint alleges three claims: (1) a claim under 42 U.S.C. § 1983 by the decedent's estate for inflicting cruel and unusual punishment on the decedent, in violation of the Eighth Amendment to the United States Constitution, and by Ms. Walker in her individual capacity for her loss of the Fourteenth Amendment protected interest in the society and companionship of her son; (2) a wrongful death claim under state (Alaska) law; and (3) a medical malpractice claim under state (Alaska) law.[3]

---

[1] At Docket 50, the case was dismissed as to all Defendants, except Dr. Meloche, upon the stipulation of the parties.

[2] Motion for Partial Summary Judgment on 42 USC Sec. 1983 Claims (hereinafter "Motion"), Exh. C, "Affidavit of Ernest Meloche," ¶¶ 3, 4 (Docket 58-4 at 1-2)

[3] Amended Complaint (Docket 24).

The underlying facts in the case are for the most part undisputed, and the events preceding the decedent's death germane to the involvement of Dr. Meloche are set forth in chronological order.

July 20, 2004:   Mr. Wallace, a 31-year old male, committed himself to the Ketchikan Correctional Center to serve a 10-day jail sentence.

July 21, 2004 :   Mr. Wallace was given a Pre-Remand Screening and a Post-Remand Screening by Linda Monticillo, a registered nurse employed by the Ketchikan Correctional Center.[4] As a result of this screening, in her opinion, Mr. Wallace's appearance, speech, thought process, mood, attitude, and motor behavior were all normal and his condition was stable.[5]  His blood pressure was 132/96, pulse rate 87, temperature 98.2°, and his breathing rate was 20 and easy (he was not gasping ).  [6] Ms. Monticillo's notes do not indicate that Mr. Wallace's breathing was abnormal or that Mr. Wallace had any obvious medical or mental

---

[4] Motion, Exh. A, "Criminal Remand Screening" (Docket 58-2). Ms. Monticillo received a bachelor's degree in nursing in 1982 and worked at the Ketchikan General Hospital until she went to work for the Ketchikan Correctional Center in December 1991. Motion, Exh. G, Deposition of Linda Monticillo, 7:21–9:4 (Docket 58-8 at 2).  At various points in the record Ms. Monticillo's name is spelled Montecillo.  For internal consistency, except where her name appears in quoted materials as "Montecillo," the Court will use the spelling "Monticillo."

[5] Montecillo Deposition, 138:2 – 138:24 (Docket 58-8 at 13); Criminal Remand Screening, pp. 2, 3 (Docket 58-2 at 2, 3).

[6] Criminal Remand Screening, p. 2 (Docket 58-2 at 2);  Motion, Exh. B, "Progress Notes," p. 1 (Docket 58-3 at 1); Montecillo Deposition, 64:22–65:8 (Docket 58-8 at 3).

problems that require medical attention.[7]  Ms. Montecillo did note
that Mr. Wallace had a history of alcohol withdrawal and should be
observed for "DT."[8]  She concluded that at that time, Mr. Wallace
had no medical issues that warranted calling Dr. Meloche.[9]

July 22, 2004:  At 2:00 p.m., Ms. Monticillo evaluated
Mr. Wallace for alcohol withdrawal.[10]  At that time he was very
sweaty, had hand tremors, voicing that things were moving on top of
the counter, and talking without sense.[11]  Mr. Wallace's blood
pressure was 160/104, he had a pulse of 137, which Ms. Monticillo
described as high and symptomatic of DTs, and a respiration rate of
20/easy, which she described as normal.[12]  She offered water to
him, which he drank.[13]  In Ms. Monticello's opinion, other than
seeing things that she did not, he did not appear mentally confused
and was able to answer her questions in a rational way.[14]  She did
not think he was in *delirium tremens*.[15]

---

[7] Criminal Remand Screening, p. 1 (Docket 58-2 at 1).

[8] *Id.*, p. 2 (Docket 58-2 at 2).  Ms. Monticillo explained that
when she referred to "DT" she was referring to alcohol withdrawal.
Monticillo Deposition, 139:18–22 (Docket 58-8 at 13).

[9] Montecillo Deposition, 138:25–139:3 (Docket 58-8 at 13).

[10] Progress Notes, p. 1 (Docket 58-3 at 1).

[11] Progress Notes, p. 1 (Docket 58-3 at 1); Monticello
Deposition, 74:19–75:2 (Docket 58-8 at 4).

[12] Progress Notes, p. 1 (Docket 58-3 at 1); Monticello
Deposition, 74:4–16 (Docket 58-8 at 4).

[13] Progress Notes, p. 1 (Docket 58-3 at 1).

[14] Monticillo Deposition, 74:23–75:12 (Docket 58-8 at 4).

[15] Monticillo Deposition, 139:25–140:2 (Docket 58-8 at 13).

At 2:30 p.m., Ms. Monticillo called Dr. Meloche.[16] Although neither recall the substance of her telephone call,[17] Ms. Monticillo's practice was to read her progress note to Dr. Meloche, which is what both believe she did here.[18] This was the only communication Dr. Meloche received from Ms. Monticillo (or any other person) regarding Mr. Wallace before Mr. Wallace died.[19] Dr. Meloche instructed Ms. Monticillo to initiate the standard State of Alaska, Department of Corrections, Alcohol Withdrawal Protocol,[20] which she did.[21]

July 24, 2004: Mr. Wallace died shortly after 1:00 a.m.[22]

This Court has original jurisdiction over the civil rights claims under 28 U.S.C. § 1331 and supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a).

---

[16] Progress Notes, p. 1 (Docket 58-3 at 1).

[17] Monticillo Deposition, 140:3-20 (Docket 58-8 at 13); Declaration of Edwin S. Budge, Exh. B, Deposition of Ernest B. Meloche, 10:16-22 (Docket 69-2 at 4).

[18] Monticillo Deposition, 76:13-22 (Docket 58-8 at 4), 104:10-20 (Docket 58-8 at 9); Meloche Affidavit, ¶ 8 (Docket 58-4 at 2-3).

[19] Monticillo Deposition, 103:14-104:6 (Docket 58-8 at 9); Meloche Affidavit, ¶ 15 (Docket 58-4 at 5).

[20] Progress Notes, p. 1 (Docket 58-2 at 1); Meloche Affidavit, ¶ 12 (Docket 58-4 at 4); Monticillo Deposition, 82:5-83:11 (Docket 58-8 at 5).

[21] Progress Notes, p. 1(Docket 58-2 at 1); Monticillo Deposition, 84:22-86:2 (Docket 58-8 at 5-6), 93:16-21 (Docket 58-8 at 7); Motion, Exh. D "Alaska DOC Medical Guideline Alcohol Withdrawal" (Docket 58-5).

[22] Amended Complaint, ¶ 18 (Docket 24 at 6).

## III.   ISSUES PRESENTED

The Motion at bar presents two issues:

1.    Whether the treatment prescribed by Dr. Melouche was so deficient as to rise to the level of constituting deliberate indifference to the medical condition of the deceased (the civil rights claim under 42 U.S.C. § 1983); and

2.    Whether the estate's damages for wrongful death are limited under state (Alaska) law.

## IV.   STANDARD OF REVIEW

Summary judgment is appropriate if, when viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact, and the moving party is entitled to judgment in its favor as a matter of law. [23] "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he is ruling on a motion for summary judgment."[24]   In response to a properly supported motion for summary judgment, the opposing party must set forth specific facts showing that there is a genuine issue for trial.[25]   The issue of material fact required to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of

---

[23] FED. R. CIV. P. 56(c); *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir.200 0) (en banc); *Taylor v. List*, 880 F.2d 1040, 1044 (9th Cir. 1989).

[24] *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 255 (1986).

[25] FED. R. CIV. P. 56(e); *Henderson v. City of Simi Valley*, 305 F.3d 1052, 1055-56 (9th Cir.2 002).

the party asserting its existence; all that is required is that
sufficient evidence supporting the claimed factual dispute be shown
to require a fact-finder to resolve the parties' differing versions
of the truth at trial.  There is no genuine issue of fact if, on
the record taken as a whole, a rational trier of fact could not
find in favor of the party opposing the motion.[26]  Since all
reasonable inferences are drawn in favor of the non-moving party
and the moving party bears the burden of production and persuasion,
the moving party has the burden of showing there is no genuine
issue of material fact.[27]  However, the court may not draw
unreasonable inferences from the evidence.[28]

 A federal court exercising supplemental jurisdiction over
state-law claims applies the law of the forum state.[29]  When
interpreting state law, this Court is bound by the decisions of the
state's highest court.  In the absence of a decision by the highest
state court, this Court "must predict how the highest state court
would decide the issue using intermediate appellate court

---

[26]/ *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

[27]/ *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323 (1986).

[28]/ *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *McLaughlin v. Liu*, 849 F.2d 1205, 1207–1209 (9th Cir. 1988).

[29]/ *Paracor Fin., v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996).

decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." [30/]

## V.  DISCUSSION

The Supreme Court, holding that the infliction of unnecessary suffering on prisoners violated the Eighth Amendment, stated in *Estelle v. Gamble*:[31/]

> [D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

In *Estelle* the Supreme Court distinguished "deliberate indifference to serious medical needs of prisoners," from "negligen[ce] in diagnosing or treating a medical condition," holding that only the former violates the Constitution.[32/]   In short, Eighth Amendment liability requires "more than ordinary lack of due care for the prisoner's interests or safety."[33/]

---

[30/] *S.D. Myers, Inc. v. City and County of San Francisco*, 253 F.3d 461, 473 (9th Cir. 2001); *Paulman v. Gateway Ventures Partners III L.P.* (*In re Filtercorp, Inc* .), 163 F.3d 570, 578 (9th Cir. 1998).

[31/] 429 U.S. 97, 104-105 (1976) (footnotes, internal quotation marks, and citations omitted).

[32/] *Id.*, at 106.

[33/] *Whitley v. Albers,* 475 U.S. 312, 319 (1986).

Eighteen years after *Estelle*, in *Farmer v. Brennan*,[34/] the United States Supreme Court made clear the test for assessing culpability in the context of Eighth Amendment cruel and unusual punishment is subjective not objective. Under *Farmer*, liability lies only in those cases in which the defendant knows of and disregards an excessive risk to an inmates health or safety; the defendant must not only be aware of the facts from which inference could be drawn that a substantial risk of serious harm exists, but the defendant must also draw the inference.[35/]  In determining deliberate indifference, the court scrutinizes the particular facts and looks for substantial indifference in the individual case, indicating more than mere negligence or isolated occurrences of neglect.[36/]

At the time he was contacted by Ms. Monticillo, Dr. Meloche was working a 24-hour shift at the Ketchikan General Hospital Emergency Room.[37/]  In his affidavit, Dr. Meloche stated:[38/]

> 9. I remember that Mr. Wallace was a 31-year-old man in alcohol withdrawal with no other known adverse health conditions. He had a history of prior alcohol withdrawal. He did not have a fever. He was not vomiting. His blood pressure and pulse were elevated, but not markedly so. He was breathing without difficulty at a rate of 20 respirations per minute. He was sweating and had a tremor. He

---

[34/] 511 U.S. 825, 837 (1994).

[35/] *Id.*

[36/] *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990).

[37/] Meloche Affidavit, ¶ 6 (Docket 58-4 at 2).

[38/] *Id.*, ¶¶ 9-16 (Docket 58-4 at 3-6).

had some hallucinations and was at times talking without sense, but he was oriented to time and place. He was able to interact with Mrs. Montecillo, was able to drink fluids, take his medication and eat. He was able to participate in his own care.

10.    Based on my conversation with Mrs. Montecillo and my years of experience in treating patients undergoing withdrawal from alcohol, I believed it appropriate to place Mr. Wallace on the State of Alaska Department of Corrections Alcohol Withdrawal Protocol. This is a State of Alaska Department of Corrections protocol that was in use at the Ketchikan Correctional Center for the entire time of my employment there. This is a protocol that was approved for use by the State of Alaska Department of Corrections physicians. To my knowledge this protocol is the only such protocol approved for use at the Ketchikan Correctional Center during the time of my employment there.

11.    I had given orders for the use of this protocol for inmates at the Ketchikan Correctional Center many, many times during the 10-year period prior to July of 2004. I have used a similar treatment plan for outpatient treatment of alcohol withdrawal for virtually the entire time I have been practicing medicine. My practice in using the State of Alaska protocol was to implement the medication schedule called for in the protocol and to then adjust the dosage of medication based on how the inmate responds. In my experience, this protocol has been an extremely effective method of treating alcohol withdrawal. In each instance that I gave an order for the use of this protocol at the Ketchikan Correctional Center the protocol itself was implemented by the Ketchikan Correctional Center registered nurses and correctional officers. I fully expected the protocol to be applied as written unless I gave orders to alter it.

12.    Based on what I learned in my conversation with Mrs. Montecillo about Mr. Wallace and my experience in treating patients going through alcohol withdrawal, I

gave her a verbal order to institute the State of Alaska Department of Corrections Alcohol Withdrawal Protocol. I made this decision based on my judgment that Mr Wallace would do well on the protocol because he was young, had no other known adverse health conditions, had no fever, was not vomiting, was oriented to time and place and was able to take food, fluids and medication. I did not believe he was in a state of delirium tremens. I also knew he would be in a cell that was continuously monitored via a video monitor by correctional officers who had experience in monitoring individuals going through alcohol withdrawal and that Mrs. Montecillo would be at the Correctional Center for significant parts of each day to assess his condition. For those times when Mrs. Montecillo was not at the Correctional Center, I knew she was on call.

13. During my conversation with Mrs. Montecillo regarding Mr. Wallace, I asked her to call me if Mr. Wallace did not respond to the protocol or if his condition deteriorated. Mrs. Montecillo said she would do so and in my years of working with her I have found her to be extremely conscientious in providing such followup. I told her my intention would be to hold my weekly clinic at the Correctional Center on Saturday, 24 July 2004, and would see Mr. Wallace then, unless she called me earlier.

14. Based on the conversation I had with Mrs. Montecillo, I did not see the need to see Mr. Wallace earlier, nor did she indicate such a need. I did not see the need to treat him in an impatient setting at the hospital given the information I obtained from Mrs. Montecillo, nor did she indicate she believed there was such a need.

15. The conversation I had with Mrs. Montecillo on the afternoon of 22 July 2004 is the only contact I had relating to Mr. Wallace between the time he entered the Ketchikan Correctional Center and the time of his death, which occurred early on 24 July 2004. During this entire time, I was available by telephone and had there been an attempt to

contact me, would have been aware of that attempt and would have responded immediately.

16. Based on my experience and what I learned about Mr. Wallace from Mrs. Montecillo, I fully expected him to do well on this protocol and to go through alcohol withdrawal without any complications. I did not think there was any significant risk of serious harm to him. If he did not do well on the protocol or if his condition deteriorated I expected to be called, as I had requested. I was available for calls at all relevant times after the 22 July 2004 call from Mrs. Montecillo and my availability further reduced any risk of serious harm to Mr. Wallace. In addition, I knew Mr. Wallace was in a monitored setting under the observation of the correctional officers and under the supervision of Mrs. Montecillo. Because of this monitored setting and my experience at the Correctional Center in similar situations, I believed that in the unlikely event that Mr. Wallace did not respond well to the protocol or his condition deteriorated, I would be promptly notified of any such change and would have the opportunity to respond as I deemed necessary depending on the circumstances as they developed. I did not believe there was any meaningful risk that I would not be so notified. For all of these reasons I believed the risk of serious harm to Mr. Wallace under the treatment plan I instituted to be minimal.

Dr. Meloche also offers the affidavit of Dr. James Thompson, a physician who practices emergency medicine at the Bartlett Regional Hospital in Juneau, and for 20 years the contract physician at the Lemon Creek Correctional Center, also operated by the Alaska Department of Corrections.[39]  Dr. Thompson reviewed the deposition of Ms. Monticillo, the Criminal Remand Screening,

---

[39] Motion, Exh. E, "Affidavit of Dr. James Thompson," ¶ 1 (Docket 58-6 at 1).

Progress Notes, Dr. Meloche's affidavit, and is familiar with the Department of Corrections Alcohol Withdrawal Protocol. [40] Dr. Thompson, like Dr. Meloche, has used the protocol extensively over the years with the "vast majority of alcohol withdrawal patients do[ing] well when managed with the Department of Corrections withdrawal protocol as written, without additional intervention." [41] It did not appear to Dr. Thompson, based upon his review of the information he was furnished, that Mr. Wallace was in *delirium tremens* at the time Dr. Meloche was called. [42] Moreover, in Dr. Thompson's opinion, it was reasonable and within the standard of care to implement the alcohol withdrawal protocol and rely on the nurse and correctional staff to observe Mr. Wallace and report if he did not respond to the treatment or his condition deteriorated. [43]

Dr. Meloche further offered the affidavit of Dr. Elliott Nipomnick, a board certified emergency medicine practitioner with 10 years experience as a medical director at a county correctional center in California. [44] Dr. Nipomnick reviewed the same information as Dr. Thompson [45] and, based upon that review,

---

[40] *Id.*, ¶ 2 (Docket 58-6 at 1–2).

[41] *Id.*, ¶ 6 (Docket 58-6 at 2).

[42] *Id.*, ¶ 3 (Docket 58-6 at 2).

[43] *Id.*, ¶¶ 3, 4 (Docket 58-6 at 2).

[44] Motion, Exh. F, "Affidavit of Dr. Elliott Nipomnick," ¶ 1 (Docket 58-7 at 1).

[45] *Id.*, ¶ 2 (Docket 58-7 at 1–2).

concurred with Dr. Thompson's opinion that it was reasonable and within the standard of care to implement the alcohol withdrawal protocol and rely on the nurse and correctional staff to observe Mr. Wallace and report if he did not respond to the treatment or his condition deteriorated.[46/]  In addition, Dr. Nipomnick opined:[47/]

> I have placed many inmates on similar protocols over the years and followed them through the course of their withdrawal. In my experience, the vast majority do well, with little or no alteration of the medication regimen. I too would have expected Mr. Wallace to do well on this alcohol withdrawal protocol for the reasons stated in paragraph 3 above. In fact, Mr. Wallace initially did improve in response to this protocol and I would have expected that improvement to continue. At the very least, I would have been expected to be notified if it did not. I would not have thought there was any significant risk of serious harm to Mr. Wallace given his age, health, the alcohol protocol he was placed on and the monitored setting he was in.

To counter this, Ms. Walker offers the opinion of Dr. Richard O. Cummins, MD, MPH, MSc, a Professor of Medicine at the University of Washington.[48/]  In Dr. Cummins' opinion, at the time Mr. Wallace committed himself to the Ketchikan Correctional

---

[46/]  *Id.*, ¶¶ 3–5 (Docket 58-7 at 2).

[47/]  *Id.*, ¶ 6 (Docket 58-7 at 2).

[48/]  Declaration of Richard O. Cummins, "Cummins Report" (Docket 68).  The qualifications of Dr. Cummins are not challenged and the Court's review of his *curriculum vitae* leaves no doubt he is eminently qualified to testify as an expert in the field of the appropriate standard of care in this case.  However, as Plaintiff candidly acknowledges, Dr. Cummins is not qualified to testify as to the standard of deliberate indifference.

Facility, he was in the initial stages of alcohol withdrawal.[49/]  On the following day, July 21, Mr. Wallace's symptoms indicated he was in Stage I of the alcohol withdrawal syndrome.[50/]  On the afternoon of July 22, when Ms. Monticillo called Dr. Meloche and reported her observations, in the opinion of Dr. Cummins, Mr. Wallace was "in Stage III of alcohol withdrawal, and he was experiencing a serious complication of the alcohol withdrawal syndrome, *delirium tremens* ("DTs")."[51/] At this point, in the opinion of Dr. Cummins:[52/]

> As of July 22nd at the latest, Mr. Wallace's condition required transfer to an in-patient treatment facility. He required parenteral (IV or IM) medications to control his serious signs and symptoms, as well as rehydration, and nutritional supplementation. He also needed diagnostic evaluation to establish the full severity of his withdrawal, as well as to identify significant co-morbidities (such as pneumonia, pancreatitis, gastritis) that often accompany alcohol withdrawal. The standard of care for Mr. Wallace at this time was in-patient treatment. With such treatment, Mr. Wallace would have been very unlikely to die. His risk of death had he received standard of care in-patient treatment would have been 1% or less. Left without such standard of care treatment at this point Mr. Wallace was at risk for the high level of mortality (up to 30-40%) observed for the *delirium tremens* syndrome prior to the development of benzodiazepines and other effective medications.

---

[49/] Cummins Report, pp. 4-5 (Docket 68 at 6-7).

[50/] *Id.*, p. 5 (Docket 68 at 7).

[51/] *Id.*

[52/] *Id.*

In Dr. Cummins' medical opinion:[53]

>    Mr. Wallace was already well into the more
>    advanced stages of alcohol withdrawal by the
>    afternoon of July 22,2004 when Dr. Meloche was
>    first informed of his condition. From this
>    point forward Mr. Wallace unequivocally
>    displayed signs and symptoms that would
>    require a reasonably prudent physician to:
>
>    •    start an aggressive alcohol substitution
>         treatment regimen, revolving around high
>         doses of benzodiazepines, the drugs of
>         choice for this syndrome;
>
>    •    administer these medications
>         eitherintramuscularly or (preferably)
>         intravenously in a hospital setting; and
>
>    •    once hospitalized, and under therapy,
>         evaluate the patient for a long list of
>         metabolic, nutritional, hematologic,
>         gastrointestinal, cardiac and
>         neurological co-morbid conditions that
>         invariably accompany chronic alcohol
>         addiction; and which can complicate the
>         more severe alcohol withdrawal syndromes.
>         On a more likely than not basis I think
>         that a number of co-morbidities would
>         have been identified and treated in
>         Mr. Wallace, if searched for by a
>         reasonably prudent physician. Mr.
>         Wallace's eventual death is best
>         explained by some combination of
>         prolonged delirium tremens syndrome,
>         dehydration, multiple electrolyte and
>         acid-base derangements, leading to a form
>         of alcohol withdrawal seizures, occult
>         status epilepticus, terminal cardiac
>         arrhythmia and cardiac arrest.
>
>    In my opinion, the responsible medical
>    personnel, primarily nurse Linda Monticello
>    and on-call physician, Dr. Meloche, had a
>    professional duty to recognize the severity of
>    Troy Wallace's alcohol withdrawal syndrome.

---

[53] *Id.*, pp. 8-9 (Docket 68 at 10-11).

They needed to appreciate that the onset of delirium and hallucinations defined Mr. Wallace as suffering from delirium tremens, a state of medical emergency with a high potential for significant morbidity and mortality. If treated by the standards of reasonable medical care, the causal chain that led to Troy Wallace's death would have been broken. This death was imminently preventable.

The need for hospital admission, parenteral alcohol substitutes, and metabolic and nutritional corrections was unquestionably present by his early afternoon evaluation on July 22, 2004. The initiation of the *preventative* protocol at this stage was inadequate and below the standard of care. These opinions apply in a similar way to the subsequent 24-hour period of July 23. The fact that he does not display the same severity of withdrawal signs and symptoms on July 23 as he was displaying on July 22, indicates only that the administration of clorazepate was having some benefit. That slight variation in clinical presentation does not indicate the end of his delirium tremens, and the risks that delirium tremens entail. It simply bought Mr. Wallace some extra time during which proper treatment could have saved his life.

Mr. Wallace's condition deteriorated during the evening of July 23 and after midnight on July 24. However, his death was still preventable and his condition reversible if emergency medical care had been provided to him at any point up to, and possibly several minutes after the cessation of body movement after 1:12 a.m. If the responsible correction officers had activated such a response within this deadline, it would have significantly increased his chances of resuscitation and recovery.

Ms. Walker also attacks as self-serving and unsubstantiated the probative value of the testimony of Dr. Meloche concerning his experience in treating patients with alcohol withdrawal syndrome and the degree of success using the standard

Alaska Department of Corrections protocol.  This a court may not do on a motion for summary judgment; it is not to weigh the evidence or judge credibility.[54/]  Instead, the court must generally treat as true all statements made under oath.[55/]  Not only does Ms. Walker offer no *evidence* in rebuttal, the affidavits of Drs. Thompson and Nipomnick corroborate Dr. Meloche's testimony that the use of the Department of Corrections Alcohol Withdrawal Protocol was appropriate and is generally successful.

Ms. Walker, based on Dr. Cummins' report, faults the use of the Alaska Department of Corrections protocol instead of hospitalizing Mr. Wallace.  As the Ninth Circuit has made clear, a difference in medical opinion is insufficient to establish deliberate indifference.[56/]  In order to prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment was not only medically unacceptable under the circumstances, but was also chosen in conscious disregard of an excessive risk to the prisoner's health.[57/]  Not only is such evidence lacking in this case, but in his affidavit, Dr. Meloche testified that he had no reason to believe that the prescribed protocol would not work.  "If Dr. [Meloche] had assessed [Wallace] and determined that he was

---

[54/] *Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1036 (9th Cir.2005).

[55/] *Earp v. Ornoski*, 431 F.3d 1158, 1170 (9th Cir. 2005)

[56/] *Toguchi v. Chung*, 391 F.3d 1051, 1058 (2004).

[57/] *Id.*

suffering from withdrawal and, in the face of that knowledge, administered drugs that [he] knew to be life-threatening, [his] conduct *might* then meet the deliberate indifference standard."[58]

Ms. Walker faults Dr. Meloche for not going to the Correctional Facility to examine Wallace personally. However, nothing in the record supports Ms. Walker's characterization of Mr. Wallace's condition on July 22 as constituting a medical emergency requiring Dr. Meloche to personally examine Mr. Wallace. In fact, the opinion of Dr. Cummins, her own expert, appears to be that it did not become a medical emergency until the evening of July 23. Nor, for that matter, is there any evidence in the record that had Dr. Meloche personally examined Mr. Wallace, his observations would have differed from those reported by Ms. Monticillo. Ms. Walker also faults Dr. Meloche for a myriad of other failures, *e.g.*, for relying on Ms. Monticillo and the correctional officers to monitor Wallace's condition and keep him apprised if there was any change, not seeking additional medical background information, not consulting any other physician or health care practitioner, how often or how Ms. Monticillo or the correctional officers were to monitor Mr. Wallace, under what circumstances or conditions he was to be contacted concerning Mr. Wallace's condition. Suffice it to say that there is a dearth of evidence in the record that these omissions even constitute

---

[58]/ *Id.*, 391 F.3d at 1059 (emphasis added).

medical malpractice, let alone rise to the level of deliberate indifference.

The Court has considered the cases relied upon by Ms. Walker and finds them either factually inapposite, non-controlling, or inconsistent with later controlling authority. Only two cases cited are Ninth Circuit cases. In *Ortiz v. City of Imperial*,[59] the Court held because the nurses and physician knew of Ortiz's head injury but disregarded evidence of complications to which they had been specifically alerted and, without an examination, prescribed sedatives that were contraindicated, summary judgment was improper. The evidence in this case established at most that the course of treatment prescribed by Dr. Meloche may have been inadequate, but it certainly was not contraindicated; nor is there any evidence that Dr. Meloche disregarded any evidence of complications. Most tellingly, the onset of the serious complications after Dr. Meloche prescribed use of the standard protocol were never reported to him. Moreover, as Dr. Meloche noted, since the case predated *Farmer*, based upon the somewhat sketchy factual recitation in the opinion, it is impossible to determine if the result would have been the same applying the *Farmer* subjective test. *Tolbert v. Eyman*,[60] a case that involved a warden who refused to allow an inmate authorized medicine necessary to treat his condition, is factually inapposite

---

[59] 884 F.2d 1312, 1314 (9th Cir. 1989).

[60] 434 F.2d 265 (9th Cir. 1970).

and its broad statement that "treatment so cursory as to amount to no treatment at all may, in the case of serious medical conditions, violate the Fourteenth Amendment," is of no particular assistance in light of the facts of this case and the later decisions in *Farmer* and its Ninth Circuit progeny.

Deliberate indifference is a high legal standard. A showing of medical malpractice or negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment. Even gross negligence is insufficient to establish a constitutional violation.[61] Ms. Walker has not presented evidence that Dr. Meloche's decision denied, delayed, or intentionally interfered with Mr. Wallace's medical treatment. To the contrary, the record, viewed in the light most favorable to Ms. Walker, reflects that Dr. Meloche was responsive to Mr. Wallace's medical needs. The report of Dr. Cummins, at most, may establish that Dr. Meloche should have recognized that Mr. Wallace was in an advanced stage of the alcohol withdrawal syndrome. This is insufficient to establish an Eighth Amendment cruel and unusual punishment violation.[62] Whether his response was medically reasonable given Mr. Wallace's medical condition and background is a question the Court does not reach on the Eighth Amendment claim. No genuine issue of fact has been raised regarding Dr. Meloche's subjective knowledge and

---

[61] *Wood v. Housewright, supra.*

[62] *Farmer*, 511 U.S. at 838 ("an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment").

conscious disregard of a substantial risk of serious injury to Mr. Wallace.[63] Accordingly, Dr. Meloche is entitled to summary judgment on the Eighth Amendment claim.[64]

Ms. Walker, in her individual capacity, seeks damages for her constitutionally protected liberty interest in the companionship and society of her son. While "[i]t is well established that a parent has a fundamental liberty interest in the companionship and society of his or her child, and that the state's interference with that liberty interest without due process of law is remediable under 42 U.S.C. § 1983,"[65] for the same reasons that the deliberate indifference claim fails, Ms. Walker's due process claim must also fail.[66]

The Amended Complaint asserts two state-law claims against Dr. Meloche: (1) wrongful death and (2) medical malpractice.[67] Dr. Meloche argues that the decedent's estate's wrongful death claim is limited to its pecuniary loss under AS § 09.55.080(a). In her opposition, while Ms. Walker extensively

---

[63] Contrary to Ms. Walker's assertions, this is not a case that even comes near to prescribing aspirin for a hypertensive inmate with a history of heart attacks. It is a question of a difference in medical opinion that, at most, raises a triable issue of fact as to negligence (medical malpractice).

[64] *See Toguchi,* 391 F.3d at 1060-61.

[65] *Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir.2001).

[66] *Toguchi,* 391 F.3d at 1060, citing *County of Sacramento v. Lewis,* 523 U.S. 833, 849 (1998) ("liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process").

[67] Amended Complaint, pp. 8-9 (Docket 24 at 8-9).

argues that the estate is entitled to recover those damages under the § 1983 action notwithstanding state law, she does not address the argument in the context of the state-law claims.  Inasmuch as the Court has determined that the § 1983 claim is to be resolved in favor of Dr. Meloche, the application of state-law limitations to the measure of damages in a civil rights case is moot.

To the extent that Dr. Meloche's argument addresses the measure of damages the decedent's estate may recover in the state-law wrongful death action, since it does not address the entire claim, it is not a proper motion for summary judgment.  Summary judgment addresses an entire claim, counterclaim, cross-claim, or affirmative defense.[68]  Summary judgment may be entered on the issue of liability alone.[69]  Adjudication of a particular fact, in the context of Rule 56, is addressed by Rule 56(d).  However, Rule 56(d) permits the court to find particular facts uncontroverted in connection with a motion brought under Rule 56 where "judgment is not rendered upon whole case or for all the relief asked."  The procedure in subdivision (d) is designed to be ancillary to a motion for summary judgment; it does not authorize the entry of judgment on part of a claim or the granting of partial relief.[70]  In short, Rule 56(d) neither creates nor authorizes a stand-alone

---

[68] *See* FED R. CIV. P. 56(a) (motion brought by the party seeking to recover on a claim) and (b) (motion brought by the party defending against the claim).

[69] FED. R. CIV. P. 56(c).

[70] *See generally* 10B CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FED. PRAC. & PROC. CIV., § 2737 (3d ed.).

motion.  Assuming the Court granted the motion, it could not enter a judgment in favor of Dr. Meloche and against the decedent's estate on the wrongful death claim.  Accordingly, the motion, to the extent it addresses the appropriate measure of damages under the state-law wrongful death action, will be denied.

Dr. Meloche also argues in his Memorandum of Law in support of the Motion that Ms. Walker has no wrongful death claim under AS § 09.55.580(a) and no right to recover for loss of consortium under AS § 09.15.010 because the decedent was above the age of majority at the time of his death.  The motion itself makes no mention of the state-law claims by Ms. Walker in her individual capacity.[71/]  The briefing by Dr. Meloche with respect to Ms. Walker's state law claims is terse and the precise relief he is seeking is unclear.  At one point, Dr. Meloche appears to argue that Ms. Walker has no state-law claims, and at another point that her claims are limited to certain damages, implicitly admitting that she may recover other damages should she prevail on the liability aspect of the state-law claims.  As a result of the fact that the motion itself did not request relief with respect to Ms. Walker's state-law claims, coupled with the inadequate briefing, the Court declines to rule on those issues.  Moreover, to the extent that Dr. Meloche addresses only the appropriate measure of damages, it suffers from the same infirmity as his motion addressing the damage claim of the estate.

---

[71/] *See* FED. R. CIV. P. 7(b); D.AK. LR 7.1(a).

**VI.   CONCLUSION AND ORDER**

Based on the foregoing, the Motion for Partial Summary Judgment on 42 U.S.C. Sec 1983 Claims, filed by Defendant Ernest Meloche, M.D., at Docket 58, is **GRANTED**, in part, and **DENIED**, in part.

IT IS ORDERED THAT the 42 U.S.C. § 1983 claim as against Ernest Meloche, M.D., is **DISMISSED**, with prejudice; judgment to be entered thereon in favor of Defendant Ernest Meloche, M.D., and against Plaintiff Julia Walker, individually and as Personal Representative of the Estate of Troy Wallace.

ENTERED this 2nd day of February, 2007.

S/RALPH R. BEISTLINE
UNITED STATES DISTRICT JUDGE